# Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

| | |
|---|---|
| ALAN KACHALSKY, CHRISTINA NIKOLOV, and SECOND AMENDMENT FOUNDATION, INC., <br><br>         Plaintiffs, <br><br>   v. <br><br> SUSAN CACACE, JEFFREY A. COHEN, and COUNTY OF WESTCHESTER, <br><br>         Defendants. | **CASE NO: 10-CV-05413 CS** |

## AMENDED BRIEF OF *AMICUS CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ....................................................................................... iii

INTRODUCTION .................................................................................................... 1

INTEREST OF *AMICUS* ........................................................................................ 3

LEGAL BACKGROUND .......................................................................................... 3

ARGUMENT ........................................................................................................... 5

    I.    THE PERMITTING PROCESS IN SECTION 400.00(2)(f) DOES NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY. .................. 6

        A.    The Concealed Weapons Permitting Process at Issue Here Does Not Implicate Protected Second Amendment Activity Because It Does Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald*. ........................................... 6

        B.    The Second Amendment Right Should Not Be Extended to Prevent Communities from Restricting or Prohibiting Carrying Guns in Public. ................................................................................... 11

    II.    EVEN IF THE CONCEALED WEAPONS PERMITTING PROCESS IN SECTION 400.00(2)(f) DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY. ......................................................... 15

        A.    The Reasonable Regulation Test is the Appropriate Standard of Review. .................................................................................... 16

            1.    Licensing officers should be afforded an appropriate amount of discretion in enforcing firearm regulations. ................. 19

            2.    Given the governmental interest in protecting the public from the harms associated with firearms, deference to legislative directives is appropriate. ............................... 19

        B.    The Concealed Weapons Permitting Process at Issue Is Constitutionally Permissible. .................................................. 21

CONCLUSION ........................................................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES:

*Andrews v. State*, 50 Tenn. 165 (1871) ................................................................10

*Aymette v. State*, 21 Tenn. 154 (1840) ................................................................10

*Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216 (N.H. 2007)........................16, 18

*Bliss v. Commonwealth*, 12 Ky. 90 (1822) ................................................................10

*Brandenburg v. Ohio*, 395 U.S. 444 (1969)................................................................1

*Cantwell v. Connecticut*, 310 U.S. 296 (1940) ................................................................1

*Chaplinsky* v. *New Hampshire*, 315 U.S. 568 (1942)................................................................1

*Commonwealth v. Robinson*, 600 A.2d 957 (Pa. Super. Ct. 1991)................................................14

*Commonwealth v. Romero*, 673 A.2d 374 (Pa. Super. Ct. 1996) ................................14

*Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328 (2008) ................................20

*District of Columbia v. Heller*, 128 S. Ct. 2783 (2008)................................*passim*

*Dorr v. Weber*, 2010 WL 1976743 (N.D. Iowa May 18, 2010) ................................9

*Fife v. State*, 31 Ark. 455 (1876) ................................................................10

*Gonzales v. Oregon*, 546 U.S. 243 (2006)................................................1, 20, 22

*Gonzalez v. Village of West Milwaukee*, 2010 WL 1904977
   (E.D. Wis. May 11, 2010)................................................................9

*Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179
   (D.D.C. 2010) ................................................................4, 5, 19, 23

*Hill v. State*, 53 Ga. 472 (1874) ................................................................10

*In re Bastiani*, 881 N.Y.S.2d 591 (N.Y. Co. Ct. 2008)................................8

*In re Factor*, 2010 WL 1753307 (N.J. Sup. Ct. Apr. 21, 2010) ................................9

*Jackson v. State*, 68 So.2d 850 (Ala. Ct. App. 1953)................................16, 18

*Kelley v. Johnson*, 425 U.S. 238 (1976) ................................................................20

*Kennedy v. Louisiana*, 128 S. Ct. 2641 (2008) ................................................................16

*Mathews v. Eldridge*, 424 U.S. 319 (1976) .................................................16

*McDaniel v. Paty*, 435 U.S. 618 (1978).....................................................1

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010)............................ *passim*

*Nordyke v. King*, 319 F.3d 1185 (9th Cir. 2003) ...................................17

*People v. Fox*, 844 N.Y.S.2d 627 (N.Y. Sup. Ct. 2007).............................7

*People v. Yarbrough*, 169 Cal.App.4th 303 (2008)..............................12, 23

*Planned Parenthood v. Casey*, 505 U.S. 833 (1992) ................................16

*Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80 (1946).............................20

*Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) .................................20

*Riddick v. U.S.*, 995 A.2d 212 (D.C. 2010)..............................................9

*Robertson v. Baldwin*, 165 U.S. 275 (1897) ....................................2, 4, 9

*Robertson v. City & County of Denver*, 874 P.2d 325 (Colo. 1994) ........16, 18

*Sims v. U.S.*, 963 A.2d 147 (D.C. 2008) .................................................9

*State ex rel. Swann v. Pack*, 527 S.W.2d 99 (Tenn.1975), cert. denied,
    424 U.S. 954 (1976).................................................................1

*State v. Cole*, 665 N.W. 2d 328 (Wis. 2003) ......................................18, 21

*State v. Comeau*, 448 N.W.2d 595 (Neb. 1989) ....................................17

*State v. Dawson*, 159 S.E.2d 1 (N.C. 1968)........................................8, 18

*State v. Hamdan*, 665 N.W.2d 785 (Wis. 2002) ....................................18

*State v. Knight*, 218 P.3d 1177 (Kan. Ct. App. 2009)................................9

*State v. Sieyes*, 225 P.3d 995 (Wash. 2010).........................................23

*State v. Workman*, 35 W. Va. 367 (1891) ...........................................10

*Swait v. University of Nebraska*, 2008 WL 5083245 (D. Neb. Nov. 5, 2008) .........9

*Teng v. Town of Kensingson*, 2010 WL 596526 (D. N.H. Feb. 17, 2010)................9

*Terry v. Ohio*, 392 U.S. 1 (1968) .................................................14, 16

*Trinen v. City of Denver*, 53 P.3d 754 (Colo. Ct. App. 2002) ....................18

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997)...................................................................20

*United States v. Bledsoe*, 2008 WL 3538717 (W.D. Tex. 2008)............................................18, 23

*United States v. Emerson*, 270 F.3d 203 (5th Cir. 2001).................................................................17

*United States v. Engstrum*, 609 F. Supp. 2d 1227 (D. Utah).........................................................23

*United States v. Hart*, 2010 WL 2990001 (D. Mass. July 30, 2010)...............................................9

*United States v. Hayes*, 129 S. Ct. 1079 (2009)..........................................................................3, 4

*United States v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010) .................................................5, 18, 23

*United States v. Masciandaro*, 648 F. Supp. 2d 779 (E.D. Va. 2009).........................................23

*United States v. McCane*, 573 F.3d 1037 (10th Cir. 2009).............................................................23

*United States v. Miller*, 604 F. Supp. 2d 1162 (W.D. Tenn. 2009) ...................................18, 20, 23

*United States v. Radenich*, 2009 WL 127648 (N.D. Ind. 2009) ...................................................23

*United States v. Schultz*, 2009 WL 35225 (N.D. Ind. 2009)...........................................................23

*United States v. Skoien*, 615 F.3d 638 (7th Cir. 2010)......................................................................5

*United States v. Tooley*, 2010 WL 2380878 (S.D.W.Va. June 14, 2010)........................................9

