**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------X   **ECF Filing**

Alan Kachalsky, Christina Nikolov, Eric Detmer,   :
Johnnie Nance, Anna Marcucci-Nance,   :
and  Second Amendment Foundation, Inc.,   :
   :
                   Plaintiffs,   : **Civil Action Number: 10-cv-5413**
   : **(Hon. Cathy Seibel)**
           -against-   :
   :
Susan Cacace, Jeffrey A. Cohen,   :
Albert Lorenzo, Robert K. Holdman   :
and County of Westchester,   :
   :
                Defendants.   :

---------------------------------------------------------------X


## MEMORANDUM IN SUPPORT OF STATE DEFENDANTS'
## CROSS-MOTION FOR SUMMARY JUDGMENT AND
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

ERIC T. SCHNEIDERMAN
Attorney General of the
 State of New York
Attorney for the State Defendants
120 Broadway, 24th  Floor
New York, NY 10271
(212) 416-8965/8553

MONICA CONNELL
ANTHONY J. TOMARI
Assistant Attorneys General
 of Counsel

## TABLE OF CONTENTS

**Page**

**TABLE OF AUTHORITIES** ........................................................................................ iii

**Preliminary Statement** .................................................................................................. 1

**Statement Of Facts** ........................................................................................................ 3

    In Heller and McDonald, the Supreme Court Recognized a Constitutional Right to
    Possess Guns in the Home for Self Defense .................................................................. 3

    New York's Statutory Scheme Regulating the Carrying of Handguns ......................... 4

    Plaintiffs' Applications For "Full Carry" Licenses ....................................................... 6

    Handgun Violence is a Public Health and Safety Concern in the State of New York . 6

**ARGUMENT** ................................................................................................................ 10

    A. Standards For Summary Judgment ....................................................................... 10

**POINT I**
NEW YORK PENAL LAW § 400.00 DOES NOT IMPLICATE, LET ALONE
VIOLATE, THE SECOND AMENDMENT. ............................................................. 12

    A. The Supreme Court Has Never Held that the Second Amendment
    Protects the Right to Carry Arms Outside the Home ............................................. 13

    B. Penal Law § 400.00(2)(f) Regulates But Does Not Ban Concealed Carrying of
    Handguns and Thus Does not Violate or Even Implicate the Core Second
    Amendment Right to Posses Handguns in the Home for Self Defense ............... 16

**POINT II**
EVEN IF THE COURT FINDS THAT PENAL LAW § 400.00(2)(f)
IMPLICATES A SECOND AMENDMENT RIGHT, PLAINTIFFS'
CHALLENGE FAILS BECAUSE NEW YORK'S STATUTE CAN
WITHSTAND ANY LEVEL OF SCRUTINY ......................................................... 19

    A. Strict Scrutiny Analysis is Inapplicable Here ..................................................... 20

    B. Courts Have Overwhelmingly Applied Intermediate Scrutiny in Regard to
    Second Amendment Challenges ........................................................................... 21

i

C. Because New York Has a Compelling Interest in Public Safety and the
   Challenged Statute is Narrowly Tailored to Advance that Interest, It Would
   Survive Any Level of Heightened Scrutiny .......................................................... 23

   1. Penal Law § 400.00(2)(f) Advances a Compelling State Interest and is
      Narrowly Tailored to Achieve Its Purpose ...................................................... 24

      a. Courts Have Recognized a Compelling State Interest in
         Promoting Public Safety ............................................................................. 24

      b. Courts Have Recognized that the Government Has a Public Safety
         Interest in Regulating and Restricting the Carrying of Concealed
         Handguns in Public ...................................................................................... 24

      c. Penal Law § 400.00(2)(f) Restricts the Concealed Carrying of
         Concealed Handguns to Prevent Crime in a Way That is Narrowly
         Tailored to Advance the Law Enforcement and Public Safety
         Interests of the State .................................................................................... 26

   2. Plaintiffs Fail to Demonstrate that Penal Law §400.00(2)(f) is
      Unconstitutional as Applied to Them ............................................................. 32

   3.  Penal Law § 400.00(2)(f) is Constitutional on its Face ................................... 33

POINT III
   THE PRIOR RESTRAINT DOCTRINE DOES NOT APPLY TO SECOND
   AMENDMENT CHALLENGES .............................................................................. 36

POINT IV
   PLAINTIFFS' EQUAL PROTECTION CLAIM MUST BE DISMISSED .............. 39

CONCLUSION .......................................................................................................... 41

## TABLE OF AUTHORITIES

**Cases**                                                                          **Page**

Abrams v. Johnson,
521 U.S. 74, 91 (1997) ................................................................................................ 23

Alexander v. Louisiana,
405 U.S. 625 (1972) ................................................................................................... 18

Alexander v. United States,
509 U.S. 544 (1993) ................................................................................................... 36

Almengor v. Schmidt,
692 F.Supp.2d 396 ( S.D.N.Y. 2010) ........................................................................ 32

Anderson v. Liberty Lobby Inc.,
477 U.S. 242 (1986) ................................................................................................... 11

Apodaca v. Oregon,
406 U.S. 404 (1972) ................................................................................................... 18

Bach v. Pataki,
289 F.Supp.2d 217 (N.D.N.Y. 2003) ......................................................................... 39

Bach v. Pataki,
408 F.3d 75 (2d Cir. 2003) ............................................................................. 5, 17, 38

Bando v. Sullivan,
290 A.D.2d 691 (3d Dep't 2002) ......................................................................... 5, 38

Bernstein v. Police Dept. of City of New York,
85 A.D.2d 574 (1st Dep't 1981) ......................................................................... 5, 38

Bickerstaff v. Vassar College,
196 F.3d 435 (2d Cir. 1999) ....................................................................................... 11

Boddie v. Connecticut,
401 U.S. 371 (1971) ................................................................................................... 32

Burke v. Jacoby,
981 F.2d 1372 (2d Cir. 1992), cert. denied, 508 U.S. 909 (1993) ............................... 11

Buzzetti v. City of New York,
140 F.3d 134 (1998) ................................................................................................... 24

Caldarola v. Calabrese,
  298 F.3d 156 (2d Cir.2002)............................................................................................ 11

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986)....................................................................................................... 11

City of Cleburne v. Cleburne Living Center,
  473 U.S. 432 (1985)....................................................................................................... 40

City of Los Angeles v. Alameda Books, Inc.,
  535 U.S. 425 (2002)....................................................................................................... 23

City of Renton v. Playtime Theatres, Inc.,
  475 U.S. 41 (1986).................................................................................................... 23, 24

Clark v. Community For Creative Non-Violence,
  468 U.S. 288 (1984)....................................................................................................... 23

Clark v. Jeter,
  486 U.S. 456 (1988)....................................................................................................... 23

Cook v. Gates,
  528 F.3d 42 (1st Cir. 2008)............................................................................................ 32

Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.,
  473 U.S. 788 (1985)....................................................................................................... 21

D'Amico v. City of N.Y.,
  132 F.3d 145 (2d Cir.1998)............................................................................................ 11

District of Columbia v. Heller,
  554 U.S. 570, 128 S.Ct. 2783 (2008)...................................................................... passim

Dorr v. Weber,
  2010 WL 197643 (N.D. Iowa, May 18, 2010)............................................................... 15

Field Day, LLC v. County of Suffolk,
  463 F.3d 167 (2d Cir. 2006)........................................................................................... 32

Gannett Co. v. DePasquale,
  443 U.S. 368 (1979)....................................................................................................... 36

Gonzales v. Village of West Milwaukee,
  2010 WL 1904977 (E.D.Wis. May 11, 2010)................................................................. 15

Graham v. Henderson,
    89 F.3d 75 (2d Cir. 1996)............................................................................................ 11

Hawaii Housing Authority v. Midkiff,
    467 U.S. 229 (1984).................................................................................................... 17

Heller v. District of Columbia,
    698 F.Supp.2d 179 (D.D.C. March 26, 2010) ("Heller II").................................... passim

Hobbs v. County of Westchester,
    397 F.3d 133 (2d Cir. 2005)........................................................................................ 36

Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation,
    311 F.3d 534 (2d Cir. 2002)........................................................................................ 11

Int'l Soc'y for Krishna Consciousness v. Lee,
    505 U.S. 672 (1992) ................................................................................................... 21

Lewis v. Casey,
    518 U.S. 343 (1996).................................................................................................... 17

Los Angeles v. Alameda Books, Inc.,
    535 U.S. 425 (2002).................................................................................................... 23

Mack v. U.S.,
    6 A.3d 1224 (D.C. 2010) ............................................................................................ 15

Marshall v. Walker,
    958 F.Supp. 359 (N.D. Ill. 1997)................................................................................ 26

Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,
    475 U.S. 574 (1986).................................................................................................... 11

Matter of Alarie,
    168 Misc.2d 329 (N.Y. Co. Ct.1996)............................................................................. 5

Matter of County of Westchester v. D'Ambrosio,
    244 A.D.2d 334 (2d Dep't 1997).................................................................................. 6

McDonald v. City of Chicago, Ill.,
    __U.S. __, 130 S.Ct. 3020 (2010)......................................................................... passim

Near v. State of Minnesota ex rel. Olson,
    283 U.S. 697 (1931).................................................................................................... 36

Nordyke v. County of Alameda et al.,
    563 F.3d 439 (9th Cir. 2009) ........................................................................................ 14

O & G Indus., Inc. v. Nat'l R.R. Passenger Corp.,
    537 F.3d 153 (2d Cir. 2008), cert. denied, --- U.S. ----, 129 S.Ct. 2043 (2009) ........... 10

Parker v. District of Columbia,
    478 F.3d 370 (D.C. Cir. 2007) ..................................................................................... 37

People v. Adams,
    193 Misc.2d 78 (N. Y. Sup. Ct. 2002) ............................................................................ 5

People v. Dykes,
    209 P.3d 1 (Cal. 2009) ................................................................................................. 16

People v. Marin,
    795 N.E.2d 953 (Ill. App. 2003)(citations omitted), app. den'd,
    206 Ill.2d 635 (2003) ....................................................................................... 10, 16, 29

People v. McGee,
    341 Ill.App.3d 1029 (Ill.App. 1 Dist 2003) ........................................................... 26, 29

People v. Perkins,
    62 A.D.3d 1160 (2d Dep't 2009) .................................................................................. 16

People v. West,
    422 N.E.2d 943 (Ill.App. 1981) ................................................................................... 26

People v. Yarbrough,
    169 Cal. App. 4th 303 (2008) ...................................................................................... 25

Peruta v. County of San Diego,
    2010 WL 5137137 (S.D.Cal. December 10, 2010) ................................................. passim

Richmond v. J.A. Croson Co.,
    488 U.S. 469 (1989) ..................................................................................................... 17

Riddick v. U.S.,
    995 A.2d 212 (D.C. 2010) ............................................................................................ 15

Robertson v. Baldwin,
    165 U.S. 275 (1897) ..................................................................................................... 14

Robinson v. California,
    370 U.S. 660 (1962) ..................................................................................................... 18

Ruston v. Town of Skaneateles,
  610 F.3d 55 (2d Cir. 2009)........................................................................................... 39

Schall v. Martin,
  467 U.S. 253 (1984)..................................................................................................... 24

Sims v. United States,
  963 A.2d 147 (D.C. 2008) ........................................................................................... 15

State of Illinois v. Dawson,
  2010 Ill.App. LEXIS 863 (August 18, 2010).................................................................. 15

State v. Hamdan,
  665 N.W.2d 785 (Wis. 2003)........................................................................................ 20

State v. Knight,
  241 P.3d 120 (Kan. Ct. App. 2010) .............................................................................. 15

Swait v. University of Nebraska,
  2008 WL 5083245 (D. Neb. 2008) ............................................................................... 16

Turner Broadcasting Sys., Inc. v. FCC,
  512 U.S. 622 (1994)..................................................................................................... 17

Turner Broadcasting Sys., Inc. v. FCC,
  520 U.S. 180 (1997)..................................................................................................... 17

U.S. v. Chester,
  __F.3d.__, 2010 WL 5396069 (4th Cir. December 30, 2010).................... 14, 21, 36, 39

U.S. v. Frederick,
  2010 WL 2179102 (D.S.D. May 27, 2010) ................................................................... 34

U.S. v. Hall,
  2008 WL 3097558 (S.D.W.Va. 2008) .......................................................................... 16

U.S. v. Hart,
  No. 09-10376-WGY, 2010 WL 2990001 (D. Mass. July 30, 2010)............................. 15

U.S. v. Jones,
  673 F.Supp.2d 1347 (N.D.Ga. 2009) ........................................................................... 33

U.S. v. Lopez,
  514 U.S. 549 (1995)..................................................................................................... 23

U.S. v. Polouizzi,
   697 F.Supp.2d 381 (E.D.N.Y. 2010) ............................................................................ 32

U.S. v. Quattrone,
   402 F.3d 304 (2d Cir. 2005).......................................................................................... 36

U.S. v. Rybar,
   103 F.3d 273 (3d Cir. 1996).......................................................................................... 17

U.S. v. Skoien,
   587 F.3d 803 (7th Cir. 2009) ........................................................................................ 20

