**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------X

Alan Kachalsky, Christina Nikolov, Eric Detmer,   :
Johnnie Nance, Anna Marcucci-Nance,          :
and Second Amendment Foundation, Inc.,      :
                                             :

            Plaintiffs,          : **Civil Action Number: 10-cv-5413**
                                      : **(Hon. Cathy Seibel)**
-against-                            :
                                             :

Susan Cacace, Jeffrey A. Cohen,            :
Albert Lorenzo, Robert K. Holdman       :
and County of Westchester,             :
                                           :

            Defendants.         :
-----------------------------------------------------------------X

### STATE DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

### AND

### STATE DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Local Rule 56.1 of the Civil Rules of the United States District Courts for the

Eastern and Southern Districts of New York, State Defendants Susan Cacace, Jeffrey A. Cohen,

Albert Lorenzo, and Robert K. Holdman, by their attorney, ERIC T. SCHNEIDERMAN,

Attorney General of the State of New York, submit the following response to the Plaintiffs'

Statement of Undisputed Material Facts in Support Plaintiff's Motion for Summary Judgment.

State Defendants also submit the State Defendants' Statement of Undisputed Material Facts In

Support Of State Defendants' Motion for Summary Judgment.  Citations to exhibits in the State

Defendants' Statement are to those annexed to the declarations submitted in support of the State

Defendants' Motion for Summary Judgment.

Plaintiffs have moved for summary judgment before any discovery has taken place in this action, before a ruling on State Defendants' motion to dismiss, and before answers have been submitted. As a result, in response to some of Plaintiffs' asserted statements of undisputed facts, State Defendants must state that they can neither concede nor dispute the statement because of the lack of discovery. State Defendants submit that in those instances where they cannot state whether they dispute a statement, the asserted facts are not material to State Defendants' Motion for Summary Judgment. Plaintiffs' fact statements are set forth below with their citations to the right, in the same format used in Plaintiffs' 56.1 statement. State Defendants' responses are set forth following each of Plaintiffs' numbered statements, and bear the same paragraph numbers as used by Plaintiffs in their Statement of Undisputed Material Facts.

## STATE DEFENDANTS' RESPONSES TO PLAINTIFFS' STATEMENT OF UNDISPUTED FACTS

1. Unlicensed possession of any firearm is a class A misdemeanor.                    1. New York Penal Law § 265.01(1).

State Defendants' Response

1.    Disputed. Penal Law 265.01 does not render the carrying of any and all firearms a class-A misdemeanor. Penal Law § 265.00(3) defines "firearm" for the purposes of 265.01 to mean "(a) any pistol or revolver; or (b) a shotgun having one or more barrels less than eighteen inches in length; or (c) a rifle having one or more barrels less than sixteen inches in length; or (d) any weapon made from a shotgun or rifle whether by alteration, modification, or otherwise if such weapon as altered, modified, or otherwise has an overall length of less than twenty-six inches; or (e) an assault weapon." Thus, it is a Class A misdemeanor under 265.01 to carry a handgun.

2

2. Unlicensed possession of a loaded firearm outside one's home or place of business constitutes "Criminal Possession of a Firearm in the Second Degree," a class C felony.

2. New York Penal Law § 265.03(3).

### State Defendants' Response

2. Disputed in part. Admitted that Penal Law 265.03(3) provides that a "person is guilty of criminal possession of a weapon in the second degree when...such person possesses any loaded firearm. Such possession shall not, except as provided in subdivision one or seven of section 265.02 of this article, constitute a violation of this subdivision if such possession takes place in such person's home or place of business." Criminal possession of a weapon in the second degree is a class C felony but the definition of "firearm in this section is as set out in Penal Law § 265.00(3) and does not include all firearms.

3. For most civilians who are not otherwise barred from possessing carrying weapons, the only theoretically available permit to carry handguns in public for self-defense is a permit "to have and carry concealed, without regard to employment or place of possession, by any person when proper cause exists for the issuance thereof."

3. New York Penal Law §§ 265.20, and 400.00(2)(f).

### State Defendants' Response

3. Disputed in part. Penal Law § 265.00(3) defines "firearm" for the purposes of 265.01 to mean "(a) any pistol or revolver; or (b) a shotgun having one or more barrels less than eighteen inches in length; or (c) a rifle having one or more barrels less than sixteen inches in length; or (d) any weapon made from a shotgun or rifle whether by alteration, modification, or otherwise if such weapon as altered, modified, or otherwise has an overall length of less than

twenty-six inches; or (e) an assault weapon. " Thus, it is a Class A misdemeanor under 265.01 to

carry a handgun or long gun modified to be easily concealable or an assault weapon. There are

different types of licenses set out in Penal Law 400.00(2), any of which are available to the

public upon satisfaction for the requirements of a license.

4. Plaintiffs Kachalsky, Nikolov, Detmer, Nance, and Marcucci-Nance, all reside in Westchester County. Each (a) is over 21 years old, (b) of good moral character, ¶ 1. (c) has never been convicted of a felony or serious crime, (d) has never been mentally ill or confined to any institution, (e) has not had a license revoked or been the subject of a family court order, and (f) with exception of Plaintiff Detmer, who is qualified under subdivision 400.00.1(i), has completed a firearms safety course.

4. Kachalsky Decl., ¶ 1; Nikolov Decl., ¶ 1; Detmer Decl., ¶¶ 1-2; Nance Decl., ¶ 1; Marcucci-Nance Decl.,

State Defendants' Response

4. Disputed in part. State Defendants (a) admit that each of the individual Plaintiffs

is over 21 years of age; (b) deny sufficient information to assess whether each Plaintiff is of good

moral character as Plaintiffs' motion for summary judgment is made prior to discovery; (c) admit

that at the time of their respective applications, the Westchester County Police investigation did

not reveal that any of the Plaintiffs had been convicted of a felony or serious crime although

Plaintiff Kachalsky had been arrested for an offense, the details of which are set out in his

application (see Tomari Decl., Ex. F), but otherwise deny sufficient information to confirm or

deny Plaintiffs' criminal history; (d) admit that at the time of their respective applications the

Westchester County Police investigation did not reveal any "derogatory information" from the

State Office of Mental Hygiene regarding any Plaintiff but otherwise deny sufficient information

to confirm or deny Plaintiffs' assertion on this point; (e) deny sufficient information to confirm or

4

deny Plaintiffs' assertion that Plaintiffs have never had a license revoked or been subject to a

family court order; and (f)  admit that Plaintiffs had undergone the requisite training at the time

of their respective license applications but otherwise deny sufficient information to confirm or

deny Plaintiffs' assertions.

5. Because Plaintiffs reside in Westchester    5. N.Y. Penal Law § 265.00(10)
County, their applications for gun carry
licenses are passed on by state judges
acting as licensing officers.

State Defendants' Response

     5.     Undisputed.

6. Kachalsky's application for a handgun      6. Exh. A.
carry license pursuant was referred for
decision to Defendant Susan Cacase, [sic] "in
[her] capacity as handgun licensing officer
for the County of Westchester."

