IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

| | | |
|---|---|---|
| ALAN KACHALSKY, et al., | : | Case No. 10-CV-05413-CS |
| | : | |
| Plaintiffs, | : | SEPARATE STATEMENT OF |
| | : | DISPUTED MATERIAL FACTS |
| v. | : | IN OPPOSITION TO INDIVIDUAL |
| | : | DEFENDANTS' MOTION FOR |
| SUSAN CACACE, | : | SUMMARY JUDGMENT [L.R. 56.1] |
| | : | |
| Defendants. | : | |
| | : | |

-------------------------------------------------------X

SEPARATE STATEMENT OF DISPUTED MATERIAL FACTS IN OPPOSITION TO
INDIVIDUAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

**COME NOW** the Plaintiffs, Alan Kachalsky, Christina Nikolov, Eric Detmer, Johnnie

Nance, Anna Marcucci-Nance, and Second Amendment Foundation, Inc., by and through

undersigned counsel, and submit their Separate Statement of Disputed Material Facts in

Opposition to Individual Defendants' Motion for Summary Judgment.

Dated: February 9, 2011                    Respectfully submitted,

Alan Gura*                                 Vincent Gelardi
Gura & Possessky, PLLC                     Gelardi & Randazzo
101 N. Columbus Street, Suite 405          800 Westchester Avenue, Suite S-608
Alexandria, VA 22314                       Rye Brook, NY 10573
703.835.9085/Fax 703.997.7665             914.251.0603/Fax 914.253.0909
Lead Counsel                               Local Counsel
*Admitted Pro Hac Vice


By:   /s/ Alan Gura
      Alan Gura

      Attorneys for Plaintiffs

**Alleged Fact**                                      **Response**

1.    Plaintiff Alan Kachalsky is a natural        1.    Undisputed.
      person; and a citizen of the United
      States, State of New York, County of
      Westchester.  First Amended
      Complaint ("FAC") ¶ 1; Tomari
      Decl. Exhibit "A".

2.    Plaintiff Christina Nikolov is a            2.    Undisputed.
      natural person; and a citizen of the
      United States, State of New York,
      County of Westchester.  FAC ¶ 2;
      Tomari Decl. Exhibit "A".

3.    Plaintiff Eric Detmer is a natural         3.    Undisputed.
      person; and a citizen of the United
      States, State of New York, County of
      Westchester.  FAC ¶ 3; Tomari Decl.
      Exhibit "A".

4.    Plaintiff Johnnie Nance is a natural       4.    Undisputed.
      person; and a citizen of the United
      States, State of New York, County of
      Westchester.  FAC ¶ 4; Tomari Decl.
      Exhibit "A".

5.    Plaintiff Anna Marcucci-Nance is a        5.    Undisputed.
      natural person; and a citizen of the
      United States, State of New York,
      County of Westchester.  FAC ¶ 5;
      Tomari Decl. Exhibit "A".

6.    Plaintiff Second Amendment               6.    Undisputed.
      Foundation, Inc. ("SAF") is a
      non-profit membership organization
      incorporated under the laws of the
      State of Washington, with its
      principal place of business in
      Bellevue, Washington.  FAC ¶ 6;
      Tomari Decl. Exhibit "A".

**Alleged Fact**                                    **Response**

7.    The Hon. Susan Cacace is now, and          7.    Undisputed.
      was at all times relevant herein, a
      County Court judge for Westchester
      County ("Westchester").  She has
      been on the bench for five (5) years.
      Pursuant to New York State Penal
      Law §265.00 (10) as a county judge
      she is also a handgun licensing
      officer for Westchester.  Declaration
      of Hon. Susan Cacace. ("Cacace
      Decl.") ¶ 2.

8.    The Hon. Jeffrey A. Cohen currently       8.    Undisputed.
      sits as a Justice on the bench of the
      Appellate Division, Second
      Department.  Prior to his
      appointment thereto on December 9,
      2010, he served as a County Court
      judge for Westchester for three (3)
      years.  He has been on the bench for
      four (4) years.  Pursuant to New
      York State Penal Law §265.00 (10)
      as a county judge he was also a
      handgun licensing officer for
      Westchester.  Declaration of the
      Hon. Jeffrey A. Cohen ("Cohen
      Decl.") ¶ 2.

9.    The Hon. Albert Lorenzo is now, and       9.    Undisputed.
      was at all times relevant herein, an
      Acting Justice for the Supreme
      Court, of the State of New York,
      Westchester County.  He has been on
      the bench for eight (8) years.
      Pursuant to New York State Penal
      Law §265.00 (10) as an acting justice
      he serves as a handgun licensing
      officer for Westchester.  Declaration
      of Hon. Albert Lorenzo ("Lorenzo
      Decl.") ¶ 2.

**Alleged Fact**

**Response**

10.    The Hon. Robert K. Holdman currently sits as a Justice of the Supreme Court of the State of New York, Bronx County.  Prior to serving as a Supreme Court Justice for the Bronx, and at all times relevant herein, he served as a Justice for the Supreme Court, of the State of New York, Westchester County. He has been on the bench since June of 2005.  Pursuant to New York State Penal Law §265.00 (10), as a Supreme Court Justice in Westchester, he was also a handgun licensing officer for Westchester County. Declaration of Hon. Robert K. Holdman ("Holdman Decl.") ¶ 2.

10.    Undisputed.

11.    New York State does not ban handguns, but requires them to be licensed. FAC ¶ 21, Tomari Decl. Exhibit "A";  N.Y. Penal Law § 265.00; § 400.00 *et seq.*; Declaration of Bruce Bellom, sworn to January 25, 2011 ("Bellom Decl."), ¶ 3.

11.    Disputed.  As described more fully in the Amended Complaint and Plaintiffs' Motion for Summary Judgment, New York law permits Defendants to generally ban the carrying of handguns.

12.    PL § 400.00 (2) sets forth the type of handgun permits available in this State.  PL § 400.00 (2) (a) expressly provides for handgun possession in the home; PL § 400.00 (2) (b) - (e) provides for various job related licenses; and PL § 400.00 (2)(f) governs the issuance of permits to carry concealed handguns in public. N.Y. Penal Law § 265.00; § 400.00 *et seq.*

12.    Undisputed.

**Alleged Fact**                                    **Response**

13.   PL § 400.00 sets forth that an              13.   Undisputed.
      individual seeking a carried
      concealed permit must (a) be over
      21; (b) be of good moral character;
      (c) never have been convicted of a
      felony or other serious crime (d)
      never have been mentally ill or
      confined to any institution; (e) never
      had a license revoked or been the
      subject of a family court order; (f)
      have undergone a firearms safety
      training if the permit is sought in
      Westchester; and as set forward in §
      400.00 (2)(f): must show "proper
      cause" exists for such a permit.  N.Y.
      Penal Law § 400.00 *et seq.*;  FAC ¶¶
      22, 24, Tomari Decl. Exhibit "A".

