UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
WHITE PLAINS DIVISION

_____X
:
ALAN KACHALSKY, CHRISTINA :
NIKOLOV, and SECOND AMENDMENT :
FOUNDATION, INC., et al. :
     :
:
      Plaintiffs,   :  **CASE NO: 10-CV-05413 CS**
:
   v.   :
:
SUSAN CACACE, JEFFREY A. COHEN, and :
COUNTY OF WESTCHESTER, et al. :
:
      Defendants.   :
:
_____X

**BRIEF OF *AMICUS CURIAE***

ANTHONY G. PISCIONERE (AGP1598)
Piscionere & Nemarow, P.C.
Attorneys for Amicus
Westchester County Firearms
Owners Association
363 Boston Post Road
Rye, New York 10580
Tel. No.: (914) 835-6900
Facsimile (914) 835-6931


DAVID B. KOPEL
Adjunct Professor of Advanced Constitutional Law,
Denver University, Sturm College of Law
Adjunct Professor of Advanced Constitutional Law,
Denver University, Sturm College of Law
13952 Denver West Parkway, Suite 400
Golden, Colorado 80401
Tel No.: (303) 279-6536
Facsimile (303) 279-4176

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES………………………………………………………………...…ii

INTRODUCTION………………………………………………………………………………...1

INTEREST OF *AMICUS*………………………………………………………………………....1

THE STATE HAS NO DUTY TO PROTECT AN INDIVIDUAL CITIZEN IN
 NEW YORK……………………………………………………………………………….….2

THE RIGHT TO CARRY IS A CENTRAL COMPONENT OF THE RIGHT TO
 KEEP AND BEAR ARMS……………………………………………………………….…...4

THIS COURT SHOULD FIND THAT A DESIRE FOR SELF DEFENSE SATISFIES THE
 "PROPER CAUSE" STANDARD UNDER NEW YORK LAW…………………….………..…7

CONCEALED CARRY PERMIT HOLDERS ARE HIGHLY LAW-ABIDING………………..9

CONCLUSION……………………………………………………………………….…………11

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases:**

*Aymette v. State*, 21 Tenn. 154 (1840)……………………………..…………..………..7

*Basher v. City of New York*, 268 AD2d 546, 547 [2000]……………………………...….2

*Conde v. City of New York*, 24 AD3d 595, 596 [2005]……………………………..…….2

*Cuffy v. City of New York*, 69 NY2d 255, 260 [1987]……………………..…………..……..2

*District of Columbia et al. v. Heller*, 554 U. S. 570 (2008)..……...………………………..*passim*

*Kachalsky v. Cacace*, 65 A.D.3d 1045…………………………………………………….5

*Mastroianni v. County of Suffolk*, 91 NY2d 198, 203 [1997]………………………...…..2

*Matter of Bando v. Sullivan*, 290 AD2d 691 [2002]…………………………………………..4

*Matter of Bernstein v. Police Dept. of City of N.Y.,* 85 AD2d 574 [1981]…………………….5

*Matter of Fondacaro v. Kelly*, 234 AD2d 173, 173 [1996] …………………………………...5

*Matter of Hecht v. Bivona*, 11 AD3d 614 [2004]……………………………………………5

*Matter of Kaplan v. Bratton*, 249 AD2d 199, 201 [1998]……………………………………5

*Matter of Klenosky v. New York City Police Dept.*, 75 AD2d 793, 793 [1980], affd 53 NY2d 685 [1981]…………………………………………………………….5

*Matter of Milo v. Kelly*, 211 AD2d 488, 488-489 [1995]……………………………………5

*Matter of O'Brien v. Keegan*, 87 NY2d 436, 439 [1996]…………………………………….5

*Matter of Sarro v. Smith*, 8 AD3d 395 [2004]………………………………..……….5

*Matter of Tartaglia v. Kelly*, 215 AD2d 166, 166 [1995] ……………………………..…5

*Matter of Theurer v. Safir*, 254 AD2d 89, 90 [1998]……………………………………..5

*McDonald v. Chicago*, 561 U.S. __ (2010), 130, S. Ct. at 3038…………...…………… *passim*

