**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| Alan Kachalsky,  *et al.* | ) | |
| | ) | |
| Plaintiffs | ) | **Civil Action No. 10-cv-5413** |
| | ) | **(Hon. Cathy Seibel)** |
| -against- | ) | |
| | ) | |
| Susan Cacace, *et al.*, | ) | |
| | ) | |
| Defendants | ) | |
| _____ | ) | |

## AMICUS MEMORANDUM OF LAW
## SUPPORTING THE PLAINTIFFS

David T. Hardy, Esq.*
8987 E. Tanque Verde
PMB 265
Tucson AZ 85749
(520) 749-0241

Joseph E. Olson, Esq.*
Professor of Law
Hamline University School of Law
St. Paul, MN  55113-1235
(651) 523-2142

Lloyd M. Eisenberg (LE 5376)
Eisenberg & Carton
2631 Merrick Road, Suite 201
Bellmore, New York 11710
(516) 221-3700

Attorneys for Amici Academics for the Second Amendment
and LI Second Amendment Preservation Association

*Not admitted to this Court.

# TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

Interests of the Amici . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

The Sullivan Act in Historical Context . . . . . . . . . . . . . . . . . . . . . . . . . 3

Enactment and Early History of the Sullivan Act. . . . . . . . . . . . . . . . . . 6

The Uniform Firearm and Uniform Pistol Acts . . . . . . . . . . . . . . . . . . . 13

The Sullivan Act and Problems with Discretionary Application. . . . . . . . 16

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

# TABLE OF AUTHORITIES

## Cases

*Andrews v. State*, 50 Tenn. (3 Heisk.) 165 (1871) . . . . . . . . . . . . . . . . . . . 5

*Aymette v. State*, 21 Tenn. (2 Hum.) 154, 159-60 (1840) . . . . . . . . . . . . 4

*Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822) . . . . . . . . . . . . . . . 4

*Conde v City of New York*, 24 AD3d 595, 596 (2nd Dep't 2005). . . . . . . 21

*Cuffy v City of New York*, 69 NY2d 255, 260 (1987).. . . . . . . . . . . . . . . 21

*Federation of New York State Rifle and Pistol Clubs v. McGuire*, 101 Misc. 2d 104, 420 N.Y.S.2d 602 (1979) . . . . . . . . . . . . . . . . . . . . . 16, 19

*Fife v. State*, 31 Ark. 455 (1876) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2009) . . . . . . . . . . . . . . 3

*People ex rel. Darling v. Warden of City Prison*, 154 App. Div. 413, 422, 139 N.Y.S. 277 (1913) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*State v. Chandler*, 5 La. Ann. 489, 52 Am. Dec. 599 (1850) . . . . . . . . . . . 3

*State v. Mitchell*, 3 Black. 229 (Ind. 1833) . . . . . . . . . . . . . . . . . . . . . . . 4

*State v. Reid*, 1 Ala. 612, 619 (1840) . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Wilson v. State*, 33 Ark. 557 (1878) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## Law Review Articles

Note, *The Uniform Pistol Act: A New Approach To Firearm Regulation*, 54 HARV. L. REV. 123 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .17

Sam B. Warner, *The Uniform Pistol Act*, 29 J. OF CRIM. L. & CRIMINOLOGY 529, 531 n.12 (1938-39). . . . . . . . . . . . . . . . . . . . . . . . . 15-16

## Books

GEORGE P. LEBRUN, IT'S TIME TO TELL (1962) . . . . . . . . . . . . . . . . . . . . 8, 9

JAY S. ALBANESE, ORGANIZED CRIME IN OUR TIMES (2011) . . . . . . . . . . . 18

ii

THE KNAPP COMMISSION REPORT ON POLICE CORRUPTION . . . . . . . . . . . 18

NEIL HANSON, MONK EASTMAN: THE GANGSTER WHO
BECAME A WAR HERO (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

GEORGE J. LANKEVICH, NEW YORK CITY: A SHORT HISTORY (2002). . . . 10

ALBERT FRIED, THE RISE AND FALL OF THE JEWISH
GANGSTER IN AMERICA (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

MYLES J. KELLEHER, SOCIAL PROBLEMS IN A
FREE SOCIETY (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

DAVID PIETRUSZA, ROTHSTEIN: THE LIFE, TIMES, AND MURDER
OF THE CRIMINAL GENIUS WHO FIXED THE
1919 WORLD SERIES (2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

