**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X
Alan Kachalsky, Christina Nikolov, Eric Detmer,  :
Johnnie Nance, Anna Marcucci-Nance,              :
and  Second Amendment Foundation, Inc.,          :
                                                 :
                      Plaintiffs,                :  **Civil Action Number: 10-cv-5413**
                                                 :  **(Hon. Cathy Seibel)**
-against-                                        :
                                                 :
Susan Cacace, Jeffrey A. Cohen,                  :
Albert Lorenzo, Robert K. Holdman                :
and County of Westchester,                       :
                                                 :
                      Defendants.                :
-------------------------------------------------------------X

## MEMORANDUM OF LAW IN RESPONSE
## TO THE MEMORANDA OF LAW SUBMITTED
## BY *AMICI CURIAE*

ERIC T. SCHNIEDERMAN
Attorney General of the
 State of New York
Attorney for the State Defendants
120 Broadway, 24th Floor
New York, New York 10271
(212) 416-8553/8965

ANTHONY J. TOMARI
MONICA CONNELL
Assistant Attorneys General
 Of Counsel

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................. ii

Preliminary Statement........................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

POINT I
RESTRICTIONS ON THE CARRYING OF CONCEALED
HANDGUNS ARE LONGSTANDING AND WIDESPREAD ................................ 2

    A.  Concealed Weapons Regulations Have Historically Been Upheld ..................... 2

    B.  The Academics Erroneously Assert that Discretion in Administering
        Penal Law 400.00(2)(f) Renders It Unconstitutional............................................ 4

POINT II
WCFOA FAILS TO ESTABLISH THAT REGULATION OF CARRYING
CONCEALED HANDGUNS IN PUBLIC IS UNCONSTITUTIONAL ................... 8

    A.  The Alleged Lack of a Police Duty to Defend the Public Safety Does Not
        Create an Unlimited Right to Carry Concealed Firearms in Public........................ 8

    B.  WCFOA Fails to Establish Any Right to Carry Concealed Handguns
        in Public ................................................................................................................. 8

    C.  WCFOA's Assertion that Those Who Have Been Issued
        Concealed Carry Licenses Are "Highly Law Abiding"
        Does Not Invalidate Penal Law § 400.00(2)(f)...................................................... 9

CONCLUSION............................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page**

Andersen v. Leavitt,
   2007 WL 2343672 (E.D.N.Y. 2007)................................................................................... 1

Aymette v. State,
   21 Tenn. 154 (1840)........................................................................................... 3, 4, 8, 9

Bach v. Pataki,
   408 F.3d 75 (2d Cir. 2003)................................................................................................ 4

Bando v. Sullivan,
   290 A.D.2d 691 (3d Dep't 2002)...................................................................................... 4

Bernstein v. Police Dept. of City of New York,
   85 A.D.2d 574 (1st Dep't 1981)....................................................................................... 4

Conde v. City of New York,
   24 A.D.3d 595 (2d Dep't 2005)........................................................................................ 8

Cuffy v. City of New York,
   69 N.Y.2d 255 (1987)....................................................................................................... 8

DiSanto v. Kelly,
   22 A.D.3d 357 (1st Dep't 2005)...................................................................................... 5

Goldstein v. Brown,
   189 A.D.2d 649 (1st Dep't 1993) ................................................................................... 5

Heller v. District of Columbia,
   128 S.Ct. 2783 (2008).................................................................................................. 8, 9

Matter of County of Westchester v D'Ambrosio,
   244 A.D.2d 334 (2d Dep't 1997)..................................................................................... 4

McDonald v. City of Chicago, Ill.,
   __U.S. __, 130 S.Ct. 3020 (2010)............................................................................... 8, 9

Novick v. Hillery,
   183 A.D.2d 1007 (3rd Dep't 1992) ............................................................................... 5

People v. Marin,
   795 N.E.2d 953 (Ill. App. 2003) .................................................................................. 10

People Yarbrough,
   169 Cal. App. 4th 303 (2008) ....................................................................................... 10

State v. Chandler,
   5 La.Ann. 489 (1820)................................................................................................. 2, 3

State v. Reid,
   1 Ala. 612 (1840) ...................................................................................................... 3, 4

United States v. Bledsoe, 2008 WL 3538717 (W.D. Tex. Aug. 8, 2008) ......................... 14

United States v. Gotti,
   755 F.Supp. 1157 (E.D.N.Y. 1991) ............................................................................... 1

United States v. Schultz, 2009 WL 35225 (N.D. Ind. Jan. 5, 2009) ................................. 14

United States v. Tooley, 717 F. Supp. 2d 580 (S.D.W.V. 2010) ...................................... 14

**United States Constitution**
Second Amendment............................................................................................... 1, 3, 8, 9
Fourteenth Amendment .............................................................................................. 14

**State Statutes**

New York Civil Practice and Rules (CPLR)  Article 78 ...................................................... 5
CPLR § 7804(3)............................................................................................................... 4
New York Penal Law § 400.00.................................................................................. passim
New York Penal Law § 400.00 (2) (f) ........................................................................ passim
Uniform Firearms Act § 7 (1930) ................................................................................... 7
Uniform Pistol Act § 8 (1940) ..................................................................................... 7, 8

**Other State Statutes**

Alabama Code § 13A-11-75 ............................................................................................ 6
11 Delaware Code § 1441 ............................................................................................... 6
California Penal Code § 12050.......................................................................................... 6
Hawaii Revised Statutes § 134-9 ..................................................................................... 6
Iowa Code Annotated § 724.8 ......................................................................................... 6
Maryland Code Annotated, Public Safety § 5-306(a)(5)(ii) .............................................. 6
Massachusetts Gen. Laws Ann. 140 § 131 ...................................................................... 6
New Jersey Statutes Annotated 2C:58-3........................................................................... 6
Rhode Island Gen. Laws § 11-47-11 ............................................................................... 6

## Other Authorities

Alfred Blumstein, Youth Violence, Guns, and the Illicit- Drug Industry, 86 J. Crim. L. & Criminology 10 (1995)............................................................................................... 11

Cheryl W. Thompson, Guns Used to Kill Police Officers: Where They Come From and How They Get in the Hands of Criminals, Washington Post (November 21, 2010).... 11

Hemenway, Private Guns, Public Health, 98-99, 116-17; Jeffrey Fagan et al., ......... 11, 13

James Wright & Peter Rossi, Armed and Considered Dangerous: A Survey of Felons and Their Firearms (expanded ed. 1994)............................................................................. 13

Mona A. Wright & Garen J. Wintemute, Felonious or Violent Criminal Activity That Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors, J. Trauma 69(4):948-955 (2010) ..................................................................... 11

NY Times, "States Struggle to Disarm People Who Have Lost the Right to Own Guns" (Feb 5, 2010 p. 1).......................................................................................................... 12

New York Tribune Sept. 29, 30, 1911 ("Proving Its Worth"); Oct. 13, 1911 ("the Sullivan Law is an admirable instrument in the war on cries of violence"); February 9, 1912 (Editorial stating that search of six hundred "frequenters of low resort" proved effectiveness of Sullivan law as only one had a concealed weapon.); July 14, 1912 (Robbery victim fired at thief, hit child, arrested under Sullivan Law); August 4, 1912 (Judge, a "firm believer in the efficacy of the Sullivan Law"); March 13, 1913 (Amendment to law drafted, includes allowing citizens with good reputation to obtain pistol permits); New York Times, August 29, 1911 ("Big Tim Sullivan's Measure will Aid Police in Dealing With Violent Crimes") ................................................................. 5

Peter Duffy, 100 Years Ago, the Shot That Spurred New York's Gun-Control Law, (N.Y. Times, Jan. 24, 2011).................................................................................................... 5

Pretend "Gun-Free" School Zones: A Deadly Legal Fiction, by David B, Kopel, 42 Conn. L. Rev. 515, December 9, 2009 .................................................................................... 11

The Debate on Shall Issue Laws, 5 Econ J. Watch 269, 288 (2008) by Carlisle E. Moody and Thomas B. Marvell................................................................................................. 12

Social Contagion of Violence, The Cambridge Handbook of Violent Behavior and Aggression 688, 701-10 (Daniel J. Flannery et al. eds. 2007)...................................... 11

Yet Another Refutation of the More Guns, Less Crime Hypothesis, with Some Help from Moody & Marvell, 6 Econ J. Watch 35 (2009) by Ian Ayers and John J. Donahue III ........................................................................................................ 13

## Preliminary Statement

The Hon. Susan Cacace, the Hon. Jeffrey A. Cohen, the Hon. Albert Lorenzo, and the Hon. Robert K. Holdman (collectively "State Defendants") submit this memorandum of law in response to the *amicus curiae* memoranda submitted by: 1) Academics for the Second Amendment and the Long Island Second Amendment Preservation Foundation Association (collectively, "the Academics"), and 2) the Westchester County Firearm Owners Association, Inc. ("WCFOA") in accordance with this Court's order of February 24, 2011.

