UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------x
ALAN KACHALSKY, CHRISTINA NIKOLOV, ERIC
DETMER, JOHNNIE NANCE, ANNA MARCUCCI-NANCE,
and SECOND AMENDMENT FOUNDATION, INC.,

                                  Plaintiffs,

                                                          **OPINION AND ORDER**

            - against -
                                                           No. 10-CV-5413 (CS)

SUSAN CACACE, JEFFREY A. COHEN, ALBERT
LORENZO, ROBERT K. HOLDMAN, and COUNTY OF
WESTCHESTER,

                                  Defendants.
---------------------------------------------------------------------------x

<u>Appearances:</u>

Alan Gura
Gura & Possessky, PLLC
Alexandria, Virginia
Vincent Gelardi
Gelardi & Randazzo LLP
Rye Brook, New York
*Counsel for Plaintiffs*

Anthony Tomari
Monica Connell
New York State Office of the Attorney General
New York, New York
*Counsel for Defendants Susan Cacace, Jeffrey A. Cohen, Albert Lorenzo & Robert K. Holdman*

Melissa-Jean Rotini
Westchester County Attorney's Office
White Plains, New York
*Counsel for Defendant County of Westchester*

Seibel, J.

Before the Court are the Motion to Dismiss of Defendants Susan Cacace, Jeffrey A. Cohen, Albert Lorenzo, and Robert K. Holdman (the "State Defendants"), (Doc. 30);[1] the Motion to Dismiss of Defendant County of Westchester (the "County"), (Doc. 33); the Motion for Summary Judgment of Plaintiffs Alan Kachalsky, Christina Nikolov, Eric Detmer, Johnnie Nance, Anna Marcucci-Nance, (together, the "Individual Plaintiffs"), and Second Amendment Foundation, Inc. ("SAF"), (Doc. 39); and the State Defendants' Cross-Motion for Summary Judgment, (Doc. 42).

## I.      BACKGROUND

For purposes of deciding the Motions to Dismiss, I assume the facts (but not the conclusions) as alleged in the First Amended Complaint to be true, and for purposes of deciding the Motion and Cross-Motion for Summary Judgment, the following facts are undisputed, except where noted.

The instant case presents a facial and as-applied constitutional challenge to New York Penal Law ("NYPL") Section 400.00(2)(f), which provides that licenses to "have and carry concealed" handguns "shall be issued" to "any person when proper cause exists for the issuance thereof." Plaintiffs claim that the statute violates their rights under the Second Amendment to the U.S. Constitution as recognized in the Supreme Court case *District of Columbia v. Heller*, 554 U.S. 570 (2008), and made applicable to the states in *McDonald v. City of Chicago*, 130 S.

---

[1]      The original Complaint, filed on July 15, 2010 by Alan Kachalsky, Christina Nikolov, and Second Amendment Foundation, Inc., named only Cacace, Cohen, and the County of Westchester as defendants.  (Doc. 1.)  Cacace and Cohen served a motion to dismiss on November 9, 2010, (Docs. 30–32), and, after the remaining parties were added pursuant in the First Amended Complaint ("FAC"), (Doc. 18), joined Lorenzo and Holdman in submitting supplemental materials moving to dismiss the First Amended Complaint, (Docs. 17, 34–35). The Court therefore treats the State Defendants' motion as a motion to dismiss the First Amended Complaint.

Ct. 3020 (2010).  To give proper context to Plaintiffs' claims, a brief description of New York's handgun licensing scheme is warranted.

### A.      New York's Handgun Licensing Scheme

The NYPL provides for the licensed possession of handguns in New York State.  Article 265 of the NYPL imposes a general ban on the possession of firearms, *see* N.Y. Penal Law § 265.01(1), which includes handguns, *id.* § 265.00(3)(a), but creates various specific exemptions from that ban, *see id.* § 265.20, including "[p]ossession of a pistol or revolver by a person to whom a license therefor has been issued as provided under [NYPL] section 400.00,"[2] *id.* § 265.20(3); *see Matter of O'Connor v. Scarpino*, 83 N.Y.2d 919, 920 (1994) (§ 400.00 "is the exclusive statutory mechanism for the licensing of firearms in New York State").  Section 400.00(1) sets out the eligibility requirements for handgun permit applicants and provides, generally, that applicants must:  be at least twenty-one years of age; be of good moral character; not have been convicted of a felony or a serious offense; not have suffered any mental illness or been confined to an institution for such illness; not have had a handgun license previously revoked or been the subject of a family court order; not exhibit "good cause . . . for the denial of the license"; and, for applicants in Westchester County, have "successfully completed a firearms safety course and test."  N.Y. Penal Law § 400.00(1).  Section 400.00(2) sets out the various types of licenses available, providing that "[a] license for a pistol or revolver . . . shall be issued" under various circumstances, including, for example, to "have and possess in his dwelling by a householder," to "have and possess in his place of business by a merchant or storekeeper," and to

---

[2]      The licensing exemption under Section 400.00 does not, however, preclude a conviction for knowing possession of a handgun on school grounds, in a school building, or on a school bus. N.Y. Penal Law §§ 265.20(3), 265.01(3).  Other exemptions under Section 265.20 include possession by military and law enforcement officers, as well as conditional possession of various firearms for hunting purposes and at shooting ranges.  *See, e.g.*, *id.* § 265.20(1)(a)–(d), (4), (7).

"have and carry concealed" by various city and state judges, bank or express messengers, and corrections officers.  *Id.* § 400.00(2)(a)–(e).

The provision at issue in this case is Section 400.00(2)(f), which provides that a license "shall be issued to . . . have and carry concealed, without regard to employment or place of possession, by any person when proper cause exists for the issuance thereof."  *Id.* § 400.00(2)(f). There is no provision for a license to carry an unconcealed weapon, so for applicants who want to carry a weapon and do not fit in one of the occupational categories, the only way to obtain a license to carry a handgun—whether openly or not—is to meet the requirements, including "proper cause," of the licensing provision for concealed weapons.  Though not defined in the NYPL, the term "proper cause" as used in Section 400.00(2)(f) has been interpreted by New York state courts to mean "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession."  *Bando v. Sullivan*, 735 N.Y.S.2d 660, 662 (3d Dep't 2002) (internal quotation marks omitted); *Kaplan v. Bratton*, 673 N.Y.S.2d 66, 68 (1st Dep't 1998) (internal quotation marks omitted); *Williams v. Bratton*, 656 N.Y.S.2d 626, 627 (1st Dep't 1997) (internal quotation marks omitted); *Klenosky v. N.Y. City Police Dep't*, 428 N.Y.S.2d 256, 257 (1st Dep't 1980), *aff'd*, 53 N.Y.2d 685 (1981); *see Bach v. Pataki*, 408 F.3d 75, 80 (2d Cir. 2005).

The application process for licenses under Section 400.00(2)(f), often called "full-carry permits," is administered locally.  *See* N.Y. Penal Law § 400.00(3)–(4).  Applications for full-carry permits in Westchester County request information concerning, for example, discharge from employment or the armed forces for cause, criminal history, treatment for alcoholism or drug use, history of mental illness, previous firearm licenses, and physical conditions that could interfere with safe and proper use of a handgun.  (State Defs.' 56.1 ¶¶ 16–17; Pls.' Resp. 56.1 ¶¶

16–17.)[3]  An applicant must also provide four references to attest to his or her good moral character.  (State Defs.' 56.1 ¶ 16; Pls.' Resp. 56.1 ¶ 16.)  Applications are submitted to the Pistol Licensing Unit of the Westchester County Department of Public Safety for investigation consistent with NYPL Section 400.00(4).  (State Defs.' 56.1 ¶¶ 15, 18; Pls.' Resp. 56.1 ¶¶ 15, 18.)  *See* N.Y. Penal Law § 400.00(4) (outlining investigatory procedures).  As part of this investigation, the Pistol Licensing Unit reviews the information provided and conducts a series of background checks with the New York State Department of Criminal Justice Services, the Federal Bureau of Investigation, the National Instant Criminal Background system, and the New York State Department of Mental Hygiene.  (State Defs.' 56.1 ¶¶ 18–20; Pls.' Resp. 56.1 ¶¶ 18–20.)

Once the investigation is complete, an investigation summary is compiled and, along with the application, submitted to a County Police lieutenant, the Chief Inspector of Administrative Services, and the Commissioner or a Deputy Commissioner for review.  (State Defs.' 56.1 ¶ 21; Pls.' Resp. 56.1 ¶ 21.)  Based upon that review, the Chief Inspector and Commissioner or Deputy Commissioner generate a recommendation as to whether the full-carry permit should be approved or disapproved, (*see, e.g.*, Pls.' MSJ Exs. C, E, G),[4] and the file is submitted to a state licensing officer[5] for a final determination, (State Defs.' 56.1 ¶ 22; Pls.' Resp. 56.1 ¶ 22).  Licensing officers have considerable discretion in deciding whether to grant a license

---

[3]        "State Defs.' 56.1" refers to State Defendants' Statement of Undisputed Material Facts in Support of State Defendants' Motion for Summary Judgment.  (Doc. 44, at 16–36.)  "Pls.' Resp. 56.1" refers to Plaintiffs' Separate Statement of Disputed Material Facts in Opposition to Individual Defendants' Motion for Summary Judgment.  (Doc. 47-1.)

[4]        "Pls.' MSJ" refers to Plaintiffs' Notice of Motion for Summary Judgment.  (Doc. 39.)

[5]        Except for New York City and Suffolk County, a "licensing officer" is defined as a "judge or justice of a court of record having his office in the county of issuance."  N.Y. Penal Law § 265.00(10).

application, *see, e.g.*, *Vale v. Eidens*, 735 N.Y.S.2d 650, 652 (3d Dep't 2002); *Kaplan*, 673 N.Y.S.2d at 68; *Fromson v. Nelson*, 577 N.Y.S.2d 417, 417 (2d Dep't 1991); *Marlow v. Buckley*, 482 N.Y.S.2d 183, 184 (4th Dep't 1984), particularly in determining whether an applicant has demonstrated "proper cause" under Section 400.00(2)(f), *see Bach*, 408 F.3d at 79–80 & n.8, and their decisions will not be disturbed unless determined to be arbitrary and capricious, *O'Brien v. Keegan*, 87 N.Y.2d 436, 439–40 (1996).

### B.     The Parties

Individual Plaintiffs are all United States citizens who reside in Westchester County. (State Defs.' 56.1 ¶¶ 1–5; Pls.' Resp. 56.1 ¶¶ 1–5.)  Plaintiff SAF is a non-profit membership organization incorporated under the laws of the State of Washington, with its principal place of business in Bellevue, Washington.  (State Defs.' 56.1 ¶ 6; Pls.' Resp. 56.1 ¶ 6.)  It claims to have over 650,000 members and supporters nationwide, including in Westchester County, to engage in education, research, publishing, and legal action focusing on the Second Amendment, and to expend resources encouraging the exercise of the right to bear arms, as well as advising and educating its members, supporters, and the general public about policies relating to the public carrying of handguns in New York.  (Pls.' 56.1 ¶¶ 25–26.)[6]  The State Defendants are judges on various courts within the New York State Unified Court System and, at the times of Individual

---

[6]     "Pls.' 56.1" refers to Plaintiffs' Separate Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment.  (Doc. 41.)  The State Defendants state that they lack information sufficient to admit or deny these facts, as Plaintiffs moved for summary judgment prior to discovery.  (State Defendants' Response to Plaintiffs' Statement of Undisputed Material Facts in Support of Plaintiffs' Motion for Summary Judgment ("State Defs.' Resp. 56.1") (Doc. 44, at 1–15), ¶¶ 25–26.)

Plaintiffs' full-carry permit applications, described below, served as handgun licensing officers under NYPL Section 265.00(10).[7]  (State Defs.' 56.1 ¶¶ 7–10; Pls.' Resp. 56.1 ¶¶ 7–10.)

### C.     Plaintiffs' Permit Applications

In May 2008, Plaintiff Kachalsky applied for a full-carry permit to be able to carry a concealed handgun while in public.  (State Defs.' 56.1 ¶ 25; Pls.' Resp. 56.1 ¶ 25.)  In his application, Kachalsky asserted that he believed he satisfied Section 400.00(2)(f)'s "proper cause" requirement because he was a U.S. citizen and therefore entitled to "the right to bear arms" under the Second Amendment, "we live in a world where sporadic random violence might at any moment place one in a position where one needs to defend oneself or possibly others," and he was "a law-abiding citizen" who had neither "been convicted of a crime" nor "assaulted or threatened to assault another person."  (State Defs.' 56.1 ¶ 26; Pls.' Resp. 56.1 ¶ 26.)  Upon reviewing Kachalsky's application and completing a corresponding investigation, the Department of Public Safety recommended that the permit be denied.  (State Defs.' 56.1 ¶ 27; Pls.' Resp. 56.1 ¶ 27.)  The application, investigation file, and recommendation were forwarded to Defendant Cacace, who, acting as licensing officer, reviewed those materials and issued a decision and order, dated October 8, 2008, denying Kachalsky's application.  (State Defs.' 56.1 ¶¶ 28–29; Pls.' Resp. 56.1 ¶¶ 28–29.)  Cacace observed that Kachalsky failed to state "any facts which would demonstrate a need for self protection distinguishable from that of the general

---

[7]     Cacace serves as a Judge on the County Court in Westchester County.  (State Defs.' 56.1 ¶ 7; Pls.' Resp. 56.1 ¶ 7.)  Cohen currently serves as a Justice on the New York State Supreme Court, Appellate Division, Second Department, and, at the time of the relevant licensing decision described herein, served as a Judge on the County Court in Westchester County.  (State Defs.' 56.1 ¶ 8; Pls.' Resp. 56.1 ¶ 8.)  Lorenzo serves as an Acting Justice for the New York State Supreme Court, Westchester County. (State Defs.' 56.1 ¶ 9; Pls.' Resp. 56.1 ¶ 9.)  Holdman currently serves as Justice for the New York State Supreme Court, Bronx County, and, at the time of the relevant licensing decision described herein, served as Justice for the New York State Supreme Court, Westchester County. (State Defs.' 56.1 ¶ 10; Pls.' Resp. 56.1 ¶ 10.)

public," and that "based upon all the facts and circumstances of this application, it is my opinion that proper cause does not exist for the issuance of an unrestricted 'full carry' pistol license." State Defs.' 56.1 ¶ 30; Pls.' Resp. 56.1 ¶ 30.)