*United States v. Walker*, 380 A.2d 1388 (D.C. 1977)....................................................................12

*United States v. Yanez-Vasquez*, 2010 WL 411112 (D. Kan. Jan. 28, 2010) .........................18, 23

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) .......................................................................1

*Young v. American Mini Theatres, Inc.*, 427 U.S 50 (1976) ...................................................20, 22


**STATUTES**

18 U.S.C. § 922............................................................................................................................18

18 U.S.C. § 922(g)(9) ....................................................................................................................4

*Commentaries on the Criminal Law* § 125 ....................................................................................10

New York Penal Code § 400.00(2)(f)................................................................................... passim

Second Amendment and Civil Rights Law § 4...............................................................................8

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

Wyo. Comp. Laws ch. 52, § 1 (1876) .................................................................10

**CONSTITUTIONAL PROVISIONS**

First Amendment ..........................................................................................1, 15

Fourth Amendment ..............................................................................................16

Ky. Const. of 1850, art. XIII, § 25 ....................................................................10

Second Amendment ..................................................................................... *passim*

**OTHER AUTHORITIES**

Adam Winkler, *Scrutinizing the Second Amendment*,
   105 Mich. L. Rev. 683 (2007).........................................................................16

Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession
   and Gun Assault*, AMER. J. PUB. HEALTH, vol. 99, No. 11 at 1 (Nov. 2009).........12

D.W. Webster, *et al.*, *Effects of State-Level Firearm Seller Accountability
   Policies on Firearm Trafficking*, 86 J. URBAN HEALTH: BULLETIN OF THE
   N.Y. ACAD. OF MED. 525 (2009) ......................................................................20

D.W. Webster, *et al.*, *Relationship Between Licensing, Registration, and Other
   State Gun Sales Laws and the Source State of Crime Guns*,
   7 INJURY PREVENTION 184 (2001) ....................................................................21

Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second
   Amendment*, 109 COLUM. L. REV. 1278 (Oct. 2009) ...........................................11

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive
   Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000).........14

David Hemenway, *Road Rage in Arizona: Armed and Dangerous*,
   34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002) ....................................14

Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on
   Interstate Transfer of Firearms*, 275 J. AM. MED. ASS'N 1759 (1996)...................21

Ernst Freund, *The Police Power, Public Policy and Constitutional Rights* (1904).....................11

Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-
   Defense: An Analytical Framework and a Research Agenda*,
   56 UCLA LAW REVIEW 1443 (2009) ..................................................................17

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

Hashem Dezhbhakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime*, in The Econ. of Gun Control, 473 (May 1998) ........................................................................................................13

Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 Cont. L.J. 259 (1874) .............................................11

Injury Control and Prevention, *WISQARS Injury Mortality Reports* (2007) ................................22

Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998)...............................13

Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125 (1868)......................................10

John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004)............................................................13

John J. Donohue, *The Impact of Concealed-Carry Laws*, in EVALUATING GUN POL'Y: EFFECTS ON CRIME AND VIOLENCE 289, 320 (2003) ....................................13

John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152-53 (1868) .............................................11

Michael C. Dorf, *Does Heller Protect a Right to Carry Guns Outside the Home?,* 59 SYRACUSE L. REV. 225 (2008) ..............................................11

Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. PUB. ECON. 379 (2006) ............................................................14

Philip Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041 (2009)....................................13

*Private Citizens Killed by Concealed Handgun Permit Holders: May 2007 to the Present, available at* http:// www.vpc.org/ccwkillers.htm. ...................................12, 19

Second Amendment, post-*Heller*.......................................................................8

Violence Policy Center, *Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders*, July 2009 ....................................12

Violence Policy Center, *States with Higher Gun Ownership and Weak Gun Laws Lead Nation in Gun Death* (June 2, 2010)....................................13

Webster, *et al.*, *Relationship Between Licensing*, at 184 ............................................21

Weil & Knox, *Effects of Limiting Handgun Purchases*, at 1759............................................21, 22

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

## INTRODUCTION

The right to keep and bear arms recognized in *District of Columbia v. Heller* is unique among constitutional rights in the risks that it presents.  128 S. Ct. 2783 (2008).  Unlike free speech or voting, guns are designed to kill, and gun possession and use subject others to a serious risk of harm that is all too often deadly.  The Supreme Court has not allowed the far less dangerous exercise of First Amendment rights to create comparable risks of physical harm; the Court has held such activity not constitutionally protected,[1] or has allowed regulations that "promote[] a substantial government interest that would be achieved less effectively absent the regulation" and leave open alternative channels for communication, even if it is not the least restrictive means to achieve the government's goals.  *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 799 (1989).  And the Court has always afforded States "great latitude" in exercising "police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons . . . ." *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotations omitted). The Court's recent Second Amendment decisions in *Heller* and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010) were consistent with that precedent:  they did not deprive States of their historically broad police power authority to protect the public from gun violence.

While the Supreme Court held that the Second Amendment protects a limited right to possess a gun *in the home* for self-defense, the Court has never recognized a far broader right to carry guns in public places, which would subject the public-at-large to those grave risks.  On the contrary, *Heller* found that prohibitions on concealed carrying are in line with permissible gun laws, *Heller*, 128 S. Ct. at 2816, and did not disturb the Court's ruling from over a century ago that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting

---

[1] *See Chaplinsky* v. *New Hampshire*, 315 U.S. 568, 572 (1942); *McDaniel v. Paty*, 435 U.S. 618, 628 n.8 (1978) (discussing religion cases) ("Thus, the courts have sustained government prohibitions on handling venomous snakes or drinking poison, even as part of a religious ceremony....") *citing State ex rel. Swann v. Pack*, 527 S.W.2d 99 (Tenn.1975), cert. denied, 424 U.S. 954 (1976); *see also Cantwell v. Connecticut*, 310 U.S. 296, 303-304, 308 (1940) (although the Free Exercise Clause protects "the freedom to believe and freedom to act," "[t]he first is absolute but ... the second cannot be"); *Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (per curiam).

the carrying of concealed weapons." *Robertson v. Baldwin*, 165 U.S. 275, 281-82 (1897).

In *Heller* and *McDonald*, the Court had ample opportunity to announce a right to carry in public, or to question the continuing validity of *Robertson*. *See McDonald*, 130 S. Ct. 3020; *Heller*, 128 S. Ct. 2783. After all, the Court did not limit itself to the constitutionality of the laws at issue, but expounded at length on the scope and limited nature of the Second Amendment right. Yet the Court repeatedly stated its holding as bound to the home, and the *Heller* majority cited *Robertson* approvingly (albeit on another point). 128 S. Ct. at 2802. Numerous courts, from the 19th century to post-*Heller* and *McDonald*, have recognized that the Second Amendment does not prevent states from restricting or barring the carrying of handguns – especially concealed handguns –in public. It would be unprecedented and unwise, therefore, to hold that the Constitution bars states and communities from choosing to keep guns out of public places, or – as New York has done – from allowing those tasked with protecting public safety to determine whether individuals have good cause to bring hidden handguns into public spaces. There is no Constitutional requirement that the general public, when walking to school, driving to work, or otherwise going about their daily activities, be subjected to the risks of gun carrying. And there never has been.