U.S. v. Skoien,
   614 F.3d 638 (7th Cir. 2010) ................................................................................... 19, 33

U.S. v. Skoien,
   2010 WL 2735747 (7th Cir. 2010) .......................................................................... 14, 21

U.S. v. Walker,
   709 F.Supp.2d 460 (E.D. Va. 2010) ............................................................................ 19

United States v. Booker,
   570 F.Supp.2d 161 (D.Me. 2008) ................................................................................ 32

United States v. Hart,
   2010 WL 299001 (D. Mass. July 30, 2010).................................................................. 15

United States v. Marzzarella,
   595 F.Supp. 2d 596 (W.d. Pa. 2009)............................................................................ 20

United States v. Marzzarella,
   614 F.3d 85 (3d Cir. 2010)........................................................................... 16, 19, 21, 37

United States v. Masciandro,
   648 F.Supp.2d 779 (E.D.Va. 2009) ............................................................. 15, 24, 32, 33

United States v. Miller,
   604 F. Supp. 2d 1162 (W.D.Tenn 2009)...................................................................... 22

United States v. O'Brien,
   391 U.S. 367 (1968)..................................................................................................... 21

United States v. Pettengill,
   682 F. Supp. 2d 49 (D. Me. 2010) ............................................................................... 19

United States v. Radencich,

2009 WL 127648 (N.D. Ind. Jan. 20, 2009) ........................................................... 19, 22

United States v. Rybar,
103 F.3d 273 (3rd Cir. 1996) ....................................................................................... 23

United States v. Salerno,
481 U.S. 739 (1987).......................................................................................... 24, 33, 34

United States v. Schultz,
2009 U.S. Dist. LEXIS 234 (N.D. Ind. Jan 5 2009) ...................................................... 22

United States v. Smith,
2010 WL 3743842 (S.D.W.Va. Sept.20, 2010)............................................................ 21

United States v. Tooley,
2010 WL 2842915 (S.D.W.Va. May 4, 2010).............................................................. 22

United States v. Walker,
2010 WL 1640340 (E.D. Va. 2010).............................................................................. 22

United States v. Walker,
709 F. Supp. 2d  460 (E.D.Va. 2010) ........................................................................... 19

Washington State Grange v. Washington State Republican Party,
552 U.S. 442 (2008)............................................................................................... 33, 34

Weinstock v. Columbia Univ.,
224 F.3d 33 (2d Cir. 2000)........................................................................................... 11

Williams v. State,
--- A.3d ---, 2011 WL 13746 (Md. 2011) .................................................................... 18

Williams v. State,
982 A.2d 1168 (Md. App. 2009), aff'd, 2011 WL 13746 (Md. 2011) ......................... 15

Young v. American Mini Theatres, Inc.,
427 U.S. 50 (1976)....................................................................................................... 23

**United States Constitution**
First Amendment ..................................................................................................... passim
Second Amendment.................................................................................................. passim
Fifth Amendment ............................................................................................................. 18
Sixth Amendment ............................................................................................................ 18
EighthAmendment…………………………………………………………………………18
Fourteenth Amendment ....................................................................................... 12, 39, 41

**Federal Statutes**

18 U.S.C. § 922............................................................................................................... 29
18 U.S.C. § 922 (g) (9) ................................................................................................... 14
42 U.S.C. § 1983............................................................................................................... 1

**Federal Rules of Civil Procedure** ("Fed.R.Civ.P.")
Rule 56(c)(2).................................................................................................................... 10

**State Statutes**

New York's Civil Practice Law and Rules
Article 78 ................................................................................................................... 6, 38
CPLR 401 et seq. ........................................................................................................... 38
1785 N.Y. Laws 152. ....................................................................................................... 4

New York State Penal Law
Penal Law § 265(10)........................................................................................................ 6
Penal Law § 265.00(3)(c) ................................................................................................ 6
Penal Law § 300.00(1)................................................................................................... 33
Penal Law § 400.00.................................................................................................... 5, 12
Penal Law § 400.00(1).................................................................................................... 5
Penal Law § 400.00(2)................................................................................................ 5, 19
Penal Law § 400.00(2)(a) ............................................................................................... 5
Penal Law § 400.00(2)(b) to (e)...................................................................................... 5
Penal Law § 400.00(2)(f)......................................................................................... passim
Penal Law § 400.00(3).................................................................................................... 5

**Treatises, Journals, Other Sources**

Alfred Blumstein, Youth Violence, Guns, and the Illicit- Drug Industry, 86 J. Crim. L. &
Criminology 10 (1995)................................................................................................... 10

Anthony A. Braga & D.L. Weisburd, Policing Problem Places: Crime Hot Spots and
Effective Prevention  (2010)......................................................................................... 26

Carlton F.W. Larson, Four Exceptions in Search of a Theory: District of Columbia v.
Heller and Judicial Ipse Dixit, 60 HASTINGS L.J. 1371, 1379 (2009)........................... 20

Cheryl W. Thompson, Guns Used to Kill Police Officers: Where They Come From and
How They Get in the Hands of Criminals, Washington Post (November 21, 2010).... 30

David Hemenway, Private Guns, Public Health, 45 (University of Michigan
Press 2004)................................................................................................... 7, 9, 27, 31

Dennis A. Henigan, The Heller Paradox, 56 UCLA L. REV. 1171, 1197-98 (2009)........ 20

Fed. Bureau of Investigations, U. S. Dep't of Justice, Law Enforcement Officers Killed
and Assaulted, tables 1 and 27,
http://www2.fbi.gov/ucr/killed/2009/data/table_01.html ............................................... 7

Franklin E. Zimring & Gordon Hawkins, Crime Is Not the Problem: Lethal Violence in
America, 199 (New York: Oxford University Press 1997) ........................................ 7, 8

George Newton and Franklin E. Zimring, Firearms and Violence in American Life, staff
report submitted to the National Commission on Causes and Prevention of Violence,
Washington D.C., Government Printing Office, 8 (1969)............................................... 4

Glenn Harlan Reynolds, Guns and Gay Sex: Some Notes on Firearms, the Second
Amendment, and "Reasonable Regulation, 75 Tenn. L. Rev. 137, 147-48 (2007) ...... 37

Ian Ayers and John J. Donohue III, Shooting Down the "More Guns, Less Crime,"
Hypothesis, 55 Stan. L. Rev. 1193 (April 2003)......................................    28

Ian Ayers and John J. Donohue III, The Latest Misfires In Support of the "More
Guns, Less Crime" Hypothesis, 55 Stan. L. Rev. 1371 (April 2003)..............    28

International Association of Chiefs of Police, Taking a Stand: Reducing Gun Violence in
Our Communities (2007)........................................................................................ 18, 31

Lawrence Rosenthal, Second Amendment Plumbing After Heller: Of Standards of
Scrutiny, Incorporation, Well Regulated Militias, and Criminal Street Gangs, 41 The
Urban Lawyer 1 (2009)................................................................................. 9, 27, 37, 38

Mark Tushnet, Heller and the Perils of Compromise, 13 Lewis & Clark L. Rev. 419, 429-
31 (2009)............................................................................................................. 37

Matthew Miller, David Hemenway & Deborah Azrael, State-Level Homicide
Victimization Rates in the US in Relation to Survey Measures of Household Firearm
Ownership, 2001-2003, SOC. SCI. & MED., Vol. 64, 3 (2007)...................................... 27

Mona A. Wright & Garen J. Wintemute, Felonious or Violent Criminal Activity That
Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk
Factors, J. Trauma 69(4):948-955 (2010) ..................................................................... 30

Murder: New York City, N.Y. TIMES, available at
http://projects.nytimes.com/crime/homicides/map (last visited Jan. 19, 2010) ) ........... 7

Nat'l Inst. of Justice, U. S. Dep't of Justice, Adolescents, Neighborhoods, and Violence:
Recent Findings From the Project on Human Development in Chicago Neighborhoods
(2007), http://www.ncjrs.gov/pdffiles1/nij/217397.pdf................................................... 8

Nat'l Inst. of Justice, U. S. Dep't of Justice, Gun Violence,

http://www.ojp.usdoj.gov/nij/topics/crime/gun-violence/welcome.htm........................ 8

P.J. Cook et al., The Medical Costs of Gunshot Wounds, J. AM. MED. ASS'N. 282(5),
August 4, 1999, 447-454................................................................................................... 9

Philip J. Cook & Jens Ludwig, The Social Costs of Gun Ownership, J. Pub. Econ 90
379-391 (2006)............................................................................................................... 26

Philip J. Cook et al., Criminal Records of Homicide Offenders, J. AM. MED. ASS'N,
294(5):598-601 (2005)............................................................................................. 18, 29

Philip J. Cook, et al., Underground Gun Markets, Econ. J. (November, 2007) ............... 26

Revolver Killings Fast Increasing: Legislative Measure to be Urged For Curbing the Sale
of Firearms, N.Y. Times, (Jan. 30, 1911) (Sullivan Law) ............................................... 4

Saul Cornell & Nathan DeNino, A Well Regulated Right: The Early American
Origins of Gun Control, 73 Fordham L. Rev. 487, 502 (2004) ....................................... 4

Saul Cornell, The Early American Origins of the Modern Gun Control Debate:
The Right to Bear Arms, Firearm Regulation, and The Lessons of History,
17 STNLPR 571 (2006)................................................................................................... 4

Social Contagion of Violence, The Cambridge Handbook of Violent Behavior and
Aggression 688, 701-10 (Daniel J. Flannery et al. eds. 2007)....................................... 10

Steven F. Messner, et al., Policing, drugs, and the Homicide Decline in the 1990s in New
York City, Criminology 45:385-413 (2007).................................................................. 18

Thomas L. Fowler, Law Between the Lines, 25 Campbell L.Rev. 151, 178 (2003)........ 19

United States Center for Disease Control, Nat'l Vital Statistics Report (2007);
http://www.cdc.gov/NCHS/data/nvsr/nvsr58/nvsr58_19.pdf; Zimring & Hawkins,
supra at 199 .................................................................................................................... 7

Vincent C. Alexander, Practice Commentaries 401:1 to CPLR § 401 ............................. 38

Zimring & Hawkins, The Citizen's Guide to Gun Control, New York, ........................... 8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

Alan Kachalsky, Christina Nikolov, Eric Detmer,   :
Johnnie Nance, Anna Marcucci-Nance,              :
and  Second Amendment Foundation, Inc.,          :
                                                  :
                  Plaintiffs,                     : **Civil Action Number: 10-cv-5413**
                                                  : **(Hon. Cathy Seibel)**
                  -against-                       :
                                                  :
Susan Cacace, Jeffrey A. Cohen,                   :
Albert Lorenzo, Robert K. Holdman                 :
and County of Westchester,                        :
                                                  :
                  Defendants.                     :
-------------------------------------------------------------X

## MEMORANDUM IN SUPPORT OF STATE DEFENDANTS'
## CROSS-MOTION FOR SUMMARY JUDGMENT AND
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### Preliminary Statement

Plaintiffs Alan Kachalsky, Christina Nikolov, Eric Detmer, Johnnie Nance, Anna

Marcucci-Nance and the Second Amendment Foundation, Inc. ("SAF") (collectively "Plaintiffs")

commenced this action pursuant to 42 U.S.C. §1983 seeking a declaration that section

400.00(2)(f) of the New York State Penal Law ("Penal Law § 400.00(2)(f)") -- which requires

that applicants for licenses to carry concealed handguns in public in New York State show

"proper cause" -- is unconstitutional, and an injunction against the statute's continued

enforcement.  Plaintiffs assert that, pursuant to the Supreme Court's decisions in District of

Columbia v. Heller, 554 U.S. 570, 128 S.Ct. 2783 (2008) and McDonald v. City of Chicago, Ill.,

__U.S. __ , 130 S.Ct. 3020 (2010), which struck down handgun bans and held that the Second

Amendment affords individuals a constitutional right to possess a handgun *in the home* for self-

defense, they have a fundamental right to carry concealed handguns *in public*,  and that New

York's "proper cause" provision unconstitutionally impinges on that right.

In seeking to vindicate this "right" -- a "right" that is at loggerheads with almost two centuries of American constitutional jurisprudence -- Plaintiffs ask that this Court rigidly apply First Amendment principles that have been uniquely developed to address matters of speech and public debate to their Second Amendment claims. Plaintiffs maintain that the challenged law is subject to strict scrutiny and cannot survive such review. They have moved for summary judgment.

State Defendants the Hon. Susan Cacace, the Hon. Jeffrey A. Cohen, the Hon. Albert Lorenzo and the Hon. Robert K. Holdman are New York State judges who have denied the individual Plaintiffs' applications under Penal Law § 400.00(2)(f) for unrestricted concealed carry licenses. State Defendants submit this memorandum in opposition to Plaintiffs' motion for summary judgment and in support of their own cross-motion for summary judgment to declare that the "proper cause" provision of Penal Law § 400.00(2)(f) is constitutional and to dismiss Plaintiffs' claims.[1]

Plaintiffs ask that this Court aggressively expand the basic right to self defense in one's home recognized in Heller, and to hold that the states may not regulate the carrying of concealed handguns in public. The public safety implications of Plaintiffs' request are staggering. No court has held that the Second Amendment bars states from regulating the possession of firearms in public, and this Court should not be the first.