State Defendants' Response

     6.     Undisputed.

7. Defendant Westchester County              7. Exh. A.
recommended that Kachalsky's carry
permit application be denied.

State Defendants' Response

     7.     Undisputed that the Department of Public Safety, Westchester County Police

recommended denial of Kachalsky's application for a "full carry" permit.

8. On October 8, 2008, Cacace denied
Kachalsky's permit application,
offering that Kachalsky "has not stated
any facts which would demonstrate a
need for self protection distinguishable
from that of the general public.
Accordingly, Cacace found Kachalsky
did not satisfy the requirement of New
York Penal Law § 400.00(2)(f) that
"proper cause" be shown for issuance
of the permit.

8. Exh. A.

State Defendants' Response

8. Undisputed that by decision and order dated October 8, 2008, Index No. 3/2008,

Judge Cacace denied Kachalsky's applications for the reasons stated therein.

9. Kachalsky would apply again for a
carry license, but refrains from doing
so because any such application would
likely be a futile act, as in all likelihood,
he cannot satisfy the proper cause
standard, which has already been applied
to him.

9. Kachalsky Decl., ¶ 3

State Defendants' Response

9. Disputed in part. State Defendants cannot dispute or concede the result of any

future applications for licenses by Plaintiff as the same calls for speculation. State Defendants

admit that Plaintiff Kachalsky has stated that he has not re-applied for a license because he

believes that the same is "likely be a futile act, as in all likelihood, he cannot satisfy the proper

cause standard, which has already been applied to him". State Defendants cannot state what the

result of Plaintiff Kachalsky's future application for firearms would be "in all likelihood" but do

not admit that applications for the same would be "futile".

6

10. Plaintiff Christina Nikolov's application   10. Exh. B.
for a handgun carry license pursuant to
New York Penal Law § 400.00 was
referred to Defendant Jeffrey A. Cohen
"in [his] capacity as handgun licensing
officer for Westchester County."

State Defendants' Response

> 10.     Undisputed.

11. On October 1, 2009, Cohen denied   11. Exh. B.
Nikolov's permit application. Reviewing
the application and Defendant County's
investigation of Nikolov, Cohen offered
that "conspicuously absent . . . is the
report of any type of threat to her own
safety anywhere. . . it cannot be said that
the applicant has demonstrated that she has
a special need for self-protection
distinguishable from that of the general
public; therefore, her application for a
firearm license for a full carry permit
must be denied.

State Defendants' Response

> 11.     Undisputed that by decision and order dated October 1, 2009, which was filed and

entered on October 2, 2009, Judge Cohen denied Nikolov's application for the reasons set forth

therein.

12. Plaintiff Eric Detmer serves in the   12. Detmer Decl., ¶ 2
United States Coast Guard, for one
weekend each month and two full weeks
each year. Since 2004, Detmer has been
a qualified Boarding Team Member.
Although lacking authority to arrest,
Detmer carries a .40 caliber handgun while
on duty with the Coast Guard, which he
surrenders each time upon leaving duty.

Detmer qualifies semi-annually with his
handgun, regularly taking a non-firing
judgmental pistol course, a firing tactical
pistol course, and use-of-force training.

State Defendants' Response

    12.    Disputed in part.  State Defendants admit that Plaintiff Detmer supplied the

Westchester County Police with notarized documentation attesting to the facts relating to his

service in the U.S. Coast Guard as set forth in the Westchester County Police investigation report

(Tomari Decl., Exhibit H)  but State Defendants otherwise deny sufficient information to

respond to this statement.


13. Detmer is licensed to have a private      13. Detmer Decl., ¶ 3.
handgun for the limited purpose of target
shooting and hunting. Pursuant to New
York Penal Law § 400.00, Detmer
applied to amend his license for the
purpose of "full carry."

State Defendants' Response

    13.    Undisputed that Detmer is licensed to carry a handgun in connection with target

shooting activities as set forth by the Westchester County Police investigation (Tomari Decl.,

Exhibit H) and applied to have a "full carry" unrestricted license pursuant to 400.00(2)(f).  State

Defendants otherwise deny sufficient information to respond to this statement.


14. On September 3, 2010, Defendant      14. Exh. C.
Westchester County recommended that
the application be disapproved, as
Detmer's need to enforce laws while off duty
was "speculative," and Detmer "has
not substantiated that he faces danger
during non employment hours that would
necessitate the issuance of a full carry

8

firearm license" and "has not demonstrated
an exceptional need for self protection
distinguishable from that of the general
public."

State Defendants' Response

14.     Undisputed that by letter dated September 3, 2010, Westchester County Police

recommended that Detmer's application be denied for the reasons set forth therein. (Tomari

Decl., Exhibit H).

15. On September 27, 2010, Defendant          15. Exh. D.
Lorenzo denied Detmer's application,
stating, "At this time, I see no justification
for a full carry permit."

State Defendants' Response

15.     Undisputed.

16. Plaintiff Johnnie Nance is licensed to      16. Nance Decl., ¶ 2
have a private handgun for the limited
purpose of target shooting. Pursuant to
New York Penal Law § 400.00, Nance
applied to amend his license for the
purpose of "full carry" for self-defense.

State Defendants' Response

16.     Disputed in Part. Admitted that Plaintiff Johnny Nance does have a restricted

license to carry a handgun pursuant to Penal Law § 400.00(2)(f) and did file an application to

amend his license seeking an unrestricted license under that section, but State Defendants deny

that he sought the same for "self defense". State Defendants refer to the Westchester County

Police report regarding Plaintiff Nance which documents that Nance had cited "no safety-related

concerns" and instead had indicated that he wanted to amend his license so that he could become

9

involved in competitive shooting and assist his wife in teaching and promoting safe shooting at

National Rifle Association-sponsored events and that his existing license would already permit

such uses. Plaintiff's actual application form also documents that he did not present self-defense

as a basis for his request. Tomari Decl., Exhibit I.

| | |
|---|---|
| 17. Or about August 11, 2010, Defendant Westchester County recommended that Nance's application be disapproved, as "No safety related concerns have been cited by the applicant," and Nance "has not demonstrated an exceptional need for self protection distinguishable from that of the general public." | 17. Exh. E |

State Defendants' Response

17.     It is undisputed that the Westchester County Police recommended the denial of

Plaintiff Nance's request to amend his license for the reasons stated in the written report. Tomari

Decl., Exhibit I.

| | |
|---|---|
| 18. On September 9, 2010, Defendant Holdman denied Nance's application for a carry permit. Holdman cited Defendant County's recommendation for denial, and its finding that Nance had not demonstrated any exceptional need for the permit. Holdman further stated, "The applicant has not provided the court with any information that he faces any danger of any kind that would necessitate the issuance of a full carry firearm license; or has not demonstrated a need for self protection distinguishable from that of the general public or of other persons similarly situated." | 18. Exh. F. |

10

State Defendants' Response

18. Disputed in part. It is undisputed that by decision dated September 9, 2010 and

entered on September 10, 2010, Judge Holdman issued an order regarding Plaintiff Nance's

application, but the application was for an amendment of Plaintiff Nance's license, not an

original application for a license and the application was denied based upon the reasons set forth

therein. Tomari Decl. Exhibit Q.