14.   "Proper cause" as used in the context       14.   Undisputed.
      of issuing handgun permits means a
      showing a need for "self-protection
      distinguishable from that of the
      general public".  FAC ¶¶ 25-26, 30,
      35; 36; 37, Tomari Decl. Exhibit
      "A"; Cacace Decl. ¶ 5; Cohn Decl. ¶
      5; Holdman Decl. ¶¶ 6-8; *Bach* v.
      *Pataki*, 408 F.3d 75, 80 (2d Cir.
      2003).

**Alleged Fact**                                    **Response**

15.  The Pistol Licensing Unit of the          15.  Undisputed.
     Westchester County Department of
     Public Safety maintains a copy of
     each application for a carry
     concealed, or "fully carry" permit;
     and conducts an investigation of each
     such application.  In so doing, it
     complies a file containing the results
     of the investigation and summarizes
     the investigation for the licensing
     officer who determines whether such
     permit will issue.   Declaration of
     Bruce Bellom, sworn to January 24,
     2011 ("Bellom Decl.") ¶¶ 1, 3; PL §
     400.00 (4).

16.  The application form requires the          16.  Undisputed.
     applicant to provide four (4)
     character references "who by their
     signature attest to [the applicant's]
     good moral character" and to
     disclose whether he/she has "ever
     been arrested, summoned, charged or
     indicted anywhere for any offense,
     including DWI, (except traffic
     infractions)" and if so, to disclose the
     date, police agency, charge and
     disposition, including the court and
     date of disposition. Bellom Decl. ¶ 5;
     Tomari Decl. Exhibit B.

**Alleged Fact**                                         **Response**

17.   In addition, the applicant must                17.   Undisputed.
      disclose whether he/she has ever: a)
      been discharged from any
      employment or the armed forces for
      cause; b)  undergone treatment for
      alcoholism or drug use; c) suffered
      from any mental illness; d) had a
      pistol license; dealer's license;
      gunsmith license; or any application
      for such a license disapproved or had
      such a license revoked or cancelled;
      e) any physical condition which
      could interfere with the safe and
      proper use of a handgun; and f) been
      charged, petitioned against, a
      respondent, or otherwise been a
      subject of a proceeding in family
      court.  If the "YES" box to any of
      these questions is checked, the
      applicant must provide a written
      explanation. Bellom Decl. ¶ 7;
      Tomari Decl. Exhibit B; PL § 400.00
      *et seq.*

18.   Upon receipt of a completed initial            18.   Undisputed.
      application, a police member of the
      Pistol Permit Unit conducts the
      investigation required under Penal
      Law §400.00(4).  For an initial
      application, this investigation
      includes a fingerprint based criminal
      background check with the New
      York State Department of Criminal
      Justice Services, the Federal Bureau
      of Investigation and the National
      Instant Criminal Background system.
      When the applicant is filing for a
      restriction change, the criminal
      background check is updated by a
      search of the National Instant
      Criminal Background system.
      Bellom Decl. ¶ 12; PL§400.00 *et seq.*

**Alleged Fact**                                    **Response**

19.   As part of the investigation, the            19.   Undisputed.
      applicant's identifying information is
      forwarded to the New York State
      Department of Mental Hygiene to
      determine if the applicant had any
      hospitalizations for mental illness.
      Bellom Decl. ¶ 13.

20.   In addition to the background and             20.   Undisputed.
      mental health check, the
      investigation includes a review of the
      application form, Character
      Reference Letters submitted with the
      application form, and the application
      attachment completed by the
      applicant.  Bellom Decl. ¶ 14.

21.   Upon review of all the materials,             21.   Undisputed, except to note that the
      once the investigation is deemed                    "investigation summary" referenced
      complete, an investigation summary                  by Defendants include
      is complied for the licensing officer,             recommendations. *See, e.g.*,
      whom, in Westchester,  pursuant to                  Plaintiffs' Exhibits C, E, G.
      statute, is a Judge. Prior to
      submission to the licensing officer
      however, the investigation summary,
      and all application materials, are
      submitted to a County Police
      lieutenant; the Chief Inspector of
      Administrative Services; and the
      Commissioner or a Deputy
      Commissioner, who all, also review
      the materials.  Bellom Decl. ¶¶ 2, 14;
      PL § 265.00(10).

**Alleged Fact**                                    **Response**

22.    Once all the reviews by the Department of Public Safety are complete, the entire investigation file is submitted to the Judge for review and decision on the application.  The role of the Pistol Permit Unit is limited to the investigation described herein. The County has no ability to grant or deny license applications or amendments.  Bellom Decl. ¶ 15.

22.    Disputed. The County, by and through its officers, make recommendations as to whether the applications should be granted or denied. *See, e.g.*, Plaintiffs' Exhibits C, E, G.

23.    In calendar year 2010, in Westchester County, 130 "carry concealed" pistol permits; an additional 41 pistol permits restricted to carrying for purposes of employment; and 471 pistol permits issued for the purpose of target shooting were issued.  Bellom Decl. ¶ 17.

23.    Plaintiffs are not in a position to admit or deny the truth of this statement, which is, in any event, wholly irrelevant.  It is beyond dispute that Plaintiffs' applications for carry permits were denied.

24.    This process, as just described above was used to compile the investigative files for Plaintiffs Alan Kachalsky (Tomari Decl. Exhibit F), Christina Nikolov (Tomari Decl. Exhibit G), Eric Detmer (Tomari Decl. Exhibit H), Johnnie Nance (Tomari Decl. Exhibit I) and Anna Marcucci-Nance (Tomari Decl. Exhibit J).  Bellom Decl. ¶ 16.

24.    On information and belief, undisputed, except to the extent that the County made recommendations regarding Plaintiffs' applications.

25.    In May, 2008, Kachalsky applied for a "full carry" permit to carry concealed handguns with him while in public.  FAC ¶ 26; Tomari Decl. Exhibit F.

25.    Undisputed.

9

**Alleged Fact**                                    **Response**

26.    As part of his application, Kachalsky     26.    Undisputed.
listed as factors he believed
established "proper cause" for a full
carry permit:

The factors which establish proper
cause for the issuance to myself of a
Full Carry pistol permit are: 1) the
Second Amendment of the
Constitution grants citizens the right
to bear arms.  As a citizen, I am
therefore entitled to exercise my
Constitutional right to bear arms.  I
believe the Constitutional right
entitles me to the permit without
further the need to establish "proper
cause".