*National Socialist Party of American v. Skokie*, 432 U.S. 43 (1977)…………………..…..6

*Nunn v. State*, 1 Ga. 243 (1846)……………………………………………………….……..8

*State v. Chandler,* 5 La. Ann. 489 (1850)…………………………………………………….8

*State v. Reid*, 1 Ala. 612, 616-17, (1840).…………………………………………………….8

**Statutes**

Penal Law Sec. 265.01…………………………………………………………………………3

New York State Penal Law §400.00……………………………………………………………*passim*

Penal Law § 400.00 [2] [f]………………………………………………………………….….5

**Constitutional Provisions**

First Amendment………………………………………………………………………….4, 6, 8

Second Amendment………………………………………………………………………*passim*

Fourteenth Amendment……………………………………………………………………….8

**Other Authorities**

Carlisle E. Moody & Thomas B. Marvell, *The Debate on Shall-Issue Laws*, 5 ECON J. WATCH 269, 288 (2008).………………………………………………………………………….…..10

Chicago, Ill., *Journal of Proceedings of the City Council*, p. 10049 (Mar. 19, 1982)……….10

James Wright & Peter Rossi, *Armed and Considered Dangerous: A Survey of Felons and Their Firearms* (expanded ed. 1994)……………………………………………………………….11

Kopel, 42 Conn. L. Rev., at 569-72……………………………………………………………10

# INTRODUCTION

Two recent cases decided by the Supreme Court of the United States, *District of Columbia et al. v. Heller*, 554 U. S. 570 (2008) and *McDonald v. Chicago*, 561 U.S. ___ (2010), make it clear that there is a constitutional right of self-defense that applies to citizens of each state. These decisions also make it clear that there is a constitutional right to keep and bear arms, which includes the right to carry a handgun for self-defense. New York State Penal Law §400.00 places a burden on the applicant to demonstrate "proper cause" for the issuance of a full carry license. The determinations of the license officers in question that the "proper cause" standard has not been met by applicants who desire a full carry license for self-defense effectively denies that right to the overwhelming majority of otherwise eligible applicants in violation of the Second Amendment.

# INTEREST OF *AMICUS*

Amicus Westchester County Firearm Owners Association, Inc., ("WCFOA") is an organization consisting of over 15,000 members and affiliate gun owner members, mainly Westchester County residents. Its purpose is to promote legal gun ownership, safe gun handling and legislative action protecting the rights of lawful gun owners to keep and bear arms. The case at bar deals with the application of Penal Law §400.00 by Westchester County Court judges in the denial of full carry licenses to Westchester residents. As such, the WCFOA has a compelling interest in assuring that its members and all residents are afforded their constitutional rights to keep and bear arms pursuant to the Second Amendment of the Constitution of the United States.

## THE STATE HAS NO DUTY TO PROTECT
## AN INDIVIDUAL CITIZEN IN NEW YORK

In New York State, the police have no duty to provide police protection to any particular individual.  The Courts in New York have held that "generally, a municipality may not be held liable for the failure to provide police protection because the duty to provide such protection is owed to the public at large, rather than to any particular individual" (*Conde v. City of New York*, 24 AD3d 595, 596 [2005]; see *Cuffy v. City of New York*, 69 NY2d 255, 260 [1987]).

The only exception to this rule is where a special relationship exists between the municipality and the injured party or parties (see *Mastroianni v. County of Suffolk*, 91 NY2d 198, 203 [1997]; *Cuffy v. City of New York*, 69 NY2d at 260; *Conde v. City of New York,* 24 AD3d at 596; *Basher v. City of New York*, 268 AD2d 546, 547 [2000]).

Requiring an applicant to prove that "proper cause" exists for the issuance of a full carry permit when the state has no obligation to protect that individual person only heightens the tension between an individual's constitutional right to defend themselves and their inability to do so when denied the opportunity to carry a handgun.  This tension becomes a constitutional violation when "proper cause" is not interpreted to include self-defense.