### Newspaper Article

Jo Craven McGinty, The Rich, the Famous, the Armed, The New York
Times p. MB1 (February 18, 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## PRELIMINARY STATEMENT

Amici Academics for the Second Amendment and LI Second Amendment Preservation Association hereby submit their amicus memorandum of law, documenting the history of the Sullivan Act. That 1911 enactment is the century-old ancestor of the statutory system here at issue. While it is not the first American attempt to regulate firearms possession or carrying, it marks the first attempt at regulating those activities by subjecting them to the nearly-unbridled discretion of a licensing authority.

## INTERESTS OF THE AMICI

Amicus Academics for the Second Amendment ("A2A"), is a §501(c)(3) tax-exempt organization.  Formed in 1992 by law school teachers, A2A's goal is to secure the right to keep and bear arms as a meaningful, individual right.  A2A has filed *amicus briefs* in the United States Supreme Court in *McDonald v. City of Chicago, District of Columbia v. Heller, United States. v. Lopez* and in the Fifth Circuit in *United States. v. Emerson*. It has also published a series of "*Open Letters*" signed by college and university professors in the New York Times, the National Review, the New Republic, and other print media.

Amicus LI Second Amendment Preservation Association Inc. ("LISAPA") is a not-for-profit corporation dedicated to reestablishing and preserving for residents of the State of New York (and, in particular, those residing on Long Island) the natural right of civilian self-defense afforded by the Second Amendment of the United States Constitution. LISAPA, together with its affiliate firearms club, Long Island Firearms, LLC ("LIF"), promotes responsible firearms ownership though its educational website, and frequent workshops covering such topics as firearms safety and maintenance. LISAPA and LIF also provide community support though blood drives, coat collections for the needy and other community services. LISAPA is pleased to have the opportunity to join A2A on this memorandum.

A2A and LISAPA here desire to document for the Court the historical context of the carrying restrictions at issue, the origins of the Sullivan Act, and the evolution of less restrictive alternatives which began in the decade after its enactment. A2A and LISAPA respectfully submit that daily headlines in this State have proven that the restrictions at issue as all "laws that forbid the carrying of arms . . . disarm only those who are neither inclined nor determined to commit crimes.... Such laws make things worse for the assaulted and better for the assailants; they serve

2

rather to encourage than to prevent homicides, for an unarmed man may be attacked with greater confidence than an armed man." Thomas Jefferson (quoting 18th century criminologist Cesare Beccaria).

The content of this *amicus* stems largely from original research recently undertaken by historian Clayton Cramer and, in 1972, by Thomas Mahl.

## I

## THE SULLIVAN ACT IN HISTORICAL CONTEXT

Prior to the Sullivan Act, American laws on carrying of arms had focused on creating standards applicable to all persons, with no room for official discretion.[1] The earliest restrictions, with its origins in an 1813 Kentucky statute, Ky Acts 1812-13, ch. 89, forbade concealed carry and permitted open carry. These were generally upheld against constitutional challenge on the basis that they regulated one manner of arms bearing while permitting another that was of equal value in self-defense.[2] None of these

---

[1] Before the Civil War, slave States had restricted carrying by slaves and sometimes free blacks, and after the Civil War the same States had attempted to restrict carrying by freedmen. The latter statutes were a specific target of the framers of the 14th Amendment. *See McDonald v. City of Chicago*, 130 S. Ct. 3020 (2009).

[2] *See State v. Chandler*, 5 La. Ann. 489, 52 Am. Dec. 599 (1850). ("It interferes with no man's right to carry arms [to use its words] 'in full open

3

legislative measures involved permits or official discretion. All were forbidden to carry concealed, and allowed to carry openly.

After the Civil War, some States experimented with forbidding the carrying of small, inexpensive handguns while permitting the carrying of larger, expensive ones,[3] and a few States experimented with broader restrictions on carrying. Again, there was no provision for permits or discretion. These enactments were often tested, with varying results, against the background of State constitutions.