The Academics purport to provide this Court with the historical context of the Sullivan Law and argue that the law, in its current form as New York Penal Law § 400.00(2)(f), violates the Second Amendment because it vests "unbridled" and "complete" discretion in licensing authorities.  WCFOA asserts that the "proper cause" requirement of Penal Law § 400.00(2)(f) violates a right of "self-protection" conferred by the Second Amendment. Both *amici* rely on misstatements of law and fact and neither offers additional perspectives "useful" to the court in deciding this case.  Andersen v. Leavitt, 2007 WL 2343672 at * 2 (E.D.N.Y. 2007) (Amicus brief is "useful" if it has "unique information or perspective" beyond that offered by counsel for the parties); United States v. Gotti, 755 F.Supp. 1157, 1158 (E.D.N.Y. 1991)(Amicus are to "provide supplementary assistance" to counsel and to insure "a complete and plenary presentation of difficult issues").

## ARGUMENT

## POINT I

### RESTRICTIONS ON THE CARRYING OF CONCEALED HANDGUNS ARE LONGSTANDING AND WIDESPREAD.

While conceding a longstanding history of regulation of the carrying of concealed firearms in the United States, the Academics misrepresent that history to support their argument that § 400.00(2)(f) is unconstitutional because it permits "unlimited" official discretion in the issuance of licenses, even intimating that New York Penal Law § 400.00 bears little resemblance to the original Sullivan Law. Academics' Brief pp. 1, 5-6.

### A.    Concealed Weapons Regulations Have Historically Been Upheld

In setting forth their "evolution" of concealed carry laws, the Academics cite authorities that they claim show that the earliest concealed-carry weapons bans "were generally upheld . . .on the basis that they regulated one manner of arms bearing while permitting another that was of equal value in self-defense". Academics' Brief p. 3. This is a serious misstatement of the cases upon which they rely. For example, State v. Chandler, 5 La.Ann. 489 (1820) concerned whether the court should have given a jury charge that "to carry weapons either concealed or openly, is not a crime [because] . . . the Constitution which guarantees to the citizen the right to bear arms cannot be restricted by the action of the Legislature." In dismissing the proposed jury charge, the court noted that the concealed weapons ban then in effect was "absolutely necessary" and "interfered with no man's right to carry arms (to use its words) 'in full open view', which places upon men an "equality". Contrary to the Academic Amici's assertion, the court did not say that the concealed carry ban would be unconstitutional, but for the open carry provision, or discuss the necessity of handguns for self-defense.

2

State v. Reid, 1 Ala. 612 (1840) considered the constitutionality of a state statute banning the carrying of concealed weapons in the context of a criminal proceeding where the defendant alleged he carried a weapon for self-defense. The Second Amendment was not implicated, but rather the Alabama State Constitution, which provided: "Every citizen has a right to bear arms, in defence[sic] of himself and the State". In upholding the statute, the court found:

> The question recurs, does the act "To suppress the evil practice of carrying weapons secretly" trench upon the constitutional rights of the citizen. We think not. The constitution in declaring that "Every citizen has the right to bear arms in defence [sic] of himself and the State," has neither expressly nor by implication, denied to the Legislature, the right to enact laws in regard to the manner in which arms shall be borne. The right guaranteed to the citizen, is not to bear arms upon all occasions and in all places, but merely "in defence[sic] of himself and the State." The terms in which this provision is phrased seems to us, necessarily to leave with the legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals.

In upholding the constitutionality of the concealed carry ban, the court found that the defendant "needed no arms for his protection" as "his official authority [as sheriff] furnished him an ample shield."

Finally, in Aymette v. State, 21 Tenn. 154 (1840), the court upheld a state ban on carrying concealed weapons, as such weapons could not be employed in furtherance of the collective right of the defense of the State.

Contrary to their arguments, the cases relied on by the Academics actually support the State Defendants' position that carrying of concealed weapons in public is subject to reasonable regulation by the State. See State v. Chandler, supra (Concealed weapon ban found "absolutely necessary to counteract a vicious state of society growing out of the habit of carrying concealed weapons, and to prevent bloodshed and

3

assassinations committed upon unsuspecting persons"); State v. Reid, 1 Ala. 612 (1840)

("[A] law which is intended merely to promote personal security, and to put down lawless

aggression and violence, and to that end inhibits the wearing of certain weapons . . . does

not come in collision with the constitution"); Aymette v. State, 21 Tenn. 154 (1840) ("To

hold that the Legislature could pass no law upon this subject by which to preserve the

public peace, and protect our citizens . . . or their lives from being endangered by

desperadoes with concealed arms, would be to pervert a great political right to the worst

of purposes, and to make it a social evil of infinitely greater extent to society than would

result from abandoning the right itself.").

## B.     The Academics Erroneously Assert that Discretion in Administering Penal Law 400.00(2)(f) Renders It Unconstitutional.

The Academics claim, without support from the facts of this case or any other

source, that New York licensing officers have "nearly-unbridled discretion" in granting

handgun permits. Much like plaintiffs' equally unsupported, yet oft-repeated assertion

that Penal Law § 400.00 somehow acts as a handgun ban, the Academics' assertion of

"unbridled discretion" is contrary to the facts and law.[1]  The term "proper cause" is well-

defined in New York and there is no basis for this Court to find that it is applied

arbitrarily. See Bach v. Pataki, 408 F.3d 75, 80 (2d Cir. 2003); Bando v. Sullivan, 290

A.D.2d 691, 693 (3d Dep't 2002); Matter of County of Westchester v. D'Ambrosio, 244

A.D.2d 334 (2d Dep't 1997); Bernstein v. Police Dept. of City of New York, 85 A.D.2d

574 (1st Dep't 1981); First Amended Complaint ¶ 25. Moreover, licensing decisions are

---

[1] Amici cite to various anecdotes from the past where licensing discretion was allegedly abused but fail to point to any such abuse as to how the statute has been applied currently and they ignore the data demonstrating that the State issues thousands of licenses to carry concealed weapons each year. So, for example, in 2009, New York State issued or renewed 18,577 handgun licenses. New York City currently has 36,017 handgun licenses on file. See Sherman Decl., Exhibits A and B; Bellom Decl. ¶ 17.

4

subject to expedited State court review under New York Civil Practice and Rules (CPLR) Article 78 proceedings, which expressly provide for a determination of whether the licensing decision was "arbitrary and capricious or an abuse of discretion". CPLR § 7804(3). Any licensing decision rendered arbitrarily or capriciously is reversed. See, e.g., DiSanto v. Kelly, 22 A.D.3d 357 (1st Dep't 2005) (technical violation of notification procedure did not provide basis for denying handgun carry license); Goldstein v. Brown, 189 A.D.2d 649 (1st Dep't 1993)(denial of license despite proof of threats was arbitrary and capricious); Novick v. Hillery, 183 A.D.2d 1007 (3d Dep't 1992). [2]

Furthermore, many other jurisdictions provide this type of "discretion" to local officials in regard to concealed carry licenses and the assertion that New York is unique