On February 6, 2009, Kachalsky filed a petition under Article 78 of the New York Civil Practice Law and Rules with the New York State Supreme Court, Appellate Division, Second Department, appealing his permit denial.  (State Defs.' 56.1 ¶ 31; Pls.' Resp. 56.1 ¶ 31; Tomari Decl. Ex. L.)[8]  By Order dated September 8, 2009, the Appellate Division affirmed the denial, holding that Kachalsky "failed to demonstrate 'proper cause' for the issuance of a 'full carry' permit.  Accordingly, the respondent's determination was not arbitrary or capricious and should not be disturbed."  *Kachalsky v. Cacace*, 884 N.Y.S.2d 877, 877 (2d Dep't 2009).  Kachalsky thereafter sought leave to appeal to the New York State Court of Appeals, (State Defs.' 56.1 ¶ 32; Pls.' Resp. 56.1 ¶ 32), but on February 16, 2010, the court dismissed his appeal *sua sponte* "upon the ground that no substantial constitutional question [was] directly involved," *Kachalsky v. Cacace* ("*Kachalsky II*"), 14 N.Y.3d 743, 743 (2010).

In March 2009, Plaintiff Nikolov applied for a full-carry permit.  (State Defs.' 56.1 ¶ 35; Pls.' Resp. 56.1 ¶ 35.)  In her application, Nikolov asserted that she believed she satisfied Section 400.00(2)(f)'s "proper cause" requirement because  she was a "law-abiding citizen," she possessed a concealed weapon permit in the State of Florida and had neither brandished nor discharged her weapon outside of shooting ranges there, she had completed three firearms safety courses with the National Rifle Association within the previous three years, her experience as a pilot and flight instructor gave her the "calm demeanor . . . essential when either involved in or a witness to a potentially dangerous situation," and she was a transgender female subject to a

---

[8]     "Tomari Decl." refers to the Declaration of Anthony J. Tomari, submitted in support of State Defendants' Cross-Motion for Summary Judgment.  (Docs. 49, 51, 65, 66.)

higher likelihood of being the victim of violence.   (State Defs.' 56.1 ¶ 36; Pls.' Resp. 56.1 ¶ 36.)
Upon reviewing Nikolov's application and completing a corresponding investigation, the
Department of Public Safety recommended that the permit be denied.  (State Defs.' 56.1 ¶ 37;
Pls.' Resp. 56.1 ¶ 37.)  The application, investigation file, and recommendation were forwarded
to Defendant Cohen, who, acting as licensing officer, reviewed those materials and issued a
decision and order, dated October 2, 2008, denying Nikolov's application.  (State Defs.' 56.1 ¶¶
38–39; Pls.' Resp. 56.1 ¶¶ 38–39.)  Cohen observed that "[c]onspicuously absent" from
Nikolov's application "is the report of any type of threat to her own safety," and
"notwithstanding her accomplishments and unblemished record, it cannot be said that the
applicant has demonstrated that she has a special need for self-protection distinguishable from
that of the general public."  (State Defs.' 56.1 ¶ 39; Pls.' Resp. 56.1 ¶ 39; *see* Tomari Decl. Ex.
O.)

     In June 2010, Plaintiff Nance applied for a full-carry permit.  (State Defs.' 56.1 ¶ 47;
Pls.' Resp. 56.1 ¶ 47.)  At that time, Nance was licensed to have a handgun for the purpose of
target shooting only.  (State Defs.' 56.1 ¶ 46; Pls.' Resp. 56.1 ¶ 46.)  In his application, Nance
asserted that he believed he satisfied Section 400.00(2)(f)'s "proper cause" requirement because
he was a "citizen in good standing in the community," he was "steadily employed and stable," he
was "of good moral character," and the permit would facilitate his efforts to become involved
with competitive shooting and gun safety instruction.  (State Defs.' 56.1 ¶ 48; Pls.' Resp. 56.1 ¶
48.)  Upon reviewing Nance's application and completing a corresponding investigation, the
Department of Public Safety recommended that the permit be denied.  (State Defs.' 56.1 ¶ 49;
Pls.' Resp. 56.1 ¶ 49.)  The application, investigation file, and recommendation were forwarded
to Defendant Holdman, who, acting as licensing officer, reviewed those materials and issued a

decision, dated September 9, 2010, denying Nance's application.  (State Defs.' 56.1 ¶ 50; Pls.' Resp. 56.1 ¶ 50.)  Holdman observed that Nance had "not provided the court with any information that he faces any danger of any kind that would necessitate the issuance of a full carry firearm license; [and had not] demonstrated a need for self-protection distinguishable from that of the general public or of other persons similarly situated."  (State Defs.' 56.1 ¶ 53; Pls.' Resp. 56.1 ¶ 53.)

As with Nance, in June 2010, Plaintiff Marcucci-Nance applied to amend her pistol permit from a target-shooting permit to a full-carry permit.  (State Defs.' 56.1 ¶¶ 54–55; Pls.' Resp. 56.1 ¶¶ 54–55.)  In her application, she cited the same reasons as Nance for why she believed she satisfied Section 400.00(2)(f)'s "proper cause" requirement, (State Defs.' 56.1 ¶ 56; Pls.' Resp. 56.1 ¶ 56), and her application was similarly addressed:  after an investigation, the Department of Public Safety recommended denial, and Holdman, to whom the application materials were forwarded, denied the application on September 9, 2010, citing the same concerns as he did with respect to Nance.  (State Defs.' 56.1 ¶¶ 57–60; Pls.' Resp. 56.1 ¶¶ 57–60.)

Finally, in July 2010, Plaintiff Detmer applied for a full-carry permit.  (State Defs.' 56.1 ¶ 41; Pls.' Resp. 56.1 ¶ 41.)  Like Nance and Marcucci-Nance, Detmer was at that time licensed to have a handgun for the purpose of target shooting only.  (State Defs.' 56.1 ¶ 40; Pls.' Resp. 56.1 ¶ 40.)  In his application, Detmer asserted that he believed he satisfied Section 400.00(2)(f)'s "proper cause" requirement because he was a federal law enforcement officer with the U.S. Coast Guard who, while on duty, regularly carried a .40-caliber pistol, and, as part of his training, had completed various courses concerning the use of his pistol.  (State Defs.' 56.1 ¶ 42; Pls.' Resp. 56.1 ¶ 42.)  The Department of Public Safety reviewed Detmer's application, conducted its investigation, recommended denial, and subsequently forwarded the file to

10

Defendant Lorenzo, who, acting as licensing officer, reviewed those materials and denied the application.  (State Defs.' 56.1 ¶¶ 44–45; Pls.' Resp. 56.1 ¶¶ 44–45.)  Lorenzo informed Detmer of this decision by letter dated September 27, 2010, in which he noted simply that there was "no justification" for issuing a full-carry permit.  (State Defs.' 56.1 ¶ 45; Pls.' Resp. 56.1 ¶ 45.)

Individual Plaintiffs state that they have not re-applied for full-carry permits because they believe such acts would be futile, and that they would carry handguns in public but for their fear of arrest, prosecution, fine, and/or imprisonment.  (Kachalsky Decl. ¶¶ 3–4; Nikolov Decl. ¶¶ 3– 4; Nance Decl. ¶¶ 5–6; Marcucci-Nance Decl. ¶¶ 5–6; Detmer Decl. ¶¶ 6–7.)[9]

### D.    Plaintiffs' Claims

As late as 2005, the Second Circuit, in rejecting a constitutional challenge to New York's handgun licensing scheme, held that the "Second Amendment's 'right to keep and bear arms' imposes a limitation on only federal, not state, legislative efforts."  *Bach*, 408 F.3d at 84.  Three years after that, in 2008, the Supreme Court issued its watershed decision *District of Columbia v. Heller*,[10] in which it undertook an exhaustive review of the text and history of the Second Amendment and concluded for the first time that the Second Amendment conferred an individual, as opposed to collective, right to keep and bear arms.  554 U.S. at 595.  The question before the Court in *Heller* was the constitutionality of several District of Columbia statutes that generally prohibited the possession of handguns and required any other lawful firearms in the home to be inoperable—*i.e.*, unloaded and disassembled or bound by a trigger lock or similar

---

[9]    "Kachalsky Decl." refers to the Declaration of Alan Kachalsky.  (Doc. 39-9.)  "Nikolov Decl." refers to the Declaration of Christina Nikolov.  (Doc. 39-12.)  "Nance Decl." refers to the Declaration of Johnnie Nance.  (Doc. 39-13.)  "Marcucci-Nance Decl." refers to the Declaration of Anna Marcucci-Nance.  (Doc. 39-10.)  "Detmer Decl." refers to the Declaration of Eric Detmer.  (Doc. 39-11.)

[10]    *Heller* is discussed in greater detail below; it is mentioned here only to place Plaintiffs' claims in jurisprudential context.

device. *Id.* at 574–75. The Court held that the "ban on handgun possession in the home violates the Second Amendment, as does [the] prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635. Two years later, in *McDonald v. City of Chicago*, the Supreme Court held that the Fourteenth Amendment's Due Process Clause incorporates the Second Amendment right recognized in *Heller*, thereby extending that right as against the states. 130 S. Ct. at 3050.

On July 15, 2010, less than a month after the Supreme Court issued its decision in *McDonald*, Kachalsky, Nikolov, and SAF filed the Complaint in the instant action. (Doc. 1.) On November 8, 2010, they joined Detmer, Nance, and Marcucci-Nance in filing a First Amended Complaint ("FAC"), (Doc. 18), the operative complaint for the purposes of the instant motions. In it, Plaintiffs assert claims under 42 U.S.C. § 1983 ("Section 1983") for violations of the Second Amendment and the Equal Protection Clause of the Fourteenth Amendment. Specifically, they claim that Section 400.00(2)(f)'s "proper cause" requirement violates the Second Amendment both facially and as applied to them, and that it classifies individuals on the basis of "irrelevant, arbitrary, and speculative criteria in the exercise of a fundamental right." (FAC ¶¶ 41, 43.) Plaintiffs seek to enjoin enforcement of Section 400.00(2)(f)'s "proper cause" requirement, as well as an order directing Defendants to issue Plaintiffs permits, declaratory relief consistent with the requested injunctive relief, costs, and fees. (*Id.* at 11.) Defendants filed Motions to Dismiss the First Amended Complaint, (Docs. 30, 33); Plaintiffs filed a Motion for Summary Judgment, (Doc. 39); and the State Defendants filed a Cross-Motion for Summary Judgment, (Doc. 42).

## II.    DISCUSSION

### A.    Motions to Dismiss

Defendants' Motions to Dismiss largely concern threshold issues.  As such, I consider these motions first.  While Defendants briefly touch upon the question of Section 400.00(2)(f)'s constitutionality in these motions, they address that issue in far greater detail in briefing submitted in connection with the Motion and Cross-Motion for Summary Judgment.  I therefore consider Defendants' constitutional arguments in conjunction with those motions.

### 1.     Legal Standards

Defendants bring their Motions to Dismiss under Federal Rules of Civil Procedure 12(b)(1), for lack of subject matter jurisdiction, and 12(b)(6), for failure to state a claim.

### a.     Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it."  *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).  "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists."  *Id.*  Defendants argue that the Court lacks subject matter jurisdiction because Plaintiffs lack standing and the case is not ripe for adjudication.  I discuss the individual standards for those doctrines below.

### b.     Rule 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief

requires more than labels and conclusions, and a formulaic recitation of the elements of a cause

of action will not do." *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation

marks omitted). While Federal Rule of Civil Procedure 8 "marks a notable and generous

departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock

the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 129 S.

Ct. at 1950.

      In considering whether a complaint states a claim upon which relief can be granted, the

court may "begin by identifying pleadings that, because they are no more than conclusions, are

not entitled to the assumption of truth," and then determine whether the remaining well-pleaded

factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.*

Deciding whether a complaint states a plausible claim for relief is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense." *Id.*

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of

misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to

relief.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

### c.      Documents the Court May Consider

      When deciding a motion to dismiss, the Court is entitled to consider the following:

> (1) facts alleged in the complaint and documents attached to it or incorporated in
> it by reference, (2) documents "integral" to the complaint and relied upon in it,
> even if not attached or incorporated by reference, (3) documents or information
> contained in [a] defendant's motion papers if plaintiff has knowledge or
> possession of the material and relied on it in framing the complaint, (4) public
> disclosure documents required by law to be, and that have been, filed with the
> Securities and Exchange Commission, and (5) facts of which judicial notice may
> properly be taken under Rule 201 of the Federal Rules of Evidence.

*Weiss v. Inc. Vill. of Sag Harbor*, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011) (internal quotation

marks omitted); *accord Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002). A

document is considered "integral" to the complaint where the plaintiff has "reli[ed] on the terms and effect of [the] document in drafting the complaint." *Chambers*, 282 F.3d at 153 (emphasis omitted). Such reliance "is a necessary prerequisite to the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." *Id*. If a document outside of the complaint is to form the basis for dismissal, however, two requirements must be met in addition to the requirement that the document be "integral" to the complaint: (1) "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document"; and (2) "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006).

### 2. Analysis

#### a. Standing and Ripeness

##### i. Standards

Article III, Section 2 of the U.S. Constitution restricts federal court jurisdiction to "Cases" and "Controversies." U.S. Const. art. III, § 2; *Vt. Right to Life Comm., Inc. v. Sorrell*, 221 F.3d 376, 381 (2d Cir. 2000). "Constitutional standing is the threshold question in every federal case, determining the power of the court to entertain the suit." *Leibovitz v. N.Y. City Transit Auth.*, 252 F.3d 179, 184 (2d Cir. 2001) (internal quotation marks omitted). To establish standing within the meaning of Article III,

> first, the plaintiffs "must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." Second, "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . the result [of] the independent action of some third party not before the court." Third, "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Moreover, the "party invoking federal jurisdiction bears the burden of establishing these elements."

*Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 175 (2d Cir. 2006) (alterations in original) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).