An extension of the Second Amendment to deny the state the authority to determine who has "proper cause" to carry guns in public would run counter to *Heller* and *McDonald's* "assurances" that "reasonable firearms regulations" remain permissible, as well as the Court's longstanding recognition that the exercise of protected activity must be balanced against legitimate public interests, chief among which is public safety. *McDonald*, 130 S. Ct. at 3047; *Heller*, 128 S. Ct at 2816-17, 2871 & n. 26. New York's law governing the carrying of concealed weapons – New York Penal Code Section 400.00(2)(f) – is precisely such a reasonable regulation.

The permitting process of Section 400.00(2)(f) does not implicate protected Second Amendment activity and even if it did, requiring a showing of "proper cause" as a condition to issuing a concealed weapons is a reasonable, justified, and permissible exercise of the state's

police powers.  While Plaintiffs may disagree with Section 400.00(2)(f), their recourse is through the legislative process, not the judiciary.  This Court is obligated to uphold legislation where there is a reasonable basis to do so; it should not usurp the functions of the Legislature by declaring a new Second Amendment right that the Supreme Court has not acknowledged and by striking down a law that so plainly satisfies the state's interest in protecting public safety.

## INTEREST OF *AMICUS*

*Amicus* the Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy.  Through its Legal Action Project, the Brady Center has filed numerous briefs *amicus curiae* in cases involving both state and federal gun laws, including in the U.S. Supreme Court cases *District of Columbia v. Heller*, 128 S. Ct. 2783 (2008), *United States v. Hayes*, 129 S. Ct. 1079 (2009), and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010).  *Amicus* brings a broad and deep perspective to the issues raised by this case and has a compelling interest in ensuring that the Second Amendment does not impede reasonable governmental action to prevent gun violence.

## LEGAL BACKGROUND

Recent Supreme Court Second Amendment Jurisprudence:  In *Heller*, the Supreme Court recognized the right of "law-abiding, responsible citizens" to keep and bear arms in the home for the purpose of self-defense.  128 S. Ct. at 2818, 2821.  While the Court could have simply decided whether the District's handgun ban was unconstitutional, it went out of its way to assure courts that its holding did not "cast doubt" on other gun laws – even approving of the constitutionality of a number of gun laws and then making clear that "[w]e identify these presumptively lawful regulatory measures only as examples; our list does not purport to be exhaustive."  *Id.* at 2816-17, 2871 & n. 26.  Moreover, in approvingly discussing long-understood limitations on the right to keep and bear arms, the Court specifically noted that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under the Second Amendment or state analogues."  *Id.* at 2816.

The language is consistent with the Court's ruling in *Robertson v. Baldwin* that "the right of the people to keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of concealed weapons." 17 S. Ct. at 326.

Nor did the Court in *Heller* state that concealed carry bans could only be permissible if open carrying of guns in public were allowed.  Rather, the Court repeatedly defined the Second Amendment right as a narrow right to possess a gun *in the home* in its holding.  And the Court made clear that "carry" did not imply "outside the home," as the Court ultimately held that "[a]ssuming that Heller is not disqualified from the exercise of Second Amendment rights, the District must permit him to register his handgun and must issue him a license *to carry it in the home*." 128 S. Ct. at 2822 (emphasis added).[2]

In *McDonald*, the Court incorporated the Second Amendment to the states, but it did not broaden the right recognized in *Heller*.  On the contrary, the Court "repeat[ed]" the "assurances" it made in *Heller* regarding its limited effect on other gun laws, and agreed that "state and local experimentation with reasonable firearms regulation will continue under the Second Amendment."   130 S. Ct. at 3047 (internal citation omitted).  Once again, the Court did not extend the Second Amendment right outside the home, and instead again went out of its way to list a broad range of presumptively lawful gun restrictions.

The Standard of Review: Neither *Heller* nor *McDonald* articulated a standard of review for Second Amendment challenges, though the Court in *Heller* explicitly rejected the "rational basis" test and implicitly rejected the "strict scrutiny test."   *See Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 187 (D.D.C. 2010) (the "strict scrutiny standard of review would not square with the [*Heller*] majority's references to 'presumptively lawful regulatory measures' . . . .").  The Court's reasoning also foreclosed any form of heightened scrutiny that would require the government to ensure that firearms legislation has a tight fit between means

---

[2] The narrow scope of the Court's ruling in *Heller* was also apparent in the Court's 2009 opinion in *United States v. Hayes*, 129 S. Ct. 1079 (2009), in which the Court upheld a broad reading of 18 U.S.C. § 922(g)(9) – which prohibits possession of firearms by persons convicted of misdemeanor crimes of domestic violence – without even mentioning the Second Amendment.

and ends, as *Heller* recognized that the Constitution provides legislatures with "a variety of tools for combating" the "problem of handgun violence," *Heller*, 130 S. Ct. at 2822, and listed as examples a host of "presumptively lawful" existing firearms regulations without subjecting those laws to any such analysis. *Id.* at 2816-17 & n. 26.

      *Heller* and *McDonald* thus left lower courts with the task of determining an appropriate standard of review for Second Amendment claims: one that is less rigorous than strict scrutiny, "presumes" the lawfulness of a wide gamut of gun laws currently in force, allows for "reasonable firearms regulations," and permits law-abiding, responsible citizens to keep guns in their homes for self-defense. As discussed below, the "reasonable regulation" test, overwhelmingly applied by courts throughout the country construing state right to keep and bear arms provisions, is the most appropriate standard of review for the New York statute at issue here.

      <u>The Two-Pronged Approach</u>: In the wake of *Heller* and its progeny, a number of courts have begun to utilize a two-pronged approach to Second Amendment claims. *See, e.g., United States v. Skoien*, 615 F.3d 638 (7th Cir. 2010); *Heller II*, 698 F. Supp. 2d at 188; *United States v. Marzzarella*, 614 F.3d 85 (3rd Cir. 2010). Under this approach, courts ask: (1) does the law or regulation at issue implicate protected Second Amendment activity, and (2) if so, does it withstand the appropriate level of scrutiny? *See, e.g., Heller II*, 698 F. Supp. 2d at 188; *Marzzarella*, 614 F.3d at 89. If the challenged law or regulation does not implicate protected Second Amendment activity, then the analysis ends and the law is deemed constitutional. Even if the law implicates protected activity, however, it still will be deemed constitutional if it passes muster under the appropriate level of scrutiny. *Marzzarella*, 614 F.3d at 89.

      This two-pronged approach represents an appropriate manner in which to approach the issues presented by Second Amendment claims. *Amicus* advocates its use by this Court in analyzing the constitutionality of New York Penal Code Section 400.00(2)(f).

## ARGUMENT

      For at least two principal reasons, the firearms regulation in Section 400.00(2)(f) is constitutional. First, the permitting process in Section 400.00(2)(f) does not implicate protected

Second Amendment Activity.   Second, even if it did, Section 400.00(2)(f) is a reasonable regulation that furthers important governmental interests established by the New York Legislature and promoted by New York counties.

## I.   THE PERMITTING PROCESS IN SECTION 400.00(2)(F) DOES NOT IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY.

In analyzing the pending motion to dismiss, *amicus* respectfully suggests that the Court should use the two-prong approach to Second Amendment claims and hold that the permitting process in Section 400.00(2)(f) does not implicate protected Second Amendment activity because Plaintiffs have no general Second Amendment right to possess and carry weapons in public places.