Furthermore, even if the Court did enlarge the right enunciated in Heller to hold that New York's reasonable licensing scheme implicates Plaintiffs' constitutional rights, Penal Law § 400.00(2)(f) passes constitutional muster. Notwithstanding Plaintiffs' arguments, the

---

[1] State Defendants have a pending motion to dismiss under Rules 12(b)(1) and (6) asserting jurisdictional grounds for dismissal which remain extant but which are not repeated herein.

overwhelming majority of courts to consider Second Amendment challenges have applied

intermediate scrutiny to Second Amendment claims, not strict scrutiny -- and in any event Penal

Law § 400.00(2)(f) satisfies both intermediate and strict scrutiny.

Finally, Plaintiffs' efforts to strike at the law with an equal protection claim are

unavailing. They simply cannot establish that Penal Law § 400.00(2)(f) violates a fundamental

right and that they have been treated differently than others who are similarly situated.

For all these reasons, Plaintiffs' motion for summary judgment should be denied and the

State Defendants cross motion should be granted.

## Statement Of Facts

The Court is referred to the facts in the State Defendants' Rule 56.1 Statement of

Undisputed Material Facts ("State Defs. 56.1"); the Declaration of Philip Cook ("Cook

Decl.") and the exhibits thereto; the Declaration of Franklin E. Zimring ("Zimring

Decl."); the Declaration of Susan Cacace ("Cacace Decl."); the Declaration of Jeffrey A.

Cohen ("Cohen Decl.");  the Declaration of Albert Lorenzo ("Lorenzo Decl."); the

Declaration of Robert K. Holdman, ("Holdman Decl."); the Declaration of the Hon.

David R. Roefaro, Mayor of Utica ("Utica Decl."); the Declaration of the Hon. Stephanie

A. Miner, Mayor of Syracuse ("Syracuse Declaration"); the Declaration of State Police

Col. Thomas L. Fazio ("Fazio Decl."); the Declaration of State Police Sgt. James

Sherman and the exhibits thereto ("Sherman Decl."); the Declaration of New York City

Police Department Deputy Inspector Andrew Lunetta ("Lunetta Decl."); the Declaration

of Westchester County Pistol Licensing Unit Commanding Officer Bruce Bellom

("Bellom Decl"); the Declaration of Marge Cohen, New York State Division of Criminal

Justice Service and the exhibits thereto; and the Declaration of Assistant Attorney

3

General Anthony J. Tomari ("Tomari Decl.") and the exhibits thereto, for a full recitation

of all the facts and circumstances underlying this case. A brief statement of relevant facts

is set forth herein.

## New York's Statutory Scheme Regulating the Carrying of Handguns

New York's gun licensing policy provides a comprehensive and rational

framework for protecting the public from a real danger while permitting individuals to

possess firearms. There can be little doubt that increased carrying of concealed handguns

in public presents genuine public safety and health concerns. In balancing such concerns,

New York State does not ban handguns, but does require a license for their possession or

carrying. See Penal Law 400.00(2)(f).[2] New York's current handgun law was first

codified in 1911 as the Sullivan Law.[3] Enacted to combat handgun violence, the Sullivan

---

[2] For example, in 2009, the last year for which statistics were available, New York State issued or renewed 18,577 handgun licenses. New York City currently has 36,017 handgun licenses on file. See Sherman Decl., Exhibits A and B; Bellom Decl. ¶ 17.

[3] State and local laws have long restricted the use of firearms in public. "The earliest and most numerous state and local laws relate to the carrying or use of firearms. In the 1600s, Massachusetts prohibited the carrying of defensive firearms in public places. Kentucky in 1813, Indiana in 1819, Arkansas and Georgia in 1837 passed laws prohibiting the carrying of concealed weapons." George Newton and Franklin E. Zimring, Firearms and Violence in American Life, staff report submitted to the National Commission on Causes and Prevention of Violence, Washington D.C., Government Printing Office, 8 (1969). Gun regulations for public safety purposes have been used by state and local governments dating to even before the adoption of the Second Amendment,. See Saul Cornell & Nathan DeNino, A Well Regulated Right: The Early American Origins of Gun Control, 73 Fordham L. Rev. 487, 502 (2004). State regulations prohibiting the use of firearms on certain occasions and in certain locations also existed in 1785. See 1785 N.Y. Laws 152. After the War of 1812, a number of states enacted laws against the practice of carrying concealed weapons. Id. at 506. By 1820, New York Governor DeWitt Clinton recognized that the carrying of concealed weapons threatened "an essential right of every free citizen"-- that is, the right to enjoy their liberty free from the fear created by this dangerous practice. Saul Cornell, The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearm Regulation, and The Lessons of History, 17 STNLPR 571, 585 (2006). The growing urbanization in New York, as well as the increased availability and lower cost of readily concealable firearms, and their increased efficiency, resulted in attempts, like the Sullivan Law, to address these serious public safety concerns. See Tomari Decl. S(2) (Revolver Killings Fast Increasing: Legislative Measure to be Urged For Curbing the Sale of Firearms, (N.Y. Times, Jan. 30, 1911). See also Peter Duffy, 100 Years Ago, the Shot That Spurred New York's Gun-Control Law, (N.Y. Times, Jan. 24, 2011), available at http://cityroom.blogs.nytimes.com/2011/01/23/100-years-ago-the-shot-that-spurred-new-yorks-gun-control-law/?scp=1&sq=sullivan%20law&st=cse. The history of the enactment of the Sullivan Law is set out in the accompanying State Defendants' Statement Pursuant to Rule 56.1.

4

Law has regulated the possession and carrying of handguns in New York State for a

century. It does not regulate the carry or possession of rifles or shotguns ("long guns"),

unless they have been modified to make them readily concealable or constitute an assault

weapon. Penal Law § 265.00(3)(c); People v. Adams, 193 Misc.2d 78, 80 (N.Y. Sup. Ct.

2002); Matter of Alarie, 168 Misc.2d 329 (N.Y. Co. Ct.1996).

Now embodied in Penal Law § 400.00, the Sullivan Law requires a license to

carry a handgun in New York. Penal Law 400.00(1) establishes certain minimum

eligibility requirements for licenses, including that the licensee be over 21 years old, lack

of any conviction for a felony or serious offense, not suffer from a disqualifying mental

illness, and not have an order of protection issued against her or him.

Penal Law § 400.00(2) sets forth the types of handgun licenses available in New

York. New York expressly permits possession of handguns in the home *without a*

*showing of proper cause*. See Penal Law § 400.00(2)(a). New York also provides for

various job-related licenses. See id. at § 400.00(2)(b) to (e). Plaintiffs challenge only §

400.00(2)(f), which provides that a license to carry a concealed handgun in public is

available to an otherwise eligible licensee "when proper cause exists for the issuance

thereof." "Proper cause" is not defined in the statute, but has been defined through State

court decisions requiring that an applicant show a need for self-protection distinguishable

from that of the general public. See Bach v. Pataki, 408 F.3d 75, 80 (2d Cir. 2003);

Bando v. Sullivan, 290 A.D.2d 691, 693 (3d Dep't 2002); Bernstein v. Police Dept. of

City of New York, 85 A.D.2d 574 (1st Dep't 1981); FAC ¶ 25.[4]

---

[4] A full-carry application pursuant to Penal Law § 400.00(2)(f) must be made to a "licensing officer" in the
city or county where the applicant resides. Penal Law § 400.00(3). New York State licensing officers are
judges or justices of a "court of record," except in New York City and Nassau and Suffolk Counties, where

**Plaintiffs' Applications For "Full Carry" Licenses.**

Plaintiffs Eric Detmer, Johnnie Nance, and Anna Marcucci-Nance already have concealed carry licenses previously issued pursuant to 400.00(2)(f), but their licenses are limited to carrying weapons in connection with target shooting. They each sought to amend to "full carry" licenses. Plaintiffs Kachalsky and Nikolov sought a full carry permit as their first handgun license. Tomari Decl. Exhibits F - J. None of their applications set out any particularized self-defense concerns, and the applications of Detmer, Nance and Marcucci-Nance stated no self-defense rationale whatsoever: Nance and Marcucci-Nance sought full carry permits to teach NRA training courses and Detmer sought a full carry license in order to provide "the public service of enforcing laws". See Tomari Decl. Exhibits H - J.[5]

Plaintiffs' applications for full carry licenses were denied based upon findings by State Defendants that the applications failed to establish "proper cause" as required by New York State Penal Law § 400.00(2)(f). Tomari Decl. Exhibits N - R.

**Handgun Violence is a Public Health and Safety Concern in the State of New York**

New York has a vital interest in maintaining the safety and peace of its public areas. Firearm violence, and handgun violence in particular, are significant public health and safety concerns, and reasonable regulation of handguns is an important component of State and local law enforcement strategies. See Lunetta Decl. ¶¶ 7-16 (Describing interest

---

the licensing officer is the Police Commissioner or Sheriff. Penal Law § 265(10). Applicants for a license may appeal any determination pursuant to Article 78 of New York's Civil Practice Law and Rules. See, e.g., Matter of County of Westchester v D'Ambrosio, 244 A.D.2d 334 (2d Dep't 1997).

[5] State Defendants have moved to dismiss based upon the Plaintiffs' lack of standing. The applications of Plaintiffs' Nikolov and Kachalsky included generalized self-defense language, but were decided before the Second Amendment was held applicable to the states in McDonald. Plaintiffs Detmer, Nance and Marcucci-Nance did not raise self-defense as a concern in their applications. Tomari Decl. H - J (Plaintiffs' applications).

6

in limiting concealed carrying of handguns, particularly in New York City); Fazio Decl.
¶¶ 3-9; Cook Decl. ¶¶ 19, 20.

Since 1960, more Americans have been murdered with guns than were killed in
all the wars in the twentieth century combined. See David Hemenway, Private Guns,
Public Health, 45 (University of Michigan Press 2004). The toll of gun-related violence
is a daily fact of American life. For example, during the 1990s, firearms were used to kill
more than ninety people and wound about three hundred more per day on average. See
Hemenway, supra, 1. In 2007, there were 18,361 criminal homicides, of which 69% were
committed with guns, three quarters of those with handguns; emergency rooms treated
nearly 50,000 nonfatal gunshot injuries; and there were over 300,000 assaults and
robberies in which the perpetrator used a gun. See Cook Decl. ¶¶ 3-5. In New York
State alone, 481 people were killed with firearms in 2009 (300 in New York City[6] and
181 outside of New York City). United States Center for Disease Control, Nat'l Vital
Statistics Report (2007); http://www.cdc.gov/NCHS/data/nvsr/nvsr58/nvsr58_19.pdf;
Zimring & Hawkins, supra at 199.

Handgun-related crime is a serious problem for law enforcement. Although
handguns represent less than a third of all guns in the United States, of the 536 law
enforcement officers killed in the line of duty between 2000-2009 (including 15 in New
York State), 490 were killed with firearms and of those, handguns were used by the
perpetrator 73% of the time. Cook Decl. ¶ 5; Lunetta Decl. ¶¶ 10-13; Franklin E. Zimring
& Gordon Hawkins, Crime Is Not the Problem: Lethal Violence in America, 199 (New
York: Oxford University Press 1997); Fed. Bureau of Investigations, U. S. Dep't of

---

[6]Murder: New York City, N.Y. TIMES, available at http://projects.nytimes.com/crime/homicides/map (last
visited Jan. 19, 2010).

Justice, Law Enforcement Officers Killed and Assaulted, tables 1 and 27,

http://www2.fbi.gov/ucr/killed/2009/data/table_01.html. Every New York City Police

officer who has been killed in the line of duty since 2005 has been killed with a handgun.

Lunetta Decl. ¶ 10. Increased carrying of handguns would render common police

activities like patrols and car stops more dangerous as well. Lunetta ¶¶ 11-16.

The handgun is regulated because it is particularly subject to misuse. More than

75% of all gun killings involve a handgun, perhaps because handguns are small, easy to

carry and conceal, and deadly at short range. Zimring & Hawkins, Crime Is Not the

Problem: Lethal Violence in America, supra, Chapters 1, 3 and 7; Zimring & Hawkins,

The Citizen's Guide to Gun Control, New York, supra, at Chapter 5, p. 38. "Most

firearms assaults and almost all firearms robberies take place outside the offender's home,

so that using a firearm in crime requires transporting it outside the home." Zimring Decl.

¶ 6. It has been reported that 86% of firearms used in all assaults were handguns and 96%

of firearms robberies were committed with handguns, at least in part because of the

ability to carry guns to crime sites without detection. Zimring Decl. ¶ 8 citing National

Violence Commission survey of crime in ten large cities; Cook Decl. ¶ 17.