19. Citing the denial of Kachalsky's     19. Exh. F
application, Holdman found Nance did
not demonstrate "proper cause" within the
meaning of the governing provision.
Holdman continued: "In sum, the applicant
has not shown sufficient circumstances to
distinguish his need from those of countless
others, nor has he demonstrated a specific
need for self protection distinguishable
from that of the general community or of
persons engaged in the same business or
profession."

State Defendants' Response

19. Disputed in part. It is undisputed that by decision dated September 9, 2010 and

entered on September 10, 2010, Judge Holdman issued an order denying Plaintiff Nance's

application to amend his license based upon the reasons set forth therein. Tomari Decl. Exhibit

Q.

20. Plaintiff Anna Marcucci-Nance is licensed 20. Marcucci-Nance Decl., ¶ 2.
to have a private handgun for the limited
purpose of target shooting. Pursuant to
New York Penal Law § 400.00, Marcucci-
Nance applied to amend her license for the
purpose of "full carry" for self-defense.

11

State Defendants' Response

20.    Undisputed.

21. On August 11, 2010, Defendant        21. Exh. G
Westchester County recommended that
the application be disapproved, as "No
safety related concerns have been cited
by the applicant," and Marcucci-Nance
"has not demonstrated an exceptional need
for self protection distinguishable from
that of the general public."

State Defendants' Response

21.    It is undisputed that the Westchester County Police recommended the denial of

Plaintiff Marcucci-Nance's request to amend her license for the reasons stated in the written

report.  Tomari Decl., Exhibit J.

22. On September 9, 2010, Holdman denied 22. Exh. H
Marcucci-Nance's application for a carry
permit. Holdman cited Defendant County's
recommendation for denial, and its finding
that Marcucci-Nance had not demonstrated
any exceptional need for the permit.
Holdman further stated, "The applicant has
not provided the court with any information
that she faces any danger of any kind that
would necessitate the issuance of a full carry
firearm license; or has not demonstrated a
need for self protection distinguishable from
that of the general public or of other persons
similarly situated."

State Defendants' Response

22.    Disputed in part. It is undisputed that by decision dated September 9, 2010 and

entered on September 10, 2010, Judge Holdman issued an order regarding Plaintiff Marcucci-

12

Nance's application, but the application was for an amendment of Plaintiff Nance's license, not

an original application for a license and the decision was based upon the reasons set forth

therein.  Tomari Decl. Exhibit R.


23. Citing the denial of Kachalsky's            23. Exh. H
application, Holdman found Marcucci-
Nance did not demonstrate "proper cause"
within the meaning of the governing
provision. Holdman continued: "In sum,
the applicant has not shown sufficient
circumstances to distinguish her need from
those of countless others, nor has she
demonstrated a specific need for self
protection distinguishable from that of the
general community or of persons engaged in
the same business or profession."

State Defendants' Response

23.     Disputed in part. It is undisputed that Judge Holdman cited the Kachalsky case in

his decision but it is disputed that that was the only basis for his denial of Plaintiff Marcucci-

Nance's application to amend her license.  The decision speaks for itself and the application to

amend was denied based on the reasoning set forth therein.  Tomari Decl. Exhibit R.


24. Plaintiff Second Amendment Foundation, 24. Versnel Decl., ¶ 2
Inc. ("SAF") is a non-profit membership
organization incorporated under the laws
of Washington with its principal place of
business in Bellevue, Washington.

State Defendants' Response

24.     Undisputed.


13

25. SAF has over 650,000 members and supporters nationwide, including many in Westchester County, New York. The purposes of SAF include education, research, publishing and legal action focusing on the Constitutional right to privately own and possess firearms, and the consequences of gun control.

25. Versnel Decl., ¶ 2

State Defendants' Response

25. Because Plaintiffs have moved for summary judgment prior to discovery, State

Defendants cannot set forth whether these statements are disputed or undisputed.

26. SAF expends its resources encouraging exercise of the right to bear arms, and advising and educating their members, supporters, and the general public about the policies with respect to the public carrying of handguns in New York. The issues raised by, and consequences of, Defendants' policies, are of great interest to SAF's constituency. Defendants' policies regularly cause the expenditure of resources by SAF as people turn to it for advice and information.

26. Versnel Decl., ¶ 3

State Defendants' Response

26. Because Plaintiffs have moved for summary judgment prior to discovery, State

Defendants cannot set forth whether these statements are disputed or undisputed.

27. Defendants' policies bar SAF's members and supporters from obtaining permits to carry handguns.

27. Versnel Decl., ¶ 4

State Defendants' Response

27. Disputed. Because Plaintiffs have moved for summary judgment prior to

discovery and have not identified a member of SAF who has been denied a gun license under

Penal Law § 400.00(2)(f), and State Defendants do not know of any such person, the State

Defendants cannot set forth whether these statements are disputed or undisputed with regard to

members of SAF.  However, under New York state law, there is no provision "barring" SAF

members from obtaining such gun licenses although such members, like all members of the

public, must meet the eligibility requirements and must establish "proper cause" for the issuance

thereof.  See Penal Law 400.00(2)(f).

28. Plaintiffs Alan Kachalsky, Christina Nikolov, Eric Detmer, Johnnie Nance, Anna Marcucci-Nance, and the members and supporters of plaintiff SAF, would carry functional handguns in public for self-defense, but refrain from doing so because they fear arrest, prosecution, fine, and imprisonment for lack of a license to carry a handgun.

28. Kachalsky Decl., ¶ 4; Nikolov Decl., ¶ 4; Detmer Decl., ¶ 6; Nance Decl., ¶ 6; Marcucci-Nance Decl., ¶ 6; Versnel Decl., ¶ 5.

State Defendants' Response

28.     Disputed; calls for speculation.  State Defendants cannot attest to, or verify the

individual intentions and rationales of the named plaintiffs, and especially the unidentified

"members and supporters" of SAF.

\*     \*     \*     \*     \*

15

## STATE DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.   THE PARTIES

#### A. Plaintiffs

1.      Plaintiff Alan Kachalsky is a natural person; and a citizen of the United States, State of New York, County of Westchester.  First Amended Complaint ("FAC") ¶1; Tomari Decl. Exhibit "A".

2.      Plaintiff Christina Nikolov is a natural person; and a citizen of the United States, State of New York, County of Westchester.  FAC ¶2; Tomari Decl. Exhibit "A".

3.      Plaintiff Eric Detmer is a natural person; and a citizen of the United States, State of New York, County of Westchester.  FAC ¶3; Tomari Decl. Exhibit "A".

4.      Plaintiff Johnnie Nance is a natural person; and a citizen of the United States, State of New York, County of Westchester.  FAC ¶4; Tomari Decl. Exhibit "A".

5.      Plaintiff Anna Marcucci-Nance is a natural person; and a citizen of the United States, State of New York, County of Westchester.  FAC ¶5; Tomari Decl. Exhibit "A".

6.      Plaintiff Second Amendment Foundation, Inc. ("SAF") is a non-profit membership organization incorporated under the laws of the State of Washington, with its principal place of business in Bellevue, Washington.  FAC ¶6; Tomari Decl. Exhibit "A".