If the issuing agency for some reason
requires more than this, then I will
cite the fact that we live in a world
sporadic random violence might at
any moment place one in a position
where one needs to defend oneself or
possibly others, e.g. random
shootings in universities (Virginia
Tech), post offices, airline check-in
counters, malls, road rage, as well as
the run-of-the-mill street muggings
and robberies.  While the odds of
finding oneself in a Virginia Tech
type situation are remote, one must
reflect that had there been even one
armed person, the death toll might
have been considerably less than 31
dead.  While one never knows what
one might do in such situations, it is
my belief that it is better to have the
option to defend oneself (and others)
than not to have the option.  As a
pilot and skydiver, I have been
trained to handle emergencies, and I

**Alleged Fact**                                     **Response**

have actually handled several
emergencies, so it is unlikely that I
will respond in a dangerous manner.

Additionally, as an attorney (who has
practiced criminal law in this State
and in this County for over 25 years),
I know when the use of deadly force
is justified. I also know when the use
of deadly force is neither justified
(nor required). I am capable of, and
have previously defended myself (on
rare occasions) and others from
non-deadly force.  Two of these
incidents resulted in police
intervention.  On one such occasion,
I was compelled to intervene when
my client was being choked by her
estranged husband.  On another such
occasion, I was assaulted with a 12"
butcher's knife by an irate employee.
I have been threatened once by the
spouse of my (divorce) client, and
once by my own (unhappy) client.

However, as we see every day,
sometimes, non-deadly force is
simply not enough for self-defense.
In those situations, I am entitled to,
and, by applying for a full carry
pistol permit, it is my intention to
carry a licensed concealed pistol to
defend myself and others in the event
circumstances require it.

Finally, I am a law-abiding citizen.  I
have never been convicted of a
crime, nor have I ever assaulted or
threatened to assault another person.

Tomari Decl. Exhibit F.

11

**Alleged Fact**                                    **Response**

27.   Upon completion of its investigation,        27.   Undisputed.
      the Department of Public Safety
      recommended denial of Kachalsky's
      application as he failed to
      'demonstrate a need for self
      protection distinguishable from that
      of the general public.  Tomari Decl.
      Exhibit F.

28.   The application, investigation file          28.   Undisputed.
      and recommendations of the
      Department of Public Safety were
      forwarded to the Hon. Susan Cacace,
      who acted as the licensing officer for
      Kachalsky application.  Cacace Decl.
      ¶ 2.

29.   After reviewing the materials related        29.   Undisputed.
      to Mr. Kachalsky's application,
      Judge Cacace issued a decision and
      order denying Mr. Kachalsky's
      application, dated October 8, 2008,
      noting "the State has a substantial
      and legitimate interest and grave
      responsibility for ensuring the safety
      of the general public" and that
      licensing officers "are vested with
      broad discretion in determining
      applications for an unrestricted pistol
      license and are required to exercise
      their judgment on the basis of a total
      evaluation of relevant factors".
      Cacace Decl. ¶ 4; Tomari Decl.
      Exhibit K.

**Alleged Fact**

**Response**

30.   Judge Cacace denied Kachalsky's
application for an unrestricted, full
carry pistol permit, as he failed to
state "any facts which would
demonstrate a need for self
protection distinguishable from that
of the general public", and because
"based upon all the facts and
circumstances of this application, it
is my opinion that proper cause does
not exist for the issuance of an
unrestricted 'full carry' pistol license"
to Mr. Kachalsky.  FAC ¶ 26;
Cacace Decl. ¶ 5,  Tomari Decl.
Exhibit K.

30.   Undisputed.

| Alleged Fact | Response |
|---|---|
| 31.  Kachalsky appealed the denial of his application to the New York State Appellate Division, Second Department through a Special Proceeding commenced pursuant to Article 78 of the New York Civil Practice Law and Rules ("CPLR"). In his Verified Petition, Kachalsky asserted a Second Amendment challenge.  Tomari Decl. Exhibits L and M. By Order dated September 8, 2009, the Appellate Division held that Kachalsky "failed to demonstrate 'proper cause' for the issuance of a 'full carry permit' [and] accordingly, [Judge Cacace's] determination was not arbitrary and capricious and should not be disturbed".  *Kachalsky* v. *Cacace*, 65 A.D.3d 1045 (2d Dep't 2009); FAC ¶ 27, Tomari Decl. Exhibit A. | 31.  Undisputed, except for the allegation that Kachalsky "asserted a Second Amendment challenge."  Kachalsky asserted that the Second Amendment secured his right to carry a gun in public, however, under New York law, Article 78 proceedings are not considered vehicles by which to lodge constitutional challenges to state law. It is well-established that "article 78 does not lie to challenge a legislative act . . . a petitioner who is challenging the validity of legislation may not use an article 78 proceeding for that purpose; a lawsuit to challenge the validity of legislation should take the form of an action for a declaratory judgment." *Matter of Council of City of N.Y.* v. *Bloomberg*, 6 N.Y.3d 380, 388 (2006) (citation omitted). "New York law permits a party in an Article 78 proceeding to 'raise a claim that the administrative application of a rule to her is unconstitutional,' but does not allow the party to raise a general constitutional challenge to a law or regulation." *Karamoko* v. *N.Y. City Hous. Auth.*, 170 F. Supp. 2d 372, 378 (S.D.N.Y. 2001) (quoting *Hachamovitch* v. *Debuono*, 159 F.3d 687, 695 (2d Cir. 1998)). In any event, this factual allegation is irrelevant to any issue in the case. |

**Alleged Fact**                                    **Response**

32.    Kachalsky then sought leave to appeal the denial of his Article 78 petition to the New York Court of Appeals, again, arguing that the denial of a "full carry" permit infringed his Second Amendment right.  Tomari Decl. Exhibit N.  The Court of Appeals, *sua sponte*, dismissed his appeal, upon the grounds that "no substantial constitutional question is directly involved".  *Kachalsky* v. *Cacace*, 14 N.Y.3d 743 (2010); FAC ¶ 28, Tomari Decl. Exhibit A.

32.    Undisputed, subject to the response to item number 31. In any event, this factual allegation is irrelevant to any issue in the case.

33.    The Court of Appeals dismissal of Kachalsky's petition for leave to appeal was issued prior to the Supreme Court's decision in *McDonald* v. *City of Chicago*, which held that the Second Amendment applied to the states.  FAC ¶ 28, Tomari Decl. Exhibit A.

33.    Undisputed, but in any event, these factual allegations are irrelevant to any issue in the case.

34.    Kachalsky has taken no further action on his application and has not re-applied for a license.  FAC ¶ 29, Tomari Decl. Exhibit A.

34.    Undisputed, but in any event, these factual allegations are irrelevant to any issue in the case.

35.    In March, 2009, Nikolov applied for a "full carry" permit to carry concealed handguns with her while in public.  FAC ¶ 30, Tomari Decl. Exhibits A and G.