In *McDonald,* the Supreme Court held that the Second Amendment applies to the Sates. However, the Court also discussed the right to self defense.

> *"Self-defense is a basic right, recognized by many legal systems from ancient times to the present day,[15] and in Heller, we held that individual self-defense is "the central component" of the Second Amendment right. 554 U. S., at ___ (slip op., at 26); see also id., at ___ (slip op., at56) (stating that the "inherent right of self-defense has been central to the Second Amendment right"). Explaining that "the need for defense of self, family, and property is most acute" in the home, ibid., we found that this right applies to handguns because they are "the most preferred firearm in the nation to 'keep' and use for protection of one's home and family,"*

2

> *id., at ___ (slip op., at 57) (some internal quotation marks omitted); see also id., at ___ (slip op., at 56) (noting that handguns are "overwhelmingly chosen by American society for [the] lawful purpose" of self-defense); id., at ___ (slip op., at 57) ("[T]he American people have considered the handgun to be the quintessential self-defense weapon"). Thus, we concluded, citizens must be permitted "to use [handguns] for the core lawful purpose of self-defense." Id., at (slip op., at 58). McDonald, supra, at 19-20.*

The Court in *McDonald* did restate that certain limitations could be placed on the Second Amendment right to keep and bear arms.

> *"We made it clear in Heller that our holding did not cast doubt on such longstanding regulatory measures as "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms." Id., at ___– ___ (slip op., at 54–55). We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms." McDonald, supra,* at 39-40.

Notably absent from the Supreme Court's pronouncement above was any statement that could be construed as permitting laws that essentially completely prohibit the licensing of law abiding citizens to carry a handgun outside of the home.

New York State already has laws regulating the carrying of firearms in sensitive places. Firearms are not allowed in Courthouses or schools (Penal Law Sec. 265.01). However, the statute in question places an unconstitutional obstacle preventing the exercise of this basic constitutional right, lawfully keeping and bearing a handgun for self-defense by the denial of full carry licenses unless an applicant demonstrates "proper cause".

## THE RIGHT TO CARRY IS A CENTRAL COMPONENT OF
## THE RIGHT TO KEEP AND BEAR ARMS

The Court in *McDonald*, when discussing its decision in *Heller*, noted that "*the possession of firearms was thought to be essential for self-defense. As we put it, self-defense was "the central component of the right itself."* *McDonald*, *supra,* at 40-41. The practical application of the law in question is to deny the overwhelming majority of law abiding persons the ability to exercise this basic constitutional right of self-protection. The Plaintiffs herein all lack any criminal record and it appears even lack any prior arrests. They are of excellent character, properly trained, and law-abiding. The reasons for the denials of a full carry license to the Plaintiffs herein would apply to virtually every applicant that is not in imminent danger from threats or otherwise. It should be noted that the lengthy application process would not allow an applicant to obtain a full carry license to protect herself from a specific threat in a timely manner. Therefore, the reasons for denial of full carry license cited in the complaint effectively deny virtually all applicants their constitutional right to self-defense. While a right can be regulated, destruction of the right for nearly the entire population amounts to unconstitutional prohibition, not legitimate regulation.

Requiring an applicant to state facts which "would demonstrate a need for self protection distinguishable from that of the general public" (Amended Complaint, ¶ 26), or "the report of any type of threat to her own safety anywhere" (Amended Complaint ¶30), or requiring an applicant to substantiate that he "faces danger during non employment hours that would necessitate the issuance of a full carry firearms license" (Amended Complaint ¶32), effectively denies fully carry licenses to virtually all applicants. Such a standard would not be tolerated in the attempted exercise of one's First Amendment Rights; such a standard should not be tolerated in the attempted exercise of one's Second Amendment Rights.