In 1870, Tennessee amended its constitution and added the provision that "the Legislature shall have power, by law, to regulate the wearing of

---

view,' which places men upon an equality. This is a right guaranteed by the Constitution of the United States ...."); *State v. Reid*, 1 Ala. 612, 619 (1840) ("[W]e are inclined to the opinion that the legislature cannot inhibit the citizen from bearing arms *openly*, because it authorizes him to bear them for the purpose of defending himself and the state, and it is only when carried openly that they can be effectively used for defense."); *State v. Mitchell*, 3 Black. 229 (Ind. 1833); *Aymette v. State*, 21 Tenn. (2 Hum.) 154, 159-60 (1840) (noting that State right to arms provision adds "for the common defense*"). The Kentucky statute was stricken in *Bliss v. Commonwealth*, 12 Ky. (2 Litt.) 90 (1822); the State constitution was eventually amended to allow regulation of concealed carry. Ky. Const. art. 13 §25 (1850).

[3] Handguns were then broad classed in three size categories. "Horse pistols" were the largest, suited for carrying in a holster attached to the saddle. "Belt pistols" were suitable for carry in a holster attacked to the belt. "Pocket pistols" were the smallest, and could be fit into a pocket. Some statutes referred to "army and navy" pistols, roughly meaning a horse or belt handgun.

arms with a view to prevent crime." Tenn. Const. of 1870, art. I, § 26. The state legislature then prohibited the carrying, "privately or publicly," of "any belt or pocket pistol or revolver," Act of June 11th, 1870, ch. 13 § 1, 1870, Tenn. Pub. Acts 28. In *Andrews v. State*, 50 Tenn. (3 Heisk.) 165 (1871), the Tennessee Supreme Court voided the ban insofar as it restricted all carrying, while suggesting that limits on carrying of smaller handguns, or into churches and public gatherings, would be permissible. The rationale of the case is explicitly dependent on the presence of the limiting words -- for the common defense -- in the Tennessee Constitution.

Five years later, Arkansas enacted a similar statute banning the carrying of, *inter alia*, "any pistol of any kind whatever." Act of Feb. 16, 1875, § 1, 1874-75 Ark. Laws 155. In *Fife v. State*, 31 Ark. 455 (1876), that State's Supreme Court held that the ban could be applied to pocket pistols, but application to "army and navy repeaters" would be unconstitutional. That court subsequently reversed a conviction where the jury had not been instructed on that limiting interpretation, since applying the statute's literal wording would be "an unwarranted restriction upon the constitutional right to keep and bear arms." *Wilson v. State*, 33 Ark. 557 (1878).

The Sullivan Act, and its later amendments, were thus not the first American restriction on handgun carrying. The Sullivan Act is, however, a

5

century-distant ancestor of the statute at issue here, comprising only ten paragraphs of text, and in its initial form regulating concealed but not open carrying of a handgun. But while it was not the first attempt at restricting carry, it was the first American attempt to create a firearms regulation that centered upon almost unlimited official discretion.

## II

### ENACTMENT AND EARLY HISTORY OF THE SULLIVAN ACT

In legislative *realpolitiks*, laws often have two purposes: the stated goal, and the goal that the author dares not to avow.  The Sullivan Act's stated goal was the deterrence of concealed carry. As the New York court of appeals explained in 1913: "There has been for many years upon the statute books a law against the carriage of concealed weapons…. It did not seem effective in preventing crimes of violence in this State." *People ex rel. Darling v. Warden of City Prison*, 154 App. Div. 413, 422, 139 N.Y.S. 277 (1913).