---

[2]   The Academics distort the historical context and legislative history of the Sullivan Law. Their assertion that § 400.00 bears little resemblance to the original Sullivan Law is incorrect.  The "proper cause" language first appeared in 1913 -- a mere two years after passage of the original Sullivan Law, and has remained in the licensing provisions of every analogous law up to and including Penal Law § 400.00. The Sullivan Law, like numerous concealed carry provisions enacted across the country, was intended to address the particular danger presented by the carrying of concealed handguns in public; to limit gang violence; and to "decrease appreciably the number of homicides, accidental and impulsive". Tomari Decl., Exhibit S(2), (3), (4). It was the product of a push by public officials, including the New York City Coroner George P. LeBrun, to address New York's burgeoning handgun violence problem. Tomari Decl. Exhibit S(2). As Mr. LeBrun expressed "[t]he Sullivan Law does not restrict the purchase of rifles and shotguns...nor does it prevent a reputable citizen who needs a gun from obtaining a permit. It is aimed specifically at keeping the small pocket-size pistols from the hands of men who would use them to shoot down human prey". George P. LeBrun and Edward D. Radin, It's Time to Tell, William Morrow and Co., New York (1962), 102-115. It had broad support throughout the legislature, Tomari Decl., Exhibit S(6) and was crafted to prevent violence while balancing the interests of individual liberty. Tomari Decl. Exhibit S (9).  In his autobiography It's Time to Tell, LeBrun noted that he was inspired to draft the Sullivan Law following the senseless murder of a writer by a deranged gunman and by his daily view of the ravages of gun violence, including impulsive shootings and bystander shootings. LeBrun worked with legislator Timothy Sullivan because Sullivan had clearly expressed a concern with gun violence in his district.  The measure had the backing of "all of the criminal court judges and the district attorney" and numerous prominent citizens. It passed the Senate almost unanimously. The Sullivan Law was effective in limiting and addressing the gun violence scourge in New York. See, e.g., New York Tribune Sept. 29, 30, 1911 ("Proving Its Worth"); Oct. 13, 1911 ("the Sullivan Law is an admirable instrument in the war on crimes of violence"); February 9, 1912 (Editorial stating that search of six hundred "frequenters of low resort" proved effectiveness of Sullivan Law as only one had a concealed weapon.); July 14, 1912 (Robbery victim fired at thief, hit child, arrested under Sullivan Law); August 4, 1912 (Judge, a "firm believer in the efficacy of the Sullivan Law"); March 13, 1913 (Amendment to law drafted, includes allowing citizens with good reputation to obtain pistol permits); New York Times, August 29, 1911 ("Big Tim Sullivan's Measure will Aid Police in Dealing With Violent Crimes"). For the Court's convenience, copies of these articles are annexed hereto. See also, Peter Duffy, 100 Years Ago, the Shot That Spurred New York's Gun-Control Law, (N.Y. Times, Jan. 24, 2011), available at http://cityroom.blogs.nytimes.com/2011/01/23/100-years-ago-the-shot-that-spurred-new-yorks-gun-control--law/?scp=1&sq=sullivan%20law&st=cse.

5

or alone in this regard is baseless. See, e.g., Alabama Code § 13A-11-75 (a) (sheriff may issue a license if it appears the applicant "has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol, and that he or she is a suitable person to be so licensed".); California Penal Code § 12050 (license applicant must show "good cause"); Connecticut General Statutes Ann. § 29-28 (license to carry firearm issued "provided such authority shall find that such applicant intends to make no use of any pistol or revolver ... other than a lawful use and that such person is a suitable person to receive such permit."); 11 Delaware Code § 1441 (applicant must demonstrate good moral character, and reputation for "peace and good order in the community... and that the carrying of a concealed deadly weapon by the applicant is necessary for the protection of the applicant or the applicant's property"); Hawaii Revised Statutes § 134-9 (license to carry concealed weapon issued in "an exceptional case, when an applicant shows reason to fear injury to the applicant's person or property" and where "the urgency or the need has been sufficiently indicated"); Maryland Code Annotated, Public Safety § 5-306(a)(5)(ii) (applicant must show "good and substantial to wear, carry or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger".); Massachusetts Gen. Laws Ann. 140 § 131 (licensing authority may issue license upon a showing of need to carry); New Jersey Statutes Annotated 2C:58-3 (No license required to be issued to "any person where the issuance would not be in the interest of the public health, safety or welfare"); Rhode Island Gen. Laws § 11-47-11 (permit issued "if it appears that the applicant has good reason to fear an injury to his or her person or property or has any other proper reason for carrying a pistol or revolver, and that he or she is a suitable person to be so licensed"); see also, Cook Decl., ¶ 21.

6

Finally, the Uniform Firearms Act and the Uniform Pistol Act, which the

Academics cite as their preferred, allegedly less-restrictive legislative alternative to §

400.00(2)(f) provided licensing officials with a similar "discretion" in issuing licenses:

> The judge of a court of record, the chief of police of a municipality, the sheriff of a county, *may* upon the application of any person issue a license to such person to carry a pistol in a vehicle or concealed on or about his person within this state for not more than one year from date of issue, *if it appears that the applicant has good reason to fear an injury to his person or property*, or has any other proper reason for carrying a pistol, and that he is suitable person to be licensed.

Unif. Firearms Act § 7 (1930) (emphasis added). Similarly, Section 8 of the

Uniform Pistol Acts provides:

> A person desiring a license to carry a pistol shall apply to the chief of police or corresponding police officer of the municipality in which he resides...The officer to whom the application is made shall forward this information together with his recommendation to the state, who may make whatever further investigation he deems necessary and shall issue to the applicant a qualified or unlimited license to carry a pistol...*if it appears that the applicant has a proper reason for carrying a pistol and is of good character and reputation and a suitable person to be so licensed.*

Unif. Pistol Act § 8 (1940) (emphasis added). Thus, even the proposed model firearms

codes espoused by the Academics grant discretion to licensing officials and require a

showing of "proper reason" for the issuance of an "unlimited license" to carry a pistol.

The Academics' assertion that the "discretion" given to licensing officials in New York

renders Penal Law 400.00 (2)(f) unconstitutional is without merit.

7

## POINT II

### WCFOA FAILS TO ESTABLISH THAT REGULATION OF CARRYING CONCEALED HANDGUNS IN PUBLIC IS UNCONSTITUTIONAL.

### A. The Alleged Lack of a Police Duty to Defend the Public Safety Does Not Create an Unlimited Right to Carry Concealed Firearms in Public.

WCFOA (as well as the Academics) asserts that they have a right to carry

concealed guns in public because the police have no obligation to protect them. This

argument is frivolous and insulting to law enforcement officers and authorities. WCFOA

cites decisions denying money damages against municipalities in civil actions where it is

alleged that the police failed to protect certain individuals, and extrapolates from these

cases the offensive conclusion that law enforcement authorities cannot be relied on to

protect the public See, e.g., Cuffy v. City of New York, 69 N.Y.2d 255, 260 (1987);

Conde v. City of New York, 24 A.D.3d 595, 596 (2d Dep't 2005). These cases, which set

out well established principles of tort liability, do not stand for the proposition that the

police in New York State lack interest in public safety or that there must be an absolute

right to carry concealed handguns in public because the police cannot be counted on to

protect the public, and there is no basis for this Court to so hold.

### B. WCFOA Fails to Establish Any Right to Carry Concealed Handguns in Public.

WCFOA cites no post-Heller or McDonald case in support of its argument that

there is a fundamental right to carry concealed handguns in public, relying instead upon a

mischaracterization of the Heller decision. WCFOA claims that in Heller, the Supreme

Court rejected the holding of Aymette v. State, 21 Tenn. 154 (1840) which WCFOA

asserts recognized a Second Amendment right to carry in the home but not outside the

home. WCFOA Brief p. 7. WCFOA is wrong both in regard to its summary of the

8

Aymette case and its citation to Heller.

Aymette involved an appeal from a criminal conviction for the concealed carrying of a bowie-knife in contravention of a state statute. The criminal defendant challenged the legality of that statute under the state's constitutional provision which recognized "that the free white men of this State have a right to keep and bear arms for their common defence". The Tennessee court held that the object of the constitutional provision was clearly to secure a "common" right "of general and public nature, to be exercised by the people in a body, for their common defence," and found that the statute banning the carrying of concealed weapons did not violate the state's constitution, as concealed weapons "could in no degree contribute" to the collective right of defense of the State. Id. In Heller v. District of Columbia, 128 S.Ct. 2783, 2809, 2815 (2008), the Supreme Court discussed Aymette in the context of whether the right to bear arms under the Second Amendment is an individual or collective right, and its discussion of Aymette did not establish in any way an individual right to carry concealed handguns in public, as WCFOA would have this Court believe.[3]

## C.   WCFOA's Assertion that Those Who Have Been Issued Concealed Carry Licenses Are "Highly Law Abiding" Does Not Invalidate Penal Law § 400.00(2)(f).

The WCFOA brief asserts that persons with concealed carry permits are highly law abiding, presumably suggesting that there can be no legitimate reason to regulate the

---

[3] WCFO argue that Penal Law § 400.00(2)(f) "allows licensing officers to make judgments as to whether or not a particular applicant has demonstrated "proper cause" is just the type of interest-balancing that Justice Scalia "decried" in McDonald. State Defendants note that the discussion relied on by WCFOA is actually in reference to the appropriate level of scrutiny that applies to Second Amendment challenges and has no bearing on the particular application of any law. Moreover, as explained at length previously in Point I(B) herein, under Penal Law § 400.00(2)(f), the definition of "proper cause" is well-established and consistently applied. It requires no "balancing" of interests and WCFOA's assertion that, for that reason, it violates the constitution, is meritless.

9

concealed carrying of handguns in public because those who apply for licenses are likely
to remain law abiding. This argument is seriously flawed.

First, the likelihood that a concealed carry licensee will use his or her firearm in a
crime is not the only risk that the State's regulation is designed to prevent. The carrying
of concealed handguns in public poses a threat to the public in many other ways. The
increased prevalence of these weapons increases their availability to juveniles and
criminals and itself makes policing much more difficult and risky and thus poses a threat
to public safety. Cook Decl., ¶¶ 12-16; Fazio Decl., ¶¶ 10-15; Lunetta Decl., ¶¶ 11-16.