The ripeness doctrine "is drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (internal quotation marks omitted). Its purpose is to "ensure that a dispute has generated injury significant enough to satisfy the case or controversy requirement of Article III" and "prevent[] a federal court from entangling itself in abstract disagreements over matters that are premature for review because the injury is merely speculative and may never occur." *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 90 (2d Cir. 2002). In determining whether a claim that challenges a law is ripe for review, the Court must consider whether the issue is fit for adjudication as well as the hardship to the plaintiff that would result from withholding review. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967), *overruled on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977); *Marchi v. Bd. of Coop. Educ. Servs.*, 173 F.3d 469, 478 (2d Cir. 1999). "Standing and ripeness are closely related doctrines that overlap 'most notably in the shared requirement that the [plaintiff's] injury be imminent rather than conjectural or hypothetical.'" *N.Y. Civil Liberties Union v. Grandeau*, 528 F.3d 122, 130 n.8 (2d Cir. 2008) (second alteration in original) (quoting *Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 225 (2d Cir. 2006)).

## ii.        Individual Plaintiffs

With respect to Individual Plaintiffs, Defendants' arguments as to standing and ripeness are essentially one and the same: they argue that because Kachalsky and Nikolov failed to apply for full-carry permits post-*McDonald*, and because Detmer, Nance, and Marcucci-Nance's claims precede any state court ruling interpreting New York's "proper cause" requirement post-

*McDonald*, their purported injuries are speculative.  That is, they argue that Individual Plaintiffs'

injuries have not yet manifested themselves in post-*McDonald* permit denials and/or adverse

court rulings.  I therefore consider the ripeness arguments together with and as a part of the

standing inquiry.  *See, e.g.*, *Grandeau*, 528 F.3d at 130 n.8; *Brooklyn Legal Servs.*, 462 F.3d at

225–26.  I find that Plaintiffs have standing and that their claims are ripe.

"As a general rule, 'to establish standing to challenge an allegedly unconstitutional

policy, a plaintiff must submit to the challenged policy.'"  *Prayze FM v. FCC*, 214 F.3d 245, 251

(2d Cir. 2000) (quoting *Jackson-Bey v. Hanslmaier*, 115 F.3d 1091, 1096 (2d Cir. 1997)); *see*

*Bach v. Pataki*, 289 F. Supp. 2d 217, 223 (N.D.N.Y. 2003) ("In many cases, requiring litigants to

actually apply for a license before challenging a licensing scheme prevent[s] courts, through

avoidance of premature adjudication, from entangling themselves in abstract disagreements over

administrative policies, and also . . . protect[s] the agencies from judicial interference until an

administrative decision has been formalized and its effects felt in a concrete way by the

challenging parties.") (alterations in original) (internal quotation marks omitted), *aff'd*, 408 F.3d

75.  Each of the Individual Plaintiffs have submitted to Section 400.00(2)(f), having applied for,

and subsequently been denied, full-carry permits under the statute.  (FAC ¶¶ 26, 30, 32–37.)

Defendants' characterization of Individual Plaintiffs' injuries as "speculative" ignores the plain

fact that these very permit denials constitute actual, ongoing injuries not contingent upon any

future event.  Recent caselaw in the area of handgun regulation is instructive.  Notably, in *Parker*

*v. District of Columbia*, 478 F.3d 370 (D.C. Cir. 2007), *aff'd sub nom. Heller*, 554 U.S. 570, the

D.C. Circuit observed that "a license or permit denial pursuant to a state or federal administrative

scheme [constitutes] an Article III injury," *id.* at 376, and that by dint of the fact that Heller

applied for and was denied a registration certificate to own a firearm, he had standing to

challenge the D.C. firearm registration system:

> Heller has invoked his rights under the Second Amendment to challenge the
> statutory classifications used to bar his ownership of a handgun under D.C. law,
> and the formal process of application and denial, however routine, makes the
> injury to Heller's alleged constitutional interest concrete and particular.  He is not
> asserting that his injury is only a threatened prosecution, nor is he claiming only a
> general right to handgun ownership; he is asserting a right to a registration
> certificate, the denial of which is his distinct injury.

*Id.*

The D.C. Circuit recently reaffirmed this view in *Dearth v. Holder*, 641 F.3d 499 (D.C.

Cir. 2011).  There, the plaintiff, an American citizen who lived in Canada, challenged a federal

regulation prohibiting people living outside the United States from lawfully purchasing firearms

in the United States.  *Id.* at 500–01.  The plaintiff sought to purchase firearms to stow with his

relatives in Ohio, and had twice attempted to purchase firearms but encountered difficulties with

completing the required paperwork asking for his state of residence.  *Id.* at 501.  The court stated,

> We agree with [plaintiff] that the Government has denied him the ability to
> purchase a firearm and he thereby suffers an ongoing injury.  [Plaintiff's] injury is
> indeed like that of the plaintiff in *Parker*, who had standing to challenge the
> District of Columbia's ban on handguns because he had been denied a registration
> certificate to own a handgun.  As we there stated, a license or permit denial
> pursuant to a state or federal administrative scheme that can trench upon
> constitutionally protected interests gives rise to an Article III injury; the formal
> process of application and denial, however routine, suffices to show a cognizable
> injury.

*Id.* at 502 (citations and internal quotation marks omitted).[11]  I find *Parker* and *Dearth*

persuasive.  The State Defendants' denial of the Individual Plaintiffs' permit applications

---

[11]     *Dearth* reversed *Hodgkins v. Holder*—on which Defendants rely in their papers—in
which the district court held that "past refusals of merchants to sell firearms to [plaintiffs] are not
enough, without more, to provide the basis for a[ ] [declaratory judgment] action."  677 F. Supp.
2d 202, 204 (2010).

constitutes an actual and ongoing injury because it forestalls the exercise of their alleged

constitutional rights.[12]

Defendants' attempt to shift the focus of this inquiry to future, contingent events in an

attempt to describe the purported injuries as "speculative" is unavailing.  Defendants' reliance

upon *Golden v. Zwickler*, 394 U.S. 103 (1969), demonstrates how their focus is misplaced.  In

that case, the Court determined that a plaintiff seeking to challenge a New York statute

criminalizing the distribution of anonymous election campaign literature did not have standing

where he sought only to distribute literature criticizing a particular congressman who, at the time

the case was heard, had left the House of Representatives to begin a 14-year term on the New

York State Supreme Court.  *Id.* at 109–10 & n.4.  The Court held that because "the prospect was

neither real nor immediate of a campaign involving the Congressman, it was wholly conjectural

that another occasion might arise when [the plaintiff] might be prosecuted for distributing the

handbills referred to in the complaint," and his "assertion in his brief that the former

Congressman *can be* 'a candidate for Congress again' is hardly a substitute for evidence that this

is a prospect of 'immediacy and reality.'"  *Id.* at 109 (emphasis added).  In sharp contrast to

*Golden*, there is no contingency here upon which Individual Plaintiffs' injuries are conditioned;

Defendants' permit denials have actually prevented—and indeed continue to prevent—

Individual Plaintiffs from being able to exercise their alleged constitutional right.  *See Dearth*,

641 F.3d at 503 (distinguishing *Golden* on similar grounds).

Further, Individual Plaintiffs' injuries may not be labeled as speculative, as Defendants

argue, simply because they have failed to submit post-*McDonald* applications for full-carry

permits.  That state licensing officers might grant Individual Plaintiffs' second full-carry permit

---

[12]     For purposes of the standing inquiry, the Court assumes the validity of Individual
Plaintiffs' claims that their rights have been violated.  *See Lujan*, 504 U.S. at 561.

applications were they to submit such applications at some point in the future does not suggest

that their current injuries are speculative—at most, it suggests that the *continuation* of their

injuries *past that point* is speculative.  But putting that aside, Defendants' argument is unavailing

in light of the fact that the decisions denying Detmer, Nance, and Marcucci-Nance's applications

were issued after the Court's decision in *McDonald*.  (FAC ¶¶ 33, 35, 37.)  Crucially, the

decisions issued with respect to Nance and Marcucci-Nance reaffirm that in order to meet the

"proper cause" requirement of Section 400.00(2)(f), applicants must demonstrate a "need for self

protection distinguishable from that of the general public," and cite as support the Appellate

Division's decision upholding the October 2008 denial of Kachalsky's full-carry permit

application.  (*Id.* ¶¶ 35, 37; Rotini Decl. Exs. D–E.)[13]  *See Kachalsky*, 884 N.Y.S.2d 877.  These

decisions signal the continued vitality of the "proper cause" requirement as a basis on which

New York handgun licensing officers deny full-carry permit applications, and demonstrate that

were the Individual Plaintiffs to submit new applications post-*McDonald* (for Detmer, Nance,

and Marcucci, their second post-*McDonald* applications; for Kachalsky and Nikolov, their first),

they would be futile.  Individual Plaintiffs cannot be required to engage in a "futile gesture as a

prerequisite for adjudication in federal court."  *Williams v. Lambert*, 46 F.3d 1275, 1280 (2d Cir.

1995); *cf. Bach*, 408 F.3d at 82–83 (plaintiff's failure to apply did not deprive him of standing to

challenge concealed-firearm statute because he did not live or work in New York, as required by

---

[13]      "Rotini Decl." refers to the Declaration of Melissa-Jean Rotini in Support of Motion to
Dismiss Amended Complaint.  (Doc. 33-1.)  I may consider the decisions issued with respect to
Nance and Marcucci-Nance, as they are quoted in the First Amended Complaint.  *See McCarthy
v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

the statute, and thus "[i]mposing a filing requirement would force [him] to complete an application for which he is statutorily ineligible").[14]

Nor were Individual Plaintiffs required to bring their post-*McDonald* federal constitutional challenge in state court before resorting to this Court. It is well-settled that "[w]hen federal claims are premised on 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3)—as they are here—[a plaintiff is] not required [to] exhaust[ ] . . . state judicial or administrative remedies." *Steffel v. Thompson*, 415 U.S. 452, 472–73 (1974) (citing *McNeese v. Bd. of Educ.*, 373 U.S. 668 (1963); *see Monroe v. Pape*, 365 U.S. 167 (1961)). This rule reflects "the paramount role Congress has assigned to the federal courts to protect constitutional rights." *Id.* Defendants argue that *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008), compels a finding that the case is premature for adjudication, but that case does not speak to the situation here, where a plaintiff challenges existing state court interpretations of a state statute in federal court. Instead, in *Washington State Grange*, the petitioners sought to challenge a state ballot initiative that had never before been subject to state review: indeed, "[t]he State ha[d] had no opportunity to implement [the initiative], and its courts ha[d] had no occasion to construe the law in the context of actual disputes . . . , or to accord the law a limiting construction to avoid constitutional questions." *Id.* at 450. And while it is true that a plaintiff may be required to

---

14      Defendants attempt to distinguish *Bach* on the basis that the in-state residency/work requirement there was written into the statute, whereas here the requirement that applicants demonstrate a "need for self protection distinguishable from that of the general public" does not appear in the statute and is instead derived from state courts' interpretation of the phrase "proper cause," (Reply Memorandum of Law in Further Support of the State Defendants' Motion to Dismiss the Complaint, (Doc. 37), at 10), but the distinction is unavailing. Plaintiffs' claims in essence target the "proper cause" requirement, not the interpretation thereof: they argue that the right to carry handguns in public is absolute and that individuals cannot be required to demonstrate proper cause to exercise that purported right—not that "proper cause" should somehow be interpreted differently. In any event, to the extent that the instant case does not comport with *Bach*, the standing analysis remains unaffected, as, unlike *Bach*, the Individual Plaintiffs here actually submitted applications under the relevant handgun statute.

exhaust his or her state appellate remedies when he or she has already initiated a proceeding in state court, that is an issue properly raised not in the context of ripeness or standing, but rather abstention—which I address below.

### iii. SAF

SAF asserts both organizational and representational standing. While it is true that organizations can have standing on their own behalf when they have suffered injuries, *see Warth v. Seldin*, 422 U.S. 490, 511 (1975), SAF has not sufficiently alleged an injury. It maintains that it "promot[es] the exercise of the right to keep and bear arms" and engages in "education, research, publishing and legal action focusing on the [c]onstitutional right to privately own and possess firearms," (FAC ¶ 6), but such activates, standing alone, are plainly insufficient to give rise to standing. SAF also maintains that it has "over 650,000 members and supporters nationwide." (*Id.*) An organization may sue on behalf of its members, but only if "[(1)] its members would have standing to sue in their own right, [(2)] the interests at stake are germane to the organization's purpose, and [(3)] neither the claim asserted nor the relief requested requires individual members' participation in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). SAF cannot meet the first requirement, as it fails to allege anywhere in the First Amended Complaint that it has any members who have applied for and been rejected full-carry permits under Section 400.00(2)(f). SAF alleges in conclusory fashion that the various Defendants have "enforced the challenged laws, customs and practices against . . . SAF's membership," (FAC ¶¶ 7–11), but it has neither identified particular members who have standing, nor specified how they would have standing to sue in their own right. It therefore fails to satisfy the first requirement identified above. *See, e.g.*, *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 235 (1990).

### b.    Abstention

Defendants argue that this Court should abstain from deciding this case under the doctrines laid down in *Younger v. Harris*, 401 U.S. 37 (1971), *Railroad Commission v. Pullman Co.*, 312 U.S. 496 (1941), and/or *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943).  I find that none of these abstention doctrines apply.

### i.    *Younger* Abstention

In *Younger v. Harris*, the Supreme Court held that federal courts must abstain from exercising jurisdiction over federal constitutional claims that involve or call into question ongoing state proceedings.  401 U.S. at 43–44.  "Although the *Younger* abstention doctrine was born in the context of state criminal proceedings, it now applies with equal force to state administrative proceedings."  *Diamond "D" Constr. Corp. v. McGowan*, 282 F.3d 191, 198 (2d Cir. 2002) (citing *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.*, 477 U.S. 619, 627 (1986)).  "*Younger* abstention is required when three conditions are met:  (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims."  *Id.* (citing *Grieve v. Tamerin*, 269 F.3d 149, 152 (2d Cir. 2001)). "Despite the strong policy in favor of abstention, a federal court may nevertheless intervene in a state proceeding upon a showing of 'bad faith, harassment or any other unusual circumstance that would call for equitable relief.'"  *Id.* (quoting *Younger*, 401 U.S. at 54).