### A.   The Concealed Weapons Permitting Process at Issue Here Does Not Implicate Protected Second Amendment Activity Because It Does Not Impact The Right to Possess Firearms in The Home Protected in *Heller* and *McDonald*.

The Supreme Court's decision in *Heller* recognized that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms *in defense of hearth and home*." *Heller*, 128 S. Ct. at 2821 (emphasis added).  In the course of its lengthy majority opinion, the Court had ample opportunity to state that Mr. Heller had a right to carry guns in public. However, it did not do so: the Court never recognized a right to carry guns in public.  Indeed, the Court carefully limited its holding to Mr.  Heller's right "*to carry* [] *in the home*," *id.* at 2822 (emphasis added), and did not mention the carrying of firearms in public at all.   *See id*.  The Court's opinion focuses on the historical recognition of the right of individuals "to keep and bear arms to defend their homes, families or themselves," *id.* at 2810, and the continuing need to keep and use firearms "in defense of hearth and home."   *Id.* at 2821.   The Court's holding is specifically limited to the right to keep firearms in the home:  "[i]n sum, we hold that the District's ban on handgun possession *in the home* violates the Second Amendment, as does its prohibition against rendering any lawful firearm *in the home* operable for the purpose of immediate self-defense." *Id.* at 2821-22 (emphasis added).

Ignoring the Court's extensive and careful language limiting the right to keep and bear

arms in the home, Plaintiffs imply in their complaint that the *Heller* Court actually embraced a Constitutional right to carry guns in public. *See* Complaint ¶ 13. This, however, is a misreading of the *Heller* opinion. Indeed, Plaintiffs cannot explain why Justice Scalia would be so explicit about the fact that the Second Amendment was "not unlimited" and that a (non-exhaustive) host of gun laws remained "presumptively lawful," yet keep his supposed ruling that the Second Amendment protected a right to carry guns in public hidden and implicit, leaving courts with (at most) supposed tea leaves on which to find a broad right to carry in public.[3] Nor can Plaintiffs explain why the *Heller* Court expressly approved of decisions upholding concealed carry bans, but chose not to state the flip-side that is crucial to Plaintiffs' argument – that some form of public carrying must be permitted.

This Court should not reach for an interpretation of *Heller* as implicitly overruling *Robertson*'s recognition that the Second Amendment does not protect a right to carry concealed weapons – especially given *Heller*'s explicit embrace of concealed carry bans and its repeated statements limiting its holding to the home. Indeed, lower courts should "presume" that state statutes are valid, and strike them down as unconstitutional "only as a last resort." *People v. Fox*, 844 N.Y.S.2d 627, 635 (N.Y. Sup. Ct. 2007).

In keeping with this case law, New York courts have refused to read *Heller* as conferring a broad right to carry guns outside of the home. In *People v. Perkins*, for instance, the New York Supreme Court, Appellate Division, Third Department noted that:

> While the United States Supreme Court concluded in [*Heller*] that the Second Amendment confers a constitutionally protected individual right to keep and bear arms as a means of self-defense within the home, it also held that the right conferred by the Second Amendment . . . is not absolute and may be limited by reasonable governmental restrictions . . . Here, defendant was not in his home at the time of the crime and did not have a valid pistol permit. Inasmuch as the relevant sections of the Penal Law are constitutionally sound and defendant's

---

[3] Nor do the Court's "tea leaves" even indicate its recognition of a right to carry guns in public. For example, the *Heller* Court discussed "bear" as meaning "carry" simply to support its position that the Second Amendment's use of "bear arms" "in no way connotes participation in a structured military organization," and, therefore, the Court opined, the phrase did not indicate that the Second Amendment was limited to militia matters. 128 S. Ct. at 2793. The *Heller* Court did ***not*** state that the Second Amendment protects a right to carry arms in public.

> conduct did not conform to that which is protected by the Second Amendment
> and Civil Rights Law § 4, defendant's constitutional challenge lacks merit.

880 N.Y.S.2d 209, 210 (N.Y. Sup. Ct. 2009) (internal citations omitted). And in *In re Bastiani*, 881 N.Y.S.2d 591, 593 (N.Y. Co. Ct. 2008) the court of Rockland County, New York upheld New York's law that limited carrying to those permitted based on "special need," noting that "[r]easonable regulation of handgun possession survives the *Heller* decision." The court observed that the applicant was "permitted to possess her weapon for many sports related undertakings in addition to possession in her home. Nothing in *Heller* grants the applicant more than what she already has." *Id.*

Other courts have held similarly that the Second Amendment, post-*Heller*, does not protect a right to carry concealed weapons in public. In *People v. Dawson*, the Illinois Court of Appeals rejected arguments strikingly similar to Plaintiffs', and held:

> The specific limitations in *Heller* and *McDonald* applying only to a ban on
> handgun possession in a home cannot be overcome by defendant's pointing to the
> *Heller* majority's discussion of the natural meaning of "bear arms" including
> wearing or carrying upon the person or in clothing. Nor can the *Heller* majority's
> holding that the operative clause of the second amendment "guarantee[s] the
> individual right to possess and carry weapons in case of confrontation" require
> heightened review of the AUUW [aggravated unlawful use of a weapon] statute's
> criminalization of the carrying of an uncased and loaded firearm. As addressed
> above, *Heller specifically limited its ruling to interpreting the amendment's
> protection of the right to possess handguns in the home*, not the right to possess
> handguns outside of the home in case of confrontation-a fact the dissent heartily
> pointed out by noting that "[n]o party or *amicus* urged this interpretation; the
> Court appears to have fashioned it out of whole cloth." The *McDonald* Court
> refused to expand on this right, explaining that the holding in *Heller* that the
> second amendment protects "the right to possess a handgun in the home for the
> purpose of self-defense" was incorporated.

2010 WL 3290998, *7 (Ill. App. Ct. Aug. 18, 2010) (internal citations omitted) (emphasis added). Recognizing that "when reasonably possible, a court has the duty to uphold the constitutionality of a statute," *id.* at *6, the *Dawson* Court rejected the contention that the Second Amendment protects a broad right to carry that would invalidate Illinois's law.

The Kansas Court of Appeals also recognized that "[i]t is clear that the [*Heller*] Court was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes. [The defendant's] argument, that *Heller* conferred on an

individual the right to carry a concealed firearm, is unpersuasive." *State v. Knight*, 218 P.3d 1177, 1189 (Kan. Ct. App. 2009).