Moreover, handguns are closely linked to criminal violence. In 2005, over 94%

of gang-related homicides involved a handgun[7] and exposure to firearms has been linked

to gang-related youth violence and drug trafficking. Nat'l Inst. of Justice, U. S. Dep't of

Justice, Adolescents, Neighborhoods, and Violence: Recent Findings From the Project on

Human Development in Chicago Neighborhoods (2007), http://www.ncjrs.gov/pdffiles1/

---

[7] Nat'l Inst. of Justice, U. S. Dep't of Justice, Gun Violence, http://www.ojp.usdoj.gov/nij/topics/crime/gun-violence/welcome.htm.

nij/217397.pdf. See also Lawrence Rosenthal, supra, 1, 15-19, 25-33 (noting the link between gangs, drugs and guns and that decreased carrying of guns decreased crime as did targeted patrolling in drug hot spots).

High homicide and other gun violence rates are a peculiarly American problem. When compared with those in countries of comparable social and economic development, the homicide rate in the United States is up to fifteen times greater -- even when the rates of property and violent crime are the same. See Hemenway, supra, pp. 1-3. The difference, sometimes referred to as "American Exceptionalism," is that the prevalence of firearms in the United States makes firearms more readily available to criminals who are far more likely to use a firearm. Cook Decl., ¶ 16; Hemenway, supra, 1. The higher criminal use of handguns results in a much higher crime-related death rate. Thus the prevalence of firearms, even while not affecting the volume of violence, increases the lethality of crime. Cook Decl. ¶¶ 12-16; Hemenway, supra, 46-47.

Gun related homicides are not the only public health concern relating to gun violence. The toll on those injured by firearm violence is vast. For example, firearm-related injuries are one of the leading causes of spinal cord injury in the United States. Hemenway, supra, 4. The cost of treating handgun related injuries is an enormous financial burden, estimated at $2 billion dollars per year, which is often born by the government. Cook Decl. ¶¶ 6-7, citing P.J. Cook et al., The Medical Costs of Gunshot Wounds, J. AM. MED. ASS'N. 282(5), August 4, 1999, 447-454; Hemenway, supra, 4.

The public perception of danger is also another toll of gun violence. When people believe that more handguns are present in the community, they report feeling less safe and are more likely to arm themselves in response. Particularly among youths and

9

criminals, this "contagion effect" may result in more people carrying handguns, leading to an increase in handgun- related violence. See Hemenway, supra, 98-99, 116-17; Jeffrey Fagan et al., Social Contagion of Violence, The Cambridge Handbook of Violent Behavior and Aggression 688, 701-10 (Daniel J. Flannery et al. eds. 2007); Alfred Blumstein, Youth Violence, Guns, and the Illicit- Drug Industry, 86 J. Crim. L. & Criminology 10 (1995).

But perhaps the most crucial point is that, unlike in the private space of one's home, the increased presence of firearms in public spaces presents heightened and substantial risks to others. When guns are more prevalent in public, they necessarily become more available to those who should not have them. This in turn increases the difficulty and danger of police work. (Fazio Decl. ¶¶ 3-6; Lunetta Decl. ¶¶ 11-16). And more carrying loaded handguns in public unavoidably increases the risks of accidental discharges, injuries to bystanders, escalation of minor confrontations into gun battles, and thus threaten public order and safety. See People Yarbrough, 169 Cal. App. 4th 303, 314 (2008); People v. Marin, 795 N.E.2d 953, 958–59 (Ill. App. 2003). In short, when more people carry concealed handguns in public, both public safety and the crucial perception of public safety are adversely affected in ways that are not implicated by gun possession in the home. Roefaro Decl. ¶¶ 4,5; Miner Decl. ¶¶2-5; Hemenway, supra, 98-99.

## ARGUMENT

### A.    Standards For Summary Judgment

Summary judgment is appropriate if "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). O & G Indus., Inc. v. Nat'l R.R. Passenger Corp., 537 F.3d 153, 159 (2d Cir. 2008), cert.

10

denied, ___ U.S. ___, 129 S.Ct. 2043 (2009). Where the undisputed facts reveal an absence of sufficient proof on an essential element of a claim, any factual disputes with respect to other elements become immaterial and cannot defeat a motion for summary judgment. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Burke v. Jacoby, 981 F.2d 1372, 1379 (2d Cir. 1992), cert. denied, 508 U.S. 909 (1993). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact," i.e. one where the resolution would "affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original); Bickerstaff v. Vassar College, 196 F.3d 435, 445 (2d Cir. 1999); Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Caldarola v. Calabrese, 298 F.3d 156, 160 (2d Cir.2002); D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir.1998). Allegations and conclusory statements are insufficient to create issues of material fact and withstand summary judgment. Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000). Where both sides have moved for summary judgment, each motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration. Hotel Emps. & Rest. Emps. Union v. City of N.Y. Dep't of Parks & Recreation, 311 F.3d 534, 543 (2d Cir. 2002).

11

## POINT I

### NEW YORK PENAL LAW § 400.00 DOES NOT IMPLICATE, LET ALONE VIOLATE, THE SECOND AMENDMENT.

In <u>District of Columbia v. Heller</u>, 554 U.S. 570, 128 S.Ct. 2783 (2008), the

Supreme Court struck down District of Columbia laws which imposed a complete ban on

handgun possession, and held for the first time that the Second Amendment protects an

individual right to possess firearms for self-defense *in the home*. <u>Heller</u>, 128 S.Ct. at

2817, 2821. The Court held that "the right secured by the Second Amendment is not

unlimited," cannot be construed as "a right to keep and carry any weapon whatsoever in

any manner whatsoever and for whatever purpose," and noted that many existing gun

regulations are "presumptively lawful." <u>Id.</u> at 2816.

In its historical analysis of the Second Amendment, the Court cited with approval

numerous laws establishing prohibitions on carrying concealed weapons. <u>Heller</u> notes

that the "majority of the 19th century courts to consider the question held that

prohibitions on carrying concealed weapons were lawful under the Second Amendment

or state analogues," and found that such laws do not conflict with the right to posses a

handgun in the "hearth and home" for self-defense. <u>Id.</u> at 2817, 2821[8]

Plaintiffs insist that "[t]his case is not difficult" because the "Second Amendment

secures a right to carry arms for self-defense", and that "Defendants refuse to

_____

[8] In <u>McDonald v. City of Chicago</u>, __U.S. __, 130 S.Ct. 3020 (2010), the Supreme Court struck down a handgun ban similar to the one at issue in <u>Heller</u> and held that the Second Amendment right recognized in <u>Heller</u> is applicable to the states, but did not expand the right. The Court explained that, "[i]n <u>Heller</u>, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense...We therefore hold that the Due Process Clause of the Fourteenth Amendment incorporates the Second Amendment right recognized in <u>Heller</u>." <u>McDonald</u>, 130 S.Ct. at 3050. The Court repeated <u>Heller</u>'s language concerning the right's limited effect on firearms regulations, stating that its holding did not "cast doubt" on "longstanding regulatory measures." <u>Id.</u> at 3047. In both <u>Heller</u> and <u>McDonald</u>, the Court declined to establish an analytic framework for ensuing Second Amendment constitutional challenges, except noting that "rational basis" review, as well as a balancing test described by Justice Breyer his <u>Heller</u> dissent would not pertain. <u>Heller</u>, 128 S.Ct. at 2820-2821; <u>McDonald</u>, 130 S.Ct. at 3047.

acknowledge that carrying arms is a right" Pls. Mem. p. 6. Although the State

Defendants agree that this case is straightforward, the law should lead the Court in the

opposite direction urged by Plaintiffs. In Heller and McDonald, the Supreme Court could

have recognized a fundamental right to carry guns outside the home but did not. The

right recognized by the Court in those cases was explicitly limited to the home.

Furthermore, post-Heller cases overwhelmingly hold that the Second Amendment does

not preclude the regulation of guns inside and outside the home.

**A.      The Supreme Court Has Never Held that the Second Amendment
          Protects the Right to Carry Arms Outside the Home.**

In Heller, the Supreme Court held that a District of Columbia law that banned

handgun possession, including in the home, and required "residents to keep their lawfully

owned firearms 'unloaded and disassembled or bound by a trigger lock or similar

device,'" violated the respondent's Second Amendment right to keep and bear arms for

self-defense in the home. 128 S.Ct. at 2788. "[T]he District's ban on handgun

possession *in the home* violates the Second Amendment, as does its prohibition against

rendering any lawful firearm *in the home* operable for the purpose of immediate self-

defense". Id. at 2821-22 (emphasis added). Here, Plaintiffs not only want to extend the

Heller right outside the home but argue that the State may not regulate the carrying of

concealed weapons in public. Heller cannot support Plaintiffs' argument.

This conclusion is bolstered by the limiting language in Heller itself, which has

been recognized in subsequent lower court decisions:

> Like most rights, the right secured by the Second Amendment is not
> unlimited. From Blackstone through the 19th-century cases, commentators
> and courts routinely explained that the right was not a right to keep and carry
> any weapon whatsoever in any manner whatsoever and for whatever purpose.
> For example, the majority of the 19th-century courts to consider the question

13

> held that prohibitions on carrying concealed weapons were lawful under the
> Second Amendment or state analogues. Although we do not undertake an
> exhaustive historical analysis today of the full scope of the Second
> Amendment, nothing in our opinion should be taken to cast doubt on
> longstanding prohibitions on the possession of firearms by felons and the
> mentally ill, or laws forbidding the carrying of firearms in sensitive places
> such as schools and government buildings, or laws imposing conditions and
> qualifications on the commercial sale of arms.

128 S.Ct. at 2816-17. [9]

To alleviate any doubt as to the limited nature of its holding, the Court added a

footnote stating: "We identify these presumptively lawful regulatory measures only as

examples; our list does not purport to be exhaustive". Id. at 2817 at n.26. Indeed,

neither Heller nor McDonald disturbed Robertson v. Baldwin, 165 U.S. 275, 281-82

(1897), in which the Supreme Court expressly recognized that "the right of the people to

keep and bear arms (article 2) is not infringed by laws prohibiting the carrying of

concealed weapons."

Consistent with these admonitions, numerous courts considering the scope of

Heller have cautioned against construing it more broadly than the Court intended. See,

U.S. v. Chester, __ F.3d.__, 2010 WL 5396069 at *2 (4th Cir. December 30, 2010)

("Significantly, Heller recognized that the right to keep and bear arms, like other

Constitutional rights, is limited in scope and subject to some regulation"); U.S. v.

Skoien, 2010 WL 2735747, at *1 (7th Cir. 2010) (upholding provisions of 18 U.S.C. §

922 (g) (9) forbidding a convicted domestic violence misdemeanant from possessing

firearms in order to advance state interest in avoiding armed mayhem); Peruta v. San

Diego, 2010 WL 5137137 at * 4 (S.D.Cal. December 10, 2010) (the Second Amendment

right is not unlimited and not a right "to keep and carry any weapon whatsoever in any

---

[9] The limiting language in Heller has been referred to as its "famous passage". See Nordyke v. County of
Alameda et al., 563 F.3d 439 (9th Cir. 2009).

14

manner whatsoever and for whatever purpose"); United States v. Hart, 2010 WL 299001
at *3 (D. Mass. July 30, 2010) ("Heller does not hold, or even suggest, that concealed
weapons laws are unconstitutional"); Gonzales v. Village of West Milwaukee, 2010 WL
1904977 (E.D.Wis. May 11, 2010) (Supreme Court did not hold that the Second
Amendment protects carrying guns outside the home); Heller v. District of Columbia,
698 F.Supp.2d 179, 192-93, 195 (D.D.C. March 26, 2010) ("Heller II") (Revised District
of Columbia regulations are constitutional); United States v. Masciandro, 648 F.Supp.2d
779,  788 (E.D.Va. 2009) ("[t]he Supreme Court's holding should not be read by lower
courts as an invitation to invalidate the existing universe of public weapons regulations");
State of Illinois v. Dawson, 2010 Ill.App. LEXIS 863 at *19 (August 18, 2010) (Heller
specifically limited its ruling to interpreting the Amendment's protection of the right to
possess handguns in the home, not the right to possess handguns outside the home in case
of confrontation); Williams v. State, 982 A.2d 1168, 1172 (Md. App. 2009) (defining
"the right articulated in Heller" as "the right to keep and bear arms in the home for the
purpose of immediate self-defense."), aff'd, 2011 WL 13746, at *8 (Md. 2011) (holding
that the Second Amendment was inapplicable to a state statute that expressly permitted
home possession).[10]

---

[10] Numerous courts have reached similar conclusions. See also Mack v. U.S., 6 A.3d 1224, 1235-37 (D.C. 2010) (noting that it was neither "clear" nor "obvious" that the Second Amendment extended to weapons carried "outside the home" or to concealed weapons); Riddick v. U.S., 995 A.2d 212, 222 (D.C. 2010) ("what assuredly is not 'clear' and 'obvious' from [Heller] is that it dictates an understanding of the Second Amendment which would compel the District to license a resident to carry and possess a handgun outside the confines of his home, however broadly defined.")(quoting Sims v. United States, 963 A.2d 147, 150 (D.C. 2008)); State v. Knight, 241 P.3d 120, 133 (Kan. Ct. App. 2010) (endorsing the State's argument "that Heller [must] be read narrowly, only applying to 'absolute prohibitions of handguns held and used for self-defense in the home'" and stressing that "[t]he Supreme Court's decision [in Heller] turned solely on the issue of handgun possession *in the home*" and that "the Court was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes"); Dorr v. Weber, 2010 WL 197643 at *8 (N.D. Iowa, May 18, 2010 ("Robertson remains the law, and "a right to carry a concealed weapon under the Second Amendment has not been recognized to date."); U.S. v. Hart, No. 09-10376-WGY, 2010 WL 2990001, at *3 (D. Mass. July 30, 2010) (holding that "it was not a violation of

**B.**   **Penal Law § 400.00(2)(f) Regulates But Does Not Ban Concealed Carrying of Handguns and Thus Does not Violate or Even Implicate the Core Second Amendment Right to Possess Handguns in the Home for Self Defense.**

Plaintiffs cite no federal case which establishes a fundamental right to carry

weapons outside the home. See Pls. Mem. pp. 7-13. Furthermore, Plaintiffs admit – as

they must – that "*concealed* carrying may be banned" (Pls. Mem. at 11), but argue, based

on a strained interpretation of the 19th Century *state* court cases mentioned in Heller, that

such a rule is "conditioned on the allowance of open carrying." Id. at 11-12. Plaintiffs

are wrong.