#### B. Defendants

7.      The Hon. Susan Cacace is now, and was at all times relevant herein, a County Court judge for Westchester County ("Westchester").  She has been on the bench for five (5) years.  Pursuant to New York State Penal Law §265.00 (10) as a county judge she is also a handgun licensing officer for Westchester.  Declaration of Hon. Susan Cacace. ("Cacace Decl.")¶2.

16

8.      The Hon. Jeffrey A. Cohen currently sits as a Justice on the bench of the Appellate Division, Second Department. Prior to his appointment thereto on December 9, 2010, he served as a County Court judge for Westchester for three (3) years. He has been on the bench for four (4) years. Pursuant to New York State Penal Law §265.00 (10) as a county judge he was also a handgun licensing officer for Westchester. Declaration of the Hon. Jeffrey A. Cohen ("Cohen Decl.")¶2.

9.      The Hon. Albert Lorenzo is now, and was at all times relevant herein, an Acting Justice for the Supreme Court, of the State of New York, Westchester County. He has been on the bench for eight (8) years. Pursuant to New York State Penal Law §265.00 (10) as an acting justice he serves as a handgun licensing officer for Westchester. Declaration of Hon. Albert Lorenzo ("Lorenzo Decl.")¶2.

10.     The Hon. Robert K. Holdman currently sits as a Justice of the Supreme Court of the State of New York, Bronx County. Prior to serving as a Supreme Court Justice for the Bronx, and at all times relevant herein, he served as a Justice for the Supreme Court, of the State of New York, Westchester County. He has been on the bench since June of 2005. Pursuant to New York State Penal Law §265.00 (10), as a Supreme Court Justice in Westchester, he was also a handgun licensing officer for Westchester County. Declaration of Hon. Robert K. Holdman ("Holdman Decl.")¶2.

## II.     CONCEALED HANDGUN PERMITS IN NEW YORK STATE

### A.      State Requirements

11.     New York State does not ban handguns, but requires them to be licensed. FAC ¶ 21, Tomari Decl. Exhibit "A";  N.Y. Penal Law § 265.00; § 400.00 *et seq.*; Declaration of Bruce Bellom, sworn to January 25, 2011 ("Bellom Decl."), ¶ 3.

17

12.     PL § 400.00 (2) sets forth the type of handgun permits available in this State.  PL § 400.00 (2) (a) expressly provides for handgun possession in the home; PL § 400.00 (2) (b) - (e) provides for various job related licenses; and PL § 400.00 (2)(f) governs the issuance of permits to carry concealed handguns in public.  N.Y. Penal Law § 265.00; § 400.00 *et seq.*

13.     PL § 400.00 sets forth that an individual seeking a carried concealed permit must (a) be over 21; (b) be of good moral character; (c) never have been convicted of a felony or other serious crime (d) never have been mentally ill or confined to any institution; (e) never had a license revoked or been the subject of a family court order; (f) have undergone a firearms safety training if the permit is sought in Westchester; and as set forward in § 400.00 (2)(f): must show "proper cause" exists for such a permit.  N.Y. Penal Law § 400.00 *et seq.*;  FAC ¶¶ 22, 24, Tomari Decl. Exhibit "A".

14.     "Proper cause" as used in the context of issuing handgun permits means a showing a need for "self-protection distinguishable from that of the general public".  FAC ¶¶ 25-26, 30, 35; 36; 37, Tomari Decl. Exhibit "A"; Cacace Decl. ¶ 5; Cohn Decl. ¶ 5; Holdman Decl. ¶¶ 6-8; Bach v. Pataki, 408 F.3d 75, 80 (2d Cir. 2003).

**B.     The Procedure to Obtain a Concealed Carry Permit in Westchester County**

15.     The Pistol Licensing Unit of the Westchester County Department of  Public Safety maintains a copy of each application for a carry concealed, or "fully carry" permit; and conducts an investigation of each such application.  In so doing, it compiles a file containing the results of the investigation and summarizes the investigation for the licensing officer who determines whether such permit will issue.  Declaration of Bruce Bellom, sworn to January 24, 2011 ("Bellom Decl.") ¶¶ 1, 3; PL § 400.00 (4).

18

16.     The application form requires the applicant to provide four (4) character references "who by their signature attest to [the applicant's] good moral character" and to disclose whether he/she has "ever been arrested, summoned, charged or indicted anywhere for any offense, including DWI, (except traffic infractions)" and if so, to disclose the date, police agency, charge and disposition, including the court and date of disposition. Bellom Decl. ¶ 5; Tomari Decl. Exhibit B.

17.     In addition, the applicant must disclose whether he/she has ever: a) been discharged from any employment or the armed forces for cause; b) undergone treatment for alcoholism or drug use; c) suffered from any mental illness; d) had a pistol license; dealer's license; gunsmith license; or any application for such a license disapproved or had such a license revoked or cancelled; e) any physical condition which could interfere with the safe and proper use of a handgun; and f) been charged, petitioned against, a respondent, or otherwise been a subject of a proceeding in family court. If the "YES" box to any of these questions is checked, the applicant must provide a written explanation. Bellom Decl. ¶ 7; Tomari Decl. Exhibit B; PL § 400.00 *et seq.*

18.     Upon receipt of a completed initial application, a police member of the Pistol Permit Unit conducts the investigation required under Penal Law §400.00(4). For an initial application, this investigation includes a fingerprint based criminal background check with the New York State Department of Criminal Justice Services, the Federal Bureau of Investigation and the National Instant Criminal Background system. When the applicant is filing for a restriction change, the criminal background check is updated by a search of the National Instant Criminal Background system. Bellom Decl. ¶ 12; PL § 400.00 *et seq.*

19

19.     As part of the investigation, the applicant's identifying information is forwarded to the New York State Department of Mental Hygiene to determine if the applicant had any hospitalizations for mental illness. Bellom Decl. ¶ 13.

20.     In addition to the background and mental health check, the investigation includes a review of the application form, Character Reference Letters submitted with the application form, and the application attachment completed by the applicant. Bellom Decl. ¶ 14.

21.     Upon review of all the materials, once the investigation is deemed complete, an investigation summary is complied for the licensing officer, whom, in Westchester, pursuant to statute, is a Judge. Prior to submission to the licensing officer however, the investigation summary, and all application materials, are submitted to a County Police lieutenant; the Chief Inspector of Administrative Services; and the Commissioner or a Deputy Commissioner, who all, also review the materials. Bellom Decl. ¶¶ 2, 14; PL § 265.00 (10).

22.     Once all the reviews by the Department of Public Safety are complete, the entire investigation file is submitted to the Judge for review and decision on the application. The role of the Pistol Permit Unit is limited to the investigation described herein. The County has no ability to grant or deny license applications or amendments. Bellom Decl. ¶ 15.

23.     In calendar year 2010, in Westchester County, 130 "carry concealed" pistol permits; an additional 41 pistol permits restricted to carrying for purposes of employment; and 471 pistol permits issued for the purpose of target shooting were issued. Bellom Decl. ¶ 17.

24.     This process, as just described above was used to compile the investigative files for Plaintiffs Alan Kachalsky (Tomari Decl. Exhibit F), Christina Nikolov (Tomari Decl. Exhibit G), Eric Detmer (Tomari Decl. Exhibit H), Johnnie Nance (Tomari Decl. Exhibit I) and Anna Marcucci-Nance (Tomari Decl. Exhibit J). Bellom Decl. ¶ 16.