35.    Undisputed.

**Alleged Fact**

**Response**

36.     As part of her application, Nikolov listed as factors she believed established "proper cause" for a full carry permit:

36.     Undisputed.

First of all, I have been a law-abiding citizen my entire life, as evidenced by my non-existent criminal record. And I meet all the other minimum requirements stated within the Pistol License Information Handbook.

In addition, I currently possess a concealed weapon permit (with full-carry privileges) in the State of Florida and have never once brandished or discharged my firearms anywhere other than in a safe manner at a law-enforcement utilized shooting range. As someone with considerable experience carrying a firearm legally, I am well aware of the responsibility involved when carrying a concealed firearm and the restraint required.

If ever confronted with a potentially dangerous situation, common sense dictates that the course of action is to extract myself from the situation and contact the authorities immediately. And if I am unable to escape, the only time I would ever take out my firearm would be if my life were in imminent danger an I have exhausted all other non-lethal options. But even then, depending on the circumstances (closed quarters, innocent people nearby, etc.), I would still need to determine whether using a firearm would be prudent.

**Alleged Fact**                                    **Response**

I have completed three firearms
safety courses with NRA certified
Instructors over the past three years
and continually seek opportunities to
further educate myself in the area of
safety, even when not required by
law.

For the past 20 years I have been a
licensed commercial pilot and for
more than two years, a certified
flight instructor and instrument flight
instructor.  As a pilot and more
importantly, someone who teaches
people to fly, it is absolutely critical
for me to always remain calm
regardless of how stressful a
situation becomes.  I mention this
because a calm demeanor is essential
when either involved in or a witness
to a potentially dangerous situation.

Also relevant to my application and
establishing proper cause for issuing
me a New York State full carry
firearm license is my status a [sic]
transgender female, [sic] the
National Coalition of Anti-Violence
programs reports that I am far more
likely to be a victim of violent crime
than a genetic female.  And these
hate crimes are increasingly locally,
as well as nationwide. I have
included a list of hundreds of crimes
against people in similar
circumstances as myself, some of
which are high profile, like the
Brandon Teena murder.

Tomari Decl. Exhibit G.

17

**Alleged Fact**                                    **Response**

37.  Upon completion of its investigation,      37.   Undisputed.
     the Department of Public Safety
     recommended denial of Nikolov's
     application as she failed to
     demonstrate a need for self
     protection distinguishable from that
     of the general public.  Tomari Decl.
     Exhibit G.

38.  The application, investigation file        38.   Undisputed.
     and recommendations of the
     Department of Public Safety were
     forwarded to the Hon. Jeffrey A.
     Cohen, who acted as the licensing
     officer for Nikolov's application.
     Cohen Decl. ¶ 2.

39.  After reviewing the materials related      39.   Undisputed.
     to Ms. Nikolov's application, Judge
     Cohen issued a decision and order
     denying Mr. Kachalsky's application,
     dated October 2 2008, because she
     failed to demonstrate "that she has a
     special need for self-protection
     distinguishable from that of the
     general public".  FAC ¶ 30; Cohen
     Decl. ¶ 5; Tomari Decl. Exhibit O.
     Ms. Nikolov did not appeal her
     decision of re-apply for a license.

40.  Detmer is licensed to have a handgun       40.   Undisputed.
     for the purpose of target shooting
     only.  FAC ¶ 32, Tomari Decl.
     Exhibits A and H.

41.  In July, 2010 Detmer sought to             41.   Undisputed.
     amend his current pistol permit from
     target shooting only, to a "full carry"
     permit to carry concealed handguns
     while in public.  FAC ¶ 32, Tomari
     Decl. Exhibits A and H.

**Alleged Fact**

**Response**

42.     As part of his application, Detmer
        listed as factors he believed
        established "proper cause" for a full
        carry permit:

42.     Undisputed.

I am a Federal Law Enforcement
Officer with the United States Coast
Guard (USGC).  Specifically, I have
been a qualified Boarding Team
Member (BTM) since September,
2004.  When on-duty with the USCG
I carry a .40 caliber pistol as a
personal defense weapon.  As a BTM
my dutied include boarding pleasure
and commercial boats, inspecting
shore side facilities and interacting
with the public, all while performing
the public service of enforcing laws.
To maintain my BTM qualification, I
complete semi-annual training
consisting of a non-firing judgmental
pistol course, a firing tactical pistol
course, and use -of-force training.
This training ensures I use the pistol
safely and properly while on-duty.
With a full carry permit, I would
safely provide the same public
service of enforcing laws while
off-duty, if needed.  My training and
experience with the USGC shows I
am qualified to have a full carry
permit.

Attached is my enlistment contract
with the USCG, showing I will be
working for the USCG until at least
December, 2014.  Also attached is
my BTM qualification letter, dated
September, 2004.

FAC ¶ 31, Tomari Decl. Exhibit H.

**Alleged Fact**                                              **Response**

43.    Detmer's application represented that          43.    Undisputed.
       while he carries a .40 caliber
       handgun when on duty with the
       Coast Guard, he has no authority to
       make arrests, and must surrender the
       handgun each time he leaves duty.
       FAC ¶ 31, Tomari Decl. Exhibits A
       and H.

44.    Upon completion of its investigation,         44.    Undisputed.
       the Department of Public Safety
       recommended denial of Detmer's
       application as he failed to
       'demonstrate a need for self
       protection distinguishable from that
       of the general public.  FAC ¶ 32,
       Tomari Decl. Exhibit H.

45.    After reviewing the materials related         45.    Undisputed.
       to Mr. Detmer's application, Judge
       Lorenzo denied Detmer's application
       to change his permit from "target
       shooting", to "full carry", and so
       informed him through
       correspondence dated September 27,
       2010, finding there was "no
       justification" warranting a "full
       carry" permit.  FAC ¶ 33; Lorenzo
       Decl. ¶ 5; Tomari Decl. Exhibit P.

46.    Nance is licensed to have a handgun           46.    Undisputed.
       for the purpose of target shooting
       only.  FAC ¶ 34, Tomari Decl.
       Exhibits A and I.

47.    In June, 2010 Nance sought to                 47.    Undisputed.
       amend his pistol permit from target
       shooting only, to a "full carry" permit
       to carry concealed handguns while in
       public.  FAC ¶ 34, Tomari Decl.
       Exhibit I.

**Alleged Fact**                                        **Response**

48.    As part of his application, Nance         48.    Undisputed.
       listed as factors he believed
       established "proper cause" for a full
       carry permit:

       I am a citizen in good standing in the
       community with many family and
       social ties.  I am steadily employed
       and stable.  I am of good moral
       character.

       My intent to change restriction is due
       to my desire to become involved in
       competitive shooting at various
       range locations.  Also, the NRA has
       offered to partner with my wife to
       provide all female classes to women.
       It is my intention to co-instruct these
       classes.  I would like to use my NRA
       Instructor Safety certifications to
       promote safe gun handling at various
       locations.  Having a full carry permit
       would facilitate these endeavors.