The application of Plaintiff Alan Kachalsky, an attorney, was denied on the ground that he "has not stated any facts that would demonstrate a need for self protection distinguishable from that of the general public". That decision was affirmed on appeal, with the Appellate Decision agreeing with the licensing officer (a Westchester County Court Judge) that *"The petitioner failed to demonstrate "proper cause" for the issuance of a "full carry" permit (Penal Law § 400.00 [2] [f]; Matter of Hecht v. Bivona, 11 AD3d 614 [2004]; Matter of Sarro v. Smith, 8 AD3d 395 [2004]; Matter of Bando v. Sullivan, 290 AD2d 691 [2002]). Accordingly, the respondent's determination was not arbitrary or capricious and should not be disturbed (see Matter of O'Brien v. Keegan, 87 NY2d 436, 439 [1996]; Matter of Sarro v. Smith, 8 AD3d at 395). Kachalsky v. Cacace*, 65 A.D.3d 1045.

There are several notable New York cases affirming a licensing officer's denial of a full carry license for failure to demonstrate "proper cause". *Matter of Hecht v. Bivona*, 11 AD3d 614 [2004]; see also *Matter of Theurer v. Safir*, 254 AD2d 89, 90 [1998]; *Matter of Kaplan v. Bratton*, 249 AD2d 199, 201 [1998]; *Matter of Fondacaro v. Kelly*, 234 AD2d 173, 173 [1996]; *Matter of Tartaglia v. Kelly*, 215 AD2d 166, 166 [1995]; *Matter of Milo v. Kelly*, 211 AD2d 488, 488-489 [1995]; *Matter of Bernstein v. Police Dept. of City of N.Y.*, 85 AD2d 574 [1981]; *Matter of Klenosky v. New York City Police Dept.*, 75 AD2d 793, 793 [1980], affd 53 NY2d 685 [1981]).

The above cases were all decided before the Supreme Court decisions in *Heller* and *McDonald*, but the state of the law in New York is the same post-*McDonald*. Penal Law §400.00 requires denial by the licensing officer based on the statutory standard of placing the burden on the applicant to demonstrate "proper cause", and the licensing officer being affirmed by the Appellate courts because the determination was not arbitrary or capricious.

If the "proper cause" standard set forth in Penal Law §400.00 is allowed to continue, then it is clear from the case law and the application of the standard to the Plaintiff's herein, that applicants for full carry licenses will continue to be denied their Second Amendment rights. Penal Law §400.00 unconstitutionally places a burden on an applicant to show "proper cause" for the lawful exercise of a constitutional right.

The type of obstacle which allows licensing officers to make such judgments as to whether or not a particular applicant has demonstrated "proper cause" is just the type of interest-balancing that Justice Scalia decried when he wrote in *McDonald*,

> *"Finally, JUSTICE BREYER is incorrect that incorporation will require judges to assess the costs and benefits of firearms restrictions and thus to make difficult empirical judgments in an area in which they lack expertise. As we have noted, while his opinion in Heller recommended an interest-balancing test, the Court specifically rejected that suggestion. See supra, at 38–39. "The very enumeration of the right takes out of the hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is really worth insisting upon." Heller, supra, at ___ (slip op., at 62–63)." McDonald, supra, at 44.*

The limitation on a State's ability to place such an unconstitutional obstacle preventing the exercise of a constitutional right was discussed in *Heller* when Justice Scalia, writing for the majority, said:

> *"A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. We would not apply an "interest-balancing" approach to the prohibition of a peaceful neo-Nazi march through Skokie. See National Socialist Party of America v. Skokie, 432 U. S. 43 (1977) (per curiam). The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong-headed*

6

> *views. The Second Amendment is no different."* Heller, *supra at slip op 63.*

This principle was re-affirmed when Justice Alito wrote in *McDonald*,

> *"Third, JUSTICE BREYER is correct that incorporation of the Second Amendment right will to some extent limit the legislative freedom of the States, but this is always true when a Bill of Rights provision is incorporated. Incorporation always restricts experimentation and local variations, but that has not stopped the Court from incorporating virtually every other provision of the Bill of Rights. "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table." Heller, 554 U. S. 570, at (slip op., at 64). This conclusion is no more remarkable with respect to the Second Amendment than it is with respect to all the other limitations on state power found in the Constitution." Supra at 44*

The statute in question requires the exact kind of "interest balancing" approach condemned by the Supreme Court in both *Heller* and *McDonald* for a constitutional right. Now that the Second Amendment has been applied to the States by *McDonald*, New York's statutory scheme which requires licensing officers (often County Court Judges) to engage in "interest balancing" by determining if an applicant has demonstrated "proper cause" cannot withstand constitutional scrutiny.