The law's sponsor, legislator "Big Tim" Sullivan, earned his nickname by his near-giant stature. He was a product of a time when many men "worked both sides of the law." In the West, the Earp brothers saw no contradiction between being reforming lawmen and being gunmen and brothel owners themselves. Big Tim Sullivan saw no conflict between being

a prominent legislator, often a reformer, and receiving payments from every "saloonkeeper, gambler, thief, and pimp operating on the Lower East Side."[4] He reputedly owned brothels, and he "was publicly advertised as the vice president of the Max Hockstein Association, the society of politicians, pimps, and thieves, which was the leading social and political organization [in the Bowery]."[5]

Sullivan was a major player in politics, moving between the U.S. House of Representatives and the State legislature. Politics was then a full-contact sport, and to hold office, he relied on repeat voters, physical force, and tossing an occasional ballot box in the East River.[6] On the Senate floor, Sullivan joked about his reputation. He mentioned social organizations

---

[4] DAVID PIETRUSZA, ROTHSTEIN: THE LIFE, TIMES, AND MURDER OF THE CRIMINAL GENIUS WHO FIXED THE 1919 WORLD SERIES 54-55 (2003). Prostitution was then officially illegal, but was unofficially tolerated. Paul B. Brooks, *The Relation of the General Practitioner to the Prevention of Venereal Diseases*, 13 NEW YORK STATE JOURNAL OF MEDICINE 102 (Feb. 1913). *See also* GEORGE JACKSON KNEELAND AND KATHARINE BEMENT DAVIS, COMMERCIALIZED PROSTITUTION IN NEW YORK CITY (1913).

[5] George Kibbe Turner, *Tammany's Control of New York by Professional Criminals*, 33 MCCLURE'S MAGAZINE 121 (June, 1909).

[6] DAVID PIETRUSZA, ROTHSTEIN: THE LIFE, TIMES, AND MURDER OF THE CRIMINAL GENIUS WHO FIXED THE 1919 WORLD SERIES 54-55 (2003); MARK GROSSMAN, POLITICAL CORRUPTION IN AMERICA: AN ENCYCLOPEDIA OF SCANDALS, POWER, AND GREED 312 (2003).

which supported his gun bill and quipped, "The only thing they found bad about the bill was that Tim Sullivan introduced it."[7]

That begs the question: why *did* he introduce the bill? Some historians suggest that  Sullivan wanted voters to know that while he winked at consensual vice, he was against gunplay and street crime.[8]  The actual history of the Sullivan Act is, however, somewhat more complicated.

Sullivan had started out with the intent to make concealed carry, already forbidden, into a felony. A half-century later, Medical Examiner George P. LeBrun revealed that he was the drafter of the remainder of the legislation.[9] He approached "Big Tim" with the idea for a broader bill, telling him that a ban on concealed carry would do nothing to prevent impulsive suicides and

---

[7] *Bar Hidden Weapons on Sullivan's Plea*, NEW YORK TIMES, May 11, 1911, at 3. Online at:
http://graphics8.nytimes.com/packages/pdf/nyregion/2011/bar-hidden-weapons.pdf

[8] NEIL HANSON, MONK EASTMAN: THE GANGSTER WHO BECAME A WAR HERO 101 (2010).

[9] GEORGE P. LEBRUN, IT'S TIME TO TELL 105-07 (1962); Thomas Earl Mahl, A History of Individual and Group Action in Promoting National Gun Control Legislation During the Interwar Period (unpub. Master's thesis, Kent State Univ. 1972) at 15-17.

murders, and Sullivan told him to draft what he wanted and Sullivan would push it.[10]

Push it he did. While Sullivan enjoyed legislative work, he deeply disliked speaking on the floor. This time, LeBrun wrote a half-century later, he made "made the supreme sacrifice" and did speak – an event so rare that members of the other legislative branch attended to witness the occurrence – and his four-paragraph speech was the longest of his entire career.[11]

Sullivan's motive, as expressed to LeBrun, puts the matter in historical, and somewhat amusing, context. Sullivan noted that the public did not much care if gangsters shot each other, but now and then they missed and hit an innocent person.

> Everybody runs to me and they want me to have the cops do something, as if the police weren't busy with it anyway. But even when gangsters kill each other I still have problems. If the police make an arrest, the friends and relations come knocking on my door for me to get a lawyer or arrange bail. And they're hardly out the door when the relatives of the victim come to me for a contribution to pay for his burial.[12]

Sullivan may have had another, unspoken, motivation for this remarkable effort. The original statute required permits, but gave no meaningful criteria

---

[10] George P. Lebrun at 106; Thomas Earl Mahl, *supra*, at 16.