Second, the carrying of a concealed weapon outside the home impacts members
of the public and their perception of safety and use of public spaces in a manner that
carrying inside the home does not. See, e.g., Zimring Decl., ¶¶ 5-15. Unlike inside one's
home, the increased presence of firearms in public presents substantial risks to others
through increased risk of violence, accidental discharges, injuries to bystanders, and
escalation of minor confrontations into gun battles.[4] See People Yarbrough, 169 Cal.
App. 4th 303, 314 (2008); People v. Marin, 795 N.E.2d 953, 958–59 (Ill. App. 2003).
The public carrying of handguns by those not properly trained in their use presents an

---

[4] Although there is no registry or recording of the number of unintended victims of shootings, including
innocent bystanders killed in incidents involving gun use in public, such incidents are commonly reported
in the press. See, e.g., http://www.nbcconnecticut.com/news/local/Unintended-Target-An-11-Year-Old-
New-Haven-Boy-Comes-Under-Fire-97446909.html (June, 2010 shooting of an 11 year old boy); Miner
Decl., ¶ 4 (bystander shooting of toddler in October, 2010);
http://www.news4jax.com/news/21341869/detail.html (woman killed in coffee shop when concealed carry
permit holder dropped his handgun); http://www.jdnews.com/articles/information-70504-available-
jacksonville.html (December 9, 2009 accidental shooting when gun dropped in mall);
http://www.nola.com/crime/index.ssf/2010/09/gunfire_in_galatoires.htm (September 24, 2010 accidental
discharge of handgun carried in purse of handgun licensee) l; http://www.khou.com/news/HPD-Woman-
shot-after-gun-discharges-inside-Houston-restaurant--113543634.html (January 13, 2011, woman shot
when concealed carry license holder drops handgun in restaurant);
http://www.khou.com/news/crime/Deputies-Man-killed-innocent-bystander-wounded-in-apartment-
shooting-84583842.html (February 17, 2010, gun violence results in shooting of innocent bystander shot
while sitting in apartment).

undue risk of public danger when such persons decide to use handguns in public. See Fazio Decl. ¶¶ 5-6; Lunetta Decl. ¶¶ 10-15. Higher prevalence of carrying handguns in public may result in a "contagion effect", leading to an increase in handgun-related violence. See Hemenway, Private Guns, Public Health, 98-99, 116-17; Jeffrey Fagan et al., Social Contagion of Violence, The Cambridge Handbook of Violent Behavior and Aggression 688, 701-10 (Daniel J. Flannery et al. eds. 2007); Alfred Blumstein, Youth Violence, Guns, and the Illicit- Drug Industry, 86 J. Crim. L. & Criminology 10 (1995).

Third, contrary to the WCFOA's assertion, the commission of crimes by those authorized to carry guns in public is not negligible. The Violence Policy Center tracks such shootings and reports that since May, 2007, there have been at least 18 mass shootings involving legal concealed handgun holders who killed or have been charged with killing 79 victims collectively.[5] Since May 2007, legal concealed handgun carriers have killed at least 288 individuals--including nine law enforcement officers--in 194 incidents in 29 states. Id. Furthermore, if the State is required to issue a license to anyone without a disqualifying previous conviction, most people arrested in Westchester County and in New York for felonies and homicides in 2009, for example, would still qualify to obtain such a license. Cook Decl. ¶¶ 27-38.[6]

---

[5] See http://www.vpc.org/ccwkillers.htm. The details of the underlying incidents can also be obtained at that site. Such mass shootings have certainly effected New York and its environs. For example, on April 3, 2009, Jiverly Wong, who had a gun license, shot and killed 14 people at the American Civic Association in Binghamton, New York. See http://thelede.blogs.nytimes.com/2009/04/03/shooting-in-binghamton/.
[6] The risks of gun misuse by legal possessors have demonstrated that even absent a disqualifying conviction, such legal possessors with a history of arrests or misdemeanor convictions are at a much higher risk of being convicted of felonies or violent crimes notwithstanding their prior legal purchases Mona A. Wright & Garen J. Wintemute, Felonious or Violent Criminal Activity That Prohibits Gun Ownership Among Prior Purchasers of Handguns: Incidence and Risk Factors, J. Trauma 69(4):948-955 (2010). Legal purchasers are also a source of guns used in crime. Cheryl W. Thompson, Guns Used to Kill Police Officers: Where They Come From and How They Get in the Hands of Criminals, Washington Post (November 21, 2010). Available at http://www.washingtonpost.com/wpdyn/content/article/2010/11/20/AR2010112002865.html?nav=emailpage.

11

In support of their assertion that licensees are law-abiding, the WCFOA brief presents a six-item list of unreferenced and undocumented statistical assertions regarding the law abiding nature of concealed carry license holders in several states including Ohio, Louisiana, Michigan and Minnesota. These statistics apparently come from the article, which WCFOA cites while omitting the title, Pretend "Gun-Free" School Zones: A Deadly Legal Fiction, by David B, Kopel, 42 Conn. L. Rev. 515, December 9, 2009. The statistics appear to be fatally defective as unaudited administrative records regarding the reporting of revocations. So, for example, WCFOA claims that Ohio had "only 637 revocations for any reason, including moving out of state" out of 142,732 licensees. WCFOA brief at p. 9. Florida had 4927 licenses revoked for a "crime after licensure." Pretend "Gun-Free" School Zones, 42 Conn. L. Rev. at 569. This method of analysis is to report the aggregate apparent records of licensing authorities who may or may not have accurate records of individual risks, and are not an accurate or reliable measure of risk or even of criminal activity by licensees. This dangerous unreliability can provide the illusion of safety. For example, the New York Times recently published an article, "States Struggle to Disarm People Who Have Lost the Right to Own Guns" (Feb 5, 2010 p. 1), concluding of California's gun licensing system: "There is another major blind spot in the system. Tens of thousands of gun owners ... bought their weapons legally but under the law should no longer have them because of subsequent mental health or criminal issues....Policing these prohibitions is difficult in most states. The authorities usually have to stumble upon a weapon in say a traffic stop or some other encounter, and run the persons name through various record checks."[7]  California's experience in tracking criminal and mental health records of licensees has led to a list of over 18,000

---

[7] See http://www.nytimes.com/2011/02/06/us/06guns.html.

12

people who cannot legally possess the guns they had once legally purchased and an estimate that there may be as many as 180,000 current handgun owners who, because of a subsequent criminal or mental health incident, are legally barred from possessing the guns they own.[8]  Thus, aggregate statistics of the sort presented by WCFOA on pages 8 and 9 of its brief should be anything but reassuring.  The low numbers are just as likely to be indications of inefficiency as of safety.

To the extent that WCFOA argues that issuing more concealed carry licenses would make New York safer, its argument fails. For this principle, they rely upon the article The Debate on Shall Issue Laws, 5 Econ J. Watch 269, 288 (2008) by Carlisle E. Moody and Thomas B. Marvell.  As an initial matter, the research upon which the article relies has been conclusively discredited by a panel of experts assembled by the National Research Council of the National Academy of Sciences. See Cook Decl. ¶¶ 23-26. Additionally, the conclusions in that Article were specifically rebutted by the responsive article Yet Another Refutation of the More Guns, Less Crime Hypothesis, with Some Help from Moody & Marvell, 6 Econ J. Watch 35 (2009) by Ian Ayers and John J. Donahue III. Finally, even taking the conclusions of Moody and Marvell at face value, they found that the rates of assault and robbery actually increase following adoption of shall-issue or "right to carry" laws and a net increase in the costs of crime in 23 of the 24 states they examined. WCFOA thus fails to support its assertion that requiring issuance of a concealed carry license to those who ask for the same would make New York safer.[9]

---

[8]  See http://www.nytimes.com/2011/02/06/us/06guns.html.