*Younger* abstention does not apply here because there are no ongoing state proceedings. "The Supreme Court has clearly held that a would-be plaintiff who has been subjected to a state proceeding which he seeks to challenge in federal court must first exhaust all available state appellate remedies . . . ."  *Kirschner v. Klemons*, 225 F.3d 227, 234 (2d Cir. 2000) (citing

*Huffman v. Pursue, Ltd.*, 420 U.S. 592, 608 (1975)).  Here, Kachalsky initiated an Article 78

proceeding in state court to challenge the denial of his full-carry permit application, but he

exhausted all available state court remedies, appealing the Appellate Division's decision to the

New York Court of Appeals, where his appeal was summarily dismissed.  *See Kachalsky II*, 14

N.Y.3d at 743.  Once the Court of Appeals dismissed Kachalsky's appeal, there ceased to be an

ongoing state proceeding with which lower federal courts were capable of interfering.  *See, e.g.*,

*Aretakis v. Comm. on Prof'l Standards*, No. 08-9712, 2009 WL 1905077, at *5 (S.D.N.Y. July 1,

2009) (where New York Court of Appeals denied plaintiff's application for leave to appeal

Appellate Division's order suspending his license to practice law, court held that "no 'pending

state proceeding' exists, and the *Younger* abstention doctrine cannot be applied"); *Ponterio v.

Kaye*, No. 06-6289, 2007 WL 141053, at *6 (S.D.N.Y. Jan. 22, 2007) ("[Plaintiff] has litigated

and lost his state claims up to the New York Court of Appeals.  As *Younger* requires, he appears

to have exhausted his state-court remedies.").

     Nor are there any ongoing state proceedings with respect to the remaining Individual

Plaintiffs, as none of them commenced state court proceedings to challenge the denial of their

full carry permit applications.  *See Coastal Distribution, LLC v. Town of Babylon*, 216 F. App'x

97, 102 (2d Cir. 2007) (where plaintiff did not challenge zoning board of appeals' decision via an

Article 78 proceeding, *Younger* did not apply; caselaw "gives no support to the proposition that

the availability of an Article 78 action *after* the completion of state administrative proceedings

renders them ongoing perpetually").

ii.       *Pullman* **Abstention**

*Pullman* abstention applies when "difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided."  *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984).  In the Second Circuit,

> [t]hree basic conditions must be present to trigger *Pullman* abstention:  "First, the state statute must be unclear or the issue of state law uncertain; second, resolution of the federal issue must depend upon the interpretation given to the ambiguous state provision; and third, the state law must be susceptible of an interpretation that would avoid or modify the federal constitutional issue."

*Williams v. Lambert*, 46 F.3d 1275, 1281 (2d Cir. 1995) (internal quotation marks omitted).

Abstention under this doctrine is limited to uncertain questions of state law because "[a]bstention from the exercise of federal jurisdiction is the exception, not the rule."  *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813 (1976).  In fact, even when the three conditions specified above are fulfilled, the court is "not required to abstain, and, to the contrary, important federal rights can outweigh the interests underlying the *Pullman* doctrine."  *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 100 (2d Cir. 2005) (internal quotation marks omitted).  Moreover, "abstention should not be ordered merely to await an attempt to vindicate the claim in a state court."  *Wisconsin v. Constantineau*, 400 U.S. 433, 439 (1971).

As noted above, courts in New York have consistently interpreted Section 400.00(2)(f)'s "proper cause" requirement to mean "a special need for self-protection distinguishable from that of the general community or of persons engaged in the same profession."  *See, e.g.*, *Bando*, 735 N.Y.S.2d at 662; *Kaplan*, 673 N.Y.S.2d at 68; *Williams*, 656 N.Y.S.2d at 627; *Klenosky*, 428 N.Y.S.2d 257.  Where, as here, state courts have settled upon an interpretation of the statute at issue, *Pullman* abstention is not warranted.  *See, e.g.*, *Commack Self-Service Kosher Meats v. Rubin*, 986 F. Supp. 153, 157–58 (E.D.N.Y. 1997) (*Pullman* abstention not applicable "[b]ecause there exist[ed] a well established interpretation of the . . . [l]aws by the New York state courts,

and because the constitutional challenges raised by plaintiffs [were] not entangled in a skein of

state law that must be untangled before the federal case can proceed") (internal quotation marks

omitted).

### iii.       *Burford* **Abstention**

The *Burford* abstention doctrine serves to "protect[ ] complex state administrative

processes from undue federal interference."  *New Orleans Pub. Serv., Inc. v. Council of New*

*Orleans*, 491 U.S. 350, 362 (1989) (internal quotation marks omitted).  It does not, however,

"require abstention whenever there exists such a process, or even in all cases where there is a

potential for conflict with state regulatory law or policy."  *Id.* (internal quotation marks omitted).

A federal court should abstain under *Burford*

> (1) when there are difficult questions of state law bearing on policy problems of
> substantial public import whose importance transcends the result in the case then
> at bar; or (2) where the exercise of federal review of the question in a case and in
> similar cases would be disruptive of state efforts to establish a coherent policy
> with respect to a matter of substantial public concern.

*Id.* at 361 (internal quotation marks omitted); *accord Dittmer v. Cnty. of Suffolk*, 146 F.3d 113,

116 (2d Cir. 1998).  In evaluating whether the exercise of federal review would be disruptive of

state efforts to establish a coherent policy, district courts should consider "(1) the degree of

specificity of the state regulatory scheme; (2) the need to give one or another debatable

construction to a state statute; and (3) whether the subject matter of the litigation is traditionally

one of state concern."  *Hachamovitch v. DeBuono*, 159 F.3d 687, 697 (2d Cir. 1998).

*Burford* abstention does not apply here because Plaintiffs' claims do not present an

"ambiguous state law issue," and do not seek to "involve federal courts in supervising,

interrupting, or meddling in state policies by interfering in state regulatory matters"; instead, the

claims present "a direct challenge to the constitutionality of a state statute, a controversy federal

courts are particularly suited to adjudicate." *Alliance of Am. Insurers v. Cuomo*, 854 F.2d 591, 600–01 (2d Cir. 1988) (declining, on same grounds, to apply *Burford* abstention to constitutional challenge to provision of New York Medical and Dental Malpractice and Professional Conduct Act imposing moratorium on medical malpractice insolvencies and authorizing stabilization of rates for medical malpractice coverage).  Though not binding on this Court, particularly instructive is a recent case from the District of Maryland, *Wollard v. Sheridan*, No. 10-2068, 2010 WL 5463109 (D. Md. Dec. 29, 2010), in which the court declined to abstain from passing on the constitutionality of a nearly identical statute—namely, a state law requiring that applicants for full-carry handgun licenses demonstrate "good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger." *Id.* at *1.  The court held that neither of the two grounds for *Burford* abstention was applicable because

> Maryland appellate courts have repeatedly examined and interpreted the statute at issue in this case, and there is no reason to believe this case will present a new question of state law. . . . In addition, where, as here, a plaintiff "launches a *facial* attack on [a] state statute [ ] *as a whole*" abstention on the second ground is not appropriate because the potential relief—an injunction barring the enforcement of the statute—"could not possibly threaten [the statute's] *uniform* application."

*Id.* at *5 n.6 (quoting *Martin v. Stewart*, 499 F.3d 360, 367 (4th Cir. 2007)) (second, third, and fourth alterations, and emphases in original) (citations omitted).  That rationale applies with equal force here and compels rejection of Defendants' arguments as to *Pullman* abstention.

### c.  *Res Judicata*

Defendants argue that Kachalsky's Article 78 proceeding and the State Defendants' rejection of Individual Plaintiff's permit applications have claim preclusive effect on the Section 1983 claims currently before this Court.  A federal court assessing the effect of a state court judgment looks to the law of the state in which the judgment was entered, *Marrese v. Am. Acad.*

*of Orthopedic Surgeons*, 470 U.S. 373, 380 (1985), here, New York.  Under New York's *res judicata* doctrine,

> a party may not litigate a claim where a judgment on the merits exists from a prior action between the same parties involving the same subject matter.  The rule applies not only to claims actually litigated but also to claims that could have been raised in the prior litigation. . . . Additionally, . . . once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy.

*In re Hunter*, 4 N.Y.3d 260, 269 (2005) (citations and internal quotation marks omitted).

I find that Kachalsky's Article 78 proceeding does not bar him from bringing the instant as-applied and facial challenges to Section 400.00(2)(f).  Whether a claim that was not raised in the previous action could have been raised therein "depends in part on . . . 'whether the facts essential to support the second were present in the first.'"  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 287 (2d Cir. 2002) (emphasis and internal quotation marks omitted).  Consequently, *res judicata* "does not preclude litigation of events arising after the filing of the complaint that formed the basis of the first lawsuit."  *Curtis v. Citibank, N.A.*, 226 F.3d 133, 139 (2d Cir. 2000).  Similarly, "[m]odifications in controlling legal principles could render a previous determination inconsistent with prevailing doctrine, and changed circumstances may sufficiently alter the factual predicate such that new as-applied claims would not be barred by the original judgment" on *res judicata* grounds.  *Monahan v. N.Y. City Dep't of Corr.*, 214 F.3d 275, 290 (2d Cir. 2000) (citations and internal quotation marks omitted).  Kachalsky's constitutional challenges are based on *McDonald*'s application of the Second Amendment, as discussed in *Heller*, to the states.  At the time of Kachalsky's Article 78 proceeding, however, the prevailing law was that Second Amendment did not apply to the states.  *See Bach*, 408 F.3d at 84 (New York's handgun licensing scheme did not infringe plaintiff's Second Amendment "right to keep

and bear arms," which "imposes a limitation on only federal, not state, legislative efforts").  He therefore could not have based his prior proceeding on the Second Amendment's applicability to the states, and, because of that, his constitutional challenges are not precluded.  *See, e.g.*, *Bronx Household of Faith v. Bd. of Educ.*, 226 F. Supp. 2d 401, 412 (S.D.N.Y. 2002) ("[T]he Supreme Court has cast doubt upon the Court of Appeals' majority opinion . . . .  Because there has been a change in the law, another look at the situation is justified.  Concomitantly, the change in the law is sufficiently serious to reject defendants' assertion that plaintiff's preliminary injunction motion should be denied on the grounds of res judicata or collateral estoppel."), *aff'd*, 331 F.3d 342 (2d Cir. 2003).

Nor are the claims brought by Nikolov, Detmer, Nance, and Marcucci-Nance precluded because their applications for full-carry permits were denied.  *Res judicata* applies to "give conclusive effect to the quasi-judicial determinations of administrative agencies, when rendered pursuant to the adjudicatory authority of an agency to decide cases brought before its tribunals employing procedures substantially similar to those used in a court of law."  *Ryan v. N.Y. Tel. Co.*, 62 N.Y.2d 494, 499 (1984) (citations omitted).  A review of relevant authority and the materials submitted in connection with the Motions to Dismiss, however, does not support the conclusion that the procedures for applying for a full-carry permit in any way resemble those used in a court of law, *see Shapiro v. N.Y. City Police Dep't*, 595 N.Y.S.2d 864, 867 (Sup. Ct. N.Y. Cnty. 1993) (only reference to judicial hearing in New York gun licensing regulations is in connection with suspension and revocation procedures), and, in any event, even were the State Defendants' actions to qualify as quasi-judicial, Individual Plaintiffs neither raised, nor had the opportunity to raise, arguments regarding the constitutionality of Section 400.00(2)(f) in

submitting to the State Defendants their applications for full-carry permits.  *See generally*

Tomari Decl. Exs. G–J (Nikolov, Detmer, Nance, and Marcucci-Nance's permit applications).[15]

### d.     *Rooker-Feldman* **Doctrine**

Finally, Defendants argue that Kachalsky's claims are barred by the *Rooker-Feldman*

doctrine.  *Rooker-Feldman* is a limited doctrine aimed at "cases brought by state-court losers

complaining of injuries caused by state-court judgments rendered before the district court

proceedings commenced and inviting district court review of those judgments."  *McKithen v.*

*Brown*, 626 F.3d 143, 154 (2d Cir. 2010) (internal quotation marks omitted).

> *Rooker-Feldman* directs federal courts to abstain from considering claims when
> four requirements are met:  (1) the plaintiff lost in state court, (2) the plaintiff
> complains of injuries caused by the state court judgment, (3) the plaintiff invites
> district court review of that judgment, and (4) the state court judgment was
> entered before the plaintiff's federal suit commenced.

*Id.*  At a minimum, Defendants' argument fails because Kachalsky does not complain that he

was injured by the state court judgment—*i.e.*, by the decision rendered in the Article 78

proceeding—but rather that he was injured by Section 400.00(2)(f) and by Cacace's

interpretation of the statute and application of it to Kachalsky in denying his application for a

full-carry permit.  *See Skinner v. Switzer*, 131 S. Ct. 1289, 1298 (2011) ("[Petitioner] does not

challenge the adverse [Texas Court of Criminal Appeals] decisions themselves; instead, he

targets as unconstitutional the Texas statute they authoritatively construed. . . . [A] state-court

decision is not reviewable by lower federal courts, but a statute or rule governing the decision

---

[15]      The Court may consider the permit applications in deciding the Motions to Dismiss, as
the applications are discussed in the First Amendment Complaint, (FAC ¶¶ 30, 32, 34, 36), and
incorporated by reference therein.  *See, e.g.*, *Webster v. Wells Fargo Bank, N.A.*, No. 08-10145,
2009 WL 5178654, at *12 n.8 (S.D.N.Y. Dec. 23, 2009) (loan application discussed in complaint
and thereby incorporated by reference).

may be challenged in a federal action.  [Petitioner's] federal case falls within the latter

category.") (footnote omitted).  *Rooker-Feldman* therefore does not bar Kachalsky's claims.