Other courts – both state and federal – have similarly held that there is no right to carry concealed guns in public, and the right recognized in *Heller* and *McDonald* is confined to the home. *See, e.g., Gonzalez v. Village of West Milwaukee*, 2010 WL 1904977, *4 (E.D. Wis. May 11, 2010) ("The Supreme Court has never held that the Second Amendment protects the carrying of guns outside the home."); *United States v. Hart*, 2010 WL 2990001, *3 (D. Mass. July 30, 2010) ("*Heller* does not hold, nor even suggest, that concealed weapons laws are unconstitutional."); *Dorr v. Weber*, 2010 WL 1976743, *8 (N.D. Iowa May 18, 2010) (*Robertson* remains the law, and "a right to carry a concealed weapon under the Second Amendment has not been recognized to date"); *Teng v. Town of Kensingson*, 2010 WL 596526 (D. N.H. Feb. 17, 2010) ("Given that *Heller* refers to outright prohibition on carrying concealed weapons" as "presumptively lawful". . . far lesser restrictions of the sort imposed here (i.e., requiring that Teng complete a one-page application and meet with the police chief to discuss it) clearly do not violate the Second Amendment.") (internal citation omitted); *Sims v. U.S.*, 963 A.2d 147, 150 (D.C. 2008) (Second Amendment does not "compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined."); *Riddick v. U.S.*, 995 A.2d 212, 222 (D.C. 2010) (same); *In re Factor*, 2010 WL 1753307, *3 (N.J. Sup. Ct. Apr. 21, 2010) ("[T]he United States Supreme Court has not held or even implied that the Second Amendment prohibits laws that restrict carrying of concealed weapons."); *Swait v. University of Nebraska*, 2008 WL 5083245, at *3 (D. Neb. Nov. 5, 2008) ("States can prohibit the carrying of a concealed weapon without violating the Second Amendment"); *see also United States v. Tooley*, 2010 WL 2380878, *15 (S.D.W.Va. June 14, 2010) ("Additionally, possession of a firearm outside of the home or for purposes other than self-defense in the home are not within the "core" of the Second Amendment right as defined by *Heller*. ").

Furthermore, this understanding of the Second Amendment (and its state analogues) as not protecting a general right to carry or a more particular right to carry concealed weapons has

been recognized for well over a century. *See, e.g.*, 1876 Wyo. Comp. Laws ch. 52, § 1 (1876 Wyoming law prohibiting anyone from "bear[ing] upon his person, concealed or openly, any firearm or other deadly weapon, within the limits of any city, town or village"); *Andrews v. State*, 50 Tenn. 165 (1871) (upholding statute forbidding any person to carry "publicly or privately, any . . . belt or pocket pistol, revolver, or any kind of pistol, except the army or navy pistol, usually used in warfare, which shall be carried openly in the hand" and relying on the state right-to-bear-arms provision, which it read *in pari materia* with the Second Amendment); *Fife v. State*, 31 Ark. 455 (1876) (upholding carrying prohibition as a lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms); *Hill v. State*, 53 Ga. 472, 474 (1874) ("at a loss to follow the line of thought that extends the guarantee"—in the state Constitution of the "right of the people to keep and bear arms"—"to the right to carry pistols, dirks, Bowie knives, and those other weapons of like character, which, as all admit, are the greatest nuisances of our day."); *State v. Workman*, 35 W. Va. 367, 373 (1891) (upholding conviction for carrying concealed weapon, court notes that "As early as the second year of Edward III, a statute was passed prohibiting all persons, whatever their conditions, 'to go or ride armed by night or by day.'"); *Aymette v. State*, 21 Tenn. 154, 159-61 (1840) ("The Legislature . . . have a right to prohibit the wearing or keeping weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defense.").[4]

Noted scholars and commentators have also long recognized that a right to keep and bear arms does not prevent states from restricting or forbidding guns in public places. For example, John Norton Pomeroy's Treatise, which *Heller* cited as representative of "post-Civil War 19th century sources" commenting on the right to bear arms, 128 S. Ct. at 2812, stated that the right to

---

[4] *Bliss v. Commonwealth*, 12 Ky. 90, 91, 93 (1822), in which the Kentucky Supreme Court declared Kentucky's concealed-weapons ban in conflict with its Constitution, is recognized as an exception to this consistent precedent. *See* Joel Prentiss Bishop, *Commentaries on the Criminal Law* § 125, at 75-76 (1868). In fact, the Kentucky legislature later corrected the anomalous decision by amending the state constitution to allow a concealed weapons ban. *See* Ky. Const. of 1850, art. XIII, § 25.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

keep and bear arms "is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons . . . ." John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152-53 (1868).  Similarly, Judge John Dillon explained that even where there is a right to bear arms, "the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons." Hon. John Dillon, *The Right to Keep and Bear Arms for Public and Private Defense (Part 3),* 1 Cont. L.J. 259, 287 (1874).   An authoritative study published in 1904 concluded that the Second Amendment and similar state constitutional provisions had "not prevented the very general enactment of statutes forbidding the carrying of concealed weapons," which demonstrated that "constitutional rights must if possible be so interpreted as not to conflict with the requirements of peace, order and security." Ernst Freund, *The Police Power, Public Policy and Constitutional Rights* (1904).  Post-*Heller*, scholars continue to recognize the logic behind limiting the right to the home.  *See, e.g.*, Darrell A.H. Miller, *Guns as Smut: Defending the Home-Bound Second Amendment*, 109 COLUM. L. REV. 1278 (Oct. 2009); Michael C. Dorf, *Does Heller Protect a Right to Carry Guns Outside the Home?,* 59 SYRACUSE L. REV. 225 (2008).

The concealed weapons permitting process at issue in this case does not meaningfully impede on the ability of individuals to keep handguns in defense of their homes.  Instead, it only governs the carrying of concealed weapons *in public*, a different issue entirely, and one that neither the Supreme Court nor other courts have recognized as protected under the Second Amendment.   As a result, the Court should not find that Plaintiffs are challenging protected Second Amendment activity.

### B.    The Second Amendment Right Should Not Be Extended to Prevent Communities from Restricting or Prohibiting Carrying Guns in Public.

There are profound public safety rationales for restricting guns in public, as courts continue to recognize post-*Heller*:

> Unlike possession of a gun for protection within a residence, carrying a concealed firearm presents a recognized threat to public order, and is prohibited as a means

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

of preventing physical harm to persons other than the offender.  A person who carries a concealed firearm on his person or in a vehicle, which permits him immediate access to the firearm but impedes others from detecting its presence, poses an imminent threat to public safety . . . .

*People v. Yarbrough*, 169 Cal.App.4th 303, 314 (2008) (internal quotations and citations omitted); *see also United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (there is an "inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor"). The carrying of firearms in public – and the carrying of *concealed* weapons especially – pose a number of issues and challenges not presented by the possession of firearms in the home. Three issues, in particular, are worthy of note.

First, when firearms are carried out of the home and into public, the safety of a broader range of individuals is threatened. While firearms kept in the home are primarily a threat to their owners, family members, visitors, and houseguests, firearms carried in public are a threat to strangers, neighbors, law enforcement officers, random passersby, and other private citizens. Persons licensed to carry concealed, loaded weapons under lax "shall-issue" regimes (similar to what Plaintiffs would require in New York) have used those weapons to harm the public and law enforcement officers, with one study finding that "[b]etween May 2007 and April 2009, concealed handgun permit holders shot and killed 7 law enforcement officers and 42 private citizens."  Violence Policy Center, *Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders*, July 2009.  States, therefore, have a stronger need to protect their citizens from individuals carrying guns in public than they do from individuals keeping guns in their homes.

Second, the carrying of firearms in public is not a useful or effective form of self-defense and, in fact, has been shown in a number of studies to *increase* the chances that one will fall victim to violent crime.  One study, for instance, found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," and that "guns did not protect those who possessed them from being shot in an assault."  Charles C. Branas, *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, AMER. J. PUB. HEALTH, vol.

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

99, No. 11 at 1, 4 (Nov. 2009).  Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun.   Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults.  If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.