First, Heller never conditioned the presumptive lawfulness of bans on concealed

carrying of firearms on the recognition of an unrestricted right to carry a gun openly.

Plaintiffs cite no post-Heller case that has imposed such a condition. Second, and

importantly, this case is *not* about a ban on concealed carrying – New York simply

requires the showing of "proper cause" before a permit for such use may be issued. New

York's law is constitutional because it does not ban handguns in the home, nor does it ban

handguns in public. Plaintiffs' assertion that the Second Amendment confers an

unbridled right to carry concealed guns outside the home far exceeds the Heller holding.

---

[defendant's] Second Amendment rights to stop him on the basis of the suspicion of a concealed weapon" outside his home, and implicitly rejecting the argument that "th[e] [Second Amendment] right extends to the possession of concealed handguns outside one's home."); Swait v. University of Nebraska, 2008 WL 5083245, at *3 (D. Neb. 2008) ("States can prohibit the carrying of a concealed weapon without violating the Second Amendment"); U.S. v. Hall, 2008 WL 3097558 (S.D.W.Va. 2008)(Prohibition against carrying a concealed weapon without a permit does not violate the Second Amendment); United States v. Marzzarella, 614 F.3d 85, 92 (3d Cir. 2010) (Following Heller and McDonald "the Second Amendment protects the right of law-abiding citizens to possess [handguns] for self-defense in the home"); People v. Dykes, 209 P.3d 1, 49 (Cal. 2009) (Heller recognized a limited right to keep and bear arms for personal protection in the home); People v. Perkins, 62 A.D.3d 1160, 1161 (2d Dep't 2009) (Heller confers a right to keep and bear arms as a means of self-defense within the home).

16

In fact, New York does not have a gun ban or even a handgun ban.[11]  With certain limitations not relevant here, it permits the possession and carrying of long guns and the possession and carrying of handguns in the home or in connection with work with no showing of "proper cause."  Penal Law § 400.00(2).  It also permits the concealed carrying of handguns where there is a need for self-protection distinguishable from that of the general public.  Bach v. Pataki, 408 F.3d at 80.  Thus, the statute reflects a fair legislative determination about regulation of carrying concealed handguns in public places, and it enlists the reasonable assessments of local officials.

In reviewing the constitutionality of a statute, "courts must accord substantial deference to the predictive judgments" of the legislature. Turner Broadcasting Sys., Inc. v. FCC, 520 U.S. 180, 195 (1997) (quoting Turner Broadcasting Sys., Inc. v. FCC, 512 U.S. 622, 665 (1994)). "Local officials, by virtue of their proximity to, and their expertise with, local affairs, are exceptionally well qualified to make determinations of public good 'within their respective spheres of authority.'" Richmond v. J.A. Croson Co., 488 U.S. 469, 544 (1989) (quoting Hawaii Housing Authority v. Midkiff, 467 U.S. 229, 244 (1984)). The federal judiciary is not to assume "responsibility for making the difficult policy judgments that state officials are both constitutionally entitled and uniquely qualified to make". Lewis v. Casey, 518 U.S. 343, 385 (1996). See Heller II, 698 F.Supp2d at 191 (legislative bodies are "far better equipped than the judiciary to amass and evaluate the vast amount of data bearing upon legislative questions"); cf U.S. v. Rybar, 103 F.3d 273, 294 n. 6 (3d Cir. 1996) (Alito, J., dissenting)(federal judges "are not experts on firearms, machine guns . . .or crimes in general").

---

[11] For example, in 2010 Westchester County, where Plaintiffs made their applications, issued 610 carry licenses, of which 139 were unrestricted or full carry licenses. Bellom Decl. ¶ 19.

17

Case 7:10-cv-05413-CS Document 43 Filed 02/23/11 Page 31 of 54

Therefore, unless and until the Supreme Court rules otherwise, this Court should

not overturn a century-old law regarding the carrying of guns outside the home – a

regulation that undeniably has an extraordinary impact on the safety and well-being of

New York citizens and law enforcement officials alike. See Lunetta Decl. ¶¶ 7-16; Fazio

Decl. ¶¶ 3-9; International Association of Chiefs of Police, Taking a Stand: Reducing

Gun Violence in Our Communities (2007), 26; Cook Decl. ¶¶ 18-36; Philip J. Cook et al.,

Criminal Records of Homicide Offenders, J. AM. MED. ASS'N, 294(5):598-601 (2005);

Steven F. Messner, et al., Policing, drugs, and the Homicide Decline in the 1990s in New

York City, Criminology 45:385-413 (2007).

That the Second Amendment does not protect the right to carry a concealed

handgun in public disposes of this case.[12] As the Maryland Supreme Court recently

stated, "[i]f the Supreme Court . . . meant its holding [in Heller and McDonald] to extend

beyond home possession, it will need to say so more plainly." Williams v. State, --- A.3d

---, 2011 WL 13746, at *8 (Md. 2011). Where the public safety stakes are so very high,

---

[12] Even if the Second Amendment does provide a right to carry outside the home (and it does not), the Supreme Court has never held that right to be fundamental to the principles of ordered liberty, and thus applicable to the states. The plurality opinion in McDonald dispels any doubt as to the limits of Heller and the nature and scope of the fundamental right afforded by the Second Amendment: "In Heller, we held that the Second Amendment protects the right to possess a handgun *in the home for the purpose of self-defense*." 130 S.Ct. at 3050 (emphasis added); see also Heller, 128 S. Ct. 2783, 2821 (stressing that the Second Amendment protects the "right of law-abiding, responsible citizens to use arms in defense *of hearth and home.*") (emphasis added). It was *this* right, and this right alone, that is "fundamental from an American perspective," McDonald at 3046, and would, thus, henceforth apply to the States under the incorporation doctrine. Id. at 3050. It is not, of course, uncommon for the Supreme Court to declare certain aspects of rights protected under a specific Amendment applicable to the states, while leaving other aspects outside the scope of the incorporation. See McDonald, 130 S. Ct. at 3035 n.13 (enumerating "the Bill of Rights protections [that] remain unincorporated."); Alexander v. Louisiana, 405 U.S. 625, 633 (1972) (holding that the Fifth Amendment requirement of indictment by grand jury in the case of felonies is not applicable to the states, even if other aspects of the Fifth Amendment were); Apodaca v. Oregon, 406 U.S. 404 (1972) (holding that the right to unanimity in a federal jury trial granted by the Sixth Amendment does not apply to the states, even if other aspects of the Sixth Amendment were); Robinson v. California, 370 U.S. 660 (1962) (holding that only the Eighth Amendment's prohibition on cruel and unusual punishment applies to the states).

18

this Court should not get ahead of the Supreme Court's studiously cautious Second

Amendment jurisprudence.  See id.; cf. Thomas L. Fowler, Law Between the Lines, 25

Campbell L.Rev. 151, 178 (2003) ("[W]hen express, applicable precedent exists, lower

courts should not engage in predicting how the Supreme Court will rule on the matter in

the future.").

## POINT II

### EVEN IF THE COURT FINDS THAT PENAL LAW § 400.00(2)(f) IMPLICATES A SECOND AMENDMENT RIGHT, PLAINTIFFS' CHALLENGE FAILS BECAUSE NEW YORK'S STATUTE CAN WITHSTAND ANY LEVEL OF SCRUTINY.

Plaintiffs' failure to establish a fundamental right to carry concealed firearms in

public should end this Court's inquiry.  See Heller v. District of Columbia, 698 F.Supp.2d

179, 187-88 (D.D.C. 2010)("Heller II")("to assess the constitutionality of each of the

challenged provisions, the court will begin by determining whether the provision at issue

implicates the core Second Amendment right. If it does not, then the court will uphold the

regulation.");  U.S. v. Walker, 709 F.Supp.2d 460 (E.D. Va. 2010).  But were this Court to

so extend Heller, it must adopt a proper standard of review.

Plaintiffs unpersuasively argue that the Court should apply First Amendment

jurisprudence to the Second Amendment and that Penal Law § 400.00(2)(f) must be

subject to strict scrutiny.  Following Heller, though, the overwhelming majority of courts

have applied intermediate scrutiny to Second Amendment claims. See, e.g., United

States v. Skoien, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc); Marzzarella, 614 F.3d

at 97; United States v. Walker, 709 F. Supp. 2d at 466; United States v. Pettengill, 682 F.

Supp. 2d 49, 55 (D. Me. 2010); United States v. Radencich, 2009 WL 127648, at *4

(N.D. Ind. Jan. 20, 2009); Heller II, 698 F.Supp.2d at 181; Peruta, v. County of San

Diego, 2010 WL 5137137 at \*8. Thus, even if this Court concludes that the challenged

statute implicates a fundamental or "core" Second Amendment right, strict scrutiny is

inapplicable, and reasonable regulation or intermediate scrutiny is appropriate.[13]

Furthermore, regardless of the level of scrutiny, because Penal Law § 400.00(2)(f)

advances a compelling state interest of limiting handgun violence and is narrowly tailored

to achieve that end, it would pass muster under any level of scrutiny.

## A.    Strict Scrutiny Analysis is Inapplicable Here.

Plaintiffs' arguments in favor of strict scrutiny fail for several reasons. As an

initial matter, Heller itself is inconsistent with subjecting handgun regulations to strict

scrutiny:

> "[A]s the Heller dissent and numerous other courts and legal scholars have
> pointed out, a strict scrutiny standard of review would not square with the
> majority's references to "presumptively lawful regulatory measures" such as
> laws prohibiting firearms possession by felons and the mentally ill, forbidding
> the carrying of firearms in schools or government buildings and imposing
> conditions and qualifications on the commercial sale of arms. Heller, 128
> S.Ct. at 2851 (Breyer, J., dissenting); see also Skoien, 587 F.3d at 812 (noting
> that the court did "not see how the listed laws could be 'presumptively'
> constitutional if they were subject to strict scrutiny"); Marzzarella, 595
> F.Supp.2d at 604 (observing that "the Court's willingness to presume the
> validity of several types of gun regulations is arguably inconsistent with the
> adoption of a strict scrutiny standard of review"); Dennis A. Henigan, The
> Heller Paradox, 56 UCLA L. REV. 1171, 1197-98 (2009) (stating that "the
> Heller majority ... implicitly rejected strict scrutiny" by describing certain gun
> control measures as presumptively lawful); Carlton F.W. Larson, Four
> Exceptions in Search of a Theory: District of Columbia v. Heller and Judicial
> Ipse Dixit, 60 HASTINGS L.J. 1371, 1379 (2009) (opining that "it is doctrinally
> impossible to conclude that strict scrutiny governs Second Amendment

---

[13]    While the majority of federal courts considering Second Amendment challenges in the wake of Heller
have applied some level of heightened scrutiny (but not strict) this Court must take note of the fact that
state courts reviewing these challenges over the past century, have applied what is termed the "reasonable
regulation" test where courts consider whether the challenged statute is a reasonable limitation of the right
to bear arms. State v. Hamdan, 665 N.W.2d 785, 800 (Wis. 2003). State Defendants respectfully refer this
Court to the discussion of the reasonableness test set out in the brief of *Amicus Curiae* Brady Center to
Prevent Gun Violence for a complete analysis. Reasonable regulation, as the method by which gun
regulations have traditionally been challenged should be considered here for the reasons set forth in the
Brady Center brief.

20

claims, while also upholding" the presumptively lawful exceptions specified
in Heller ). Therefore, the court rejects the plaintiffs' assertion that strict
scrutiny is warranted with respect to the challenged laws."

Heller v. District of Columbia, 698 F.Supp.2d 179, 187 (D.D.C. 2010)("Heller II").

Hence, even if Penal Law § 400.00(2)(f) implicated a "core" right protected by the

Second Amendment, it would not "invariably" be subject to a strict scrutiny. Peruta v.