## III.   PLAINTIFFS' APPLICATIONS FOR FULL CARRY PERMITS

### A.   Kachalsky

25.   In May, 2008, Kachalsky applied for a "full carry" permit to carry concealed

handguns with him while in public. FAC ¶ 26; Tomari Decl. Exhibit F.

26.   As part of his application, Kachalsky listed as factors he believed established

"proper cause" for a full carry permit:

> The factors which establish proper cause for the issuance to myself of a Full
> Carry pistol permit are: 1) the Second Amendment of the Constitution grants
> citizens the right to bear arms.  As a citizen, I am therefore entitled to exercise
> my Constitutional right to bear arms.  I believe the Constitutional right entitles
> me to the permit without further the need to establish "proper cause".
>
> If the issuing agency for some reason requires more than this, then I will cite
> the fact that we live in a world sporadic random violence might at any moment
> place one in a position where one needs to defend oneself or possibly others,
> e.g. random shootings in universities (Virginia Tech), post offices, airline
> check-in counters, malls, road rage, as well as the run-of-the-mill street
> muggings and robberies.  While the odds of finding oneself in a Virginia Tech
> type situation are remote, one must reflect that had there been even one armed
> person, the death toll might have been considerably less than 31 dead.  While
> one never knows what one might do in such situations, it is my belief that it is
> better to have the option to defend oneself (and others) than not to have the
> option.  As a pilot and skydiver, I have been trained to handle emergencies,
> and I have actually handled several emergencies, so it is unlikely that I will
> respond in a dangerous manner.
>
> Additionally, as an attorney (who has practiced criminal law in this State and
> in this County for over 25 years), I know when the use of deadly force is
> justified.  I also know when the use of deadly force is neither justified (nor
> required).  I am capable of, and have previously defended myself (on rare
> occasions) and others from non-deadly force.  Two of these incidents resulted
> in police intervention.  On one such occasion, I was compelled to intervene
> when my client was being choked by her estranged husband.  On another such
> occasion, I was assaulted with a 12" butcher's knife by an irate employee.  I
> have been threatened once by the spouse of my (divorce) client, and once by
> my own (unhappy) client.
>
> However, as we see every day, sometimes, non-deadly force is simply not
> enough for self-defense.  In those situations, I am entitled to, and, by applying

21

for a full carry pistol permit, it is my intention to carry a licensed concealed pistol to defend myself and others in the event circumstances require it.

Finally, I am a law-abiding citizen. I have never been convicted of a crime, nor have I ever assaulted or threatened to assault another person.

Tomari Decl. Exhibit F.

27.    Upon completion of its investigation, the Department of Public Safety recommended denial of Kachalsky's application as he failed to 'demonstrate a need for self protection distinguishable from that of the general public. Tomari Decl. Exhibit F.

28.    The application, investigation file and recommendations of the Department of Public Safety were forwarded to the Hon. Susan Cacace, who acted as the licensing officer for Kachalsky application. Cacace Decl. ¶ 2.

29.    After reviewing the materials related to Mr. Kachalsky's application, Judge Cacace issued a decision and order denying Mr. Kachalsky's application, dated October 8, 2008, noting "the State has a substantial and legitimate interest and grave responsibility for ensuring the safety of the general public" and that licensing officers "are vested with broad discretion in determining applications for an unrestricted pistol license and are required to exercise their judgment on the basis of a total evaluation of relevant factors". Cacace Decl. ¶ 4; Tomari Decl. Exhibit K.

30.    Judge Cacace denied Kachalsky's application for an unrestricted, full carry pistol permit, as he failed to state "any facts which would demonstrate a need for self protection distinguishable from that of the general public", and because "based upon all the facts and circumstances of this application, it is my opinion that proper cause does not exist for the issuance of an unrestricted 'full carry' pistol license" to Mr. Kachalsky.  FAC ¶ 26; Cacace Decl. ¶ 5, Tomari Decl. Exhibit K.

22

31.     Kachalsky appealed the denial of his application to the New York State Appellate Division, Second Department through a Special Proceeding commenced pursuant to Article 78 of the New York Civil Practice Law and Rules ("CPLR"). In his Verified Petition, Kachalsky asserted a Second Amendment challenge. Tomari Decl. Exhibits L and M. By Order dated September 8, 2009, the Appellate Division held that Kachalsky "failed to demonstrate 'proper cause' for the issuance of a 'full carry permit' [and] accordingly, [Judge Cacace's] determination was not arbitrary and capricious and should not be disturbed". Kachalsky v. Cacace, 65 A.D.3d 1045 (2d Dep't 2009); FAC ¶ 27, Tomari Decl. Exhibit A.

32.     Kachalsky then sought leave to appeal the denial of his Article 78 petition to the New York Court of Appeals, again, arguing that the denial of a "full carry" permit infringed his Second Amendment right. Tomari Decl. Exhibit N. The Court of Appeals, *sua sponte,* dismissed his appeal, upon the grounds that "no substantial constitutional question is directly involved". Kachalsky v. Cacace, 14 N.Y.3d 743 (2010); FAC ¶ 28, Tomari Decl. Exhibit A.

33.     The Court of Appeals dismissal of Kachalsky's petition for leave to appeal was issued prior to the Supreme Court's decision in McDonald v. City of Chicago, which held that the Second Amendment applied to the states. FAC ¶ 28, Tomari Decl. Exhibit A.

34.     Kachalsky has taken no further action on his application and has not re-applied for a license. FAC ¶ 29, Tomari Decl. Exhibit A.

**B.    Nikolov**

35.     In March, 2009, Nikolov applied for a "full carry" permit to carry concealed handguns with her while in public. FAC ¶ 30, Tomari Decl. Exhibits A and G.

36.     As part of her application, Nikolov listed as factors she believed established "proper cause" for a full carry permit:

23

First of all, I have been a law-abiding citizen my entire life, as evidenced by my non-existent criminal record. And I meet all the other minimum requirements stated within the Pistol License Information Handbook.

In addition, I currently possess a concealed weapon permit (with full-carry privileges) in the State of Florida and have never once brandished or discharged my firearms anywhere other than in a safe manner at a law-enforcement utilized shooting range. As someone with considerable experience carrying a firearm legally, I am well aware of the responsibility involved when carrying a concealed firearm and the restraint required.

If ever confronted with a potentially dangerous situation, common sense dictates that the course of action is to extract myself from the situation and contact the authorities immediately. And if I am unable to escape, the only time I would ever take out my firearm would be if my life were in imminent danger and I have exhausted all other non-lethal options. But even then, depending on the circumstances (closed quarters, innocent people nearby, etc.), I would still need to determine whether using a firearm would be prudent.

I have completed three firearms safety courses with NRA certified Instructors over the past three years and continually seek opportunities to further educate myself in the area of safety, even when not required by law.

For the past 20 years I have been a licensed commercial pilot and for more than two years, a certified flight instructor and instrument flight instructor. As a pilot and more importantly, someone who teaches people to fly, it is absolutely critical for me to always remain calm regardless of how stressful a situation becomes. I mention this because a calm demeanor is essential when either involved in or a witness to a potentially dangerous situation.