       FAC ¶ 31, Tomari Decl. Exhibit I.

49.    Upon completion of its investigation,    49.    Undisputed.
       the Department of Public Safety
       recommended denial of Nance's
       application as he failed to
       'demonstrate a need for self
       protection distinguishable from that
       of the general public.  FAC ¶ 34,
       Tomari Decl. Exhibit I.

**Alleged Fact**                                  **Response**

50.     After reviewing the materials related           50.     Undisputed.
        to Mr. Nance's application, Judge
        Holdman issued a Decision dated
        September 9, 2010 denying Nance's
        application to change his permit from
        "target shooting", to "full carry".
        FAC ¶ 35, Tomari Decl. Exhibit Q;
        Holdman Decl. ¶ 4.

51.     Judge Holdman's September 9, 2010            51.     Undisputed.
        Decision, observed that "those
        charged with the duty to oversee
        handgun licensing ... must ...
        recognize and honor the right while
        at the same time recognizing the
        limits to the right to bear arms under
        the Second Amendment".  Holdman
        Decl. ¶ 5; Tomari Decl. Exhibit Q.

52.     Judge Holdman's September 9, 2010            52.     Undisputed.
        Decision further found that "[t]he
        burden of establishing 'proper cause'
        for the issuance of a full-carry permit
        is upon the applicant to establish a
        'special need for self-protection
        distinguishable from that of the
        general community or of persons
        engaged in the same profession' ".
        Holdman Decl. ¶ 6; Tomari Decl.
        Exhibit Q.

**Alleged Fact**                                          **Response**

53.   Upon reviewing Mr. Nance's                53.   Undisputed.
      application materials, Judge
      Holdman concluded that Nance had
      "not provided the court with any
      information that he faces any danger
      of any kind that would necessitate
      the issuance of a full carry firearm
      license; or [had] demonstrated a need
      for self-protection distinguishable
      from that of the general public or of
      other persons similarly situated", and
      thus denied his application to amend
      his license from target shooting to
      "full carry".   FAC ¶ 35; Holdman
      Decl. ¶ 5; Tomari Decl. Exhibit Q.

54.   Marcucci-Nance is licensed to have a      54.   Undisputed.
      handgun for the purpose of target
      shooting only.  FAC ¶ 36, Tomari
      Decl. Exhibits A and J.

55.   In June, 2010 Marcucci-Nance              55.   Undisputed.
      sought to amend her pistol permit
      from target shooting only, to a "full
      carry" permit to carry concealed
      handguns while in public.  FAC ¶ 36,
      Tomari Decl. Exhibits A and J.

**Alleged Fact**                                   **Response**

56.   As part of her application,           56.   Undisputed.
      Marcucci-Nance listed as factors she
      believed established "proper cause"
      for a full carry permit:

      I am a citizen in good standing in the
      community with many familial and
      social ties.  I am steadily employed
      and stable.  I am of good moral
      character.  My intent to change
      restriction is due to my desire to
      become involved in competitive
      target shooting at various range
      locations.  Also, the NRA has
      offered to partner with me to provide
      all female classes to women.

      I would like to use my NRA
      Instructor Safety certifications to
      promote safe gun handling at various
      locations.  Having a full carry permit
      would facilitate these endeavors.

      FAC ¶ 36, Tomari Decl. Exhibit J.

57.   Upon completion of its investigation,  57.   Undisputed.
      the Department of Public Safety
      recommended denial of
      Marcucci-Nance's application as she
      failed to 'demonstrate a need for self
      protection distinguishable from that
      of the general public.  FAC ¶ 37,
      Tomari Decl. Exhibit J.

58.   Judge Holdman's September 9, 2010      58.   Undisputed.
      Decision, observed that "those
      charged with the duty to oversee
      handgun licensing ... must ...
      recognize and honor the right while
      the right to bear arms under the
      Second Amendment".  Holdman
      Decl. ¶ 8; Tomari Decl. Exhibit R.

24

| Alleged Fact | Response |
|---|---|
| 59. Judge Holdman September 9, 2010 Decision further found that "[t]he burden of establishing 'proper cause' for the issuance of a full-carry permit is upon the applicant to establish a 'special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession' ". Holdman Decl. ¶ 8: Tomari Decl. Exhibit R. | 59. Undisputed. |
| 60. Upon reviewing Marcucci- Nance's application materials, Judge Holdman concluded that Marcucci-Nance had "not provided the court with any information that he faces any danger of any kind that would necessitate the issuance of a full carry firearm license; or [had] demonstrated a need for self-protection distinguishable from that of the general public or of other persons similarly situated", and thus denied his application to amend his license from target shooting to "full carry".   FAC ¶ 37; Holdman Decl. ¶¶ 8-9; Tomari Decl. Exhibit R. | 60. Undisputed. |

**Alleged Fact**

61.     The current version of New York's
        Penal Law § 400.00(2)(f) was
        enacted in 1911 as "the Sullivan
        Law".  It was enacted to combat
        handgun violence and provided in its
        original format:

        Any person over the age of sixteen
        years, who shall have in his
        possession in any city, village or
        town of this state, any pistol,
        revolver or other firearm of a size
        which may be concealed upon the
        person, without a written license
        therefore, issued to him by a police
        magistrate of such city or village, or
        by a justice of the peace of such
        town, or in such manner as may be
        prescribed by ordinance in such city,
        village or town, shall be guilty of a
        misdemeanor.

        Any person over the age of sixteen
        year, who shall have or carry
        concealed upon his person in any
        city, village, or town of this state,
        any pistol, revolver, or other firearm
        without a written license therefore
        issued to him by a police magistrate
        of such city or village, or by a justice
        of the peace of such town, or in such
        a manner as may be prescribed by
        ordinance of such city, village or
        town, shall be guilty of a felony.

        N.Y. Penal Law § 1897 (1911)
        (current version at N.Y. Penal Law §
        400.00 (2)(f) (McKinney 2010));
        Tomari Decl. Exhibit S (1).

**Response**

61.     The former version of the law is
        irrelevant.

**Alleged Fact**

**Response**

62.     A January 30th, 1911 New York
        Times article states:

        A marked increase in the number of
        homicides and suicides in this city by
        shooting has led officials of the
        Coroner's office to start a movement
        which they hope will lead to new
        legislation restricting the sale of
        firearms…one of the Coroner's
        clerks has just completed a list of
        recommendations to the Legislature,
        which he and his fellow officials
        believe will result in materially
        decreasing acts of violence in which
        revolvers figure.

        Tomari Decl. Exhibit S (2).