### THIS COURT SHOULD FIND THAT A DESIRE FOR SELF DEFENSE SATISFIES THE "PROPER CAUSE" STANDARD UNDER NEW YORK LAW

*Heller* discussed a case which adopted a view of the Second Amendment that the Court rejected: that everyone has a Second Amendment right to "keep" arms in the home, but there is no general right to "bear" arms in public. *Aymette v. State*, 21 Tenn. 154 (1840). The Court in *Heller* described this theory as an "odd reading of the right" and "not one we adopt." *Heller,* 554 U. S. 570.

In *State v. Reid*, 1 Ala. 612, 616-17, (1840) a ban was upheld on carrying a weapon concealed, but added: "A statute which, under the pretense of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional." This sentence is quoted in *Heller* as an accurate expression of the right to bear arms. *Heller,* 554 U. S. 570.

Likewise cited by the Supreme Court as an accurate reading of the Second Amendment was *Nunn v. State*, 1 Ga. 243 (1846). That case, relying on the Second Amendment, struck down a general ban on carrying handguns for protection. *Nunn* upheld the ban on concealed carry, because open carry was allowed. *Nunn* is also approvingly cited in *Heller* for having "perfectly captured" a correct understanding of the Second Amendment. *Heller*, 554 U. S. 570.

*Heller* also relies on *State v. Chandler*, 5 La. Ann. 489 (1850), for correctly expressing that the Second Amendment guarantees a right to carry, but the legislature may determine whether the carry is to be open or concealed. *Heller*, at 2809.

In the beginning of the discussion of the constitutional violations that the Fourteenth Amendment was designed to remedy, *McDonald* points to a firearm carry license law with excessive discretion. The Fourteenth Amendment, according to *McDonald*, was aimed at laws such as the Mississippi statute providing that "no freedman, free negro or mulatto, not in the military service of the United States government, and not licensed to do so by the board of police of his or her county, shall keep or carry fire-arms of any kind…" *McDonald*, 130, S. Ct. at 3038.

*McDonald* rejected the argument that the Fourteenth Amendment sought only to provide a non-discrimination rule. The act referred to the "full and equal benefit," not just "equal benefit". The equality-only theory would imply that "the First Amendment, as applied to the States, would

not prohibit nondiscriminatory abridgments of the rights to freedom of speech or freedom of religion. *McDonald, supra,* at 3043.

The Plaintiffs herein have been denied their right to self defense by the adoption of a standard of "proper cause" that does not include a desire for self-defense. New York State does not allow "open carry" of handguns. Therefore, the only avenue for a licensee to legally carry a concealed handgun for her self-defense is to be issued a full carry license. When the licensing officer denies a full carry license to an applicant due to his interpretation that the "proper cause" standard has not been met by a desire for self-protection, the licensing officer is denying that applicant her constitutional rights.

Instead of declaring Penal Law § 400.00 unconstitutional, the simplest approach for this Court would be to determine in light of *Heller* and *McDonald*, lawful self-defense is necessarily a "proper cause" for the issuance of a permit to carry a handgun. Indeed, under the U.S. Constitution, lawful self-defense is the best possible cause.