[11] Thomas Earl Mahl, *supra*, at 17 – 18.

[12] George P. LeBrun, *supra*, at 110-11.

for the issuance or denial, which made it simple to ensure that those favored by Sullivan's machine could get them, while those employed by his rivals could not. As early as 1934, articles acknowledged that the law "was introduced purely on political grounds by one of two ward organizations, sometimes called gangs, the intention being to disarm by law one of the discordant elements to the advantage of the other."[13] Of course, some rivals did not carry guns, but there was a solution for that. They could be engaged in a scuffle, and a gun slipped into their coat pockets just as police arrived to break it up.[14] "I never saw that gun before in my life, officer," was an unbelievable defense, and the rival would be hauled off to prison. In response, some street toughs sewed up their coat pockets to make it harder to plant a gun on them.[15]

The Sullivan Law had been pushed as a solution to crime, with "Big Tim" predicting that "it will save more souls than all the preachers in the

---

[13] J. Lovell Johnson, *Permit Citizens To Carry Arms? Yes—Restriction Aids the Lawbreaker*, THE ROTARIAN, February 1934, at 14.

[14] Thomas Earl Mahl, *supra*, at 19.

[15] GEORGE J. LANKEVICH, NEW YORK CITY: A SHORT HISTORY 140 (2002); ALBERT FRIED, THE RISE AND FALL OF THE JEWISH GANGSTER IN AMERICA 32 (1983); HANSON, MONK EASTMAN,*supra* at 101; WILLIAM V. SHANNON, THE AMERICAN IRISH: A POLITICAL AND SOCIAL PORTRAIT, 139 (2d Ed. 1989).

city talking about it for the next ten years."[16]  It did not fulfill his promise. As one scholar concludes,  "It didn't take long for those hopes to be dashed: within twelve months of the passage of the Sullivan Law, New York City's murder rate increased 18 percent."[17] In the year after enactment, New York City experienced "a crime wave unequalled in its history." In 1912, presidents of fourteen burglary insurance companies called for repeal of the Act, arguing that burglaries and robberies had increased by 40%.[18]  The following year, an insurance industry publication argued that in practice the law restricted only the "honest man," and that a criminal would  "carry his pistol, law or no law, and is reasonably certain of evading arrest."[19]  Fifteen years after the enactment, the New York Times responding to another crime wave by calling for militia members and reserve police officers to be "loosely organized in a protective body" and allowed to carry arms: "This

---

[16] *Bar Hidden Weapons on Sullivan's Plea,  supra.*

[17] MYLES J. KELLEHER, SOCIAL PROBLEMS IN A FREE SOCIETY 188 (2004).

[18] *A Protest Against National Disarmament*, 17 FIELD & STREAM 556 (1912).

[19] *Gleaned From the Talk of the Street*, THE INSURANCE MONITOR 34 (January, 1913).

would be far better than the abandonment of the Sullivan Law and a general arming of citizens in self-defense."[20]

Some of the early charges under the Sullivan Law suggest a certain lack of sense in application.  One example involved the mass arrest of film company making a Western movie – fortunately, the judge dismissed the charges.[21]

The 1911 legal magazine *The Green Bag* gave some less amusing examples. One case involved a night watchman arrested after shooting in self-defense, while another involved a traveler passing through New York City by train with a shotgun in a case, doubtless unaware of the new law.

The third case reveals some of the ethnic tensions that may underlie the law.  An Italian immigrant, Marino Rossi, was passing through New York City on his way to a job in New Haven, Connecticut.  Rossi was carrying a revolver out of "fear of the Black Hand" (the predecessor of the Mafia), an organization that extorted money from many Italian immigrants.  The judge sentenced Rossi to a year in Sing Sing, explaining that the carrying of revolver was "the custom with and your kind, and that fact, combined with your irascible nature, furnishes much of the criminal business in this

---

[20] *Murder is Safer Than Theft*, NEW YORK TIMES, Aug. 12, 1926 at 18.