[9]  WCFOA, referring to James Wright & Peter Rossi, Armed and Considered Dangerous: A Survey of Felons and Their Firearms (expanded ed. 1994), asserts that gun regulations do not affect the conduct of criminals and thus are useless in terms of preventing gun violence.  WCFOA ignores the research that indicates that people are not so easily divided into categories as good, i.e., presenting no risk if permitted to carry a gun in public, and "bad", i.e., totally ignoring any law and criminal sanction for such carrying. See David Hemenway, Private Guns, Public Health, 20-22, 179-80. In fact, even convicted criminals may not

13

WCFOA's empirical response to defendants' evidence reflects WCFOA's fundamental error that a constitutional challenge to legislative action is to be resolved by dueling "experts" in a manner akin to a civil case. However, the plaintiffs' evidence, even if credited (and it should not be) is of no moment. The Court's constitutional analysis should end if the State's proffered evidence is sufficient on its own – notwithstanding possible competing evidence – to show that the firearms license regulation at issue furthers the State's interest. See, e.g., United States v. Schultz, 2009 WL 35225, at *5 n.6 (N.D. Ind. Jan. 5, 2009) ("The Defendant argues in his Reply that not all felons are violent, the crime of being a felon in possession of a firearm is not a crime of violence *per se,* and that '[t]here is no empirical data suggesting that persons convicted of non-violent felonies ... are more likely to seek guns or use them than other, non-convicted persons.' . . . *even assuming these are true for the moment, the Court finds that the challenged statute still substantially relates to the important governmental objective of public safety*.") (emphasis added) (internal citation omitted); United States v. Bledsoe, 2008 WL 3538717, at *4 (W.D. Tex. Aug. 8, 2008) ("To assert, as Defendant's contentions suggest, that regulations governing the sale of handguns for the 18-20 year-old age group do not further a substantial governmental interest is meritless, given the statistics suggesting that the vast majority of guns confiscated from 18-20 year old criminal defendants are handguns"); cf. United States v. Tooley, 717 F. Supp. 2d 580, 597 (S.D.W.V. 2010) (recognizing that legislative judgments are due deference by the

---

follow all laws but are influenced by laws relating to guns, which can make obtaining and carrying a gun more costly and risky. Id., citing Cook, (1996) and Wright & Rossi, supra (incarcerated felons who not carry weapons during the commission of their crimes indicated that the legal consequences of illegally carrying a weapon affected their decisions not to carry). Furthermore, a higher prevalence of guns, makes it easier for youths and criminals to obtain guns, including by thefts from people, homes and vehicles, loans from others, and off-the-books sales, which are easier to arrange and may be cheaper in those jurisdictions than in jurisdictions like New York, with relatively tight controls. Cook Decl. ¶¶ 12-17, 22.

14

courts, and that "[s]ound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable.").

## CONCLUSION

For the reasons set forth herein as well as those in the State Defendants' summary judgment submissions, State Defendants' motion for summary judgment should be granted, and the Court should declare that New York Penal Law 400.00(2)(f) does not violate the Second or Fourteenth Amendments.

Dated: New York, New York
March 10, 2011

Respectfully submitted,

ERIC T. SCHNEIDERMAN
Attorney General of the
State of New York
Attorney for the State Defendants

By:

ANTHONY J. TOMARI
Assistant Attorney General
120 Broadway, 24th Floor
New York, NY 10271
(212) 416-8965

MONICA A. CONNELL
Assistant Attorney General
120 Broadway
New York, New York 10271
(212) 416-8553

15

# ARTICLES

## PROVING ITS WORTH.

The value of the ██████ ███ as an aid in the campaign against the Black Hand is being demonstrated almost every day. The police captured on Thursday evening a young Italian suspected of having been implicated in several recent kidnappings. The evidence at hand may not be sufficient to convict him on the kidnapping charges, but, thanks to the ██████ ███, his temporary retirement from brigandage is assured. He was armed with a revolver and can be sent to jail for carrying concealed weapons, whether or not the other indictments fail.

The Sullivan law is a beautifully simple contrivance for stopping the careers of the blackmailers and bomb throwers. None of these gentry would think of going about unarmed. That would be against all precedents of the business. They will risk anything rather than give up their deadly weapons. But every one arrested with a revolver in his possession can be sent to prison on evidence which he himself gratuitously furnishes. By the time a few hundred gun carriers are serving out sentences the Black Hand operators hereabouts will wake up to the fact that New York City is no longer an inviting field in which to try to make a living by terrorizing and plundering their compatriots.

Five men and one woman were arraigned on Thursday in the Court of General Sessions for violating the Sullivan ███. Four of them pleaded guilty and the other two elected to stand trial. Such a record is encouraging. It shows that the law is beginning to bite. Many persons have lightly assumed that after a few weeks the police would forget their instructions and pistol carriers and users would go ahead conducting private warfare as formerly. Such a calculation was foolish. Being caught with a concealed weapon is a far more seri-

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**PROVING ITS WORTH**
*New - York Tribune (1911-1922);* Sep 30, 1911;
ProQuest Historical Newspapers The New York Tribune (1841-1922)
pg. 6

ous offence than it used to be, and the police cannot overlook it. Detection calls for a complaint on that charge, although under the old 🞏🞏 a prisoner might admit in court that he shot a victim with a revolver carried concealed, and if acquitted of the larger crime would never have been·indicted for the smaller. Now the smaller charge is even more menacing than the larger, since no defence is practicable. We are rapidly reaching the point at which the· barbarous practice of carrying arms to be used against fellow men in wrath or for purposes of plunder will be confined only to the incorrigibly criminal.

## HOW IT WORKS.

We reprint the following paragraph, dealing with the conviction of a notorious Black Hand operator, from the news columns of The Tribune of Wednesday:

He was arrested several times, but the evidence was insufficient to hold him for trial. The enactment of the ▓▓▓▓ ▓▓ proved his undoing. It went into effect on September 1. Four days later Costabile was arrested. Within a few days he will be on his way to prison.

Those who believe that the ▓▓▓▓ ▓▓ is a most efficient aid in the suppression and punishment of crime have only to oppose such a plain police record to the vague complaints that the ▓▓ was intended merely to disarm the respectable element in the community and thus make it more completely the prey of the criminal element. It may seem a hardship to the individual who thinks that he needs to keep a pistol in his house for his own protection to have to pay $10 a year for that privilege. But what do the slight cost and inconvenience to which legitimate owners of weapons are subjected count compared with the effective check put on the criminal classes by the short-shrift provisions of the Sullivan statute?

Those who intend to commit crimes of violence are almost universally equipped with concealed weapons. The pistol is their daily companion, for they have practically dropped all other weapons of defence or aggression. Take away their pistols and they have been put out of business. The ▓▓▓▓▓ ▓▓ makes possession of a concealed weapon a more dangerous charge on which to be arrested than criminal assault or burglary. The larger crime must be established by proof, subject to all sorts of ingenious

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**HOW IT WORKS**
*New - York Tribune (1911-1922);* Oct 13, 1911;
ProQuest Historical Newspapers The New York Tribune (1841-1922)
pg. 6

attacks. Perjured alibis and missing witnesses may upset a case really strong enough to warrant conviction. But the criminal arrested with a revolver in his possession is doomed. He testifies against himself and no defence is available. He is sent to prison, serving perhaps as long a term as he would have served if convicted after much difficulty of a felony of longer statutory standing.

The Sullivan law is an admirable instrument with which to war on crimes of violence. It can reach a criminal whether he sleeps or wakes, whether he is in action or inactive, so long as he has his weapon with him. It could be so employed in a single year as greatly to diminish the ranks of the burglars, homicides and Black Hand operators in this city, and if enforced energetically for a series of years it would almost extirpate the present overflourishing race of concealed weapon carriers.

Editorial Article 1 — No Title
New - York Tribune (1911-1922); Feb 9, 1912;
ProQuest Historical Newspapers The New York Tribune (1841-1922)
pg. 6

Six hundred frequenters of low resorts were searched last Tuesday night for concealed weapons, and only one was found carrying a revolver. Who says that the ███████ concealed weapons ████ is not bearing fruit?

The year 1915 will be an appropriate time for the next peace conference at The Hague. It will mark the completion of a hundred years of peace between Great Britain and France and between Great Britain and America. It will mark the completion of a hundred years since the ending of the Napoleonic wars, and therefore the completion of the first century of what we may regard as the modern era of peace as contrasted with the ancient and mediæval era of wars which found its culmination in the almost unbroken series of conflicts from Valmy to Waterloo.

The bridegroom of eighty-three who took unto himself a blushing bride of seventy-seven might well have asked her, if he had been inclined to delay matters a little, "Won't you wait till you are eighty in the shade?"

The Hon. William L. Ward is entitled to be called Progressive with a capital "P." He declares in favor of woman suffrage.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

## ANOTHER PARK SHOOTING

### Youth Firing at Man He Says Robbed Him Hits Small Boy.

Mulberry Park was packed with its usual crowd of children yesterday afternoon, when suddenly an Italian youth jumped from a bench and fired a revolver, shooting eight-year-old Ramano Delucin, of No. 75 Baxter street, in the left foot. Ramano dropped his hoop and began to cry. Women with shawls about their heads picked him up and bathed his foot in a fountain until Dr. Shields came from Hud-

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

ANOTHER PARK SHOOTING
*New - York Tribune (1911-1922)*; Jul 14, 1912;
ProQuest Historical Newspapers The New York Tribune (1841-1922)
pg. 3

son Street Hospital. He said the wound was not serious.