### e.     County as a Proper Party

In its Motion to Dismiss, the County puts forth the separate argument that it is not a

proper party to this lawsuit because it does not effectuate the grant or denial of full-carry permits

and plays a limited role in the permitting process under applicable state law.  The County notes

that, although county law enforcement conducts the investigations that grow out of full-carry

permit applications, the state's licensing officers (here, the State Defendants) make independent

and ultimate determinations regarding such applications.  As such, they argue, Plaintiffs have

failed to allege that they were denied any constitutional right by the County, as required by

Section 1983.  *See Dove v. Fordham Univ.*, 56 F. Supp. 2d 330, 336 (S.D.N.Y. 1999) ("In order

to hold a municipality liable as a 'person' within the meaning of § 1983, [a plaintiff] must

establish that the municipality itself was somehow at fault.").  In response, Plaintiffs note that

defendants sued under Section 1983 are "responsible for the natural consequences of [their]

actions," and "may be held liable for those consequences attributable to reasonably foreseeable

intervening forces, including the acts of third parties."  *Kerman v. City of N.Y.*, 374 F.3d 93, 126

(2d Cir. 2004) (alteration in original) (internal quotation marks omitted).  Here, Plaintiffs argue,

it was reasonably foreseeable that the State Defendants would heed County law enforcement's

recommendations to deny Plaintiffs' full-carry permit applications, and that this is sufficient to

make the County a proper party.

In light of the disposition below, I need not decide whether the County is a proper party

and assume for the sake of argument that it is.  I now turn to the question of the as-applied and

facial constitutionality of Section 400.00(2)(f), which I address in the context of Plaintiffs'

Motion for Summary Judgment and State Defendants' Cross-Motion for Summary Judgment.

### B. Motion and Cross-Motion for Summary Judgment

#### 1. Legal Standard

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be

counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255. The movant

bears the initial burden of demonstrating the absence of a genuine issue of material fact, and, if

satisfied, the burden then shifts to the non-movant to present evidence sufficient to satisfy every

element of the claim. *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986)). "The mere existence of a scintilla of evidence in

support of the [non-movant's] position will be insufficient; there must be evidence on which the

jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the

non-movant "must do more than simply show that there is some metaphysical doubt as to the

material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986),

and she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v.*

*Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1)(A).  Where, as here, affidavits are used to support or oppose the motion, they "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).

### 2.       Second Amendment Claim

Plaintiffs claim that Section 400.00(2)(f) violates the Second Amendment, which reads, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  An evaluation of Plaintiffs' claim must necessarily start with a discussion of the Second Amendment right as recognized in *Heller*.

### a.       *Heller* and the Scope of the Second Amendment

As noted above, *Heller* resolved the long-standing question as to whether the Second Amendment guarantees an individual right to keep and bear arms or merely a collective right to do so in connection with service in a militia, holding that "[t]here seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."  554 U.S. at 595.  The Court observed that, like the First and Fourth Amendments, the Second Amendment "codified a pre-existing right," *id.* at 592 (emphasis omitted), and that the amendment's prefatory clause, while not restricting the scope of the right, did "announce[] the purpose for which the right was codified:  to prevent elimination of the

militia," *id.* at 599.  The Court warned, however, that "[t]he prefatory clause does not suggest

that preserving the militia was the only reason Americans valued the ancient right; most

undoubtedly thought it even more important for self-defense and hunting"—even going so far as

to refer to individual self-defense as the "central component" of the right.  *Id.* (emphasis

omitted).

As so many courts considering statutory challenges post-*Heller* have observed, the *Heller*

Court, while not setting the outer bounds of the Second Amendment, explicitly stated that "[l]ike

most rights, the right secured by the Second Amendment is not unlimited."  *Id.* at 626.  Crucially,

the Court observed, "From Blackstone through the 19th-century cases, commentators and courts

routinely explained that the right was not a right to keep and carry any weapon whatsoever in

any manner whatsoever and for whatever purpose."  *Id.* (citations omitted).  For example, the

Court stated, "the majority of the 19th-century courts to consider the question held that

prohibitions on carrying concealed weapons were lawful under the Second Amendment or state

analogues," and

> nothing in our opinion should be taken to cast doubt on longstanding prohibitions
> on the possession of firearms by felons and the mentally ill, or laws forbidding the
> carrying of firearms in sensitive places such as schools and government buildings,
> or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27 (emphasis added).  And as a footnote to this statement, the Court specified that it

was "identify[ing] these presumptively lawful regulatory measures only as examples," and that

the "list does not purport to be exhaustive."  *Id.* at 627 n.26.[16]

---

[16]     The Court reiterated this point in *McDonald*:

> It is important to keep in mind that *Heller*, while striking down a law that
> prohibited the possession of handguns in the home, recognized that the right to
> keep and bear arms is not "a right to keep and carry any weapon whatsoever in
> any manner whatsoever and for whatever purpose."  We made it clear in *Heller*
> that our holding did not cast doubt on such longstanding regulatory measures as

What very clearly did not fall within the ambit of presumptively lawful gun regulations were the District of Columbia's statutes banning the possession of handguns in the home and requiring that other lawful firearms be inoperable.  The Court observed that "[t]he Constitution leaves the District of Columbia a variety of tools for combating [the] problem [of handgun violence], including some measures regulating handguns," "[b]ut the enshrinement of constitutional rights necessarily takes certain policy choices off the table. . . . includ[ing] the absolute prohibition of handguns held and used *for self-defense in the home*."  *Id.* at 636 (emphasis added).

This emphasis on the Second Amendment's protection of the right to keep and bear arms for the purpose of "self-defense in the home" permeates the Court's decision and forms the basis for its holding—which, despite the Court's broad analysis of the Second Amendment's text and historical underpinnings, is actually quite narrow.  For example, in considering the statutes at issue there, the Court noted that their prohibitions "extend[ ] . . . to the home, where the need for defense of self, family, and property is most acute."  *Id.* at 628.  It discussed the several reasons why citizens might prefer handguns for "home defense," concluding that "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."  *Id.* at 629.  In considering the Second Amendment's scope, the Court stated, "whatever else it leaves to future evaluation, it surely elevates above all other interests the

---

> "prohibitions on the possession of firearms by felons and the mentally ill," "laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  We repeat those assurances here. Despite municipal respondents' doomsday proclamations, incorporation does not imperil every law regulating firearms.

130 S. Ct. at 3047 (citations omitted).  "[S]tate and local experimentation with reasonable firearms regulations," it observed, "will continue under the Second Amendment."  *Id.* at. 3046 (internal quotation marks omitted).

right of law-abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 635.

The Court limited its holding as follows: "[W]e hold that the District's ban on handgun

possession in the home violates the Second Amendment, as does its prohibition against rendering

any lawful firearm in the home operable for the purpose of immediate self-defense." *Id.* at 635.[17]

> **b.      Relationship Between Section 400.00(2)(f) and the Second Amendment Right Recognized in *Heller***

The scope of the right guaranteed by the Second Amendment was not the only matter the

Court left undefined in *Heller*; it also declined to articulate the level of scrutiny that applies to

claims, such as Plaintiffs', challenging the constitutionality of statutes under the Second

Amendment.  Instead, the Court found that "[u]nder any of the standards of scrutiny that we have

applied to enumerated constitutional rights," the District's regulations "would fail constitutional

muster." *Id.* at 628–29.  The Court did, however, rule out rational-basis review,[18] observing that

"[i]f all that was required to overcome the right to keep and bear arms was a rational basis, the

Second Amendment would be redundant with the separate constitutional prohibitions on

irrational laws, and would have no effect." *Id.* at 628 n.27.  It also rejected the "interest-

balancing" approach for which Justice Breyer advocated in dissent.[19] *Id.* at 634–35 ("We know

of no other enumerated constitutional right whose core protection has been subjected to a

freestanding 'interest-balancing' approach.  The very enumeration of the right takes out of the

---

[17]      It has since repeated:  "In *Heller*, we held that the Second Amendment protects the right to possess a handgun in the home for the purpose of self-defense." *McDonald*, 130 S. Ct. at 3050.

[18]      To pass rational-basis review, a law must be rationally related to a legitimate state interest. *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 440 (1985).

[19]      Justice Breyer's test would have courts ask "'whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'" *Heller*, 554 U.S. at 634 (quoting *id.* at 689–90 (Breyer, J., dissenting)).

hands of government—even the Third Branch of Government—the power to decide on a case-by-case basis whether the right is *really worth* insisting upon."); *see, e.g.*, *Osterweil v. Bartlett*, No. 09-825, 2011 WL 1983340, at *7 (N.D.N.Y. May 20, 2011) (noting *Heller* ruled out rational basis review and the interest-balancing approach); *Peruta v. Cnty. of San Diego*, 758 F. Supp. 2d 1106, 1115 (S.D. Cal. 2010) (same).  Beyond that, however, *Heller* provided no explicit guidance regarding what test should be applied.

Unsurprisingly, the parties in this case advocate for the application of different tests (while arguing, alternatively, that their arguments succeed under *any* level of scrutiny). Defendants argue, first, that Section 400.00(2)(f) does not implicate a right protected under the Second Amendment and that the inquiry must end there; alternately, they argue that if means-ends scrutiny must be applied to the statute, the Court should employ either intermediate scrutiny or reasonableness review.[20]  (State Defs.' Mem. at 12–32.)  Plaintiffs urge the Court to apply strict scrutiny.[21]  (Pls.' Mem. at 19–24.)[22]

Given the lack of a clear directive from the Supreme Court, lower courts have devised a range of approaches to constitutional challenges under the Second Amendment post-*Heller*.  *See*

---

[20]     To pass intermediate scrutiny, a law must be substantially related to an important governmental interest.  *Clark v. Jeter*, 486 U.S. 456, 461 (1988).  As Defendants explain, to pass reasonableness review (a standard located somewhere between rational basis review and intermediate scrutiny) a court must "consider whether the challenged statute is a reasonable limitation of the right to bear arms."  (Memorandum in Support of State Defendants' Cross-Motion for Summary Judgment and in Opposition to Plaintiffs' Motion for Summary Judgment ("State Defs.' Mem."), (Doc. 43), at 20 n.13.)  *Amicus* Brady Center to Prevent Gun Violence (the "Brady Center") also advocates for reasonableness review.  (Amended Brief of *Amicus Curiae* Brady Center to Prevent Gun Violence, (Doc. 24-1), at 15–23.)

[21]     To pass strict scrutiny, a law must be narrowly tailored to serve a compelling governmental interest.  *Abrams v. Johnson*, 521 U.S. 74, 91 (1997).

[22]     "Pls.' Mem." refers to the Memorandum of Points and Authorities in Support of Plaintiffs' Motion for Summary Judgment.  (Doc. 40.)

*Heller v. District of Columbia* ("*Heller II*"), 698 F. Supp. 2d 179, 185–86 (D.D.C. 2010)

(surveying various approaches).  There is much support for Defendants' implicit argument that

before determining the level of scrutiny to be applied, the court must first determine whether the

statute at issue implicates a Second Amendment right as articulated in *Heller*.  As the Third

Circuit has held,

> As we read *Heller*, it suggests a two-pronged approach to Second Amendment
> challenges.  First, we ask whether the challenged law imposes a burden on
> conduct falling within the scope of the Second Amendment's guarantee.  If it does
> not, our inquiry is complete.  If it does, we evaluate the law under some form of
> means-end scrutiny.  If the law passes muster under that standard, it is
> constitutional.  If it fails, it is invalid.

*United States v. Marzzarella*, 614 F.3d 85, 89 (3rd Cir. 2010) (citation and footnote omitted);

*accord, e.g.*, *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*,

627 F.3d 792, 800–01 (10th Cir. 2010); *United States v. Skoien*, 614 F.3d 638, 639–43 (7th Cir.

2010); *Heller II*, 698 F. Supp. 2d at 188.  Defendants argue that the scope of the Second

Amendment right in *Heller* does not extend to invalidate regulations, such as Section

400.00(2)(f), on carrying handguns.  I agree.

As explained above, the language of *Heller* makes clear that the Court recognized "not a

right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever

purpose," 554 U.S. at 626, but rather a much narrower right—namely the "right of law-abiding,

responsible citizens to use arms in defense of hearth and home," *id.* at 635.  Indeed, *Heller*

"warns readers not to treat [it] as containing broader holdings than the Court set out to establish:

that the Second Amendment creates individual rights, one of which is keeping operable

handguns at home for self-defense." *Skoien*, 614 F.3d at 640.  In identifying limitations on the

right secured by the Second Amendment, the Court explicitly stated that "the majority of the

19th-century courts to consider the question held that prohibitions on carrying concealed

weapons were lawful under the Second Amendment or state analogues." 554 U.S. at 626. Various cases read this limiting language as removing modern-day concealed carry regulations from the ambit of Second Amendment protection. The district court in *Dorr v. Weber*, 741 F. Supp. 2d 993 (N.D. Iowa 2010), for example, adopted this view in considering a qualified immunity defense presented by a sheriff who denied concealed weapons permits to plaintiff applicants. As the court there observed, *Heller*'s limiting language makes clear that the Supreme Court did not disturb its prior ruling in *Robertson v. Baldwin*, 165 U.S. 275 (1897), where it "recognized that the Second Amendment right to keep and bear arms is not infringed by laws prohibiting the carrying of concealed weapons." *Dorr*, 741 F. Supp. 2d at 1005 (citing *Robertson*, 165 U.S. at 281–82).[23] The *Dorr* court observed that the plaintiffs in that case failed to "direct[] the court's attention to any contrary authority recognizing a right to carry a concealed weapon under the Second Amendment and the court's own research efforts . . . revealed none." *Id.* Accordingly, it concluded, "a right to carry a concealed weapon under the Second Amendment has not been recognized to date." *Id.*; *see also People v. Flores*, 86 Cal. Rptr. 3d 804, 808 (Ct. App. 2008) (citing *Robertson* and *Heller* in holding that "[g]iven this implicit approval [in *Heller*] of concealed firearm prohibitions, we cannot read *Heller* to have altered the courts' longstanding understanding that such prohibitions are constitutional"); *Mack v. United States*, 6 A.3d 1224, 1236 (D.C. 2010) (citing *Robertson* and *Heller* and noting "it simply is not obvious that the Second Amendment secures a right to carry a concealed weapon").