Philip Cook, *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

While New York's gun laws have helped it achieve one of the lowest gun death rates in the nation, many states broadly allowing concealed carrying of guns in public "experience increases in violent crime, murder, and robbery when shall-issue laws [removing police discretion to issue concealed carry licenses] are adopted."[5]  Researcher Jens Ludwig analyzed shall issue concealed carry laws and concluded, "My results suggest that shall-issue laws have resulted, if anything, in an *increase* in adult homicide rates."[6]  Likewise, another study found that "firearms homicides increased in the aftermath of the shall issue laws," such that shall issue laws may "raise levels of firearms murders" and thus may "increase the frequency of homicide."[7]  Similarly, "[f]or robbery, many states experience increases in crime" after concealed carry laws are enacted.[8]  Several different statistical approaches to the question "indicate a rather substantial increase in robbery."[9]  All told, guns are used "far more often to kill and wound innocent victims than to kill and wound criminals … [and] guns are also used far more often to intimidate and

---

[5] Violence Policy Center, *States with Higher Gun Ownership and Weak Gun Laws Lead Nation in Gun Death* (June 2, 2010) (listing New Jersey, New York, Connecticut, Massachusetts, Rhode Island, and Hawaii, all states restricting concealed carrying of firearms, as states with the lowest gun death rates); John J. Donohue, *The Impact of Concealed-Carry Laws, in* EVALUATING GUN POL'Y: EFFECTS ON CRIME AND VIOLENCE 289, 320 (2003).

[6] Jens Ludwig, *Concealed-Gun-Carrying Laws and Violent Crime: Evidence from State Panel Data*, 18 INT'L REV. L. & ECON. 239 (1998) (emphasis in original).

[7] David McDowall, et. al., *Easing Concealed Firearms Laws: Effects on Homicide in Three States*, 86 J. CRIM. L. & CRIMINOLOGY 193, 202-203 (1995) (emphasis in original).

[8] Hashem Dezhbakhsh & Paul Rubin, *Lives Saved or Lives Lost? The Effects of Concealed-Handgun Laws on Crime, in* THE ECON. OF GUN CONTROL, 473 (May 1998).

[9] John Donohue, *Guns, Crime, and the Impact of State Right-To-Carry Laws*, 73 FORDHAM L. REV. 623 (2004).

threaten than they are used to thwart crimes." David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000).

Third, the carrying of firearms in public has other negative implications for a number of social issues and societal ills that are not impacted by the private possession of handguns in the home. When the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *see also Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996) ("officer's observance of an individual's possession of a firearm in a public place in Philadelphia is sufficient to create reasonable suspicion to detain that individual for further investigation"). Law enforcement's ability to protect the public could be greatly restricted if officers were required to effectively presume that a person carrying a firearm in public was doing so lawfully. Under such a legal regime, it is possible that an officer would not be deemed to have cause to arrest, search, or even engage in a *Terry* stop if she spotted a person carrying a loaded gun, even though far less risky behavior could justify police intervention. Law enforcement should not have to wait for a gun to be fired before protecting the public. Further, if drivers are allowed to carry loaded guns, road rage can become a more serious and even potentially deadly phenomenon. David Hemenway, *Road Rage in Arizona: Armed and Dangerous*, 34 ACCIDENT ANALYSIS AND PREVENTION 807-14 (2002). And an increase in gun prevalence in public may cause an intensification of criminal violence. Philip Cook & Jens Ludwig, *The Social Costs of Gun Ownership*, J. PUB. ECON. 379, 387 (2006).

The concealed weapons permitting process at issue here prevents many of these risks to the public, without implicating the Second Amendment activity protected in *Heller*. Individuals in New York who are not otherwise disqualified by operation of law and who can demonstrate that they can possess and use firearms responsibly are allowed to maintain handguns to protect

themselves in the home.  *See* N.Y. PENAL CODE § 400.00(2)(f).  The law simply provides no basis for expanding that right to the carrying of concealed weapons in public.

## II.   EVEN IF THE CONCEALED WEAPONS PERMITTING PROCESS IN SECTION 400.00(2)(f) DID IMPLICATE PROTECTED SECOND AMENDMENT ACTIVITY, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY.

In choosing a level of scrutiny appropriate for Second Amendment challenges, courts need not – and should not – limit themselves to the choices utilized in First Amendment jurisprudence:  strict scrutiny, intermediate scrutiny, or rational basis review.  While these levels of scrutiny may seem to be the easiest and most obvious options in picking a standard of review, key differences between the First and Second Amendments suggest that using one of these three levels of scrutiny is *not*, in fact, an appropriate choice.  The exercise of Second Amendment rights creates unique risks that threaten the safety of the community and can be far more lethal than even the most dangerous speech.  Free speech, free exercise of religion, and the exercise of other rights generally do not place others at the risk of lethal harm, while guns are designed to inflict grievous injury and death – and often do.  Given the grave risks posed by guns, requiring that the government demonstrate a tight "fit" would unduly restrict the state's broad police power authority to protect the public from harm. To protect the public from the risks of gun violence – unlike the significantly more modest risks posed by free speech – states must be allowed wide latitude in exercising their police power authority.  Otherwise, the exercise of Second Amendment rights could infringe on the most fundamental rights of others – the preservation of life.  That it why states have overwhelmingly used a reasonableness test in assessing challenges to state right to keep and bear arms provisions of their constitutions.

Moreover, even when approving of regulations of conduct far less dangerous than gun possession, the Supreme Court has not limited itself to these three levels of scrutiny, but has instead fashioned a wide variety of standards of review that are tailored to specific constitutional

inquiries.[10]    For all these reasons, a standard of review specific to the Second Amendment context is warranted here, particularly given the Supreme Court's recognition that an individual's right to bear arms must be evaluated in light of a state's competing interest in public safety.  To that end, *amicus* respectfully suggests that this Court apply the test that state courts throughout the country have crafted and utilized for over a century in construing the right to keep and bear arms under state constitutions:  the "reasonable regulation" test.

## A.    The Reasonable Regulation Test is the Appropriate Standard of Review.

While courts are just beginning to grapple with a private right to arms under the federal Constitution, courts have construed analogous state provisions for over a century.   Over forty states have constitutional right-to-keep-and-bear-arms provisions, many of which protect broader rights than the Second Amendment.  Yet despite significant differences in the political backdrop, timing, and texts of these provisions, the courts in these states have, with remarkable unanimity, coalesced around a single standard for reviewing limitations on the right to bear arms:  the "reasonable regulation" test.  *See* Adam Winkler, *Scrutinizing the Second Amendment*, 105 Mich. L. Rev. 683, 686-87, n. 12 (2007) (describing "hundreds of opinions" by state supreme courts with "surprisingly little variation" that have adopted the "reasonableness" standard of review for right-to-bear-arms cases).   Under the reasonable regulation test, a state "may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable." *Robertson v. City & County of Denver*, 874 P.2d 325, 328, 333 n. 10 (Colo. 1994).[11]    More  demanding  than  rational  basis  review,  but  more  deferential  than

---

[10]  *See, e.g.*, *Kennedy v. Louisiana*, 128 S. Ct. 2641, 2649 (2008) (affirming that the Eighth Amendment's prohibition of cruel and unusual punishment should be measured by an "evolving standards of decency" test); *Planned Parenthood v. Casey*, 505 U.S. 833, 874 (1992) (applying an "undue burden" test to determine whether a statute jeopardized a woman's right to choose); *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976) (holding that determinations of procedural due process require a balancing of three competing interests); *Terry v. Ohio*, 392 U.S. 1, 30 (1968) (upholding a "stop and frisk" under the Fourth Amendment where an officer had "reasonable grounds" to believe a suspect was armed and dangerous).
[11]  *See also Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216, 1223 (N.H. 2007) (the relevant inquiry is "whether the statute at issue is a 'reasonable' limitation upon the right to bear arms"); *Jackson v. State*, 68 So.2d 850, 852 (Ala. Ct. App. 1953) ("It is uniformly recognized that the constitutional guarantee of the right of a citizen to bear arms, in defense of himself and the State . . . is subject to reasonable regulation by the State under its police power.").

intermediate scrutiny, this "reasonable regulation" test protects Second Amendment activity without unduly restricting states from protecting the public from gun violence.   The test recognizes "the state's right, indeed its duty under its inherent police power, to make reasonable regulations for the purpose of protecting the health, safety, and welfare of the people." *State v. Comeau*, 448 N.W.2d 595, 599 (Neb. 1989).   The reasonable regulation test, which was specifically designed for cases construing the right to keep and bear arms and has been adopted by the vast majority of states, remains the standard of review best-suited for Second Amendment cases after *Heller* and for the case at hand.