County of San Diego, 2010 WL 5137137 at *7. In fact, the court in Peruta, which upheld

a California "good cause" requirement, which is similar to New York's "proper cause"

provision, noted that it was unaware of any court which had applied strict scrutiny, or

any form of heightened scrutiny, "to regulations that do not touch on the 'core' Second

Amendment right: possession in the home". 2010 WL 5137137 at *8.[14]

## B.     Courts Have Overwhelmingly Applied Intermediate Scrutiny in Regard to Second Amendment Challenges.

Federal courts examining Second Amendment challenges have almost uniformly

employed intermediate scrutiny. Under this test, a statute passes muster if there is a

"reasonable fit" between the challenged regulation and a "substantial" government

objective. Chester, 2010 WL 5396069 at *8; U.S. v. Skoien, 2010 WL 2735747, at *3;

United States v.Marzzarella, 614 F.3d 85, 97 (3rd Cir. 2010).

In this regard, Peruta v. San Diego, 2010 WL 5137137 (S.D.Cal. December 10,

2010) is again instructive. At issue there was the constitutionality of California's

concealed weapons licensing statute which, analogously to New York, provides that an

individual seeking a permit to carry a concealed handgun in public had to meet

---

[14] Furthermore, in trying to graft to First Amendment rules onto the judicial assessment of weapons
regulation, and thereby increase the level of scrutiny, Plaintiffs ignore the fact that lower levels of scrutiny
are often applied even in the First Amendment context. See Peruta, 2010 WL 5137137 at *7; United States
v. O'Brien, 391 U.S. 367, 377 (1968); Int'l Soc'y for Krishna Consciousness v. Lee, 505 U.S. 672, 678-79
(1992); Cornelius v. NAACP Legal Defense & Ed. Fund, Inc., 473 U.S. 788, 806 (1985)(applying a
reasonableness standard); United States v. Smith, 2010 WL 3743842, at *8 (S.D.W.Va. Sept.20, 2010).

21

mandatory eligibility requirements and "demonstrate good cause," defined as "a set of circumstances that distinguishes the applicant from other members of the general public and causes him or her to be placed in harm's way. Under the California statute, generalized fear for one's personal safety is not, standing lone, considered "good cause". Peruta, 2010 WL 5137137 at *1.

In upholding the California provision under an intermediate scrutiny test, the court observed that the "core" Second Amendment right was "possession in the home" and noted: "[U]nlike possession in the home, carrying a concealed firearm in public presents a 'recognized threat to public order' and poses an imminent threat to public safety'". Id. at *8. Other cases applying intermediate scrutiny to the Second Amendment right recognized in Heller include Heller II, supra, (remand proceedings upholding the District of Columbia's revised firearm regulations under intermediate scrutiny); United States v. Miller, 604 F. Supp. 2d 1162 (W.D.Tenn 2009)(intermediate scrutiny applied to uphold penal statute relating to possession *in the home* by a felon); United States v. Schultz, 2009 U.S. Dist. LEXIS 234 (N.D. Ind. 2009); United States v. Radencich, 2009 WL 12648 (N.D. Ind. Jan 20, 2009); United States v. Walker, 2010 WL 1640340 (E.D. Va. 2010); and United States v. Tooley, 2010 WL 2842915 (S.D.W.Va. May 4, 2010).

Given the weight of the authority applying intermediate scrutiny -- even in cases that implicate core second Amendment rights (which this case does not) --  Plaintiffs' demand here for strict scrutiny is meritless. Penal Law § 400.00(2)(f) plainly satisfies intermediate scrutiny because there is a "reasonable fit" between the "good cause" provision and substantial government objectives.[15]

---

[15] Even using a First Amendment analysis, as plaintiffs urge, New York Penal Law 400.00(2)(f) stands as a constitutional "content-neutral" time, place, and manner regulation.  Time, place and manner regulations

## C. **Because New York Has a Compelling Interest in Public Safety and the Challenged Statute is Adequately Tailored to Advance that Interest, It Would Survive Any Level of Heightened Scrutiny.**

Plaintiffs urge a "strict scrutiny" test. Strict scrutiny requires that a law be

narrowly tailored to serve a compelling governmental interest. Abrams v. Johnson, 521

U.S. 74, 91 (1997); Clark v. Jeter, 486 U.S. 456, 461 (1988); Heller v. District of

Columbia, 698 F.Supp.2d 179, 185 (D.D.C. 2010). New York has a clear and compelling

state interest in limiting gun violence and, in particular, addressing the special risks posed

by the presence of handguns in public. In support of such interests, federal jurisprudence

recognizes the experience and expertise of state and local authorities in fighting crime.

U.S. v. Lopez, 514 U.S. 549, 583 (1995)(Kennedy, J., concurring); United States v.

Rybar, 103 F.3d 273, 294 n. 6 (3rd Cir. 1996) (Federal judges "are not experts on

firearms, machine guns, or crime in general"). State and local governments have

knowledge and insight into local problems and their appropriate solutions. Thus, the

judgment of whether and how to regulate firearms should, wherever possible, be made by

the legislature, not the judiciary. Heller at 128 S. Ct at 2817, and 2860-61 (Breyer, J.,

dissenting)(citing Los Angeles v. Alameda Books, Inc., 535 U.S. 425, 440 (2002)

---

do not ban certain conduct outright, but rather place limits in terms of appropriate physical location and
method of expressing that conduct. City of Los Angeles v. Alameda Books, Inc., 535 U.S. at 434; City of
Renton v. Playtime Theatres, Inc., 475 U.S. 41, 47-49. In order to be deemed "content- neutral," a
regulation must be aimed at the secondary effects of the conduct at issue on the surrounding community,
and not simply the conduct itself. City of Los Angeles, 535 U.S. at 434; Renton at 475 U.S. 47-49.
Permissible secondary effects that a regulation might address include crime rates, property values, and the
quality of a city's neighborhoods. Ibid. Once a regulation has been deemed a "content-neutral" time, place,
and manner regulation, the regulation is acceptable as long as it serves a "substantial governmental interest"
and does not unreasonably limit the alternative avenues of conduct. Clark v. Community For Creative
Non-Violence, 468 U.S. 288, 293 (1984); Renton 475 U.S. at 47, 106 S.Ct. at 928. A regulation does not
impermissibly limit the alternative avenues of conduct if it allows a "reasonable opportunity" for that
conduct; the regulation need not ensure that any particular individual will be allowed to perform the
conduct at issue. Young v. American Mini Theatres, Inc., 427 U.S. 50, 71 (1976).

23

(plurality opinion) ("[W]e must acknowledge that the Los Angeles City Council is in a better position than the Judiciary to gather an evaluate data on local problems")).

>    1.    **Penal Law § 400.00(2)(f) Advances a Compelling State Interest and is Narrowly Tailored to Achieve Its Purpose.**
>
>         a.    Courts Have Recognized a Compelling State Interest in Promoting Public Safety.

Courts have found substantial and compelling government interests in the prevention of crime, see Heller II, 698 F.Supp.2d at 190 -191; United States v. Salerno, 481 U.S. 739, 748-50 (1987) (Government's interest in preventing crime is compelling and can in some circumstances outweigh an individual's liberty interest); Schall v. Martin, 467 U.S. 253, 264 (1984)("The 'legitimate and compelling state interest' in protecting the community from crime cannot be doubted."), and preserving the quality of urban life, see Buzzetti v. City of New York, 140 F.3d 134, 140 (1998); Renton, 475 U.S. at 48, 50. More specifically, the regulation of loaded handguns in public areas has been deemed a compelling government interest. U.S. v. Masciandaro, 648 F.Supp.2d at 789 (Government has a compelling interest in promoting safety in public parks and statute preventing carrying loaded guns in cars in public parks survives any level of scrutiny).

>         b.    Courts Have Recognized that the Government Has a Public Safety Interest in Regulating and Restricting the Carrying of Concealed Handguns in Public.

Plaintiffs wrongly assert that there can be no state interest in regulating the carrying of handguns, arguing that "[t]he desire for self-defense, regardless of Defendants' opinions on the subject, is all the 'proper cause' required of Plaintiffs by the Second Amendment to carry a firearm." (Pls. MSJ Mem. p. 18). This view is myopic.

24

In <u>Peruta v. San Diego</u>, <u>supra</u>, analyzing a statute similar to New York's under

intermediate scrutiny, the Court recognized the government's interest in protecting the

interests of the public from the risks presented by the concealed carrying of firearms:

> In this case, Defendant has an important and substantial interest in public
> safety and in reducing the rate of gun use in crime. In particular, the
> government has an important interest in reducing the number of concealed
> weapons in public in order to reduce the risks to other members of the public
> who use the streets and go to public accommodations. The government also
> has an important interest in reducing the number of concealed handguns in
> public because of their disproportionate involvement in life-threatening crimes
> of violence, particularly in streets and other public places. [The California
> statute] relates reasonably to those interests. Requiring documentation
> enables [the State] to effectively differentiate between individuals who have a
> *bona fide* need to carry a concealed handgun for self-defense and individuals
> who do not.

2010 WL 5137137 at *8 (citations omitted). Carrying concealed loaded handguns in

public affects the public peace and the sense of safety and the security of others, altering

"the public environment for all users". Zimring Decl. ¶¶ 12-14.

As in <u>Peruta</u>, the New York statute does not impose a complete ban on carrying

concealed weapons in public, but instead, enables the State to "effectively differentiate"

between those individuals who have a genuine need to carry a concealed handgun, and

those who do not. This distinction is a "quintessential matter" of public safety and

regulation. 2010 WL 5137137 at *8. Another California court recently emphasized,

> [u]nlike possession of a gun for protection within a residence, carrying a
> concealed firearm presents a recognized threat to public order, and is
> prohibited as a means of preventing physical harm to persons other than
> the offender. A person who carries a concealed firearm on his person or in
> a vehicle, which permits him immediate access to the firearm but impedes
> others from detecting its presence, poses an imminent threat to public
> safety.

People Yarbrough, 169 Cal. App. 4th 303, 314 (2008).[16]

---

[16] Other courts have similarly stressed the importance of state's interest in regulating the public
presence of handguns. Such weapons can lead to

In this context, it is "beyond dispute that public safety is an important – indeed, a compelling governmental interest." See, Heller II, 698 F. Supp 2d at 192-93, 195(there can be no doubt "that the goal of . . . preventing armed mayhem is an important governmental objective.").

      c.      Penal Law § 400.00(2)(f) Restricts the Concealed Carrying of Handguns to Prevent Crime in a Way That is Narrowly Tailored to Advance the State's Law Enforcement and Public Safety Interests.

Penal Law § 400.00(2)(f) is narrowly tailored to permit the carrying of handguns in public while advancing the compelling state interests in public safety and crime control. Concealed handguns in public create heightened public safety concerns. Those who seek to use guns in non-domestic crime must obviously take the gun outside of their homes, and thus Penal Law § 400.00(2)(f) plays a crucial role in law enforcement efforts. Zimring Decl. ¶¶ 6-8; see also Cook Decl. ¶¶ 19, 20, citing Philip J. Cook, et al., Underground Gun Markets, Econ. J. (November, 2007); Philip J. Cook & Jens Ludwig, The Social Costs of Gun Ownership, J. Pub. Econ 90 379-391 (2006); Anthony A. Braga

---

accidents with loaded guns on public streets or the escalation of minor public altercations into gun battles or, as the legislature pointed out, the danger of a police officer stopping a car with a loaded weapon on the passenger seat. [T]hus, otherwise "innocent" motivations may transform into culpable conduct because of the accessibility of weapons as an outlet for subsequently kindled aggression. [T]he underlying activity of possessing or transporting an accessible and loaded weapon is itself dangerous and undesirable, regardless of the intent of the bearer since it may lead to the endangerment of public safety. [A]ccess to a loaded weapon on a public street creates a volatile situation vulnerable to spontaneous lethal aggression in the event of road rage or any other disagreement or dispute. The prevention of the potential metamorphosis of such "innocent" behavior into criminal conduct is rationally related to the purpose of the statute, which is to enhance public safety. Because the legislature has a compelling interest in preventing the possession of guns in public under any such circumstances, the statute is reasonably related to the legislature's purpose of "mak[ing] communities in this state safer and more secure for their inhabitants."

People v. Marin, 795 N.E.2d 953, 958–59 (Ill. App. 2003)(citations omitted), app. den'd, 206 Ill.2d 635 (2003); People v. McGee, 341 Ill.App.3d 1029, 1037 (Ill.App. 1 Dist. 2003)(Statute banning carrying loaded weapon in car constitutional because the conduct poses "inherent dangers to police officers and the general public. This is so even if the person carrying his weapon has no criminal objective."); see also Marshall v. Walker, 958 F.Supp. 359, 365 (N.D. Ill. 1997); People v. West, 422 N.E.2d 943, 945 (Ill.App. 1981)).

26

et al., Policing Problem Places: Crime Hot Spots and Effective Prevention (2010).