Also relevant to my application and establishing proper cause for issuing me a New York State full carry firearm license is my status a [sic] transgender female, [sic] the National Coalition of Anti-Violence programs reports that I am far more likely to be a victim of violent crime than a genetic female. And these hate crimes are increasingly locally, as well as nationwide. I have included a list of hundreds of crimes against people in similar circumstances as myself, some of which are high profile, like the Brandon Teena murder.

Tomari Decl. Exhibit G.

37.    Upon completion of its investigation, the Department of Public Safety recommended denial of Nikolov's application as she failed to demonstrate a need for self protection distinguishable from that of the general public.   Tomari Decl. Exhibit G.

24

38.     The application, investigation file and recommendations of the Department of

Public Safety were forwarded to the Hon. Jeffrey A. Cohen, who acted as the licensing officer

for Nikolov's application.  Cohen Decl. ¶ 2.

39.     After reviewing the materials related to Ms. Nikolov's application, Judge Cohen

issued a decision and order denying Mr. Kachalsky's application, dated October 2 2008, because

she failed to demonstrate "that she has a special need for self-protection distinguishable from that

of the general public".  FAC ¶ 30; Cohen Decl. ¶ 5; Tomari Decl. Exhibit O.  Ms. Nikolov did

not appeal her decision of re-apply for a license.

## C.     Detmer

40.     Detmer is licensed to have a handgun for the purpose of target shooting only.

FAC ¶ 32, Tomari Decl. Exhibits A and H.

41.     In July, 2010 Detmer sought to amend his current pistol permit from target

shooting only, to a "full carry" permit to carry concealed handguns while in public.  FAC ¶ 32,

Tomari Decl. Exhibits A and H.

42.     As part of his application, Detmer listed as factors he believed established "proper

cause" for a full carry permit:

> I am a Federal Law Enforcement Officer with the United States Coast Guard
> (USGC).  Specifically, I have been a qualified Boarding Team Member (BTM)
> since September, 2004.  When on-duty with the USCG I carry a .40 caliber
> pistol as a personal defense weapon.  As a BTM my duties include boarding
> pleasure and commercial boats, inspecting shore side facilities and interacting
> with the public, all while performing the public service of enforcing laws.  To
> maintain my BTM qualification, I complete semi-annual training consisting of
> a non-firing judgmental pistol course, a firing tactical pistol course, and use -
> of-force training.  This training ensures I use the pistol safely and properly
> while on-duty.  With a full carry permit, I would safely provide the same
> public service of enforcing laws while off-duty, if needed.  My training and
> experience with the USGC shows I am qualified to have a full carry permit.

25

> Attached is my enlistment contract with the USCG, showing I will be working for the USCG until at least December, 2014. Also attached is my BTM qualification letter, dated September, 2004.

FAC ¶ 31, Tomari Decl. Exhibit H.

43.　　Detmer's application represented that while he carries a .40 caliber handgun when on duty with the Coast Guard, he has no authority to make arrests, and must surrender the handgun each time he leaves duty. FAC ¶ 31, Tomari Decl. Exhibits A and H.

44.　　Upon completion of its investigation, the Department of Public Safety recommended denial of Detmer's application as he failed to 'demonstrate a need for self protection distinguishable from that of the general public. FAC ¶ 32, Tomari Decl. Exhibit H.

45.　　After reviewing the materials related to Mr. Detmer's application, Judge Lorenzo denied Detmer's application to change his permit from "target shooting", to "full carry", and so informed him through correspondence dated September 27, 2010, finding there was "no justification" warranting a "full carry" permit. FAC ¶ 33; Lorenzo Decl. ¶ 5; Tomari Decl. Exhibit P.

**D.**　　**Nance**

46.　　Nance is licensed to have a handgun for the purpose of target shooting only. FAC ¶ 34, Tomari Decl. Exhibits A and I.

47.　　In June, 2010 Nance sought to amend his pistol permit from target shooting only, to a "full carry" permit to carry concealed handguns while in public. FAC ¶ 34, Tomari Decl. Exhibit I.

48.　　As part of his application, Nance listed as factors he believed established "proper cause" for a full carry permit:

I am a citizen in good standing in the community with many family and social ties. I am steadily employed and stable. I am of good moral character.

My intent to change restriction is due to my desire to become involved in competitive shooting at various range locations. Also, the NRA has offered to partner with my wife to provide all female classes to women. It is my intention to co-instruct these classes. I would like to use my NRA Instructor Safety certifications to promote safe gun handling at various locations. Having a full carry permit would facilitate these endeavors.

FAC ¶ 31, Tomari Decl. Exhibit I.

49.     Upon completion of its investigation, the Department of Public Safety recommended denial of Nance's application as he failed to 'demonstrate a need for self protection distinguishable from that of the general public. FAC ¶ 34, Tomari Decl. Exhibit I.

50.     After reviewing the materials related to Mr. Nance's application, Judge Holdman issued a Decision dated September 9, 2010 denying Nance's application to change his permit from "target shooting", to "full carry". FAC ¶ 35, Tomari Decl. Exhibit Q; Holdman Decl. ¶4.

51.     Judge Holdman's September 9, 2010 Decision, observed that "those charged with the duty to oversee handgun licensing . . .must . . . recognize and honor the right while at the same time recognizing the limits to the right to bear arms under the Second Amendment". Holdman Decl. ¶ 5; Tomari Decl. Exhibit Q.

52.     Judge Holdman's September 9, 2010 Decision further found that "[t]he burden of establishing 'proper cause' for the issuance of a full-carry permit is upon the applicant to establish a 'special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession' ". Holdman Decl. ¶ 6; Tomari Decl. Exhibit Q.

53.     Upon reviewing Mr. Nance's application materials, Judge Holdman concluded that Nance had "not provided the court with any information that he faces any danger of any kind that would necessitate the issuance of a full carry firearm license; or [had] demonstrated a need

27

for self-protection distinguishable from that of the general public or of other persons similarly situated", and thus denied his application to amend his license from target shooting to "full carry".  FAC ¶ 35; Holdman Decl. ¶ 5; Tomari Decl. Exhibit Q.

### D.  Marcucci-Nance

54.  Marcucci-Nance is licensed to have a handgun for the purpose of target shooting only.  FAC ¶ 36, Tomari Decl. Exhibits A and J.

55.  In June, 2010 Marcucci-Nance sought to amend her pistol permit from target shooting only, to a "full carry" permit to carry concealed handguns while in public.  FAC ¶ 36, Tomari Decl. Exhibits A and J.

56.  As part of her application, Marcucci-Nance listed as factors she believed established "proper cause" for a full carry permit:

> I am a citizen in good standing in the community with many familial and social ties.  I am steadily employed and stable.  I am of good moral character.  My intent to change restriction is due to my desire to become involved in competitive target shooting at various range locations.  Also, the NRA has offered to partner with me to provide all female classes to women.
>
> I would like to use my NRA Instructor Safety certifications to promote safe gun handling at various locations.  Having a full carry permit would facilitate these endeavors.