62.     Plaintiffs are not in a position to
        admit or deny the truth of this
        statement, which is, in any event,
        wholly irrelevant.

63.     The Law was intended to eradicate
        "the concealed weapon evil" (Tomari
        Exhibit S (2)), limit gang violence
        (Tomari Decl., Exhibit S (3)), and to
        "decrease appreciably the number of
        homicides, accidental and impulsive,
        while some restraint will be imposed
        even upon the criminals." (Tomari
        Decl., Exhibit S (4)).

63.     The text of the various referenced
        documents is not disputed, but the
        legislative history of the Act as
        referenced by Defendants is entirely
        irrelevant to any issue in the case.

64.     Testimony before the Senate Codes
        Committee hearing stated  that the
        Sullivan law would prevent fifty
        murders in New York City annually,
        remove firearms from the hands of
        criminals. (Tomari Decl., Exhibit S
        (5)).

64.     The text of the various referenced
        documents is not disputed, but the
        legislative history of the Act as
        referenced by Defendants is entirely
        irrelevant to any issue in the case.

| Alleged Fact | Response |
|---|---|
| 65.  Senator Henry W. Pollock, a member of the Senate Codes Committee that approved the text of the Sullivan law, stated in a September 1, 1911 letter to New York Times that the bill was intended "to punish for the unlawful possession of dangerous weapons" and to "aid the authorities in the identification of the owner of a firearm used in the commission of a crime." Senator Pollock stated that "the only opposition to any of the provisions of this bill urged before either of the committees of the Legislature was that of representatives of manufacturers and dealers in firearms."  (Tomari Decl., Exhibit S (6). | 65.  The text of the various referenced documents is not disputed, but the legislative history of the Act as referenced by Defendants is entirely irrelevant to any issue in the case. |
| 66.  Two years after the Sullivan Law's initial enactment, a 1913 amendment created the "proper cause" requirement by the addition of a new paragraph stating:<br><br>In addition, it shall be lawful for any magistrate, upon proof before him that the person applying therefore is of good moral character, and that *proper cause* exists for the issuance thereof, to issue such person a license to have and carry concealed a pistol or revolver without regard to employment or place of possessing such weapon…<br><br>N.Y. Penal Law § 1897 (1913) (current version at N.Y. Penal Law § 400.00 (2)(f) (McKinney 2010)); Tomari Decl. Exhibit S (7). | 66.  The text of the various referenced documents is not disputed, but the legislative history of the Act as referenced by Defendants is entirely irrelevant to any issue in the case. |

**Alleged Fact**

**Response**

67.     A 1921 amendment divided the law into sections and changed the licensing language to provide:

In addition, it shall be lawful for *the police commissioner in the city of New York or elsewhere in this state*, *for a judge or justice of a court of record*, upon proof before him of the person applying therefore is of good moral character, and that proper cause exists for the issuance thereof, to issue such person a license to have and carry concealed a pistol or revolver without regard to employment or place of possessing such weapon…

N.Y. Penal Law § 1897(9)(1921) (current version at N.Y. Penal Law § 400.00 (2)(f) (McKinney 2010)) (emphasis added); Tomari Decl. Exhibit S (8).

67.     The text of the various referenced documents is not disputed, but the legislative history of the Act as referenced by Defendants is entirely irrelevant to any issue in the case.

68.     The text of the Sullivan Law remained largely unchanged until the early 1960s. On January 3rd, 1962, Senator Albert Berkowitz, at the request of the New York State Joint Legislative Committee on Firearms and Ammunitions, introduced an act to amend and reorganize provisions of the Penal Law.  The 1962 Report of the New York State Joint Legislative Committee on Firearms and Ammunition states that "more than a quarter of a million serious crimes are committed with weapons annually in the United States, and the number is on the increase." Rep. of N.Y.J. Legis. Comm., No. 29 at 11 (1962); Tomari Decl. Exhibit S (9).

68.     The text of the various referenced documents is not disputed, but the legislative history of the Act as referenced by Defendants is entirely irrelevant to any issue in the case.

| Alleged Fact | Response |
|---|---|
| 69.  Additionally, the report states:<br><br>The legislative problem posed for the fifty-one American jurisdictions (fifty states and the District of Columbia), charged with the major responsibility of criminal law enforcement in the United States, suggests itself: to enact statutes adapted to prevent these crimes and occurrences before they happen, and, at the same time, preserve the legitimate interests of individual liberty, training for national defense, hunting, target shooting and trophy collecting. | 69.  The text of the various referenced documents is not disputed, but the legislative history of the Act as referenced by Defendants is entirely irrelevant to any issue in the case. |
| 70.  On July 1, 1963, a  modified version of the original bill became effective. Rep. of N.Y. J. Legis. Comm., No. 35 at 5 (1963); Tomari Decl. Exhibit S (10). | 70.  The text of the various referenced documents is not disputed, but the legislative history of the Act as referenced by Defendants is entirely irrelevant to any issue in the case. |
| 71.  The purpose of the amendment was stated to be for "clarification and rearrangement of present laws affecting firearms and ammunition, and contains no substantive change in the present laws." N.Y. Legis. Ann. at 65 (1963), (emphasis in original), Tomari Decl. Exhibit S (11). | 71.  The text of the various referenced documents is not disputed, but the legislative history of the Act as referenced by Defendants is entirely irrelevant to any issue in the case. |
| 72.  Thus, the licensing provisions formerly found in § 1897 were placed in § 1903(2) of the Penal Laws of New York.  N.Y. Penal Law § 1903 (1963) (current version at N.Y. Penal Law § 400.00(2)(f) (McKinney 2010)); Tomari Decl. Exhibit S (12). | 72.  The text of the various referenced documents is not disputed, but the legislative history of the Act as referenced by Defendants is entirely irrelevant to any issue in the case. |

**Alleged Fact**

**Response**

73.    The 1963 New York State
Legislative Annual states:

It is noteworthy that the New York
State Conservation Council, which
represents hundreds of thousands of
sportsmen and to which belong
substantially all the responsible
conservationist groups in the state, at
the State Convention in Lake Placid
last October, unanimously adopted a
resolution not to oppose this bill,
provided that any newly discovered
substantive changes would be
deleted.

N.Y. Legis. Ann. 1963 at 66; Tomari
Decl. Exhibit S (13).

73.    The text of the various referenced
documents is not disputed, but the
legislative history of the Act as
referenced by Defendants is entirely
irrelevant to any issue in the case.

74.    In its 1965 report, the New York
State Joint Legislative Committee on
Firearms and Munitions again
recognized the role of the penal law
in crime and violence prevention.
Specifically, the Committee stated
that "the primary value to law
enforcement of adequate statutes
dealing with dangerous weapons is
prevention of crimes of violence
before their consummation."  Rep. of
N.Y. J. Legis. Comm., No.6 at 12
(1965); Tomari Decl. Exhibit S (13).