## CONCEALED CARRY PERMIT HOLDERS ARE HIGHLY LAW-ABIDING

Forty of the 50 states have laws providing for the issuance of handgun carry permits to law-abiding citizens, with legitimate self-defense being considered a proper cause of issuance of a license. In some of these states, a state agency produces annual reports of all criminal justice incidents involving concealed handgun permitees. While the details of how the data are reported vary among the states, the reports unanimously show that almost all permitees are highly law-abiding. In particular:

- Minnesota. One handgun crime (broadly defined, such as driving while under the influence if a handgun is in the car) per 1,423 permitees.

- Michigan. 161 charges of misdeeds involving handguns (including duplicate charges for one event, and charges which did not result in a conviction) in 2007 and 2008 out of an approximate Michigan population of 190,000 permitees.

- Ohio. 142,732 permanent licenses issued since 2004, and 637 revocations for any reason, including moving out of state.

- Louisiana: Permitee gun misuse rate of less than 1 in 1,000.

- Texas: Concealed handgun licensees are 79% less likely to be convicted of crimes than the non-licensee population.[1] Only 2/10 of 1% of licensees ever convicted of a violent crime or firearms regulation crime.

- Florida: The data show a rate of 27 firearms crimes per 100,000 licensed Florida residents.

A study which reviewed the entire literature on the subject of concealed carry found that the only statistically significant long-term effect is a reduction in assault. Carlisle E. Moody & Thomas B. Marvell, *The Debate on Shall-Issue Laws*, 5 ECON J. WATCH 269, 288 (2008).

In *McDonald,* Justice Scalia, writing for the majority, observed "Chicago enacted its handgun ban to protect its residents "from the loss of property and injury or death from firearms." See Chicago, Ill*., Journal of Proceedings of the City Council*, p. 10049 (Mar. 19, 1982). The Chicago petitioners and their *amici*, however, argue that the handgun ban has left them vulnerable to criminals. Chicago Police Department statistics, we are told, reveal that the City's handgun murder rate has actually increased since the ban was enacted and that Chicago

---

[1] Some Brady Center publications nevertheless assert that concealed handgun licensees are extremely dangerous people. Upon closer examination, these assertions tend of depend on errors such as classifying as gun crimes acts that were determined by law enforcement to be lawful self-defense, or claiming that a particular criminal had a carry permit when in fact he did not, or listing crimes in which the gun carry permit was irrelevant (e.g., possession of drugs in the criminal's own home). See Kopel, 42 CONN. L. REV., at 569-72.

residents now face one of the highest murder rates in the country and rates of other violent crimes that exceed the average in comparable cities. *McDonald, supra,* at 3. (footnotes omitted).

The National Institute of Justice funded a study, which interviewed felony prisoners in 11 prisons in 10 states. JAMES WRIGHT & PETER ROSSI, *ARMED AND CONSIDERED DANGEROUS: A SURVEY OF FELONS AND THEIR FIREARMS* (expanded ed. 1994). The survey found that gun control laws had little or no effect upon criminals obtaining firearms, and that most criminals avoided attacking victims who might be armed.

## CONCLUSION

New York's statutory scheme requiring applicants for full carry licenses to demonstrate "proper cause" and which then denies them the right to carry a gun for self-defense is unconstitutional on its face and in its application. This Court should declare the proper cause requirement unconstitutional or in the alternative shall direct the licensing officers in the State of New York to issue full carry permits to otherwise qualifying applicants who desire to carry a handgun for self defense.

Dated: Rye, New York
       February 23, 2011

                Respectfully submitted,

                PISCIONERE & NEMAROW, P.C.

By: _____/s/_____
     ANTHONY G. PISCIONERE (AGP1598)
     Attorneys for Amicus
     Westchester County Firearms
     Owners Association
     363 Boston Post Road
     Rye, New York 10580
     Tel. No.: (914) 835-6900
     Facsimile (914) 835-6931
     tony@pnesqs.net

_____/s/_____
DAVID B. KOPEL
Adjunct Professor of Advanced Constitutional Law,
Denver University, Sturm College of Law
13952 Denver West Parkway, Suite 400
Golden, Colorado 80401
Tel. No.: (303) 279-6536
Facsimile (303) 279-4176
dave@davekopel.org