[21] Ernest A. Dench, *Motion Picture Photography*, 20 CAMERA 121 (1916).

country." There was no suggestion that Rossi himself was a criminal, or "irascible; the sentence was based on what the judge thought Rossi's *kind* (*i.e.*, Italians) were like.[22] These were not isolated cases. In 1920, *Law Notes*, a professional journal for lawyers, pointed to several gross miscarriages of justice. A woman named Byrne waiting on "street corner in Brooklyn, saw a shining object in the gutter. She picked it up and found it to be a revolver." She was arrested and sentenced to three years in prison for possession without a license. While her sentence was reduced on appeal, the conviction stood.[23]

## III

### THE UNIFORM FIREARM AND UNIFORM PISTOL ACTS

Perhaps because of these problems, the Sullivan Act played no major role as a model for laws in other States. What did serve as such models were several uniform acts relating to firearms which, curiously enough, had their origins only a few miles from "Big Tim" Sullivan's former headquarters.

---

[22] *The Sullivan Pistol Law*, 23 THE GREEN BAG 608.

[23] *The New York Pistol Law*, LAW NOTES, December, 1920, at 163-64; SUPPLEMENT, 1921 TO ANNOTATED CONSOLIDATED LAWS OF THE STATE OF NEW YORK, 749 (1922); *People v. Byrne*, 112 Misc. 377, 184 N.Y.S. 114 (1920).

The initiating force behind the uniform acts was Karl Frederick, who formed quite a contrast to Big Tim. A New York City attorney, Harvard Law Review editor, and director of the National Wildlife Association, he had won the gold medal in free pistol shooting at the 1920 Olympics.[24] Working on behalf of the United States Revolver Association, in the early 1920s he drafted a "Uniform Revolver Act," sometimes titled the "Uniform Pistol Act," as a less-restrictive alternative to the Sullivan Act.

The key provisions of his proposal included:

1.    Licensing of handgun dealers.[25]

2.    Convicted felons, and non-citizens, were forbidden to possess firearms. Sales were prohibited where the seller had reasonable cause to believe the purchaser was a felon or alien, or where the purchaser did not provide suitable identification.

3.    A one-day waiting period following a sale, during which the seller must inform law enforcement of the transaction.

---

[24] Thomas Earl Mahl, *supra* at 23;
http://en.wikipedia.org/wiki/Karl_Frederick

[25] There was at the time no Federal licensing of dealers; this only began with the Federal Firearms Act of 1938.

4.      A prohibition on concealed carrying outside one's own

residence of place of business without a permit. Open carry was

not restricted.[26]

This model statute was adopted (in whole or in part) by seven States.

Sam B. Warner, *The Uniform Pistol Act*, 29 J. OF CRIM. L. & CRIMINOLOGY

529, 531 n.12 (1938-39).

In 1926, after several years of consideration, the National Conference

of Commissioners on Uniform State Laws adopted it with changes (chiefly

altering the ban on possession by all persons convicted of a felony into one

banning possession by those convicted of a violent felony, and omitting the

ban on possession by aliens) as the Uniform Firearms Act, *Id.* at 531. The

American Bar Association also endorsed it, and it was adopted by five more

States. *Id.* at 531 n. 13. In 1932, New York's legislature passed a bill

substituting the Uniform Firearms Act for the Sullivan Act, but it was

vetoed.[27]

In 1938, the Interstate Commission on Crime, an ad-hoc body,

proposed a somewhat stricter version, entitled the Uniform Pistol Act. *Id.* at

532. *See generally* Sam B. Warner, *supra*, at 531-540; Note, *The Uniform*

---

[26] Thomas Earl Mahl, *supra*, at 30-32.

[27] Thomas Earl Mahl, *supra*, at 56.

*Pistol Act: A New Approach To Firearm Regulation*, 54 HARV. L. REV. 123

(1940). The major changes were to broaden the prohibition on possession by

convicted felons to include those convicted of burglary or drug offenses, and

to provide for licensing of carrying by a State commission rather than by

local police or judges.[28]

### IV

### THE SULLIVAN ACT AND PROBLEMS WITH DISCRETIONARY APPLICATION

The Sullivan Law and its successors gave licensing authorities almost

complete discretion to determine whether or not to issue a permit, and what

data should be submitted with the request. "The submission and acceptance

of an application for a pistol license is an integral part of an over-all

procedure which is totally within the discretion of the Police

Commissioner." *Federation of New York State Rifle and Pistol Clubs v.*

*McGuire*, 101 Misc. 2d 104, 420 N.Y.S.2d 602 (1979). Licensing authorities

accordingly were free to impose non-statutory criteria and invent procedural

requirements. Shortly after passage of the Act, New York City magistrates

decided that a carry permit would require an affidavit, three character

---

[28] Sam B. Warner, *surpa*, at 538, 542-43.

references, and a finding that issuance was "necessary to the applicant's well-being."[29] None of these requirements was found in the original statute.