The young Italian, who said he was Bruno Bossano, of Pittsfield, Mass., told the police through an interpreter that while he was lying on the bench a man tried to steal his watch and chain, and he fired at the thief, hitting Ramano by mistake. He was arrested on charges of felonious assault and violating the ████
████ █

## WOMAN DOCTOR A THIEF

### Well Known Boston Physician Pleads Guilty in Court.

[By Telegraph to The Tribune.]

Boston, July 13.—Dr. M. Elizabeth Webb, of No. 4 Longwood Terrace, formerly a student at Radcliffe College and a graduate of the Boston Medical School, now a well known Back Bay physician, pleaded guilty to a charge of shoplifting in the municipal court to-day.

Dr. Webb, who has been a practising physician for twenty-five years, was arrested yesterday by Inspector Pelton and accused of operating in two department stores in Washington street.

In court Dr. Webb made no plea for clemency. With bowed head she uttered the one word "guilty" in a low tone. She was fined $20 and placed in charge of a probation officer until the fine was paid.

After her arrest Dr. Webb said she had a lucrative practice for years, but went abroad, and, on returning, found most of her patients had become scattered.

## SAYS HUSBAND DRINKS

### Rich Stamford Man's Wife Seeks His Commitment.

Stamford, Conn., July 13.—Following the filing of a suit for divorce from her husband, Colonel Charles W. Hendrie, Mrs. Rebecca Hendrie has applied in the Stamford Probate Court for the commitment of Colonel Hendrie to an inebriate asylum. She has also applied for the appointment of a conservator for his estate. The hearing on the first application is to be held next Tuesday. Mrs. Hendrie brought suit

CARRYING GUNS BRINGS LONG JAIL TERMS
New - York Tribune (1911-1922); Aug 4, 1912;
ProQuest Historical Newspapers The New York Tribune (1841-1922)
pg. 2

# CARRYING GUNS BRINGS LONG JAIL TERMS

## Judge Mulqueen Imposes Heavy Sentences on Many in General Sessions.

## TWO GET SEVEN YEARS

### Gunmen Are Frightened Into Confessing Guilt by His Strict Enforcement of the ███████ ███

Judge Mulqueen, a firm believer in the efficacy of the ███████ concealed weapons law, has been applying it to gunmen and blackjack wielders in Part I of General Sessions the last month with great success. During the July term of court, which ended this week, forty-four men have been convicted in that court of carrying concealed weapons.

Soon after Judge Mulqueen took the bench in Part I it was evident that the gunmen were going to suffer. The word went out that the best any one who pleaded guilty could hope for was a peni-

tentiary sentence of eleven months and twenty-nine days and a fine of $500, one day to be served for each dollar unpaid. Ordinarily that would have had the effect of decreasing the number of pleas.

But Judge Mulqueen held the ████ ████ over their heads like a club. Under that ██ a man may be convicted of carrying a revolver either as a felon or a misdemeanant. Those who pleaded guilty were sent to the penitentiary and fined, but those who went to trial and were convicted were treated as felons, and got sentences which made gangdom sit up and take notice.

### Term of Seven Years.

Two men, Julius Johnson and Walter Taylor, both of whom had police records, got the full punishment under the law—seven years in state prison. Three more—Albert Guerriro, Joseph Hawkins and "Willie" Hubbard—who had not been convicted before and were subject to the indeterminate sentence ██ got not less than three years and six months nor more than seven years each.

The effect was startling. The word went around the East Side and through the Tombs that Judge Mulqueen was "handing out stiff ones" and that he was in dead earnest about it. After that there were far more prisoners willing to plead guilty than go to trial. The contrast between a judge who would give a "gun toter" seven years straight and one who fined or sent him to the City Prison for thirty days was striking and painful.

Judge Mulqueen's theory is not a new one with him, but never before has he had a chance to try it out so thoroughly as last month. An unusually large number of men were arraigned before him charged with carrying pistols.

"The ████ ██ said Judge Mulqueen yesterday, "put a powerful weapon in the hands of the police and the courts. If used wisely the gunman can be driven from the city."

However much the abstract principles of ██ and justice may be argued, the theory on which the criminal courts are conducted is one of barter. Time and expense are saved by pleas of guilty. A guilty man who would escape if he went to trial may be persuaded to plead guilty if inducements are offered. Formerly the only inducement was a fine instead of a prison sentence. The consequence was that the real gangmen didn't care much whether he was arrested for having a revolver or not—he could plead guilty and pay a fine. Now the distinction is between a short term in the penitentiary and a long term in state prison.

### Good Behavior Insured.

Moreover, the $500 fine which Judge Mulqueen adds to the penitentiary sentence in a way puts the prisoner on parole even while he is in jail. At the expiration of his prison sentence he applies to have the fine remitted. The warden of the penitentiary forwards a report of the man's conduct to Judge Mulqueen. The judge looks into the case.

"not good" when his only offences have been infractions of minor rules. In case no serious misconduct has occurred Judge Mulqueen generally remits the fine. If the offence is at all serious the prisoner has 500 days more to serve.

Not all of those convicted have been sentenced yet. The cases of all of them are looked into very carefully, to make sure that no one who was carrying a revolver innocently is sent to prison. So far only two sentences have been suspended. One was on a boy who had a revolver in his pocket on the Fourth of July. The other was upon a ticket agent in the subway, who kept a blackjack in his booth for self-protection.

A half dozen or more are awaiting sentence in the Tombs. One of them is "Monk" Friedman, a gangman, who has promised startling disclosures. He says that he could prove intimacy between "Dollar John," whose real name, he says, is Harry Langdon, and a police captain. Once, he says, he saw money pass between them. So far all the men whom he named as those who could corroborate his story have refused to do so. He will be sentenced after the court is satisfied that he can give no assistance in the graft hunt.

Another whose case is still being investigated is that of a boy who stole a revolver from a policeman. He was arrested on the street with the revolver in his pocket on the Fourth of July. Judge Mulqueen is trying to find out whether the theft was the result of misdirected patriotism or whether the boy is really vicious.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

New - York Tribune (1911-1922); Mar 3, 1913;
ProQuest Historical Newspapers The New York Tribune (1841-1922)
pg. 14

# AMENDMENT TO THE

# ███ ███ DRAFTED

## Citizen Whose Reputation Is Good Enabled to Get Revolver Permit Without Charge.

## BOMBS INCLUDED IN TEXT

### Measure Was Drawn by Assemblyman Cotillo and J. A. Delehanty and Indorsed by General Sessions Judges.

An amendment to the ███ concealed weapons ███ a statute which has been a target for kicks for months now, has been drafted by Assemblyman Salvatore A. Cotillo, of the 28th Assembly District, and James A. Delehanty, of the District Attorney's office. The amendment makes it possible for a citizen whose reputation is good to get a revolver permit free of charge, and contains other changes intended to meet the criticisms which have been levelled at the ███.

Warren W. Foster, Joseph F. Mulqueen, Otto A. Rosalsky and Edward Swann, Judges of General Sessions, were consulted by Mr. Delehanty and gave their approval to the measure. The Judges of General Sessions consider the present ███ an excellent one. It gives the court great discretion, and under it it is often possible to sentence an old crook to a long term when the robbery or assault charge which had been brought against him might have failed to convince a jury.

The bill drawn by Mr. Cotillo and Assistant District Attorney Delehanty combines features which were embodied in several bills now pending in the Legislature. The Judges of General Sessions, in spite of the fact that the present ███ meets with their approval, have promised to lend their assistance to the new measure, as they feel that it meets a popular demand without seriously impairing the value of the original ███.

#### May Get Free Permit.

The bill provides that those entitled to possess a revolver shall be able to get a permit free of charge from any magistrate. Under the Code of Criminal Procedure almost every judicial officer of the state is a magistrate.

A permit will be issued to any prison employe upon the request of the head of the institution where he is employed.

sengers are named as others who are entitled to permits. The householder may get one to keep a revolver in his house and the merchant to keep one in his place of business. Bank messengers will be allowed to carry revolvers while employed by the bank. All those applying for permits must furnish proof of good moral character.

Aliens, who are forbidden under the present ███ to carry firearms "in a public place," are prohibited from carrying firearms at all unless they have permits. It is stipulated that aliens can obtain permits only from a court of record, and the judge must inscribe his reason for granting the permit upon the permit itself and also give the names of those who certify to the good character of the applicant.

It is made a felony to sell a concealable firearm to any one who does not display his permit at the time of the sale unless the purchaser is a policeman, sheriff or peace officer entitled to carry such weapons. In that case the purchaser must inscribe upon the record of sale his name and occupation.