Various other courts have seized upon this language in *Heller* in concluding that concealed weapons bans and regulations are constitutional under the Second Amendment. *See,*

---

[23]     *Heller* cited to *Robertson*, but only for the proposition that "the Second Amendment was not intended to lay down a 'novel principl[e]' but rather codified a right 'inherited from our English ancestors.'" 554 U.S. at 599 (alteration in original) (quoting *Robertson*, 165 U.S. at 281).

*e.g.*, *United States v. Hart*, 726 F. Supp. 2d 56, 60 (D. Mass. 2010) (rejecting defendant's motion

to suppress firearm and ammunition recovered by police during *Terry* stop, and citing *Heller*

language quoted above in holding that "*Heller* does not hold, nor even suggest, that concealed

weapons laws are unconstitutional. . . . Therefore, it was not a violation of [defendant's] Second

Amendment rights to stop him on the basis of the suspicion of a concealed weapon."); *Swait v.*

*Univ. of Neb.*, No. 08-404, 2008 WL 5083245, at *3 (D. Neb. Nov. 25, 2008) (rejecting

plaintiff's challenge to fine for concealed weapon possession and citing to *Heller* for principle

that "[S]tates can prohibit the carrying of a concealed weapon without violating the Second

Amendment"); *United States v. Hall*, No. 08-006, 2008 WL 3097558, at *1 (S.D.W.Va. Aug. 4,

2008) (denying motion to suppress and citing *Heller* in concluding "that the prohibition, as in

West Virginia, on the carrying of a concealed weapon without a permit, continues to be a lawful

exercise by the state of its regulatory authority notwithstanding the Second Amendment"); *State*

*v. Knight*, 218 P.3d 1177, 1190 (Kan. Ct. App. 2009) ("[T]he *Heller* Court specifically

mentioned prohibitions on concealed firearms in the sentence before its list of presumptively

lawful prohibitions.  The *Heller* Court began the paragraph stating that 'the right secured by the

Second Amendment is not unlimited' and, two sentences later, noted prohibitions on carrying

concealed firearms as an example.  This clearly shows that the *Heller* Court considered

concealed firearms prohibitions to be presumptively constitutional under the Second

Amendment.") (citations omitted).[24]

---

[24]     *See also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self Defense:  An Analytical Framework and a Research Agenda*, 56 UCLA L. Rev. 1443, 1523–24 (2009) ("For over 150 years, the right to bear arms has generally been seen as limited in its scope to exclude concealed carry.  Constitutional provisions enacted after this consensus emerged were likely enacted in reliance on that understanding.  If *Heller* is correct to read the Second Amendment in light of post-enactment tradition and not just Founding-era original meaning, this

Plaintiffs' attempts to cast *Heller* as creating a broader Second Amendment right implicating Section 400.00(2)(f) are unavailing.  Plaintiffs cite first to the Court's textual analysis of the phrase "keep and bear arms," (Pls.' Mem. at 8), wherein the Court stated that the phrase should be read as meaning "'wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person,'" *Heller*, 554 U.S. at 584 (alteration in original) (quoting *Muscarello v. United States*, 524 U.S. 125, 143 (1998)).  This textual interpretation does not stand on its own, however, but rather appears within the context of, and is provided solely to support, the Court's holding that the Second Amendment gives rise to an individual right, rather than a collective right connected to service in a militia.  Indeed, the Court concludes that same paragraph by observing that the phrase "keep and bear arms" "in no way connotes participation in a structured military organization."  *Id.*  Nor does this textual interpretation somehow expand the Court's holding, as such a reading overlooks the opinion's pervasive limiting language discussed above.  *See, e.g.*, *People v. Dawson*, 934 N.E.2d 598, 605 (Ill. App. Ct. 2010) ("The specific limitations in *Heller* and *McDonald* applying only to a ban on handgun possession in a home cannot be overcome by defendant's pointing to the *Heller* majority's discussion of the natural meaning of 'bear arms' including wearing or carrying upon the person or in clothing."), *cert. denied*, 131 S. Ct. 2880 (2011).

Plaintiffs also point to various nineteenth-century state court cases that they claim demonstrate that state concealed carry bans are constitutional only where the state provides for unconcealed, or open, carry as well.  (Pls.' Mem. at 10–11.)  Those cases' holdings, however, seem not to be premised on the existence of open carry provisions specifically, but rather on the

---

exclusion of concealed carry would be part of the Second Amendment's scope as well.") (citations omitted).

existence of provisions for some other means of carry generally; in other words, they suggest that such statutes would fail to pass muster only if functioning as complete bans to carrying weapons outside the home under any circumstances. *See, e.g.*, *State v. Reid*, 1 Ala. 612, 1840 WL 229, at *3 (1840) (regulation that amounted to total ban, *i.e.*, "destruction of the right," would be "clearly unconstitutional"); *Nunn v. State*, 1 Ga. 243, 1846 WL 1167, at *5 (1846) (concealed weapons ban valid so long as it does not impair right to bear arms "altogether"); *Andrews v. State*, 50 Tenn. 165, 1871 WL 3579, at *11 (1871) (statute that forbade carrying "without regard to time or place, or circumstances," violated the state right to keep and bear arms); *see also Peruta*, 758 F. Supp. 2d at 1114 ("The *Heller* Court relied on 19th-century cases upholding concealed weapons bans, but in each case, the court upheld the ban because alternative forms of carrying arms were available.").[25]  Neither the NYPL generally, nor Section 400.00(2)(f) specifically, completely bans the carrying of firearms.  As discussed above, the statute provides for carry permits to be issued under several circumstances including, but not limited to, when an applicant can demonstrate proper cause.  As the statute does not operate as a complete ban, the cases are inapposite.

Moreover, other state court cases decided around that same time suggest that bans on carrying guns in both a concealed and open manner are constitutional.  *See, e.g.*, *Fife v. State,* 31 Ark. 455, 1876 WL 1562, at *4 (1876) (upholding statute prohibiting "the carrying, as a weapon, [of] 'any pistol of any kind whatever,'" as a lawful "exercise of the police power of the State without any infringement of the constitutional right" to bear arms); *Aymette v. State*, 21 Tenn.

---

[25]     *But see State v. Chandler*, 5 La. Ann. 489, 1850 WL 3838, at *1 (1850) (law making it a misdemeanor to be "found with a concealed weapon . . . that does not appear in full open view," while "necessary to counteract a vicious state of society, growing out of the habit of carrying concealed weapons," protected right to carry "'in full open view,' which places men upon an equality" and "is the right guaranteed by the Constitution of the United States").

154, 1840 WL 1554, at *4 (1840) ("The Legislature . . . [has] a right to prohibit the wearing or keeping [of] weapons dangerous to the peace and safety of the citizens, and which are not usual in civilized warfare, or would not contribute to the common defence. . . . [A]lthough [the right keep and bear arms for the common defence] must be inviolably preserved, . . . it does not follow that the Legislature is prohibited altogether from passing laws regulating the manner in which these arms may be employed.") (cited in *Heller*, 554 U.S. at 613); *State v. Workman,* 14 S.E. 9, 11 (W. Va. 1891) (upholding conviction for carrying concealed weapon, and observing, "The second amendment of our federal constitution should be constructed with reference to the provisions of the common law upon this subject as they then existed . . . .  As early as the second year of Edward III, a statute was passed prohibiting all persons, whatever their condition, 'to go or ride armed by night or by day.' And so also at common law the 'going around with unusual and dangerous weapons to the terror of the people' was a criminal offense."); *see also Hill v. State,* 53 Ga. 472, 1874 WL 3112, at *2 (1874) ("I have always been at a loss to follow the line of thought that extends the guarantee [of the right to keep and bear arms] to the right to carry pistols . . . and those other weapons of like character, which, as all admit, are the greatest nuisances of our day.").[26]

Finally, Plaintiffs argue that *Heller*'s discussion of the lawful use of arms for hunting demonstrates that the Court's holding is not limited to possession in the home.  (Pls.' Mem. at 12.)  This argument too is unavailing, as hunting does not involve handguns and therefore falls outside the ambit of the challenged statute.  In any event, the NYPL provides for licenses to possess firearms for hunting purposes.  *See, e.g.*, N.Y. Penal Law § 265.20(4).

---

[26]     *See also* John Norton Pomeroy, *An Introduction to the Constitutional Law of the United States* 152–53 (1868) ("The right of the people to keep and bear arms . . . . is certainly not violated by laws forbidding persons to carry dangerous or concealed weapons . . . .") (source cited in *Heller*, 554 U.S. at 618).

Unlike in this case, the bulk of cases that have applied the two-pronged approach to Second Amendment challenges have found, under the first prong, that the challenged law at issue imposed a burden on conduct falling within the amendment's scope because the restrictions in the challenged statute substantially overlapped with the core Second Amendment right articulated in *Heller*—namely the right to use arms for the purpose of self-defense in the home. The clearest, and most frequent, examples are challenges to various sections of the federal Gun Control Act that ban all gun possession by certain categories of individuals (*e.g.*, felons, domestic violence misdemeanants) irrespective of the location of or purpose for such possession. *See, e.g.*, *United States v. Booker*, 644 F.3d 12 (1st Cir. 2011) (considering 18 U.S.C. § 922(g)(9), which bans possession of firearms by a person convicted of a misdemeanor crime of domestic violence); *Chester*, 628 F.3d 673 (same); *Reese*, 627 F.3d 792 (considering 18 U.S.C. § 922(g)(8), which bans possession of firearms while subject to a domestic protection order); *Skoien*, 614 F.3d 638 (18 U.S.C. § 922(g)(9)); *see also Marzzarella*, 614 F.3d 85 (considering 18 U.S.C. § 922(k), which bans possession of firearms with an obliterated serial number). As such statutes "permanently disarm[] . . . entire category[ies] of persons," *Chester*, 628 F.3d at 680, they *ipso facto* ban possession by such persons in their homes for the purpose of self-defense, and thus clearly raise red flags under *Heller*.[27] Section 400.00(2)(f), however, does not impose such a broad prohibition. For all these reasons, the Court rejects Plaintiffs' claims under the first prong of the two-prong analysis described above.

To the extent that Plaintiffs are attacking New York's statutory scheme as precluding open carry—and it is by no means clear that they are, given their concessions that each applied

---

[27]     *See also Ezell v. City of Chicago*, No. 10–3525, 2011 WL 2623511, at *14–17 (7th Cir. July 6, 2011) (considering level of scrutiny applicable to city ordinance banning firing ranges, after concluding that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use").

"to carry concealed handguns," (Pls.' Resp. 56.1 ¶¶ 25, 35, 41, 47, 55), their focus on Section

400.00(2)(f) in particular, (*see, e.g.*, FAC ¶¶ 22, 41), and their seeming rejection of open carry as

a reasonable alternative to concealed carry, (Pls.' Reply Mem. at 14)[28]—such carrying is

likewise outside the core Second Amendment concern articulated in *Heller*: self-defense in the

home. *See, e.g.*, *Moreno v. N.Y. City Police Dep't*, No. 10-6269, 2011 WL 2748652, at *3

(S.D.N.Y. May 7, 2011) (noting "*Heller* has been narrowly construed, as protecting the

individual right to bear arms for the specific purpose of self-defense within the home," and

collecting cases), *report and recommendation adopted*, 2011 WL 2802934 (S.D.N.Y. July 14,

2011); *Osterweil*, 2011 WL 1983340, at *6 (*Heller* "appears to suggest that the core purpose of

the right conferred by the Second Amendment was to allow 'law-abiding, responsible citizens to

use arms in defense of hearth and home'"); *United States v. Tooley*, 717 F. Supp. 2d 580, 596

(S.D.W.Va. 2010) ("[P]ossession of a firearm outside of the home or for purposes other than

self-defense in the home are not within the 'core' of the Second Amendment right as defined by

*Heller*."); *Gonzales v. Vill. of W. Milwaukee*, No. 09-384, 2010 WL 1904977, at *4 (E.D. Wis.

May 11, 2010) (citing *Heller* for the proposition that "[t]he Supreme Court has never held that

the Second Amendment protects the carrying of guns outside the home"); *Heller II*, 698 F. Supp.

2d at 185 (the "core Second Amendment right" is "the right of law-abiding, responsible citizens

to use arms in defense of hearth and home") (internal quotation marks omitted); *United States v.

Masciandaro*, 648 F. Supp. 2d 779, 788 (E.D. Va. 2009) ("[A]lthough *Heller* does not *preclude*

Second Amendment challenges to laws regulating firearm possession outside the home, *Heller*'s

---

[28]      "Pls.' Reply Mem." refers to the Memorandum of Points and Authorities in Opposition to
Defendants' Motion for Summary Judgment and in Reply to Defendants' Opposition to
Plaintiffs' Summary Judgment Motion.  (Doc. 47.)  Also instructive is Kachalsky's Article 78
petition in the state court, in which he exclusively contested his inability to carry a concealed
weapon, and made no mention whatsoever of open carry.  (*See* Tomari Decl. Ex. L ¶¶ 8, 14.)

*dicta* makes pellucidly clear that the Supreme Court's holding should not be read by lower courts as an invitation to invalidate the existing universe of public weapons regulations.") (emphasis in original) (footnotes omitted), *aff'd*, 638 F.3d 458 (4th Cir. 2011) ("[A]s we move outside the home, firearm rights have always been more limited, because public safety interests often outweigh individual interests in self-defense."); *Beachum v. United States*, 19 A.3d 311, 319 n.11 (D.C. 2011) ("*Heller* does not address, and we have not decided, whether the Second Amendment protects the possession of handguns for other than defensive use in the home."); *Knight*, 218 P. 3d at 1189 ("It is clear that the Court [in *Heller*] was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes.").

Although it is admittedly a closer question, given the existence of some nineteenth-century state court cases upholding the right to carry openly, *see, e.g.*, *Chandler*, 1850 WL 3838, at *1, according Second Amendment protection to the carrying of an unconcealed weapon outside the home would certainly go further than *Heller* did, and Defendants have pointed to no case decided after *Heller* that has done so.  To the contrary, *Williams v. State*, 10 A.3d 1167, 1169–70 (Md. 2011), considered a Maryland statute prohibiting any carrying outside the home without a permit, which could only be issued if the applicant, among other things, demonstrated a "good and substantial reason to wear, carry, or transport a handgun."  *Williams* found that statute to be "outside of the scope of the Second Amendment," *id.* at 1169, because, like New York's statute, it "permitt[ed] home possession," *id.* at 1178; *see id.* at 1177 ("*Heller* and *McDonald* emphasize that the Second Amendment is applicable to statutory prohibitions against home possession, the dicta in *McDonald* that 'the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home,'

notwithstanding.  Although [petitioner] attempts to find succor in this dicta, it is clear that prohibition of firearms in the home was the gravamen of the certiorari questions in both *Heller* and *McDonald* and their answers.  If the Supreme Court, in this dicta, meant its holding to extend beyond home possession, it will need to say so more plainly.") (citation omitted).