The test is also in line with the Supreme Court's statement in *McDonald* agreeing that "state and local experimentation with reasonable firearms regulation will continue under the Second Amendment."   130 S. Ct. at 3047 (internal citation omitted).   Further, pre-*Heller* courts that recognized an individual, non-militia-based right to keep and bear arms under the Second Amendment agreed that "reasonable" firearms restrictions remained permissible.   *See, e.g., United States v. Emerson*, 270 F.3d 203, 261 (5th Cir. 2001) (right is subject to "reasonable" restrictions if they are "not inconsistent with the right . . . to individually keep and bear . . . private arms."); and at 273 ("[W]hatever the nature or parameters of the Second Amendment right, be it collective or individual, it is a right subject to reasonable regulation.") (Parker, J., concurring); *Nordyke v. King*, 319 F.3d 1185, 1193 (9th Cir. 2003) ("We would make progress if the Supreme Court were to establish a doctrine of an individual Second Amendment right subject to reasonable government regulation.") (Gould J., specially concurring).

The reasonable regulation test is a more heightened form of scrutiny than the rational basis test that the majority opinion in *Heller* rejected (and is more demanding than the "interest balancing" test suggested by Justice Breyer in dissent) because it does not permit states to prohibit all firearm ownership, even if there is a rational basis to do so.   *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA LAW REVIEW 1443, 1458 (2009).   Instead, it "focuses on the balance of the interests at stake, rather than merely on whether any conceivable rationale exists

under which the legislature may have concluded the law could promote the public welfare." *State v. Cole*, 665 N.W. 2d 328, 338 (Wis. 2003).  Laws and regulations governing the use and possession of firearms thus must meet a higher threshold under the reasonable regulation test than they would under rational basis review.

Although the reasonable regulation test may be more deferential than intermediate or strict scrutiny, it is not toothless.  Under the test, laws that "eviscerate," *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis. 2002), render "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct. App. 2002), or result in the effective "destruction" of a Second Amendment right, *State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968), must be struck down.  Laws that are reasonably designed to further public safety, by contrast, are upheld.  *See, e.g., Robertson v. City & County of Denver*, 874 P.2d at 328, 330 n. 10 ("The state may regulate the exercise of [the] right [to bear arms] under its inherent police power so long as the exercise of that power is reasonable."); *Jackson*, 68 So.2d at 852 (same); *Bleiler v. Chief, Dover Police Dep't*, 927 A.2d at 1223 (same).

Nor would adopting the reasonable regulation test here be at odds with district courts that have elected to use intermediate scrutiny following *Heller*.  In virtually every post-*Heller* case where a district court has adopted intermediate scrutiny, the court was evaluating a particular provision of 18 U.S.C. § 922, the federal firearms statute that imposes restrictions on broad classes of individuals and types of arms.  *See, e.g., Marzzarella*, 614 F.3d at 88 (evaluating § 922(k) barring possession of a handgun with an obliterated serial number); *United States v. Yanez-Vasquez*, 2010 WL 411112 (D. Kan. Jan. 28, 2010) (evaluating § 922(g)(5) barring illegal aliens from possessing firearms); *United States v. Miller*, 604 F. Supp. 2d 1162, 1164 (W.D. Tenn. 2009) (evaluating § 922(g) barring felons from possessing firearms); *United States v. Bledsoe*, 2008 WL 3538717, *1 (W.D. Tex. 2008) (evaluating § 922(x) barring juveniles from possessing firearms). By contrast, Section 400.00(2)(f) involves a permitting process that relies

on *individual* determinations and law enforcement discretion, rather than broad categories.[12] Courts have always looked with a more wary eye on laws that impose restrictions on broad classes of people than laws that require individual determinations.  Heightened scrutiny – like intermediate scrutiny – is less appropriate here.

The reasonable regulation test also has two particular strengths that intermediate scrutiny does not: (1) it affords licensing officers, whether government officials, law enforcement, or judges, the discretion they need to adequately enforce handgun laws, and (2) it gives an appropriate amount of deference to legislative directives.

### 1.   Licensing officers should be afforded an appropriate amount of discretion in enforcing firearm regulations.

Licensing officers are best situated to make determinations about who in their communities can carry concealed weapons safely and responsibly.  They are likely to be familiar with the backgrounds and personalities of the members of their communities than courts or juries situated miles (and perhaps even counties) away.  They are best situated to know, for instance, whether a man requesting a concealed weapons permit previously has threatened his wife with violence (even if she, say, declined to testify against him so he was not formally charged), or whether for other reasons an individual requesting a permit would pose dangers if carrying weapons in public.  These are precisely the types of decisions that need to be made in order to protect communities from firearm violence.[13]

---

[12] The only exception appears to be a recent case in the United States District Court for the District of Columbia, *Heller v. District of Columbia* ("*Heller II*"), in which the plaintiffs challenged (1) the District of Columbia's firearm registration procedures, (2) the District's prohibition on assault weapons, and (3) the District's prohibition on large capacity ammunition feeding devices.  698 F. Supp. 2d 179, 181 (D.D.C. 2010).  But even in that case, two of the three provisions that the district court was evaluating were broad restrictions on entire classes of firearms.  *Id.*

[13] States that do *not* afford any discretion to government officials have issued handgun carry permits to numerous individuals who have gone on to kill innocent civilians and law enforcement members.  *See* Violence Policy Center, *Private Citizens Killed by Concealed Handgun Permit Holders:  May 2007 to the Present, available at* http://www.vpc.org/ccwkillers.htm.

    **2.**      **Given the governmental interest in protecting the public from the harms associated with firearms, deference to legislative directives is appropriate.**

There is a profound governmental interest in regulating the possession and use of firearms. States have "cardinal civil responsibilities" to protect the health, safety, and welfare of their citizens. *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 342 (2008); *see also Queenside Hills Realty Co. v. Saxl*, 328 U.S. 80, 83 (1946) ("[T]he legislature may choose not to take the chance that human life will be lost . . . ."). States are thus generally afforded "great latitude" in exercising "police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons . . . ." *Gonzales v. Oregon*, 546 U.S. at 270 (internal quotations omitted). Regulations on the carrying of firearms are an essential exercise of those powers, for the "promotion of safety of persons and property is unquestionably at the core of the State's police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

While individuals and organizations may differ on the net risks posed by guns in our society, such disagreement underlines that firearm regulation is best suited for the legislative arena, not the courts. *See Miller*, 604 F. Supp. 2d at 1172 n. 13 ("[D]ue to the intensity of public opinion on guns, legislation is inevitably the result of hard-fought compromise in the political branches."). Indeed, legislatures are designed to make empirical judgments about the need for and efficacy of regulation, even when that regulation affects the exercise of constitutional rights. *See, e.g., Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (state legislatures are "far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon legislative questions."); *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 544 (1989) ("Local officials, by virtue of their proximity to, and their expertise with, local affairs, are exceptionally well qualified to make determinations of public good within their respective spheres of authority.") (internal quotations and citations omitted). State governments "must [thus] be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Young v. American Mini Theatres, Inc.*, 427 U.S 50, 71 (1976).