Targeted patrol against illicit gun carrying has been shown in various studies to be effective in fighting crime nationwide and in New York City. Cook Decl. ¶¶ 19, 20; Lunetta Decl. ¶¶ 15-16; Rosenthal, supra, 25-33. If most adults in New York were to qualify to carry handguns in public, police would be less able to target the illegal use of guns, such as their use in drug sales. See Fazio Decl. ¶ 8; Lunetta Decl. ¶ 12-16. In addition, more resources will be required to address the higher risks to police and public safety posed by greater prevalence of concealed weapons. Lunetta Decl. ¶¶ 13-16.[17] Additionally, New York has an interest in reducing the availability of guns to criminals and youths. Limiting New York's ability to regulate the presence of concealed handguns in public will increase the availability of handguns to these groups. Cook ¶¶ 12-13.[18]

In contrast to Plaintiffs' assertion that "the data overwhelmingly supports the conclusion that the Second Amendment secures a beneficial policy", the increased ownership of guns has not been shown to deter violent crime. Cook Decl. ¶¶ 8-13, 23-26. The "more guns, less crime" theory advanced by Plaintiffs has been discredited by the

[17] Research reveals that whether a violent criminal will use a gun in a crime is closely linked to the availability of guns and that the use of a gun in a crime increases the lethality, i.e., the death rate from that crime. Cook Decl., ¶¶ 12-16; Hemenway, supra, at 50-53. See also Rosenthal, supra, at 33 (reduced crime rates in New York City linked to reduced carrying of weapons); Matthew Miller, David Hemenway & Deborah Azrael, State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003, SOC. SCI. & MED., Vol. 64, 3 (2007)(States with lower firearm availability experience lower levels of homicides after controlling for other factors commonly associated with homicide) (available at http://dx.doi.org/10.1016/j.socscimed.2006.09.024).

[18] Where guns are more prevalent, it is easier for youths and criminals to obtain guns, including by thefts from people, homes and vehicles, loans from others, and off-the-books sales, which are easier to arrange and may be cheaper in those jurisdictions. Cook Decl. ¶¶ 12, 13. The availability of firearms to criminals and juveniles tends to be lower in states like New York, with relatively tight controls, even despite trafficking from other areas with less restriction and more gun prevalence. Cook Decl. ¶ 12-17, 22. Where guns are more strictly regulated, the prevalence of guns and availability of guns to criminals, tends to be lower and this is true in New York and in Westchester County, the county where all the individual Plaintiffs reside.

27

National Research Council of the National Academies. Cook Decl. ¶¶ 23-26. See also

Ian Ayers and John J. Donohue III, Shooting Down the "More Guns, Less Crime"

Hypothesis, 55 Stan. L. Rev. 1193 (April 2003); Ian Ayers and John J. Donohue III, The

Latest Misfires In Support of the "More Guns, Less Crime" Hypothesis, 55 Stan. L. Rev.

1371 (April 2003); In fact, an increase in gun ownership has no deterrent effect on violent

crime but the prevalence of firearms does increase the death rate from such crimes as

assault and robbery (e.g., the criminal homicide rate). Cook Decl. ¶¶ 12-16.

Plaintiffs also wrongly argue that the state has no legitimate interest in limiting

concealed carrying of handguns in public by "law abiding" citizens, asserting that

performing "background checks" and perhaps requiring completion of a training course is

the limit of the State's discretion as to who may carry guns. Pls. MSJ Mem. p. 25.

Almost all states require a license or permit to carry a concealed handgun in

public. Thirty-three states require that a license be issued to any applicant who meets

certain minimum requirements; these jurisdictions are sometimes referred to as "shall

issue" states. Cook Decl. ¶ 21. In states like New York, referred to as "may issue" states,

the issuing authority has some discretion in granting a license. Cook Decl. ¶ 21.

Plaintiffs essentially argue that New York must become a "shall issue" state, i.e., upon a

showing that an applicant does not have prohibited conviction or mental illness condition,

a concealed-carry license must issue.

But New York's restrictions on carrying concealed handguns in public reflect an

attempt by the state to strike the right balance between public safety and the need to

permit certain individuals to defend themselves with a firearm outside the home when the

circumstances justify the attendant risks. Police receive extensive training on how and

when to use their guns. Civilians do not. The prospect of increased use of handguns on public streets by persons not trained on when and how to appropriately use them presents an undue risk of public danger. See Fazio Decl. ¶¶ 5-6;  Lunetta Decl. ¶ 10-15; People v. Marin,  supra, 795 N.E.2d at 958–59 (Discussing risk of accidents, escalation of minor altercations, and risk of gun violence in public).

Persons convicted of felonies or serious offenses are not the only persons who present a risk of misusing concealed handguns. People without a history of felony or violent misdemeanor convictions or mental health commitment may pose a risk of misuse because they become unstable, emotional, are carried away in a volatile situation, or mishandle a firearm in public. See Fazio Decl. ¶¶ 3-6, 9;  Lunetta Decl. ¶ 9, 13-14; People v. McGee, 341 Ill.App.3d at 1037.  In addition, background checks may not adequately identify those who will misuse guns. Denying licenses to carry concealed handguns in public only to those who cannot legally carry guns under federal (18 U.S.C. § 922) or state law (Penal Law § 400.00(1)) will not sufficiently  screen those who present an undue risk of misusing handguns. Cook Decl. ¶¶ 27-38; Lunetta Decl. ¶ 6, 8-13; Fazio Decl. ¶ 9. It is a myth that the vast majority of individuals who commit murder or serious crimes are career criminals who are prohibited from legal possession of firearms.  Cook Decl. ¶¶ 27-38.  For example, a 2005 study examined the criminal records of 884 individuals who committed homicide in the state of Illinois during 1990-2000.  Cook Decl. ¶ 29; Philip J. Cook et al., Criminal Records of Homicide Offenders, J. Am. Med. Ass'n., 294(5):598-601 (2005).  Only 42.6 percent of these homicide offenders had a prior felony conviction, indicating that even for the most serious form of criminal violence, homicides, the majority of offenders would likely have not been deemed

ineligible to legally posses firearms based upon prior criminal convictions, the major disqualifier for handgun purchases. Cook Decl. ¶ 29.

Professor Cook has demonstrated that most adults arrested for felony homicide charges in Westchester County in 2009, at the time of their arrests, had no disqualifying felony conviction (59%). The number was even lower for other counties analyzed. Cook Decl. ¶¶ 27-38. Similarly, Professor Cook examined those arrested for felonies in Westchester and New York State over a ten year period and found that at the time of their arrests, approximately two-thirds of those arrested for felonies had no disqualifying felony conviction. From these statistics, Professor Cook concludes that at the time of their arrests for felony homicide charges, that most adults arrested for felony homicide would not have been barred from carrying a concealed firearm if the only requirements for carrying were age and lack of a felony conviction. Cook Decl. ¶¶ 27-33.[19]

Furthermore, an investigation by the Washington Post revealed that "[l]egal purchase was the leading source of weapons used to kill police officers. In 107 slayings, the killers acquired their firearms legally." Cheryl W. Thompson, Guns Used to Kill Police Officers: Where They Come From and How They Get in the Hands of Criminals, Washington Post (November 21, 2010).[20] Even those authorized to purchase and carry handguns may present a risk of misuse of handguns. So, for example, police and public health advocates often support limits or reporting requirements on people purchasing

---

[19] A study of registered handgun owners in California found that prior conviction of misdemeanor crimes was associated with much higher (at least a 5-fold) risk for committing future crimes compared with handgun purchasers with no prior criminal history. Mona A. Wright & Garen J. Wintemute, Felonious or Violent Criminal Activity That Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors, J. Trauma 69(4):948-955 (2010). Mere history of arrest without having been convicted was associated with a 7-fold higher risk for subsequently being charged with felony or serious, violent misdemeanor crimes compared to those with no prior arrests. Id.

[20] Available at http://www.washingtonpost.com/wpdyn/content/article/2010/11/20/ AR2010112002865.html?nav=emailpage.

multiple firearms at one time, recognizing that such purchases, even if made by a person who passed a background check and thus meet Plaintiffs' definition of law abiding, may present a serious safety risk. See, e.g., International Association of Chiefs of Police, Taking a Stand: Reducing Gun Violence in Our Communities, 14 (2007); Hemenway, supra, 172, 175 (referring to efficacy of one-gun-a-month programs).

In light of the historic and troubling difficulty in designing systems that reliably identify individuals who present an undue risk if they carry firearms in public, the State of New York has made a reasonable judgment in declining to adopt a standard that requires the State to issue a license to anyone who meets minimum eligibility requirements. Instead, New York reasonably invests judges and other licensing officials with discretion to issue carrying permits when needed.[21]

Even under Plaintiffs' conception of the law, the challenged statute is sufficiently tailored to achieve its end. As Plaintiffs concede, "[t]he precedent is clear: the state may regulate the time, place and manner of carrying guns, but cannot completely abrogate the right." (Pls. Mem. p. 12). Penal Law § 400.00(2)(f) does not ban the carrying of handguns. In fact, three of the Plaintiffs in this case have limited licenses to carry handguns. See Tomari Decl. Exhibits H - J.

Penal Law 400.00(2)(f) is just one component a reasonable time, place, and manner regulation. Taken as a whole, the state licensing scheme permits people to have long guns and handguns in their homes, and to carry handguns in public if they have a

---

[21] In New York, law enforcement officials who consider applications for licenses to carry a concealed firearm may carefully consider the criminal history of applicants and determine if there is a legitimate self-protection need for a handgun. They are not mandated to issue a concealed carry license to anyone who would pass a background check as would be the case in a shall-issue state. Lunetta Decl. ¶ 2-9; Fazio Decl. ¶ 9; International Association of Chiefs of Police, Taking a Stand: Reducing Gun Violence in Our Communities, 14 (2007)(advocating that people with violent misdemeanors should be precluded from having guns).

31

demonstrated a need for self-defense. Considering the right recognized in Heller, and the

state's compelling interest in maintaining public safety and combating crime, New York's

regulatory framework strikes a wholly proper constitutional balance. U.S. v.

Masciandaro, 648 F.Supp.2d 779, 790 (E.D.Va. 2009)(holding that the challenged statute

did not place a substantial obstacle in the path of plaintiff's Second Amendment right to

use arms in defense of hearth and home but would withstand any level of heightened

scrutiny in any case); United States v. Booker, 570 F.Supp.2d 161, 162-63 (D.Me. 2008).

### 2. Plaintiffs Fail to Demonstrate that Penal Law §400.00(2)(f) is Unconstitutional as Applied to Them.

A statute or a rule may be constitutionally invalid "as-applied" when it operates to

deprive an individual of a protected right although its general validity as a measure

enacted in the legitimate exercise of state power is beyond question. Boddie v.

Connecticut, 401 U.S. 371, 379 (1971). An "as-applied challenge" requires analyzing the

facts of the particular case to determine whether the application of a statute deprives the

individual to whom it was applied of a protected right. Field Day, LLC v. County of

Suffolk, 463 F.3d 167, 174 (2d Cir. 2006); Almengor v. Schmidt, 692 F.Supp.2d 396,

397 ( S.D.N.Y. 2010). In considering an as-applied challenge, "factual context and

defendant's circumstances are critical". U.S. v. Polouizzi, 697 F.Supp.2d 381, 387

(E.D.N.Y. 2010). "As-applied challenges 'are the basic building blocks of constitutional

adjudication' because they relieve the court of having 'to consider every conceivable

situation which might possibly arise in the application of complex and comprehensive

legislation'." Cook v. Gates, 528 F.3d 42, 56 (1st Cir. 2008).

Here, Plaintiffs' as-applied challenges fail because they cannot show that New

York Penal Law § 400.00(2)(f) infringes the recognized Second Amendment right to

32

posses a handgun in the home for self-defense. See Masciandaro, 648 F.Supp at 789.
Three Plaintiffs already have limited concealed carry licenses (and did not seek to expand
those licenses based upon a need for self-defense). All, according to their allegations
herein, qualify to purchase long guns or to possess handguns in the home. See Pls.
Statement Undisputed Fact ¶ 4. It is worth recalling the Supreme Court's observation in
Heller in finding the ban on handgun possession in Washington D.C. unconstitutional:
"Few laws in the history of our nation have come close to the severe restriction of the
District's handgun ban". 128 S.Ct. at 2918. The New York statute is not such a ban; the
requirement of "proper cause" to justify issuance of a full carry license outside of the
home does not implicate the core Second Amendment right of possessing workable
firearms in the home and allows individuals with legitimate self-defense concerns to
carry a concealed weapon while allowing the State to protect the public. Cf. U.S. v.
Jones, 673 F.Supp.2d 1347, 1353 (N.D.Ga. 2009). Plaintiffs' as-applied claims thus fail.

### 3.    Penal Law § 400.00(2)(f) is Constitutional on its Face.

Plaintiffs face a heavy burden in seeking to have Penal Law § 400.00(2)(f)
invalidated as facially unconstitutional. Outside the First Amendment context, a facial
challenge can only succeed where a plaintiff can establish that there is no set of
circumstances under which the challenged statute would be constitutional. United States
v. Salerno, 481 U.S. 739, 745 (1987). Thus, where a plaintiff's as-applied challenge fails,
his or her facial challenge will also fail. Plaintiffs refer to this principal as
"controversial". Nevertheless, it is clearly the law. See, e.g., Washington State Grange
v. Washington State Republican Party, 552 U.S. 442, 449-50 (2008); U.S. v. Skoien, 614
F.3d at 645; see also, Masciandaro, supra, 648 F.Supp.2d 779.