FAC ¶ 36, Tomari Decl. Exhibit J.

57.  Upon completion of its investigation, the Department of Public Safety recommended denial of Marcucci-Nance's application as she failed to 'demonstrate a need for self protection distinguishable from that of the general public. FAC ¶ 37, Tomari Decl. Exhibit J.

58.  Judge Holdman's September 9, 2010 Decision, observed that "those charged with the duty to oversee handgun licensing . . .must . . . recognize and honor the right while at the

28

same time recognizing the limits to the right to bear arms under the Second Amendment".
Holdman Decl. ¶ 8; Tomari Decl. Exhibit R.

59.     Judge Holdman September 9, 2010 Decision further found that "[t]he burden of
establishing 'proper cause' for the issuance of a full-carry permit is upon the applicant to establish
a 'special need for self-protection distinguishable from that of the general community or of
persons engaged in the same profession' ".  Holdman Decl. ¶ 8: Tomari Decl. Exhibit R.

60.     Upon reviewing Marcucci- Nance's application materials, Judge Holdman
concluded that Marcucci-Nance had "not provided the court with any information that he faces
any danger of any kind that would necessitate the issuance of a full carry firearm license; or
[had] demonstrated a need for self-protection distinguishable from that of the general public or of
other persons similarly situated", and thus denied his application to amend his license from target
shooting to "full carry".   FAC ¶ 37; Holdman Decl. ¶¶ 8-9; Tomari Decl. Exhibit R.

## IV.     NEW YORK'S INTEREST IN LIMITING CONCEALED WEAPONS IN PUBLIC

### A.     Legislative History and Historical Perspective

61.     The current version of New York's Penal Law §400.00(2)(f) was enacted in 1911
as "the Sullivan Law".  It was enacted to combat handgun violence and provided in its original
format:

> Any person over the age of sixteen years, who shall have in his possession in any
> city, village or town of this state, any pistol, revolver or other firearm of a size
> which may be concealed upon the person, without a written license therefore,
> issued to him by a police magistrate of such city or village, or by a justice of the
> peace of such town, or in such manner as may be prescribed by ordinance in such
> city, village or town, shall be guilty of a misdemeanor.
>
> Any person over the age of sixteen year, who shall have or carry concealed upon
> his person in any city, village, or town of this state, any pistol, revolver, or other
> firearm without a written license therefore issued to him by a police magistrate of
> such city or village, or by a justice of the peace of such town, or in such a manner

29

as may be prescribed by ordinance of such city, village or town, shall be guilty of a felony.

N.Y. Penal Law § 1897 (1911) (current version at N.Y. Penal Law § 400.00 (2)(f)

(McKinney 2010)); Tomari Decl. Exhibit S (1).

62.    A January 30th, 1911 New York Times article states:

A marked increase in the number of homicides and suicides in this city by shooting has led officials of the Coroner's office to start a movement which they hope will lead to new legislation restricting the sale of firearms…one of the Coroner's clerks has just completed a list of recommendations to the Legislature, which he and his fellow officials believe will result in materially decreasing acts of violence in which revolvers figure.

Tomari Decl. Exhibit S (2).

63.    The Law was intended to eradicate "the concealed weapon evil" (Tomari Exhibit S (2)), limit gang violence (Tomari Decl., Exhibit S (3)), and to "decrease appreciably the number of homicides, accidental and impulsive, while some restraint will be imposed even upon the criminals." (Tomari Decl., Exhibit S (4)).

64.    Testimony before the Senate Codes Committee hearing stated that the Sullivan law would prevent fifty murders in New York City annually, remove firearms from the hands of criminals. (Tomari Decl., Exhibit S (5)).

65.    Senator Henry W. Pollock, a member of the Senate Codes Committee that approved the text of the Sullivan law, stated in a September 1, 1911 letter to New York Times that the bill was intended "to punish for the unlawful possession of dangerous weapons" and to "aid the authorities in the identification of the owner of a firearm used in the commission of a crime." Senator Pollock stated that "the only opposition to any of the provisions of this bill urged before either of the committees of the Legislature was that of

30

representatives of manufacturers and dealers in firearms." (Tomari Decl., Exhibit S (6).

66.    Two years after the Sullivan Law's initial enactment, a 1913 amendment created

the "proper cause" requirement by the addition of a new paragraph stating:

> In addition, it shall be lawful for any magistrate, upon proof before him that the person applying therefore is of good moral character, and that *proper cause* exists for the issuance thereof, to issue such person a license to have and carry concealed a pistol or revolver without regard to employment or place of possessing such weapon...

N.Y. Penal Law § 1897 (1913) (current version at N.Y. Penal Law § 400.00 (2)(f)

(McKinney 2010)); Tomari Decl. Exhibit S (7).

67.    A 1921 amendment divided the law into sections and changed the licensing

language to provide:

> In addition, it shall be lawful for *the police commissioner in the city of New York or elsewhere in this state, for a judge or justice of a court of record*, upon proof before him of the person applying therefore is of good moral character, and that proper cause exists for the issuance thereof, to issue such person a license to have and carry concealed a pistol or revolver without regard to employment or place of possessing such weapon...

N.Y. Penal Law § 1897 (9) (1921) (current version at N.Y. Penal Law § 400.00 (2)(f)

(McKinney 2010)) (emphasis added); Tomari Decl. Exhibit S (8).

68.    The text of the Sullivan Law remained largely unchanged until the early 1960s.

On January 3rd, 1962, Senator Albert Berkowitz, at the request of the New York State Joint

Legislative Committee on Firearms and Ammunitions, introduced an act to amend and

reorganize provisions of the Penal Law.  The 1962 Report of the New York State Joint

Legislative Committee on Firearms and Ammunition states that "more than a quarter of a million

serious crimes are committed with weapons annually in the United States, and the number is on

the increase." Rep. of N.Y.J. Legis. Comm., No. 29 at 11 (1962); Tomari Decl. Exhibit S (9).

31

69.     Additionally, the report states:

The legislative problem posed for the fifty-one American jurisdictions (fifty states
and the District of Columbia), charged with the major responsibility of criminal
law enforcement in the United States, suggests itself: to enact statutes adapted to
prevent these crimes and occurrences before they happen, and, at the same time,
preserve the legitimate interests of individual liberty, training for national defense,
hunting, target shooting and trophy collecting.

70.     On July 1, 1963, a modified version of the original bill became effective. Rep. of

N.Y. J. Legis. Comm., No. 35 at 5 (1963); Tomari Decl. Exhibit S (10).

71.     The purpose of the amendment was stated to be for "clarification and

rearrangement of present laws affecting firearms and ammunition, and contains no substantive

change in the present laws." N.Y. Legis. Ann. at 65 (1963), (emphasis in original), Tomari Decl.

Exhibit S (11).

72.     Thus, the licensing provisions formerly found in §1897 were placed in §1903(2)

of the Penal Laws of New York.   N.Y. Penal Law § 1903 (1963) (current version at N.Y. Penal

Law §400.00(2)(f) (McKinney 2010); Tomari Decl. Exhibit S (12).