74.    The text of the various referenced
documents is not disputed, but the
legislative history of the Act as
referenced by Defendants is entirely
irrelevant to any issue in the case.

**Alleged Fact**

**Response**

75.   Additionally, the committee states:

 …in the absence of adequate weapons legislation, under the traditional law of criminal attempt, lawful action by the police must await the last act necessary to consummate the crime…adequate statutes governing firearms and weapons would make lawful intervention by police and prevention of these fatal consequences, before any could occur."

Rep. of N.Y. J. Legis. Comm., No. 6 at 13 (1965); Tomari Decl. Exhibit S (13).

75.   The text of the various referenced documents is not disputed, but the legislative history of the Act as referenced by Defendants is entirely irrelevant to any issue in the case.

76.   No significant revisions occurred to the text of §1903 until the Revised Penal Law of 1965 came into effect in 1967 which renumbered many penal provisions thereby creating today's modern New York Penal Law § 400.00.

76.   The text of the various referenced documents is not disputed, but the legislative history of the Act as referenced by Defendants is entirely irrelevant to any issue in the case.

**Alleged Fact**

77.    In the past 30 years, the legislature has repeatedly chosen not to remove the "proper cause" requirement for concealed carry permits.  Notably, Senator Franz Leichter enumerated many of the reasons why the "proper cause" requirement of New York Penal Law § 400.00(2)(f) should remain intact during the 1982 Senate debate over Bill Number 3409, an act to amend the Penal Law, in relation to issuance of licenses to have and carry pistols:

And certainly one of the concerns…that any licensing authority ought to have and which will be lost under your bill is some assessment of the maturity, the responsibility and the ability of the person is licensed to safely possess and use a handgun.

So we are not only talking about crime, which obviously is important, but we're also talking about public safety…Now, in this instance, it's not only protecting a person from himself but it's protecting innocent people who get shot every day because handguns are lying around, and that is something that should be of concern to all of us…I'm afraid in your bill that some of the restrictions and some of the safeguards that we have are going to be eliminated.

…by making handguns more readily and easily accessible and available in our society, it means inevitably that more handguns are going to come into the hands of criminals, and by

**Response**

77.    The text of the various referenced documents is not disputed, but the legislative history of the Act as referenced by Defendants is entirely irrelevant to any issue in the case.

33

**Alleged Fact**                                    **Response**

loosening your standards for
licensing, it means that people are
going to have handguns who either
aren't going to safeguard them
properly or just there's going to be
more handguns available that are
going to be stolen or are going to be
used in the commission of a crime.

N.Y. Senate Debate on Senate Bill
3409, Jun. 2, 1987, at 2470-2474
(Statement of Senator Leichter);
Tomari Decl. Exhibit S (14).

**Alleged Fact**

**Response**

78.  New York has a compelling and well recognized interest in limiting the number of guns on its street; especially handguns, which are easily concealed and closely linked to use in crime. These interests are described in part in the declarations submitted in support of the State Defendants' Motion for  Summary Judgment, and described in the studies, articles, history and reports referenced in the State Defendants' Memorandum of Law in Support of Motion for Summary Judgment. These include: Declaration of Philip J. Cook, ("Cook Decl."); Declaration of Franklin E. Zimring, ("Zimring Decl."); Declaration of Thomas L. Fazio ("Fazio Decl."); Declaration of Andrew Lunetta, ("Lunetta Decl."); Declaration of Stephanie Miner ("Miner Decl."); and Declaration of the Hon. David R. Roefaro ("Roefaro Decl.").

78.  Disputed. This is not a statement of fact, but a statement of opinion. New York has an interest in limiting gun violence, but it has no interest in limiting the exercise of Second Amendment rights by law-abiding people. In any event, the reduction in gun carrying is an effect of the law, not an interest used to justify it. *See Simon & Schuster, Inc.* v. *N.Y. State Crime Victims Bd.*, 502 U.S. 105, 120 (1991).

| Alleged Fact | Response |
|---|---|
| 79. Many Americans die by gunfire. The gun deaths from homicide, accident and suicide have totaled close to one million during the last three decades. In 2007, the most recent year for which the National Center for Health Statistics provides data on deaths, there were 18,361 criminal homicides, of which 69% were committed with guns. Cook Decl. ¶ 3. | 79. Irrelevant. |
| 80. In 2007, homicide victimization rates were 15 times as high for black men aged 15-34, as for white non-Hispanic men in this age group. Homicide is the leading cause of death for black males age 15-34, and the second-leading cause of death for Hispanic males in this age group. Cook Decl. ¶ 4. | 80. Irrelevant. |
| 81. Handguns are especially a law enforcement and public health concern because they are much more likely to be used in criminal violence than long guns. While handguns are approximately one third of all guns owned by civilians in the United States, they are used in more than 75% of all gun killings. Cook Decl. ¶ 9; Zimring Decl. ¶ 5. | 81. Irrelevant. "It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon." *District of Columbia* v. *Heller*, 128 S. Ct. 2783, 2818 (2008). |
| 82. Handguns pose a particular public safety challenge because they are smaller, more conveniently carried, and easily concealed from law enforcement, potential victims, and the public at large. Cook Decl. ¶ 17. | 82. Irrelevant. Plaintiffs do not dispute that the government has a legitimate interest in regulating handguns and other firearms in the interest of public safety. |

36

**Alleged Fact**                                              **Response**

83.   It takes little skill to operate a            83.   Irrelevant.
      modern semi-automatic pistol and a
      person with just a few pockets can
      easily carry dozen of rounds of
      ammunition without ready detection.
      Declaration of Thomas L. Fazio,
      sworn to January 21, 2011 ("Fazio
      Decl.") ¶ 4.

84.   Of the 536 law enforcement officers          84.   Plaintiffs are not positioned to admit
      who were feloniously killed in the                 or deny these factual assertions
      United States between 2000 and                     which are, in any event, irrelevant.
      2009, 490 (91%) were assaulted with                Plaintiffs do not dispute that the
      a firearm and 73 % of those were                   government has a legitimate interest
      with a handgun. Cook Decl. ¶ 5;                     in regulating handguns and other
      Fazio Decl. ¶ 7.                                    firearms in the interest of public
                                                          safety.

85.   Ninety-four percent of all law               85.   Plaintiffs are not positioned to admit
      enforcement officers feloniously                   or deny these factual assertions
      killed in the line of duty in 2009                 which are, in any event, irrelevant.
      were killed by a gun, of which 58%                 Plaintiffs do not dispute that the
      were killed by handguns.                           government has a legitimate interest
      Declaration of Andrew Lunetta,                     in regulating handguns and other
      sworn to January 25, 2011 ("Lunetta                firearms in the interest of public
      Decl.") ¶ 11.                                       safety.