The standards might also vary in the same location from time to time, depending upon who issued the permits. Recently, in Onandaga County, licensing was being handled by three judges, who served in monthly rotation. In 1992, one began requiring applicants to prove attendance at a gun safety course, while the other two did not.[30] The requirement thus existed for one month out of every three.

A more serious problem with the lack of real standards is that, inevitably, the test becomes the applicant's connections rather than his or her behavior. As early as the 1920s, Mafioso were successfully obtaining unrestricted concealed carry licenses.[31]  In the 1930s, "Dutch" Schultz and other mobsters held permits.[32] Another glimpse into the process came in 1957.  At

---

[29] *Rules for Gun Carriers*, NEW YORK TIMES, Sept. 30, 1911.

[30] *Judge: No Permits Without Classes*, SYRACUSE HERALD AMERICAN, June 21, 1992 at B-3, B-17.

[31] DAVID CRITCHLEY, THE ORIGIN OF ORGANIZED CRIME IN AMERICA: THE NEW YORK CITY MAFIA, 1891-1931, at 285 n. 81(2009); THOMAS A. REPPETTO, AMERICAN MAFIA: A HISTORY OF ITS RISE TO POWER 105 (2004); SID FEDER AND JOACHIM JOESTEN, THE LUCIANO STORY 53-54 (1994).

[32] *Mulrooney Fights "Model" Pistol Bill*, NEW YORK TIMES, March 1, 1933,

Apalachin, New York, state police happened onto a meeting of American

Mafioso—and in so doing, raised public awareness of organized crime.[33]

Many of these crime bosses were carrying handguns—and had pistol permits

issued by New York or New Jersey.[34]

A system which commits decision entirely to official discretion also

invites corruption. In 1972, *The Knapp Commission Report on Police*

*Corruption* reported that, according both to applicants and police officers, it

was common throughout the city to pay a $100 bribe to the precinct

commander to obtain a pistol permit.[35]

The solution was to centralize the pistol permit process. This substituted

one problem for another. Permits had been difficult enough to obtain even

when bribery gave the issuers a personal incentive. With that removed,

licensing authorities had no reason at all to grant permits. In 1978, NYPD

---

at 8.

[33] JAY S. ALBANESE, ORGANIZED CRIME IN OUR TIMES 141-42 (2011).

[34] EDWARD BEHR, PROHIBITION: THIRTEEN YEARS THAT CHANGED AMERICA 240-41 (1996).

[35] THE KNAPP COMMISSION REPORT ON POLICE CORRUPTION 188-89 (1973). Problems with corruption were reported as early as 1920, when a magistrate was found to have signed dozens of otherwise blank permits, which sold for $2 each. *Says An Ex-Convict Got Pistol Permits*, NEW YORK TIMES, Nov. 10, 1920, at 8.

18

administration decided that they were short of officers to process applications. The solution was to slow down processing; applications now could only be filed by appointment. By March of 1979, the pistol licensing office was making appointments *a year* in advance.[36]

Of course, as George Orwell's *Animal Farm* explained, "Some animals are more equal than others." When 40 black and Puerto Rican women sought permits to protect their families against an outbreak of muggings, they were informed "It's the policy of this department not to give out permits for people who want to protect themselves."[37] A different policy applies to the rich and famous: New York City pistol permits have been issued to Donald Trump, Don Imus, Sean Hannity, Howard Stern, Robert De Niro, and others with clout,[38] none of whom likely reside in high-crime areas.

---

[36] *Federation of New York State Rifle and Pistol Clubs v. McGuire*, 101 Misc. 2d 104, 420 N.Y.S.2d 602 (1979).