Bombs and bombshells are added to the list of prohibited weapons. There have been some Black Handers convicted under the present ███ who were found with bombs in their possession, but it was thought safer to include bombs in the text.

## To Report Bill Wednesday.

Mr. Cotillo, who is a member of the Codes Committee, said yesterday the bill would be reported out on Wednesday.

Judge Mulqueen, who had nineteen offenders before him last month for carrying concealed weapons, expressed himself as in favor of the bill. "There has been a great deal of senseless criticism of the present ███," he said, "but I think that if this amendment is passed no decent citizen will have valid complaint to make."

Of the nineteen men brought into Judge Mulqueen's court fifteen pleaded guilty and one was convicted by a jury. One was sentenced to six years and ten months and one to six years. They were each old offenders and other charges less susceptible of proof, were made against both of them. Four were released under suspended sentences.

One of those released was a man who had attempted suicide. He had been in the Tombs several weeks, and Dr. Gregory, of Bellevue Hospital, reported to Judge Mulqueen that if he stayed there any longer he would be a fit subject for an asylum. Another who got a suspended sentence was a performer who was arrested because he was carrying an enormous horse pistol of ancient design. He used it in his act.

Judge Rosalsky sent one man to Sing Sing for not less than three years and seven months nor more than five years and seven months for carrying a revolver. He was said to be a professional crook. The only other man convicted before Judge Rosalsky was not known to the police and got off with two months in the penitentiary.

Judge Foster frequently imposes fines upon those convicted before him.

Reproduced with permission of the copyright owner. Fu

NEW LAW PROHIBITS DANGEROUS WEAPONS
New York Times (1857-1922); Aug 29, 1911;
ProQuest Historical Newspapers The New York Times (1851 - 2007)
pg. 5

# NEW LAW PROHIBITS DANGEROUS WEAPONS

## Big Tim Sullivan's Measure Will Aid Police in Dealing with Violent Crimes.

### PISTOL SALES REGULATED

Every Purchaser Must Show License—Merely to Possess Blackjack a Felony—Strict Laws for Aliens.

The Sullivan dangerous weapon law, passed at the recent session of the Legislature, the most drastic law ever enacted in this State to control the carrying and use of pistols, stilettos, dirks, metal knuckles, blackjacks, &c., will go into effect at midnight Thursday. In anticipation of this Police Commissioner Waldo and Chief Magistrate William McAdoo, whose departments will have to bear the brunt of the enforcement of the new law, had a long conference in the latter's office yesterday afternoon.

They discussed the situation and the best means of enforcing the law rigidly throughout the city. Every policeman will receive a copy of the statute between now and Thursday, and with it a general order instructing the police as to their duties.

The new law affects every person who is interested in the manufacture or sale or who owns any of the specified weapons. It is a most carefully drawn measure, and the police, the District Attorney, and the City Magistrates believe that its scope is wide enough to cover every case involving the carrying of concealed weapons.

For instance, Section 1,896 of the new law, which amends the section of that number of the present law, deals with the making and disposing of such dangerous weapons as cannot have any legitimate use. It provides that after Sept. 1 it will be a misdemeanor for any person to manufacture, or cause to be manufactured, or sell or keep for sale, to offer, give, or dispose of a blackjack, bludgeon, sandbag, sandclub, billy, slungshot, metal knuckles, &c., to any other person.

Then, going on to consider persons less than 16 years of age, it makes it a misdemeanor to sell, loan, lease, offer, or give them any gun, revolver, pistol, or other firearm, or any airgun, spring gun or other weapon in which the propelling force is air or a spring. Moreover, to give or loan them any toy pistol in which loaded or blank cartridges may be used, or cartridges and ammunition of any kind, will also be a misdemeanor.

Section 1,897, which deals with the carrying of dangerous weapons, reads:

A person who attempts to use against another, or who carries, or possesses, any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sandbag, metal knuckles or bludgeon, or who, with intent to use the same unlawfully against another, carries or possesses a dagger, dirk, dangerous knife, razor, stiletto, or any other dangerous

ing or carrying the same as required by law, and shall also enter in such register the date of such permit, the number thereof, if any, and the name of the Magistrate or other officer by whom the same was issued.

Every person who shall fail to keep a register used to enter therein the facts required by this section, or who shall fail to exact the production of a permit to possess or carry such pistol, revolver, or other firearm, if such permit is required by law, shall be guilty of a misdemeanor. Such register shall be open at all reasonable hours for the inspection of any peace officer.

A person becoming the lawful possessor of such a pistol, revolver, or other firearm, who shall sell, give, or transfer the same to another person without first notifying the police authorities, shall be guilty of a misdemeanor. This section shall not apply to wholesale dealers.

At Police Headquarters it was announced that a squad of detectives, acting under the direct command of Inspector Hughes of the Detective Bureau, will have the job of enforcing the law in so far as it refers to pawnbrokers and other dealers in firearms. These concerns will be required to keep a complete record of everything pertaining to their trade in weapons, and such record must be transmitted to the police whenever called for.

A Times reporter called yesterday on several of the larger firms dealing in firearms and asked what their attitude was as to the law. The answer was the same everywhere—a strict compliance with all its provisions. The small dealers also said their intention was to live strictly up to the letter of the law.

## ARRESTED AS FORGER.

### Hungarian Who Sailed from Here Last Week Captured at Southampton.

Henry Pecham, who came to America from Hungary a year ago, sailed last week for home with $500 that he is said to have obtained by forging the name of A. T. Craven, cashier of the People's Bank of Dunora, Penn. Under the name of Herman Anton he sailed in the steerage with his wife and two male relatives. Foreign representatives of the Pinkertons arrested him when he arrived at Southampton on Saturday. Extradition papers have been signed by Gov. Dix, and Detective Flood will go to England to bring him to this city for trial.

Pecham, says the Pinkertons, worked for the bank in Dunora as a solicitor among the coal miners of the region. He is said to have stolen a number of blank drafts, drawn on the Hanover National Bank of this city. With one of these made out to his order for the sum of $600 he approached Jacob Unger, a furniture dealer of 1,439 First Avenue, and offered to buy some furniture. The deal was made. Unger indorsing the check and drawing the money from the Bank of Europe, an immigrant bank in First Avenue. Pecham made a deposit of $300 in the bank, received $500 in cash, out of which he paid a small deposit on the furniture to Unger and sailed away. Unger suffers the loss, as he indorsed the check and can be held for the money.

## FOOTPAD ROBS BY DAY.

### Snatches a Young Woman's Handbag and Retains $48.

Miss Clara Allen of 1,000 Flatbush Avenue, Brooklyn, employed in research work at the Willard Parker Hospital, was held up at Fourteenth Street and Avenue C yesterday afternoon and robbed of $48. The thief, a young "gorilla" of the east side, grabbed Miss Allen's handbag with such force as to throw her down, leaving the torn handbag strap in her hand.

He ran down Avenue C. Miss Allen jumped up and cried "Stop thief!" and gave chase. A crowd took up the cry.

The thief turned into Thirteenth Street and ran into the hallway of 611. Patrolman James Haggerty of the Union Market Police Station searched the roof of

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

deadly instrument or weapon, is guilty of a felony.

Any person under the age of 16 years, who shall have, carry, or have in his possession any of the articles named or described in the last section, which it is forbidden therein to offer, sell, loan, lease or give to him, shall be guilty of a misdemeanor.

Further on in the same section is a clause that, the police say, gives promise of going a long way toward eradicating the concealed weapon evil. It makes it necessary for all persons over 16 years of age to have a written license, issued by the proper authorities, if they wish to carry any firearm of a size that may be concealed on the person. Even to have in his possession such a weapon without a license will render a man guilty of a misdemeanor, and to carry it without a license will be a felony. A specially stringent clause relates to aliens. It is

Any person not a citizen of the United States, who shall have or carry firearms or any dangerous or deadly weapon in any public place, at any time, shall be guilty of a felony.

It is, however, stipulated that none of these provisions shall affect firearms that are being transported as merchandise, nor public officers whose duties necessitate their carrying weapons.

Weapons, the possession of which has been proved to be unlawful, must be surrendered to the Sheriff of the county or the head of the police force to be destroyed or rendered useless. The section governing the sale of revolvers and other firearms has been so drawn as to make it possible to identify the original owner of any firearm that may figure in a crime, and deals with every phase of the situation. Here it is:

Every person selling a pistol, revolver, or other firearm of a size which may be concealed upon the person, whether such seller is a retail dealer, pawn broker, or otherwise, shall keep a register in which shall be entered at the time of sale, the date of sale, name, age, occupation, and residence of every purchaser of such a pistol, revolver, or other firearm, together with the caliber, make, model, manufacturer's number, or other marks of identification on such pistol, revolver, or other firearm.