Similarly, the court in *People v. Dawson* considered a challenge to Illinois's aggravated unlawful use of a weapon statute, which made it illegal for any person to carry "on or about his or her person or in any vehicle or concealed on or about his or her person *except when on his or her land or in his or her abode or fixed place of business* any pistol, revolver, . . . or other firearm."  934 N.E.2d at 604 (emphasis added).  The court determined that the statute, under which the defendant challenging the law was convicted, was constitutional, as "*Heller* specifically limited its ruling to interpreting the [Second A]mendment's protection of the right to possess handguns in the home, not the right to possess handguns outside of the home in case of confrontation."  *Id.* at 605–06; *see Little v. United States*, 989 A.2d 1096, 1100–01 (D.C. 2010) (rejecting defendant's Second Amendment challenge to his conviction under D.C. gun statute because "[i]n *Heller*, the issue was the constitutionality of the District of Columbia's ban on the possession of usable handguns in the home," and defendant conceded that he was outside of his home) (internal quotation marks and citation omitted).

In any event, even if the Second Amendment can plausibly be read to protect a right infringed upon or regulated by Section 400.00(2)(f), the statute passes constitutional muster for the reasons explained below.

### c.    Section 400.00(2)(f) Passes Constitutional Muster

As noted above, *Heller* left open the question of which form of means-ends scrutiny applies to evaluate statutes regulating conduct protected by the Second Amendment, ruling out

only rational basis review and an "interest-balancing approach."  Following closely on *Heller*'s

heels, some lower courts adopted a uniform level of scrutiny applicable to all Second

Amendment challenges.  *See, e.g.*, *Heller II*, 698 F. Supp. 2d at 186 (adopting intermediate

scrutiny); *United States v. Engstrum*, 609 F. Supp. 2d 1227, 1231–32 (D. Utah 2009) (adopting

strict scrutiny);[29] *United States v. Miller*, 604 F. Supp. 2d 1162, 1171 (W.D. Tenn. 2009)

(adopting intermediate scrutiny).  Most circuit courts to have (more recently) considered this

question, however, reject a one-size-fits-all framework in favor of a variable approach whereby

the level of scrutiny to be applied is determined on a case-by-case basis depending on the

proximity of the right burdened by the statute at issue to the core Second Amendment right

recognized in *Heller*.  *See, e.g.*, *Ezell*, 2011 WL 2623511, at *13–17; *Booker*, 644 F.3d at 25;

*United States v. Masciandaro*, 638 F.3d 458, 469–71 (4th Cir. 2011); *Reese*, 627 F.3d at 801–02;

---

[29]     *Engstrum* reasoned that strict scrutiny was warranted for the following two reasons:

> First, the *Heller* Court described the right to keep and bear arms as a fundamental
> right that the Second Amendment was intended to protect.  The Tenth Circuit has
> declared that, where fundamental rights are at stake, strict scrutiny is to be
> applied.  Second, the *Heller* Court categorized Second Amendment rights with
> other fundamental rights which are analyzed under strict scrutiny.

609 F. Supp. 2d at 1231–32.  *Engstrum* appears to be the only case post-*Heller* to adopt a one-size-fits-all strict scrutiny approach; indeed, Plaintiffs do not cite to other cases endorsing such an approach, (Pls.' Mem. at 19–24), and the Court is unable to locate any.  The dissenting opinion in *Heller*, and various lower courts to consider the issue post-*Heller*, reject this approach as inconsistent with the *Heller* majority's reference to "presumptively lawful" statutes prohibiting firearm possession by felons, by the mentally ill, or in sensitive places, or imposing conditions and qualifications on the commercial sale of firearms.  *See, e.g.*, *Heller*, 554 U.S. at 688 (Breyer, J., dissenting) ("the majority implicitly, and appropriately, rejects [strict scrutiny] by broadly approving a set of laws . . . whose constitutionality under a strict scrutiny standard would be far from clear"); *Skoien*, 587 F.3d at 812 ("We do not see how the listed laws could be 'presumptively' constitutional if they were subject to strict scrutiny . . . ."); *Heller II*, 698 F. Supp. 2d at 187 ("[A] strict scrutiny standard of review would not square with the majority's references to 'presumptively lawful regulatory measures . . . .'"); *United States v. Marzzarella*, 595 F. Supp. 2d 596, 604 (W.D. Pa. 2009) ("[T]he Court's willingness to presume the validity of several types of gun regulations is arguably inconsistent with the adoption of a strict scrutiny standard of review."), *aff'd*, 614 F.3d 85.

*Marzzarella*, 614 F.3d at 96–98;[30] *see also Osterweil*, 2011 WL 1983340, at *8–10.  This

approach is borrowed from First Amendment jurisprudence.  As the court in *Marzzarella*

explained,

> Whether or not strict scrutiny may apply to particular Second Amendment
> challenges, it is not the case that it must be applied to all Second Amendment
> challenges.  Strict scrutiny does not apply automatically any time an enumerated
> right is involved.  We do not treat First Amendment challenges that way.  Strict
> scrutiny is triggered by content-based restrictions on speech in a public forum, but
> content-neutral time, place, and manner restrictions in a public forum trigger a
> form of intermediate scrutiny.  Regulations on nonmisleading commercial speech
> trigger another form of intermediate scrutiny,[31] whereas disclosure requirements
> for commercial speech trigger a rational basis test.  In sum, the right to free
> speech, an undeniably enumerated fundamental right, is susceptible to several
> standards of scrutiny, depending upon the type of law challenged and the type of
> speech at issue.  We see no reason why the Second Amendment would be any
> different.

*Marzzarella*, 614 F.3d at 96–97 (footnote and citations omitted); *see Ezell*, 2011 WL 2623511, at

*16–17 (analogizing to the different First Amendment standards applied to restrictions on the

content of speech, the "time, place, and manner" of the speech, political speech, adult

bookstores, commercial speech, and the expressive association rights of voters, candidates, and

parties in elections).  I find this analogy persuasive and apply it in determining the proper level

of scrutiny for Section 400.00(2)(f).[32]

---

[30]    *But see Nordyke v. King*, 644 F.3d 776, 784–85 (9th Cir. 2011) (adopting a "substantial
burden framework" similar to that used in abortion cases).

[31]    Such regulations must directly advance a substantial governmental interest and not be
more burdensome than necessary to serve that interest.  *See Cent. Hudson Gas & Elec. Corp. v.
Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980).

[32]    Plaintiffs argue that because courts have looked to First Amendment jurisprudence as a
guide in developing a standard of analysis for Second Amendment claims, the Court should
import the First Amendment principle of prior restraint and apply it to strike down Section
400.00(2)(f), as the statute accords licensing officers "unbridled discretion" in granting full-carry
permits.  (Pls.' Mem. at 13–18.)  I decline to do so.  While these cases borrow an *analytical
framework*, they do not apply *substantive* First Amendment rules in the Second Amendment
context, and while state licensing officers do have discretion in deciding whether to grant full-

The question, then, is which level of scrutiny applies here.  Strict scrutiny is not warranted, as, under this approach, it is reserved for "any law that would burden the 'fundamental,' core right of self-defense in the home by a law-abiding citizen."  *Masciandaro*, 638 F.3d at 470.  Section 400.00(2)(f) clearly does not burden that right, as it speaks only to possession *outside* the home, and, in any event, the NYPL separately provides that gun permits "shall be issued to . . . have and possess in his dwelling by a householder."  N.Y. Penal Law § 400.00(2)(a).  And while strict scrutiny is too stringent a standard to apply in this instance, reasonableness review, which Defendants and *Amicus* Brady Center invite the Court to apply, is too lenient.  Indeed, "[t]he reasonableness test subjects firearms laws to only a marginally more heightened form of review than rational-basis review."  *Heller II*, 698 F. Supp. 2d at 186 ("'[N]early all laws survive the reasonable regulation standard, thus giving wide latitude to legislatures. . . . Like rational basis, the reasonable regulation standard tends to be, more than anything else, shorthand for broad judicial deference.'" (quoting Adam Winkler, *Scrutinizing the*

---

carry permits, their discretion is not "unbridled," but is instead constrained by the well-established judicial construction of the term "proper cause"—which Plaintiffs themselves admit is a "strict policy," (FAC ¶ 25)—as well as "arbitrary and capricious" review.

Further to their "unbridled discretion" argument, Plaintiffs argue that licensing officers enforce Section 400.00(2)(f)'s "proper cause" requirement together with Section 400.00(1)(b)'s "good moral character" eligibility requirement.  (Pls.' Mem. at 18–19; Pls.' Reply Mem. at 9.) The State Defendants' decisions denying Plaintiffs' applications, however, suggest the opposite, as they do not discuss or even refer to the "good moral character" requirement.  (*See* Rotini Decl. Exs. A–E.)  To the extent that Plaintiffs raise an independent objection to the "good moral character" requirement, I decline to consider that argument herein.  Plaintiffs do not object to that requirement in their pleadings, and their claims target Section 400.00(2)(f) exclusively.  (FAC ¶¶ 22, 41, 43.)  *See, e.g.*, *Chapman v. City of N.Y.*, No. 06-3153, 2011 WL 1240001, at *7 n.5 (E.D.N.Y. March 30, 2011) ("As this claim was not raised in [plaintiff's] complaint, it will not be considered by the Court [on summary judgment].") (citing *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (2d Cir. 2010)).  In any event, were the "good moral character" requirement subject to intermediate scrutiny (the standard I find applicable for reasons stated below), it would likely pass muster, as restricting handguns to those of good moral character would substantially relate to the government's strong interest in public safety and crime prevention in ways similar to those described below in connection with Section 400.00(2)(f).

*Second Amendment*, 105 Mich. L. Rev. 683, 718–19 (2007))).  In any event, reasonableness review is virtually absent from post-*Heller* Second Amendment jurisprudence.

I therefore join the multitude of other cases applying intermediate scrutiny under this approach.  *See, e.g.*, *Booker*, 644 F.3d at 25; *Masciandaro*, 638 F.3d at 471; *Chester*, 628 F.3d at 683; *Reese*, 627 F.3d at 802; *Skoien*, 614 F.3d at 642; *Marzzarella*, 614 F.3d at 97; *Osterweil*, 2011 WL 1983340, at *10; *Peruta*, 758 F. Supp. 2d at 1117.  As noted above, to the extent that Section 400.00(2)(f) overlaps at all with the core Second Amendment right as recognized in *Heller*, it decidedly does not overlap to the same extent as Gun Control Act provisions that ban certain categories of individuals from both in-home possession and public carry, and thus it may plausibly be argued that a more lenient standard of review is warranted here than in those cases.  The application of intermediate scrutiny in two recent cases outside the Gun Control Act context, however, suggests that, if Section 400.00(2)(f) must be subject to constitutional review at all, intermediate scrutiny applies here as well.  Specifically, intermediate scrutiny was applied in *United States v. Masciandaro*, where the federal regulation at issue banned possession of a loaded handgun in a motor vehicle within a national park area, 638 F.3d at 459–60, and in *Peruta v. City of San Diego*, where the state statute at issue, like Section 400.00(2)(f), required applicants for full-carry permits to demonstrate "a set of circumstances that distinguishes the applicant from other members of the general public and causes him or her to be placed in harm's way," 758 F. Supp. 2d at 1110.[33]

As noted above intermediate scrutiny requires that the law be substantially related to an important governmental interest.  To satisfy this standard, Defendants need to show a "reasonable" "fit between the legislature's ends and the means chosen to accomplish those ends."

---

[33]      *Peruta*, which the Court finds persuasive, was decided before the Ninth Circuit adopted a "substantive burden framework" for Second Amendment claims in *Nordyke v. King*.

*Bd. of Trustees of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) (internal quotation marks

omitted).  Defendants here claim that the law serves to promote public safety and prevent crime,

(State Defs.' Mem. at 24), and this is supported by the history behind Section 400.00(2)(f),

which the State Defendants have provided to the Court.

For example, the "proper cause" requirement, now located at Section 400.00(2)(f) was

added in 1913 as N.Y. Penal Law § 1897, (*see* State Defs.' 56.1 ¶ 66), and the law thereafter

underwent a series of modifications to the ordering of its statutory provisions.  In a report

produced in 1962 in connection with one of those modifications, the state Joint Legislative

Committee on Firearms and Ammunitions stated,

> More than a quarter of a million serious crimes are committed with
> weapons annually in the United States, and the number is on the increase.
>       . . . .
> The legislative problem posed for the fifty-one American jurisdictions
> (fifty states and the District of Columbia), charged with the major responsibility
> of criminal law enforcement in the United States, suggests itself:  to enact statutes
> adapted to prevent these crimes and occurrences before they happen, and, at the
> same time, preserve the legitimate interests of individual liberty, training for
> national defense, hunting, target shooting and trophy collecting.

Report of the N.Y. State Joint Legislative Comm. on Firearms & Ammunition, Doc. No. 29, at

11–12 (1962) (Tomari Decl. Ex. S(9)).  In a 1965 supplement to that report, the committee

added,

> The primary value to law enforcement of adequate statutes dealing with
> dangerous weapons is prevention of crimes of violence before their
> consummation.
>       . . . .
> . . . In the absence of adequate weapons legislation, under the traditional
> law of criminal attempt, lawful action by the police must await the last act
> necessary to consummate the crime . . . .  Adequate statutes governing firearms
> and weapons would make lawful intervention by police and prevention of these
> fatal consequences, before any could occur.