In fulfilling their responsibility to protect the public, states have enacted laws, including

BRIEF OF AMICUS CURIAE BRADY
CENTER TO PREVENT GUN VIOLENCE

permitting regimes like the one at issue here, to ensure that guns are used responsibly and possessed by responsible, law-abiding persons. These laws have helped reduce the use of guns in crime and saved lives. *See, e.g.*, D.W. Webster, *et al.*, *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. URBAN HEALTH: BULLETIN OF THE N.Y. ACAD. OF MED. 525 (2009); D.W. Webster, *et al.*, *Relationship Between Licensing, Registration, and Other State Gun Sales Laws and the Source State of Crime Guns*, 7 INJURY PREVENTION 184 (2001); Douglas Weil & Rebecca Knox, *Effects of Limiting Handgun Purchases on Interstate Transfer of Firearms*, 275 J. AM. MED. ASS'N 1759 (1996). The risks posed by invalidating or unduly restricting these legislative judgments on firearms regulations is severe, and courts should review such legislative judgments with an appropriate amount of deference. Here, too, therefore, the reasonable regulation test is better situated than either intermediate or strict scrutiny to defer to legislative judgments. It allows for different permitting and concealed carry regimes depending on the needs of the particular state or locale, and recognizes the strong interest of the state in protecting its citizens rather than being overly focused on a narrow means-end nexus of the challenged regulation.

### B. The Concealed Weapons Permitting Process at Issue Is Constitutionally Permissible.

New York's concealed weapons permitting process clearly passes the reasonable regulation test. Courts have repeatedly found that there is a "compelling state interest in protecting the public from the hazards involved with certain types of weapons, such as guns," *Cole*, 665 N.W. 2d at 344, particularly given "the danger [posed by the] widespread presence of weapons in public places and [the need for] police protection against attack in these places." *Id.* (internal quotations omitted).

Indeed, as discussed above, there is strong sociological and statistical evidence which suggests that permitting and registration procedures that make it more difficult for someone to carry a gun in public reduce both the number of gun deaths and criminal access to firearms. *See, e.g.*, Webster, *et al.*, *Relationship Between Licensing*, at 184. Webster, *et al.*, *Effects of State-*

*Level*, at 525; Weil & Knox, *Effects of Limiting Handgun Purchases*, at 1759.  And that has been shown to be true in New York.  During the 1990s, for instance, the crime drop in New York City was almost exactly twice that of other large cities elsewhere in the United States.  FRANKLIN E. ZIMRING, THE GREAT AMERICAN CRIME DECLINE 137 (2007).  And by 2000, the rates of most offenses in New York City were so low that the City no longer looked like a typical large city. *Id.* at 139.  One explanation for this is New York City's "combination of low civilian handgun ownership and tight handgun control laws."  *Id.* at 157. New York's effective street policing techniques might be far less effective if law enforcement were forced to presume that those carrying guns in public were doing so lawfully. New York's firearms regulations seemingly achieve what they were designed to do:  reduce the risks associated with the possession of firearms such that the gun death rate in New York state is one of the lowest in the nation and less than half the national average.  Centers for Disease Control and Prevention, National Center for Injury Control and Prevention, *WISQARS Injury Mortality Reports* (2007).

Moreover, New York's concealed weapons permitting process is not an outright ban on the possession, or even the carrying, of firearms and thus does not approach the blanket prohibition on handgun ownership that the Supreme Court struck down in *Heller*.  *See Heller*, 128 S. Ct. at 2788.  Instead, it merely requires individuals who wish to carry concealed firearms outside the home to meet certain basic requirements and to have their request approved by government officials, law enforcement and judges. *See* N.Y. PENAL CODE § 400.00(2)(f).  Those officials, in turn, review applications to ensure that all the statutory requirements have been met. *See id.*  This is a perfectly reasonable process designed to ensure that individuals who do not have good cause to carry concealed weapons in public do not do so, and those who do carry do so responsibly.  The New York Legislature has decided that this is a reasonable way to protect public safety.  The Court should not second-guess those judgments, particularly for firearms activity that has never been recognized as a Second Amendment right by any other court.

In sum, the New York concealed weapons permitting process is both reasonable and not unduly restrictive of an individuals' Second Amendment right to keep guns in their home.  It is

thus a valid exercise of state's "police powers to legislate as to the protection of the lives, limb, health, comfort, and quiet of all persons" and passes the reasonable regulation test.[14] *Gonzales v. Oregon*, 546 U.S. 243, 270 (2006) (internal quotations omitted).

## CONCLUSION

For all the foregoing reasons, the Court should find that Section 400.00(2)(d) is constitutional.

Dated: November 22, 2010

Respectfully submitted,

_____/s/_____
Kevin T. Baumann
Hogan Lovells US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3081
Facsimile: (212) 918-3100
E-Mail: kevin.baumann@hoganlovells.com

Adam K. Levin
Tracy L. Hresko
Hogan Lovells US LLP
555 13th Street, NW
Washington, DC 20004
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
E-Mail: adam.levin@hoganlovells.com

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, NW, Suite 1100
Washington, DC 20005

---

[14] Section 400.00(2)(f) also would survive intermediate (or even strict) scrutiny were the Court to apply that standard of review because it is substantially related to an important government interest. Not surprisingly, a number of courts have found that the protection of the public from firearm violence is an important government interest, *see, e.g., Heller II*, 698 F. Supp. 2d at 186; *Miller*, 604 F.Supp.2d at 1171; *Bledsoe*, 2008 WL 3538717 at *4, and upheld statutes that impose much broader restrictions on an individual's ability to possess and carry firearms. *See, e.g., Marzzarella*, 2010 WL 2947233 at *7; *Heller II*, 698 F. Supp. 2d at 197; *State v. Sieyes*, 225 P.3d 995, 995 (Wash. 2010); *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1233 (D. Utah); *Yanez-Vasquez*, 2010 WL 411112 at *3; *Miller*, 604 F.Supp.2d at 1171-72; *United States v. McCane*, 573 F.3d 1037, 1050 (10th Cir. 2009); *United States v. Masciandaro*, 648 F. Supp. 2d 779, 789-91 (E.D. Va. 2009); *United States v. Radenich*, 2009 WL 127648 (N.D. Ind. 2009); *United States v. Schultz*, 2009 WL 35225 (N.D. Ind. 2009); *Flores*, 169 Cal. App. 4th at 574-75; *Bledsoe*, 2008 WL 3538717 at *4.

E-Mail: jlowy@bradymail.org

Attorneys for *Amicus Curiae* Brady Center to
Prevent Gun Violence