33

Facial challenges are limited because claims of facial invalidity are often speculative, and thus risk a premature interpretation of statutes and may cause a court to anticipate a question of constitutional law "in advance of the necessity of deciding it' or to "'formulate a rule of constitutional law broader than required by the precise facts to which it is to be applied'". U.S. v. Frederick, 2010 WL 2179102, *6 (D.S.D. May 27, 2010), citing, Washington State Grange, supra, 552 U.S. at 450. Facial challenges are also disfavored because they undermine the democratic process by "preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." Washington State Grange, supra, 552 U.S. at 450; U.S. v. Frederick, supra. Even "the fact that [the regulations] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render [them] wholly invalid," and in deciding a facial challenge, a court must be careful not to go beyond the statute's facial requirements and speculate about hypothetical situations. Salerno, 481 U.S. at 745.

The Supreme Court did not confer a right to carry concealed weapons in public in either Heller or McDonald. Heller recognized a right to possession in the home, so it is nested in the personal autonomy of the household. Non-family members enter the house by choice and with the approval of the householders. Whether an individual has a handgun in his or her home is not a direct threat to the interests, the authority, or the expectations of security of other citizens in public. When gun carrying extends outside the home environment, it also leaves the autonomy that applies in the home, and the interests in concealed-carrying in public must be balanced against the need to protect others who use the public. Plaintiffs invite the Court to significantly extend constitutional doctrine, arguing for an absolute right and asserting that "the 'proper cause'

standards would fail <u>any</u> level review as there is never a legitimate state interest…in depriving people of the means of self-defense." Pls. MSJ Mem. p. 24.

Plaintiffs' argument implies that no public safety concern can counterbalance a person's unfettered right to carry concealed loaded handguns in public, but the public interest is plainly implicated by Plaintiffs' position. Plaintiffs' advocacy of a right to carry in public (not enunciated by the Supreme Court) which cannot be regulated flatly contradicts the <u>Heller</u> Court's admonitions regarding the presumptive legality of longstanding regulations regarding guns, even regulations that reach the carrying of guns in the home. 128 S.Ct. at 2816-17. The "proper cause" standard reduces the number of persons permitted to carry hidden deadly weapons in New York and by doing so addresses the public safety issue of having more secretly armed strangers in public while permitting the carrying of handguns where there is a demonstrated need for self-defense. The State of New York has determined that merely excluding those who have, for example, a felony conviction or were involuntarily committed from possessing handguns in public does not provide adequate security to the public and the data support this. For example, as set forth above, almost 60% of people arrested for felony homicide charges in Westchester County between 2000 and 2009 have no previous disqualifying felony conviction. Cook Decl. ¶¶ 27-35.

With these principles in mind, § 400.02(f) is facially constitutional. Thus, even if there were a fundamental right to carry firearms in public, which there is not, because the State may constitutionally reasonably regulate that right, there are plainly constitutional applications of New York Penal Law § 400.00(2)(f) and any facial challenge must fail.

35

## POINT III

## THE PRIOR RESTRAINT DOCTRINE DOES NOT APPLY TO SECOND AMENDMENT CHALLENGES.

"The term 'prior restraint' is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." Alexander v. United States, 509 U.S. 544, 550 (1993). A "prior restraint" is a regulation or order that suppresses *speech* or provides for its suppression at the discretion of government officials-on the basis of the speech's content and in advance of its actual expression. U.S. v. Quattrone, 402 F.3d 304, 309 -310 (2d Cir. 2005) (emphasis added); Hobbs v. County of Westchester, 397 F.3d 133, 148 (2d Cir. 2005). It is uniquely linked to the First Amendment. Gannett Co. v. DePasquale, 443 U.S. 368, 393 n. 25 (1979) (quoting Near v. State of Minnesota ex rel. Olson, 283 U.S. 697, 713 (1931)).

The law of prior restraint has no application to plaintiffs' Second Amendment claims. The cases cited by plaintiffs (see Pls. Mem. at 13-14), lend no support to the proposition that the gun regulation at issue in this case must be assessed under the law of prior restraint. At most, those decisions merely suggest looking to First Amendment precedent as a guide for determining the appropriate standard of constitutional review in Second Amendment cases.[22] They most assuredly did not apply the prior restraint doctrine. See, e.g., United States v. Chester, No. 09-4084, -- F.3d --, 2010 WL 5396069, at *8 (4th Cir. Dec. 30, 2010) ("[W]e agree with those who advocate looking to the First Amendment as a guide in developing a *standard of review* for the Second Amendment.")

---

[22] Notably, of the cases relied upon here by plaintiffs, the only two cases that actually adopted a particular standard of constitutional review both chose intermediate scrutiny. See Chester, 2010 WL 5396069, at *26; Marzzarella, 614 F.3d at 97.

(emphasis added).[23] While the other two cases cited by plaintiffs for this argument make loose comparisons to the First Amendment in *dicta*, they contain no mention of—let alone apply—the prior restraint doctrine. See United States v. Marzzarella, 614 F.3d 85, 89 n.4 (3d Cir. 2010); Parker v. District of Columbia, 478 F.3d 370, 399 (D.C. Cir. 2007).

Several commentators similarly have cautioned against importing First Amendment analysis into the Second Amendment context. See Rosenthal, supra, 82-83; Mark Tushnet, Heller and the Perils of Compromise, 13 Lewis & Clark L. Rev. 419, 429-31 (2009). Simply adopting First Amendment standards of constitutional review would ignore the critical fact that the right of free expression is distinct and qualitatively different from the right of self defense. See, e.g., Glenn Harlan Reynolds, Guns and Gay Sex: Some Notes on Firearms, the Second Amendment, and "Reasonable Regulation, 75 Tenn. L. Rev. 137, 147-48 (2007). Indeed, this distinction is borne out by the textual disparities between the First and Second Amendments—the Second Amendment contains prefatory language recognizing regulatory power over firearms, while the First Amendment contains no similar qualification.[24] Plaintiffs fail to acknowledge these critical textual differences as well as the disparate nature of the rights they embody.

---

[23] It is worth noting that Judge Davis's concurrence in Chester—one of the three cases relied upon by plaintiffs to support their unfounded prior restraint argument—*expressly criticized* the application of First Amendment doctrine to Second Amendment cases. Acknowledging that the Court in Heller did refer to the First Amendment, Judge Davis emphasized that "these limited references are hardly an invitation to import the First Amendment's idiosyncratic doctrines wholesale into a Second Amendment context, where, without a link to expressive conduct, they will often appear unjustified." Chester, 2010 WL 5396069, at *38 (Davis, J., concurring). Judge Davis also cautioned against importing the First Amendment's overbreadth doctrine into the Second Amendment framework, *id.* at *41-42, another unsupported position advocated by plaintiffs (see Pls.' MSJ Mem. at 16).

[24] See Rosenthal, supra, at 82-83 ("[T]he First Amendment's textually unqualified protection for 'the freedom of speech' is thought to 'reflect[] our profound national commitment to the principal that debate on public issues should be uninhibited, robust, and wide-open.' Thus, regulation of the content of speech that disadvantages particular content, ideas or viewpoints is considered suspect. In contrast, the Second Amendment contains a textual recognition of regulatory power not found in the First Amendment . . . .").

Plaintiffs' First Amendment analogy is strained further by Heller's own

recognition that the right to bear arms under the Second Amendment is subject to

substantial and numerous limitations—all of which could properly be characterized as

prior restraints:

> [N]othing in our opinion should be taken to cast doubt on longstanding
> prohibitions on the possession of firearms by felons and the mentally ill, or
> laws forbidding the carrying of firearms in sensitive places such as schools
> and government buildings, or laws imposing conditions and qualifications on
> the commercial sale of arms.

Heller, 554 U.S. at 626-27; see also Rosenthal, supra, at 83 ("Heller itself, by identifying

prohibitions on concealed carry as presumptively lawful, suggests that the right to bear

arms is not to be treated as 'uninhibited, robust, and wide-open.' Moreover, . . . Heller

seems to contemplate some inquiry into the extent to which a challenged restriction limits

the right to keep and bear arms . . . .").

Plaintiffs' argument that the licensing scheme at issue here is an unlawful prior

restraint because it vests "unbridled" discretion in licensing officials is contradictory to

their assertion that the "proper cause" requirement has been clearly defined and "strictly"

applied as requiring an applicant to show a need for self-defense distinguishable from the

general public, a standard which Plaintiffs claim that they cannot meet.[25] See First

Amended Complaint ¶ 25; Plaintiffs' Statement of Undisputed Facts, ¶¶ 8, 11. Bach v.

Pataki, 408 F.3d at 80; Bando v. Sullivan, 290 A.D.2d at 693; Bernstein v. Police Dept.

of City of New York, 85 A.D.2d 574 (1st Dep't 1981).

---

[25] As is discussed more fully in State Defendants' motion to dismiss, Plaintiffs can avail themselves of
judicial recourse from licensing determinations. Speedy review of licensing determinations decisions is
available to the state appellate courts through an Article 78 proceeding, a civil "special proceeding"
designed to be faster and more efficient than regular civil proceedings. See CPLR 401 et seq.; Vincent C.
Alexander, Practice Commentaries 401:1 to CPLR § 401.

Following Plaintiffs' prior restraint argument to its logical conclusion would mean that nearly every firearm regulation would be presumptively invalid. <u>Heller</u>, itself, precludes that approach. <u>Heller</u>, 554 U.S. at 626-27.

## POINT IV

### PLAINTIFFS' EQUAL PROTECTION CLAIM MUST BE DISMISSED.

Plaintiffs assert that Penal Law § 400.00(2)(f) violates Fourteenth Amendment equal protection, alleging that requiring "that handgun carry permit applicants demonstrate cause for the issuance of a permit classifies individuals, including plaintiffs, on the basis of irrelevant, arbitrary, and speculative criteria in the exercise of a fundamental right." ¶ 43. Other than this conclusory statement, the First Amended Complaint is barren of any factual allegations in support of an equal protection claim. Plaintiffs' motion for summary judgment on their equal protection claim is no better supported. Thus, summary judgment for the State Defendants on the equal protection claim, is warranted. <u>See</u>, <u>Ruston v. Town of Skaneateles</u>, 610 F.3d 55, 59 (2d Cir. 2009) (Plaintiffs must show a high degree of similarity between themselves other persons to whom they compare themselves such that no rational person could justify differential treatment). Here Plaintiffs show no facts warranting a conclusion that they were treated differently than other similarly situated persons.

Under equal protection analysis "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest". <u>Bach v. Pataki</u>, 289 F.Supp.2d at 228. The party attacking the legislative classification bears the burden of demonstrating "there is no reasonable basis for the challenged distinction". <u>Id</u>. at 228-29. Plaintiffs here fail to establish any impermissible

governmental classification at work regarding the challenged statute and there can be no
equal protection violation as long as the challenged statute bears a rational relation to a
legitimate state interest. City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 440
(1985); Peruta, 2010 WL 5137137 at * 9.

In  dismissing an almost identical "good cause" equal protection claim, the court
in Peruta found Plaintiffs failed to show "a set of circumstances that distinguishes the
applicant from other members of the general public and causes him or her to be placed in
harm's way" with the understanding that "generalized fear" was not enough.  "When a
government's action does not involve a suspect classification or implicate a fundamental
right, even intentional discrimination will survive constitutional scrutiny for an equal
protection violation as long as it bears a rational relation to a legitimate state interest".
Peruta, 2010 WL 5137137 at *9 (citations omitted).  Peruta  noted the state's "important
and substantial interest" in reducing the number of concealed weapons to reduce the risk
to others in public areas and to generally reduce violence and concluded:

> . . . Defendants' "good cause" policy is valid.  Accordingly, the policy does
> not treat similarly situated individuals differently because not all law-abiding
> citizens are similarly situated, as Plaintiffs contend.  Those who can document
> circumstances demonstrating "good cause" are situated differently than those
> who cannot.  Therefore, [the State of California's] "good cause" policy does
> not violate equal protection.

2010 WL 5137137 at *9.

Therefore the State Defendants are entitled to summary judgment on plaintiffs'
equal protection claim.

40

## CONCLUSION

For the reasons set forth herein, Plaintiffs' motion for summary judgment should

be denied and all of Plaintiffs' claims and causes of action should be dismissed, State

Defendants' motion for summary judgment should be granted, and the Court should

declare that New York Penal Law 400.00(2)(f) does not violate the Second or Fourteenth

Amendments.

Dated: New York, New York
     January 26, 2011

                           Respectfully submitted,

                           ERIC T. SCHNEIDERMAN
                           Attorney General of the
                            State of New York
                           Attorney for the State Defendants
                           By:

                           ANTHONY J. TOMARI
                           Assistant Attorney General
                           120 Broadway
                           New York, New York 10271
                           (212) 416-8553

                           MONICA CONNELL
                           Assistant Attorney General
                           120 Broadway, 24th Floor
                           New York, NY 10271
                           (212) 416-8965

ANTHONY J. TOMARI
MONICA CONNELL
Assistant Attorneys General
Of Counsel