73.     The 1963 New York State Legislative Annual states:

It is noteworthy that the New York State Conservation Council, which represents
hundreds of thousands of sportsmen and to which belong substantially all the
responsible conservationist groups in the state, at the State Convention in Lake
Placid last October, unanimously adopted a resolution not to oppose this bill,
provided that any newly discovered substantive changes would be deleted.

N.Y. Legis. Ann. 1963 at 66; Tomari Decl. Exhibit S (13).

74.     In its 1965 report, the New York State Joint Legislative Committee on Firearms

and Munitions again recognized the role of the penal law in crime and violence prevention.

Specifically, the Committee stated that "the primary value to law enforcement of adequate

32

statutes dealing with dangerous weapons is prevention of crimes of violence before their

consummation." Rep. of N.Y. J. Legis. Comm., No.6 at 12 (1965); Tomari Decl. Exhibit S (13).

75.   Additionally, the committee states:

…in the absence of adequate weapons legislation, under the traditional law of criminal attempt, lawful action by the police must await the last act necessary to consummate the crime…adequate statutes governing firearms and weapons would make lawful intervention by police and prevention of these fatal consequences, before any could occur."

Rep. of N.Y. J. Legis. Comm., No.6 at 13 (1965); Tomari Decl. Exhibit S (13)

76.   No significant revisions occurred to the text of §1903 until the Revised Penal Law

of 1965 came into effect in 1967 which renumbered many penal provisions thereby creating

today's modern New York Penal Law §400.00.

77.   In the past 30 years, the legislature has repeatedly chosen not to remove the

"proper cause" requirement for concealed carry permits. Notably, Senator Franz Leichter

enumerated many of the reasons why the "proper cause" requirement of New York Penal Law

§400.00(2)(f) should remain intact during the 1982 Senate debate over Bill Number 3409, an act

to amend the Penal Law, in relation to issuance of licenses to have and carry pistols:

And certainly one of the concerns…that any licensing authority ought to have and which will be lost under your bill is some assessment of the maturity, the responsibility and the ability of the person is licensed to safely possess and use a handgun.

So we are not only talking about crime, which obviously is important, but we're also talking about public safety…Now, in this instance, it's not only protecting a person from himself but it's protecting innocent people who get shot every day because handguns are lying around, and that is something that should be of concern to all of us…I'm afraid in your bill that some of the restrictions and some of the safeguards that we have are going to be eliminated.

…by making handguns more readily and easily accessible and available in our society, it means inevitably that more handguns are going to come into the hands of criminals, and by loosening your standards for licensing, it means that people are going to have

33

handguns who either aren't going to safeguard them properly or just there's going to be more handguns available that are going to be stolen or are going to be used in the commission of a crime.

N.Y. Senate Debate on Senate Bill 3409, Jun. 2, 1987, at 2470-2474 (Statement of Senator Leichter); Tomari Decl. Exhibit S (14).

## B.  NEW YORK HAS A COMPELLING INTEREST IN LIMITING CONCEALED HANDGUNS

78.  New York has a compelling and well recognized interest in limiting the number of guns on its street; especially handguns, which are easily concealed and closely linked to use in crime. These interests are described in part in the declarations submitted in support of the State Defendants' Motion for Summary Judgment, and described in the studies, articles, history and reports referenced in the State Defendants' Memorandum of Law in Support of Motion for Summary Judgment.  These include: Declaration of Philip J. Cook, ("Cook Decl."); Declaration of Franklin E. Zimring, ("Zimring Decl."); Declaration of Thomas L. Fazio ("Fazio Decl."); Declaration of Andrew Lunetta, ("Lunetta Decl."); Declaration of Stephanie Miner ("Miner Decl."); and Declaration of the Hon. David R. Roefaro ("Roefaro Decl.").

79.  Many Americans die by gunfire.  The gun deaths from homicide, accident and suicide have totaled close to one million during the last three decades. In 2007, the most recent year for which the National Center for Health Statistics provides data on deaths, there were 18,361 criminal homicides, of which 69% were committed with guns.  Cook Decl. ¶ 3.

80.  In 2007, homicide victimization rates were 15 times as high for black men aged 15-34, as for white non-Hispanic men in this age group.  Homicide is the leading cause of death for black males age 15-34, and the second-leading cause of death for Hispanic males in this age group.  Cook Decl. ¶ 4.

34

81.     Handguns are especially a law enforcement and public health concern because they are much more likely to be used in criminal violence than long guns. While handguns are approximately one third of all guns owned by civilians in the United States, they are used in more than 75% of all gun killings. Cook Decl. ¶ 9; Zimring Decl. ¶ 5.

82.     Handguns pose a particular public safety challenge because they are smaller, more conveniently carried, and easily concealed from law enforcement, potential victims, and the public at large. Cook Decl. ¶ 17.

83.     It takes little skill to operate a modern semi-automatic pistol and a person with just a few pockets can easily carry dozen of rounds of ammunition without ready detection. Declaration of Thomas L. Fazio, sworn to January 21, 2011 ("Fazio Decl.") ¶ 4.

84.     Of the 536 law enforcement officers who were feloniously killed in the United States between 2000 and 2009, 490 (91%) were assaulted with a firearm and 73 % of those were with a handgun. Cook Decl. ¶ 5; Fazio Decl. ¶ 7.

85.     Ninety-four percent of all law enforcement officers feloniously killed in the line of duty in 2009 were killed by a gun, of which 58% were killed by handguns. Declaration of Andrew Lunetta, sworn to January 25, 2011 ("Lunetta Decl.") ¶ 11.

86.     Every New York City Police Department ("NYPD") officer killed since 2005 has been killed with a handgun. Lunetta Decl. ¶ 10.

87.     The likelihood that a gun will be used in crime is closely linked to the general availability of guns, and especially handguns. Cook Decl. ¶¶ 12, 14; Roefaro Decl. ¶ 5; Lunetta Decl. ¶ 12.

88.     Allowing more individuals to carry concealed handguns will endanger officers stopping individuals on the street or making car stops, and complicate interactions between uniformed officers and those working in plain clothes or off-duty. Lunetta Decl. ¶¶ 13- 16.

89.     From 1981 to 2009, 26 police officers around the country were shot and killed by fellow officers who had mistaken them for criminals. Fazio Decl. ¶ 6.

90.     The ability to stop and frisk individuals who appear to be carrying handguns in public is one of the NYPD's greatest tactics in curbing violence. Increasing the prevalence of concealed handguns will undermine that tactic. Lunetta Decl. ¶ 16.

91.     The majority of criminal homicides and other serious crimes are committed by individuals who have not been convicted of a felony and would receive permits to carry concealed weapons without the "proper cause" requirement. Cook Decl. ¶¶ 27-35; Roefaro Decl. ¶¶ 4, 6.

Dated:  New York, New York
        January 26, 2011

                              ERIC T. SCHNEIDERMAN
                              Attorney General of the
                              State of New York
                              Attorney for State Defendants
                              By:


                              Anthony J. Tomari
                              Monica Connell
                              Assistant Attorney General
                              120 Broadway - 24th Floor
                              New York, New York 10271
                              (212) 416 - 8553

To:     Alan Gura, Esq.
        Gura & Possessky, PLLC

        Melissa-Jean Rotini, Esq.
        Westchester County Attorney's Office

                              36