86.   Every New York City Police                   86.   Plaintiffs are not positioned to admit
      Department ("NYPD") officer killed                 or deny these factual assertions
      since 2005, has been killed with a                 which are, in any event, irrelevant.
      handgun.  Lunetta Decl. ¶ 10.                       Plaintiffs do not dispute that the
                                                          government has a legitimate interest
                                                          in regulating handguns and other
                                                          firearms in the interest of public
                                                          safety.

**Alleged Fact**

87.     The likelihood that a gun will be
        used in crime is closely linked to the
        general availability of guns, and
        especially handguns. Cook Decl. ¶¶
        12, 14; Roefaro Decl. ¶ 5; Lunetta
        Decl. ¶ 12.

**Response**

87.     Disputed. This is not a "fact," but a
        matter of opinion, and the subject of
        much legitimate debate as a matter of
        criminology. *See, e.g.* Florenz
        Plassman & John Whitley,
        *Comment: Confirming "More Guns,
        Less Crime,"* 55 STANFORD L. REV.
        1313 (2003); Don B. Kates & Gary
        Mauser, *Would Banning Firearms
        Reduce Murder and Suicide: A
        Review of International Evidence*, 30
        HARVARD JOURNAL OF LAW & PUB.
        POL'Y 651 (2007); "[N]o statistically
        significant relationship between guns
        and murder rates." Jeffrey Miron,
        *Violence, Guns, and Drugs: A
        Cross-Country Analysis*, 44
        JOURNAL OF LAW & ECONOMICS,
        615. "[N]o significant correlations
        (of gunstock levels) with total
        suicide or homicide rates were
        found." Abstract to Martin Killias, et
        al., *Guns, Violent Crime, and Suicide
        in 21 Countries*, 43 CANADIAN J. OF
        CRIMINOLOGY 429 (2001); Lawrence
        Southwick, *Do Guns Cause Crime?
        Does Crime Cause Guns? A Granger
        Test*, 25 ATLANTIC ECON. J. 256
        (1997); Gary Kleck & Britt
        Patterson, *The Impact of Gun
        Control and Gun Ownership Levels
        on City Violence Rates*, 9 J. QUANT.
        CRIMINOLOGY 249-87 (1993); "The
        estimated net effect of guns on
        crime... is generally very small and
        insignificantly different from zero."
        Carlisle Moody & Thomas Marvell,
        *Guns and Crime*, 71 SO. ECON. J.
        720, 735 (2005); *see also* John Lott,
        MORE GUNS, LESS CRIME:
        UNDERSTANDING CRIME AND GUN
        CONTROL LAWS (3d edition, Univ. of

**Alleged Fact**                                      **Response**

Chicago Press 2010). From 1946 to
2004, gun ownership in the United
States increased from 34,400 to
85,000 civilian firearms per 100,000
people, while the murder rate
dropped from 6.9 to 5.5 per 100,000
individuals. Between 1973 and 2003,
the civilian gun stock rose from 627
to 858 per 1000 people, while the
murder rate declined 41%. *See*
Murder rate from FBI, Uniform
Crime Reports; Guns per capita from
Gary Kleck, Targeting Guns:
Firearms and Their Control 96-97
(1997), and BATF Annual Firearms
Manufacture and Export Reports,
available at
http://www.atf.gov/statistics/afmer/

| **Alleged Fact** | **Response** |
|---|---|
| 88. Allowing more individuals to carry concealed handguns will endanger officers stopping individuals on the street or making car stops, and complicate interactions between uniformed officers and those working in plain clothes or off-duty. Lunetta Decl. ¶¶ 13- 16. | 88. Disputed. This is plainly a matter of opinion, not a "fact." Considering that 43 states issue licenses to carry concealed handguns on a shall-issue basis, or require no such licenses at all, this opinion is obviously widely disputed. |
| 89. From 1981 to 2009, 26 police officers around the country were shot and killed by fellow officers who had mistaken them for criminals. Fazio Decl. ¶ 6. | 89. Plaintiffs are not in a position to dispute this figure, which is, in any event, irrelevant. |
| 90. The ability to stop and frisk individuals who appear to be carrying handguns in public is one of the NYPD's greatest tactics in curbing violence. Increasing the prevalence of concealed handguns will undermine that tactic. Lunetta Decl. ¶ 16. | 90. Disputed. What qualifies as a "greatest tactic" is a matter of debate. Plaintiffs submit that stopping law-abiding people for exercising a constitutional right is not a great tactic. Numerous police tactics that would undoubtedly be effective in reducing crime would also be unconstitutional, *e.g.*, dispensing with the Fourth, Fifth, Sixth, and Eighth Amendments. |

| Alleged Fact | Response |
|---|---|
| 91.  The majority of criminal homicides and other serious crimes are committed by individuals who have not been convicted of a felony and would receive permits to carry concealed weapons without the "proper cause" requirement.  Cook Decl. ¶¶ 27-35; Roefaro Decl. ¶¶ 4, 6. | 91.  Irrelevant, but in any event, disputed. "The vast majority of persons involved in life threatening violence have a long criminal record with many prior contacts with the justice system." Delbert Elliott, *Life Threatening Violence is Primarily a Crime Problem*, 69 COLO. L. REV. 1081, 1093 (1998)(summarizing studies); *see also* Jo McGinty, *New York Killers, and those Killed, by the Numbers*, NEW YORK TIMES, Apr. 28, 2006 (for murders committed in 2003-05, "More than 90 percent of the killers had criminal records . . ."; Richard Berke, *Capital Offers a Ripe Market to Drug Dealers*, NEW YORK TIMES, Mar. 28, 1989, at 1, 6 (almost all murderers and victims in Washington, D.C. "involved in the drug trade"); Anthony Braga et al., *Understanding and Preventing Gang Violence: Problem Analysis and Response Development in Lowell, Massachusetts*, 9 POLICE Q. 20, 29-31 (2006) (in Lowell, Mass., "Some 95% of homicide offenders" had been "arraigned at least once in Massachusetts courts" before they killed. "On average ... homicide offenders had been arraigned for 9 prior offenses...."); Gus Sentementes, *Patterns persist in city killings: Victims, suspects usually black men with long criminal histories*, BALTIMORE SUN, Jan. 1, 2007 (92% of Baltimore murder suspects in 2006 had criminal records); "Homicide offenders are likely to commit their murders in the course of long criminal careers consisting primarily of nonviolent crimes but |

**Alleged Fact**                                          **Response**

including larger than normal
proportions of violent crimes."
David Kennedy & Anthony Braga,
*Homicide in Minneapolis: Research
for Problem Solving*, 2 HOMICIDE
STUD. 263, 276 (1998) (analyzing
national date for 1988, 74% of
criminals for whom data was
available had prior criminal record).