[37] *40 in Bronx SeeK Gun Permits For Protection Against Addicts*, NEW YORK TIMES Sept. 26, 1969, at 31.

[38] *Lifestyles Of The Rich And Packin': High Profile Celebrities Seeking Gun Permits On the Rise,* NEW YORK DAILY NEWS, Sept. 27, 2010. Online at http://www.nydailynews.com/ny_local/2010/09/27/2010-09-27_celebrities_seeking_pistol_permits_on_the_rise_in_the_city_lifestyles_o f_rich_n_.html; *Madoff Son Of A Gun*, New York Daily Post, Dec. 27, 2009, at ___; online at

The record for customer-friendly service came, however, in the case when Steven Tyler and Joe Perry of the band Aerosmith obtained pistol permits in New York City. While ordinary applicants were waiting a year for an appointment to submit their application, the head of the License Division, Benjamin Petrofsky, cut through the usual red tape for the musicians, by fingerprinting them at Madison Square Garden before one of Aerosmith's shows.  Petrofsky received a limo ride and a ticket to the show.[39]

Official discretion as a bar to the exercise of a Constitutional right always leads to invidious discrimination, often on the basis of political contacts, wealth, status as a celebratory, or other arbitrary factors that change as fast as administrators do.  It happens in 2011 in New York.[40]

In New York, as in many other jurisdictions, the general rule is that "a municipality may not be held liable for the failure to provide police protection because the duty to provide such protection is owed to the public

---

http://www.nypost.com/p/news/local/madoff_son_of_gun_LDcUvEw9PXY 0rS1oNFfl1J

[39] Jon Wiederhorn, "Janie's Got A Gun Permit? Aerosmith Flap Lands Cop In Hot Water," *MTV,* December 19, 2002, online at http://www.mtv.com/news/articles/1459226/janies-got-gun-permit.jhtml, last accessed February 1, 2011.

[40] Jo Craven McGinty, The Rich, the Famous, the Armed, The New York Times p. MB1, February 18, 2011, online at http://www.nytimes.com/2011/02/20/nyregion/20guns.html

at large, rather than to any particular individual" *Conde v City of New York*,

24 AD3d 595, 596 (2nd Dep't 2005); *Cuffy v City of New York*, 69 NY2d

255, 260 (1987).[41] That being the case, New York's law essentially

restricting the right of self protection to a privileged few should not be

allowed to stand.

## Conclusion

The Sullivan Act's discretionary licensing originates in a historical quirk –

Tim Sullivan wanted to make concealed carry a felony, but George LeBrun

felt he should go farther. The Act's subjugation of the right to bear arms to

the almost complete discretion of a licensing official results in a fundamental

right whose meaning varies by place and time, even by month. No other

Constitutional right is subject to such unrestrained ministerial whim.[42] In

other jurisdictions, such complete discretion was rejected in favor of less

---

[41] A very narrow exception to the rule exists where a special relationship exists between the municipality and the injured party pursuant to which the municipality specifically assumed the obligation of protection and the injured party justifiably relied upon the same to his or her detriment. *Cuffy v. City of New York*, 69 NY2d at 260; *Conde v City of New York*, 24 AD3d at 596.

[42] Compare the treatment of First Amendment rights. One can be required to get a Parade Permit but the process is not discretionary and the terms of the permit cannot restrict the core right of free speech. The Second Amendment should be treated no differently.

restrictive measures aimed at securing the same goals while reducing

arbitrary administration.

DATED:     February 23, 2011

Respectfully submitted,

David T. Hardy, Esq.*                Joseph E. Olson, Esq.*
8987 E. Tanque Verde                 Professor of Law
PMB 265                              Hamline University School of Law
Tucson AZ 85749                      St. Paul, MN  55113-1235
(520) 749-0241                       (651) 523-2142


                                     Eisenberg & Carton


                                     By: _____
                                          Lloyd M. Eisenberg (LE 5376)
                                     2631 Merrick Road, Suite 201
                                     Bellmore, New York 11710
                                     (516) 221-3700

           Attorneys for Amici Academics for the Second Amendment
             and LI Second Amendment Preservation Association

*Not admitted to this Court.