Such person shall also, before delivering the same to the purchaser, require such purchaser to produce a permit for possess-

the house and found Miss Allen's handbag, containing her check book, bank book, and $3 in silver, the thief having contented himself with the money that was in bills. He is described as 17 years old, of dark complexion, with black hair.

# POLICEMAN LOCKED UP.

## Charged with Attacking Storekeeper In His Precinct.

Policeman Thomas Loughlin of the Fourth Street (Long Island City) Police Station was locked up in his own station house last night, charged with assault on Otto Jochin, who keeps an ice cream and candy store at 66 Vernon Avenue, within a block of the station house. Loughlin was arrested by Detective Kennedy of his precinct.

It was said by bystanders that Loughlin entered the store, got into an argument with the proprietor, whom he struck, and then smashed two ice cream tables and one of the front windows of the store. Jochin called for help and Kennedy was called in.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Case 7:10-cv-05413-GS... DOCUMENT #7... Filed 03/10/11 Page 36 of 37

ProQuest Historical Newspapers The New York Tribune (1841-1922)
pg. 1

# POLICE GET MAN LONG
# WANTED AS KIDNAPPER

## Believe Arrest Will Solve Not a Few of Recent Disappearance Mysteries.

### FIND A REVOLVER ON HIM

#### Valuable Jewelry and $100 in His Pockets Supposed to Have Been Received in Ransoms.

In the arrest last night of Vito Micelli, whom the police know by the names of Pietro Pallazzolo and Pietro Mallei, Inspector Hughes, of the Detective Bureau, believes he has captured the man who kidnapped Michele Scimeca, the three-year-old son of Dr. Mariano Scimeca, of No. 2 Prince street, in June of last year, and also was concerned in the kidnapping of Vincenzo Sabella, who disappeared from his home, No. 359 Broome street, in July of this year, and of Pietro Quatrono, of No. 119 Elizabeth street, who disappeared last month.

According to the story told at the Detective Bureau, after the kidnapping of the Scimeca boy suspicion was directed toward Micelli as having had something to do with the affair. Detectives Carrao, Castano and Dondero were assigned to the case. Micelli, it is said, soon found the trail the officers were pursuing too hot for him and set sail for Italy just as he was about to be apprehended.

In the mean time, however, the police say, a ransom of $1,750 had been paid by young Scimeca's parents, and the boy had been picked up in West 59th street by his grandmother. The greater part of the ransom money is supposed to have found its way into Micelli's pockets.

In January of this year Micelli returned to this country and, still under the eye of the police, was traced to Buffalo and then to Mamaroneck, where the trail was lost.

After the disappearance of the Sabella boy Inspector Hughes told the detectives on the case that they must land their man at once. Last night the vigil of the detectives was rewarded when they saw Micelli standing at Delancey and Norfolk streets. They immediately pounced upon him and led him to Headquarters.

Micelli was reticent at first, saying that he did not understand English. Then the officers began to search him an hauled a revolver from one of his pockets. This aroused the prisoner, who, it would seem, had heard of the ▓▓▓▓ ▓▓▓ and he shouted in perfect English: "That gun was not in my pocket! I am being made the goat!"

Several diamond rings and other jewelry and $100 in cash also were found on Micelli, according to the police. They gave it as their opinion that the money and jewelry were part of the payment Micelli had received in ransoms.

After his examination at Headquarters Micelli was taken to the Elizabeth street police station, where he was locked up on charges of kidnapping and carrying a concealed weapon. The warrant for his arrest was issued in October, 1910, by Magistrate Barlow on the same day that the prisoner sailed for Italy.

The records at Headquarters show that Micelli was sent to the Elmira Reformatory in 1908 for a burglary committed in an East Side flat. His picture is in the Rogues' Gallery.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

STREETS PERILOUS AS A BATTLEFIELD
New York Times (1857-1922); Feb 4, 1912;
ProQuest Historical Newspapers The New York Times (1851 - 2007)
pg. 5

# STREETS PERILOUS

# AS A BATTLEFIELD

## Coroners Will So Report In Speaking of Violent Deaths In the City.

## PISTOL LAW NOT ENFORCED

## Murders Last Year Than Year ore, Though Fewer Deaths Were Caused by Firearms.

0165

George F. Le Brun, clerk of the Coroner's office, said yesterday the figures in his office showed that there had been 6,701 violent deaths in Manhattan last year which came under the jurisdiction of the office. This is an increase of 212 over 1910.

There were 73 homicides by shooting, a decrease of 12 over 1910. Mr. Le Brun also called attention to the decrease in the number of suicides by this means. Both decreases he attributed to the Sullivan weapon law, which was introduced at the request of the Board of Coroners. Mr. Le Brun said:

"The Sullivan law is, however, not being properly enforced. For instance, this office has investigated numbers of suicides where the gun was brand new. In

some of the cases, the suicide had purchased his overcoat or a piece of jewelry to get money to buy the gun. We could not prove that the gun had been bought in the same pawnshop, but all the circumstances point so strongly to this that I believe a strict enforcement of the law will greatly reduce the number of killings.

Mr. Le Brun said that while only $60 gun permits under the law had been issued, he was morally sure that several times that number of revolvers had been sold since the law went into effect, and that these sales without permits were to persons without respect for law.

"At the last session of the Legislature, Mr. Le Brun said that the Coroners had, for the passage of a law compelling the adoption of safety devices on elevators. This is an increase of 18 over last year. He said:

### Unnecessary Deaths in Elevators.

"Evidence brought out in these cases at the inquests shows that at least 75 per cent. of the deaths might have been avoided had proper precautions been taken in equipping the elevators with safety devices.

"The juries in the majority of these cases have censured the owners of buildings, and recommended the use of buildings, and recommended the use of elevators. Two hundred and sixty-seven persons in the past five years have been killed by the operation of elevators. Two hundred and sixty-seven persons in the past five years have been killed by elevator accidents in Manhattan. This is an increase of 18 over last year. Mr. Le Brun is inclined to include a

number of so-called accidental deaths from gas asphyxiation among the suffer of homicides, though they are not so listed in the Coroner's tables.

"Some of these cases of so-called accidental death from gas have a very doubtful aspect," he said. "We had 60 of them last year, and this number is growing. The suspicion in most of these cases is that the suicide had purchased sufficient for them. Europe. They had nothing in their pocketbook except ships tickets, at the start. It is known that they usually start back without $300 or $2,000 saved.

Of the cases of homicide by violence, the police made no arrests in 23 cases, and in 20 others the men arrested were discharged by the Coroners after an inquest.

### Killing by Automobiles.

There were 88 cases of homicide by assault, and the police made, 60 arrests. Thirty-one of those arrested were discharged. Mr. Le Brun said that the Coroners would ask for a special laboratory equipment to make investigations in cases of suspected homicide by poison, which are now difficult to handle.

There were 380 suicides in the borough last year, 78 less than in 1910, and 420 persons were killed by casualties in which another person was implicated. Of these, 28 over 1910. On this point the Coroner's, Israel L. Feinberg, James E. Winterbottom, and others asserted that:

"Evidence adduced in the majority of these cases shows that the killing of human life is in most cases carelessness of the chauffeur for such carelessness. The office has referred 47 of these cases to the Grand Jury.

"The streets of the city are becoming

more perilous than a battlefield, and it is high time that some change in the laws governing the operation of automobiles in this city be enacted which may be the means of preventing loss of life.

### Other Deaths by Accident.

Not only was there an increase in the number of automobile killings last year, but there were 130 persons killed by horse-drawn vehicles—40 more than in 1910. Ten persons each were killed by the elevated railroads and the subways, a decrease of seven from the elevated record of last year and a decrease of two in the subway record. Thirteen persons were killed on the New York Central's surface tracks on the west side, a decrease of one.

A total of 184 persons were killed while at work on new buildings, 210 persons were accidentally drowned, 96 from illuminating gas, and 80 from accidental poisoning.

Five persons choked to death on their food, and 365 died from accidental falls from windows, downstairs, into basements, from roofs, and so forth. The Washington Place fire brought up the list of deaths from conflagration to 161 last year.

Some of the deaths will cause the following comment in the annual report soon to be issued:

"Autopsies made by the Coroners' Physicians disclose in many cases that a good deal of wood alcohol and other deleterious drinks are served in the saloons of the city and vicinity. We therefore strongly recommend that the proper authorities take some action to put a stop to this wholesale poisoning."

Mr. Le Brun said yesterday:

"The slowness of the Coroners' Physicians in performing their autopsies resulted in the conviction of a man who killed his wife and later attempted to concoct a story of a suicide compact."