Report of the N.Y. State Joint Legislative Comm. on Firearms & Ammunition, Doc. No. 6, at

12–13 (1965) (Tomari Decl. Ex. S(13)).  Finally, in 1982, during a floor debate regarding

substantive changes to portions of the state handgun licensing scheme, Senator Franz Leichter,

speaking regarding Section 400.00(2)(f)'s "proper cause" requirement, observed,

> [W]e are not only talking about crime, which obviously is important, but we're
> also talking about public safety. . . . [I]n this instance, it's not only protecting a
> person from himself but it's protecting innocent people who get shot every day
> because handguns are lying around, and that is something that should be of
> concern to all of us.

N.Y. Senate Debate on Senate Bill 3409, at 2471 (June 2, 1987) (Tomari Decl. Exs. S(14)).

Despite proposals to change the licensing scheme, Section 400.00(2)(f)'s "proper cause"

requirement has remained.  (State Defs.' 56.1 ¶ 77.)[34]

The Supreme Court has repeatedly acknowledged that governments have an important,

even compelling, interest in protecting public safety.  *See, e.g.*, *United States v. Salerno*, 481

U.S. 739, 745 (1987) (federal government has "compelling interests in public safety");

*Tennessee v. Garner*, 471 U.S. 1, 25–26 (1985) (O'Connor, J., dissenting) (commenting, in

Fourth Amendment context, that there is an "important public interest in crime prevention and

detection"); *Schall v. Martin*, 467 U.S. 253, 264 (1984) ("The 'legitimate and compelling state

interest' in protecting the community from crime cannot be doubted.  We have stressed before

that crime prevention is 'a weighty social objective' . . . .") (collecting cases) (citations omitted).

And various lower courts have acknowledged the connection between promoting public safety

and regulating the carrying of concealed handguns.  This case finds an analogue in *Peruta*,

where, as noted above, the concealed carry regulation at issue required that an applicant for a

---

[34]     Plaintiffs question the relevance of the legislative history, (Pls.' Reps. 56.1 ¶¶ 63–77), but
courts have cited to such history to demonstrate the important government interest implicated by
a challenged statue, *see, e.g.*, *Heller II*, 698 F. Supp. 2d. at 190.

full-carry permit demonstrate "a set of circumstances that distinguishes the applicant from other

members of the general public and causes him or her to be placed in harm's way." There, the

court held that the state

> has an important and substantial interest in public safety and in reducing the rate
> of gun use in crime. In particular, the government has an important interest in
> reducing the number of concealed weapons in public in order to reduce the risks
> to other members of the public who use the streets and go to public
> accommodations. The government also has an important interest in reducing the
> number of concealed handguns in public because of their disproportionate
> involvement in life-threatening crimes of violence, particularly in streets and
> other public places.

*Peruta*, 758 F. Supp. 2d at 1117 (citations omitted); *see, e.g.*, *Richards v. Cnty. of Yolo*, No. 09-

1235, 2011 WL 1885641, at *4 (E.D. Cal. May 16, 2011) (agreeing with defendants' assertion

that "regulating concealed firearms is an essential part of [the] County's efforts to maintain

public safety and prevent both gun-related crime and, most importantly, the death of its

citizens"); *People v. Yarbrough*, 86 Cal. Rptr. 3d 674, 682 (Ct. App. 2008) ("Unlike possession

of a gun for protection within a residence, carrying a concealed firearm presents a recognized

threat to public order, and is prohibited as a means of preventing physical harm to persons other

than the offender. A person who carries a concealed firearm on his person or in a vehicle, which

permits him immediate access to the firearm but impedes others from detecting its presence,

poses an imminent threat to public safety.") (citations, footnote, and internal quotation marks

omitted).[35]

Notwithstanding the emphasis placed on the interest in regulating concealed carry, the

same rationales apply equally, or almost equally, to the regulation of open carry. *See, e.g.*,

---

[35]    The court in *Yarbrough* also observed that "carrying a firearm concealed on the person or
in a vehicle in violation of [California state law] is not in the nature of a common use of a gun
for lawful purposes which the court declared to be protected by the Second Amendment in
*Heller*." 86 Cal. Rptr. 3d at 682.

*Osterweil*, 2011 WL 1983340, at *10 ("[T]he harm caused by gun violence in this country has

been well-documented, and government efforts to curtail this threat have a direct impact on

domestic security.  As such, the government objective promoted by these laws is not only

'legitimate,' but also 'important.'") (citations omitted); *Miller*, 604 F. Supp. 2d at 1171 (same);

*City of N.Y. v. Bob Moates' Sport Shop, Inc.*, 253 F.R.D. 237, 240–41 (E.D.N.Y. 2008) ("By

enacting strong gun control laws to protect its citizens from gun-related crimes, New York City

and State have expressed a special public policy interest in the subject matter of this litigation.");

*City of N.Y. v. A-1 Jewelry & Pawn, Inc.*, 501 F. Supp. 2d 369, 429 (E.D.N.Y. 2007) ("New

York has a strong interest in the safety of its residents and territory from handgun violence . . .

."); *People v. Marin*, 795 N.E.2d 953, 958–959, 962 (Ill. Ct. App. 2003) ("The overall purpose of

the . . . statute is to protect the public from gun violence.  This purpose is accomplished not only

by prohibiting the possession of weapons by gang members, but by prohibiting the accessibility

to loaded weapons in public places by society at large. . . . [T]he underlying activity of

possessing or transporting an accessible and loaded weapon is itself dangerous and undesirable,

regardless of the intent of the bearer since it may lead to the endangerment of public safety.

Access to a loaded weapon on a public street creates a volatile situation vulnerable to

spontaneous lethal aggression in the event of road rage or any other disagreement or dispute.")

(citations omitted).  For all these reasons, I hold that the state has an important government

interest in promoting public safety and preventing crime.[36]

---

[36]     In an effort to further demonstrate the state's interest in regulating handguns to promote
public safety and prevent crime, the State Defendants have provided the Court various witness
affidavits.  Based on those affidavits, the State Defendants conclude that "[t]he likelihood that a
gun will be used in crime is closely linked to the general availability of guns, and especially
handguns," "[a]llowing more individuals to carry concealed handguns will endanger officers
stopping individuals on the street or making car stops, and complicate interactions between
uniformed officers and those working in plain clothes or off-duty," "[i]ncreasing the prevalence

I also hold that Section 400.00(2)(f) is substantially related to that important government interest. The statute does not function as an outright ban on concealed carry, but rather calls for individualized, case-by-case determinations regarding whether full-carry permit applicants have an actual and articulable—rather than merely speculative, potential, or even specious—need for self-defense. As crafted, the statute seeks to limit the use of handguns to self-defensive purposes—a use which, although in this context existing outside the home, is nonetheless a hallmark of *Heller*—rather than for some other use that has not been recognized as falling within the protections of the Second Amendment. This purpose is furthered by the statute's directive that full-carry permits "shall be" issued where there exists proper cause—rather than directing merely that permits "may" be issued in such instances.

The other provisions of Section 400.00(2) create alterative means by which applicants may secure permits and highlight the emphasis the statute places upon self-defense: as noted above, it compels the issuance of handgun permits to merchants and storekeepers for them to keep in their places of business—where they may be subject to robberies—as well as the issuance of full-carry permits to messengers for banking institutions and express companies, who often carry sensitive communications or valuable parcels that others may covet, to state judges and justices, who may be the targets of criminal defendants or disgruntled litigants (or their associates), and to employees at correctional facilities, for whom protection from those being housed at such facilities is necessary. Surely, the legislature cannot be expected to enumerate every profession or circumstance that might give rise to an articulable need for self-defense, and

---

of concealed handguns will undermine" officers' "ability to stop and frisk individuals who appear to be carrying handguns in public," and "[t]he majority of criminal homicides and other serious crimes are committed by individuals who have not been convicted of a felony and would receive permits to carry concealed weapons without the 'proper cause' requirement." (State Defs.' 56.1 ¶¶ 87–88, 90–91.) Plaintiffs dispute these facts, (Pls.' Resp. 56.1 ¶¶ 87–88, 90–91), and, therefore, I do not rely on them in deciding the instant motions.

so Section 400.00(2)(f) vests the responsibility for discerning such need in the capable hands of

the state's neutral and detached licensing officers.

In upholding California's version of Section 400.00(2)(f), the Court in *Peruta* observed

that

> [r]equiring documentation enables Defendant to effectively differentiate between
> individuals who have a bona fide need to carry a concealed handgun for self-
> defense and individuals who do not.
>     The Court acknowledges Plaintiffs' argument that many violent gun
> crimes, even a majority, are committed by people who cannot legally have guns,
> and the ongoing dispute over the effectiveness of concealed weapons laws.  But
> under intermediate scrutiny, Defendant's policy need not be perfect, only
> reasonably related to a "significant," "substantial," or "important" governmental
> interest.  Defendant's policy satisfies that standard.

*Id.* (citations omitted).  Plaintiffs here make the same argument as in *Peruta*, and the Court

recognizes not only that many violent crimes are committed by those carrying handguns

illegally, but also that most gun owners across the country are responsible, law-abiding citizens.

The Court also recognizes the existence of contrasting studies and statistics concerning the

relationship between handgun ownership and violent crime.  But it is the job of the legislature,

not the Court, to weigh the conflicting evidence and make policy choices (within constitutional

parameters).  *See, e.g.*, *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997) (legislature is

"far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing

upon legislative questions") (internal quotation marks omitted); *City of Richmond v. JA. Croson

Co.*, 488 U.S. 469, 544 (1989) ("Local officials, by virtue of their proximity to, and their

expertise with, local affairs, are exceptionally well qualified to make determinations of public

good within their respective spheres of authority.") (internal quotation marks omitted).  As with

the statute at issue in *Peruta*, Section 400.00(2)(f) may not be perfect, but it need not be to pass

constitutional muster.  Section 400.00(2)(f)'s limitations promote the government's strong interest in public safety and crime prevention, and are substantially related to it.

* * *

Section 400.00(2)(f) does not burden recognized protected rights under the Second Amendment.  If Section 400.00(2)(f) could be read to implicate such rights, the statute, as applied to Plaintiffs, does not violate the Second Amendment under intermediate scrutiny. Accordingly, the Court *a priori* rejects Plaintiffs' facial constitutional challenge.  "[A] plaintiff can only succeed in a facial challenge by 'establish[ing] that no set of circumstances exists under which the Act would be valid,' *i.e.*, that the law is unconstitutional in all of its applications." *Wash. State Grange*, 552 U.S. at 449 (quoting *Salerno*, 481 U.S. at 745); *see Skoien*, 614 F.3d at 645 ("[a] person to whom a statute properly applies [cannot] obtain relief based on arguments that a differently situated person might present").  As Section 400.00(2)(f) is constitutional as applied to Plaintiffs, it is therefore not unconstitutional in all its applications.  *See Heller II*, 698 F. Supp. 2d at 188 n.10.[37]

### 3.  Equal Protection Claim

---

[37]    To the extent that Plaintiffs' facial claim is framed as an "overbreadth" challenge, it must fail on that ground as well:

> Without entertaining the novel notion that an overbreadth challenge could be recognized outside the limited context of the First Amendment, [the Court] conclude[s] that a person . . . to whom a statute was constitutionally applied, will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.  This conclusion reflect[s] the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws.

*Masciandaro*, 638 F.3d at 474 (fourth alteration in original) (citations and internal quotation marks omitted).

Finally, Plaintiffs challenge Section 400.00(2)(f) as violative of the Equal Protection Clause.  The "Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).  Equal protection claims are subject to a two-step analytical process.  *See Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).  First, a plaintiff must "demonstrate that he was treated differently than others similarly situated as a result of intentional or purposeful discrimination."  *Id.*  Second, he must show that "the disparity in treatment cannot survive the appropriate level of scrutiny."  *Id.*  The claim fails, as Section 400.00(2)(f) does not treat similarly situated individuals differently, but rather applies uniformly.  Further, all full-carry permit applicants are not similarly situated because some can demonstrate "proper cause" for the issuance of a permit, while others cannot.  *See, e.g.*, *Osterweil*, 2011 WL 1983340, at *11; *Richards*, 2011 WL 1885641, at *6; *Peruta*, 758 F. Supp. 2d at 1117–18; *see also Ruston v. Town Bd.*, 610 F.3d 55, 59 (2d Cir. 2009) (equal protection claim failed because plaintiffs did not allege "applications that were made by persons similarly situated").

## III.   CONCLUSION

For the reasons stated above, I hereby DENY the State Defendants' and the County's Motions to Dismiss, DENY Plaintiffs' Motion for Summary Judgment, and GRANT the State Defendants' Cross-Motion for Summary Judgment.  Although the County has not cross-moved for summary judgment, I hereby GRANT it summary judgment *sua sponte*.[38]  The Clerk of the Court is respectfully directed to terminate the pending motions, (Docs. 30, 33, 39, 42), and close the case.

**SO ORDERED.**

Dated: ~~August~~ 1/2 2011
     White Plains, New York

                                          CATHY SEIBEL, U.S.D.J.

---

[38]    As the Second Circuit recently stated,

> [D]istrict courts have the discretion to grant summary judgment *sua sponte*, even without notice in certain circumstances.  In granting summary judgment *sua sponte*, however, a district court must determine that the party against whom summary judgment is rendered has had a full and fair opportunity to meet the proposition that there is no genuine issue of material fact to be tried . . . . [T]he district court must assure itself that following the procedures set out in Rule 56 would not alter the outcome.  Discovery must either have been completed, or it must be clear that further discovery would be of no benefit.  The record must, therefore, reflect the losing party's inability to enhance the evidence supporting its position and the winning party's entitlement to judgment.

*Priestley v. Headminder, Inc.*, No. 09-4931, 2011 WL 3190307, at *6 (2d Cir. July 28, 2011) (citation and internal quotation marks omitted).  The Court is satisfied that those standards have been met here.  Although the County did not cross-move for summary judgment, the State Defendants did, on claims identical to those advanced against the County, and Plaintiffs had a full and fair opportunity to submit materials in opposition to that cross-motion—and indeed did submit such materials.  *See, e.g.*, *Parks v. Town of Greenburgh*, 344 F. App'x 654, 655 (2d Cir. 2009) (*sua sponte* grant of summary judgment in favor of remaining defendants not error where "[plaintiff] had the opportunity to submit evidence in opposition to [officer's] summary judgment motion" and "[plaintiff's] claim of selective treatment was identical as it related to the [officer] and the remaining defendants").